1  JAMES P. COLLINS, JR. (SBN 47608)
   COTKIN & COLLINS
2  A PROFESSIONAL CORPORATION
   200 West Santa Ana Blvd., Suite 800
3  P.O. Box 22005
   Santa Ana, CA 92702-2005
4  Telephone: (714) 835-2330
   Facsimile: (714) 835-2209
5  Email: jpc@cclawfirm.cc

6

7  Attorneys for Plaintiffs STEVEN SCHUSSLER
   and SCHUSSLER CREATIVE, INC.

8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12  STEVEN SCHUSSLER and          Case No. 07CV2016IEG AJB
    SCHUSSLER CREATIVE, INC.,
13
                                  **PLAINTIFFS' APPLICATION FOR**
14           Plaintiffs,          **TEMPORARY RESTRAINING ORDER**
                                  **AND NOTICE OF MOTION AND**
15       vs.                      **MOTION FOR PRELIMINARY**
                                  **INJUNCTION; POINTS AND**
16  J. FRANK WEBSTER, aka "MR.    **AUTHORITIES IN SUPPORT;**
    HOT DOG," aka "UNCLE          **DECLARATION OF STEVEN**
17  FRANK,"                       **SCHUSSLER; [PROPOSED] ORDER**
                                  **FILED AND SERVED**
18           Defendants.          **CONCURRENTLY HEREWITH**

19

20

21

22

23      TO DEFENDANT J. FRANK WEBSTER, AKA "MR. HOT DOG," AKA

24  "UNCLE FRANK" ("WEBSTER"):

25      PLEASE TAKE NOTICE plaintiffs STEVEN SCHUSSLER

26  and SCHUSSLER CREATIVE, INC. are seeking the following

27  injunctive relief from this court:

28

220304-1.wpd                    -1-

1.   A temporary restraining order prohibiting
defendant WEBSTER from committing any of the following
acts, pending a hearing on the issuance of a preliminary
injunction against WEBSTER:

    (A)   Sending e-mails, letters, or other correspondence
to current or prospective business associates of
plaintiffs, or making verbal statements to such
persons, or posting materials on a website, which
state or imply that plaintiffs have stolen,
misappropriated, or infringed upon intellectual
property allegedly belonging to defendant
relating to the Hot Dog Hall Of Fame; and

    (B)   Sending e-mails, letters, or other correspondence
to any person, business, corporation, city,
municipality, or any representative of a city or
municipality, or making verbal statements to such
persons, which state or imply that plaintiffs
have stolen, misappropriated, or infringed upon
intellectual property allegedly belonging to
defendant relating to the Hot Dog Hall Of Fame.

2.   An order to show cause as to why defendant
WEBSTER should not be preliminarily enjoined from
committing any of the conduct described in paragraph 1(A)
and 1(B) above.

    Plaintiffs' application for the above-described
temporary restraining order and preliminary injunction is
based upon this Notice and Motion, upon the Points and
Authorities attached hereto, upon the Declaration of Steven

1  Schussler and the accompanying exhibits which are attached

2  thereto showing that plaintiffs are continuing to suffer

3  irreparable injury from the defendant's tortious conduct,

4  and upon all the files, pleadings and documents of record

5  on file herein.

6

7  DATED: October 24, 2007        JAMES P. COLLINS, JR.
                                  COTKIN & COLLINS
8                                 A PROFESSIONAL CORPORATION

9

10                 By   _____
11                      James P. Collins, Jr.
                        Attorneys for Plaintiffs
12                      STEVEN SCHUSSLER and SCHUSSLER
                        CREATIVE, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PAGE(S)

I.    PLAINTIFFS ARE BEING IRREPARABLY INJURED BY
      DEFENDANT'S TORTIOUS CONDUCT . . . . . . . . . 4

II.   BACKGROUND . . . . . . . . . . . . 4

      A.   The Parties . . . . . . . . . . . 4

      B.   Defendant WEBSTER's Campaign to
           Disrupt Plaintiffs' Business . . . . . 6

III.  PLAINTIFFS ARE ENTITLED TO A TEMPORARY
      RESTRAINING ORDER TO PROTECT SCHUSSLER CREATIVE's
      REPUTATION, GOODWILL, AND PRESENT AND PROSPECTIVE
      BUSINESS RELATIONSHIPS . . . . . . . . . . 11

      A.   Plaintiffs Will Likely Succeed on
           the Merits in This Action . . . . . 13

      B.   Plaintiffs Will Continue to Suffer
           Irreparable Harm if Relief is
           Denied . . . . . . . . . 16

      C.   Defendant Will Suffer No Harm as a
           Result of an Order Granting
           Preliminary Relief . . . . . . . 20

IV.   CONCLUSION . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

PAGE(S)

**FEDERAL CASES:**

*American Motorcyclist Ass'n v. Watt,*
   714 F.2d 962 (9th Cir.1983) . . . . . . . . . . . 12

*Bell Atlantic Business Systems, Inc. v. Storage Technology Corp.,*
   No. C-94-0235 MHP 1994 WL 125173, at *2
   (N.D.Cal. March 31, 1994) . . . . . . . . . . . 17

*Burnett v. Rowzee,*
   No. SA CV 07-641DOCANX, 2007 WL 2735682,
   at *5 (C.D.Cal. Aug. 28, 2007) . . . . . . . . . 11

*Drews Company, Inc. v. Ledwith-Wolfe Associates, Inc.,*
   371 S.E.2d 532 (1988) . . . . . . . . . . . . . 18

*Futuredontics, Inc. v. Goodman,*
   No. 98-55801, 1999 WL 848822, at *1
   (9th Cir. Oct. 11, 1999) . . . . . . . . . . . . 16

*Humetrix, Inc., v. Gemplus S.C.A.,*
   268 F.3d 910 (9th Cir. 2001) . . . . . . . . . . 18

*Iron Steamer, Ltd. v. Trinity Restaurant, Inc.,*
   110 N.C.App. 843 (1993) . . . . . . . . . . . . 18

*Johnson & Johnson v. Carter-Wallace,*
   631 F.2d 186 (2d Cir. 1980) . . . . . . . . . . 19

*Nike, Inc. v. McCarthy,*
   379 F.3d 576 (9th Cir.2004) . . . . . . . . . . 12

*Pioneer Military Lending, Inc. v. Dufauchard,*
   No. CIV. S-06-1445 LKK/PAN,
   2006 WL 2053486, at *18 (E.D.Cal. July 21, 2006) . 16

*Rent-a-Center, Inc. v. Canyon Television & Appliance,*
   944 F.2d 597 (9th Cir.1991) . . . . . . . . . . 16

*Robi v. Five Platters, Inc.,*
   918 F.2d 1439 (9th Cir. 1990) . . . . . . . 14, 19

*Stanley v. Univ. of S. Cal.,*
   13 F.3d 1313 (9th Cir.1994) . . . . . . . . . . 11

*State of Alaska v. Native Vill. of Venetie,*
   856 F.2d 1384 (9th Cir.1988) . . . . . . . . . . 12

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.,*
   497 F.2d 203 (9th Cir. 1974) . . . . . . . . 18, 19

**TABLE OF AUTHORITIES**
(Continued)

PAGE(S)

*U.S. v. Nutri-cology, Inc.,*
    982 F.2d 394 (9th Cir.1992)  . . . . . . . . . .  12

*Weinberer v. Romero-Barcelo,*
    456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).  11

*Xcentric Ventures v. Stanley,*
    No. CV-07-00954-PHX-NVW, 2007 WL 2177323
    (D. Ariz. July 27, 2007) . . . . . . . . . . . .  15

*Zeidler v. A&W Restaurants, Inc.,*
    No. 99 C 2591, 2001 WL 561367, *3
    (N.D.Ill. May 21, 2001)  . . . . . . . . . . . .  18

**CALIFORNIA CASES:**

*Della Penna v. Toyota Motor Sales, U.S.A.,*
    11 Cal.4th 376 (1995)  . . . . . . . . . . . . .  14

*Gerwin v. Southeastern Cal. Assn. of Seventh Day
Adventists,* 14 Cal.App.3d 209 (1971)  . . . . . . . .  18

*Kids' Universe v. In2Labs*
    (2002) 95 Cal.App.4th 870  . . . . . . . . . . .  18

*Pacific Gas and Electric Co. v. Bear Stearns & Co.,*
    50 Cal.3d 1118 . . . . . . . . . . . . . . . . .  13

*Quelimane Co. v. Stewart Title Guaranty Co.,*
    19 Cal.4th 25 (1998)  . . . . . . . . . . . . . .  13

*Reeves v. Hamilton,*
    33 Cal.4th 1140 (2004) . . . . . . . . . . . . .  13

*Resort Video, Ltd. v. Laser Video, Inc.,*
    35 Cal.App.4th 1679 (1995) . . . . . . . . . . .  18

*Youst v. Longo,*
    43 Cal.3d 64, footnote 6 (1987)  . . . . . . . .  14

1
2

**POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

3
4

    **I.    PLAINTIFFS ARE BEING IRREPARABLY INJURED BY DEFENDANT'S TORTIOUS CONDUCT**

5    Plaintiffs Steven Schussler and SCHUSSLER CREATIVE,

6 INC. move for a temporary restraining order and preliminary

7 injunction to stop the irreparable damage that has been and

8 is continued to be caused to plaintiffs if defendant

9 J. FRANK WEBSTER, a/k/a "Mr. Hot Dog", or "Uncle FRANK", is

10 not restrained from disrupting SCHUSSLER CREATIVE, INC.'s

11 business relations and contracts by sending threatening and

12 defamatory correspondence to Schussler's business partners

13 and municipal officials.  WEBSTER has, by his own

14 admission, deliberately embarked on a campaign to damage

15 plaintiffs in their business by "poisoning the well" with

16 their business partners, potential business partners, and

17 city officials.  By his acts, WEBSTER has tortiously

18 interfered with SCHUSSLER CREATIVE, INC.'s current

19 contractual and prospective business relationships.  (See

20 Steven Schussler declaration attached hereto, ¶¶ 9-21.)

21 It is evident that Defendant will not stop his campaign

22 unless he is enjoined from said behavior by this court.

23 (*Id.* ¶¶ 9-14.)

24    **II.  BACKGROUND**

25        **A.    The Parties**

26    Plaintiff SCHUSSLER CREATIVE, INC., specializes in the

27 development of innovative concepts for restaurants and

28 entertainment venues such as "The Rainforest Café" and "T-

1  Rex" for which the corporation has come to be known.
2  (Schussler Dec., ¶2.)  Plaintiff STEVEN SCHUSSLER, the
3  Chairman of the Board and Chief Executive of SCHUSSLER
4  CREATIVE, INC., is the main creative force responsible for
5  generating these innovative restaurant concepts. (*Id.*)
6      Plaintiffs' business model is unique in that the
7  restaurants they design are elaborate attractions that are
8  very expensive to construct and initially operate.  (*Id.*,
9  at ¶¶ 3-4.)
10     The restaurants are typically located in large
11  shopping malls as anchor tenants. (*Id.*)  In order to be
12  profitable, Plaintiffs must secure financing in the form of
13  tenant allowances from shopping mall developers.  (*Id.*)
14  Tenant allowances are low-interest or no-interest loans or
15  grants provided by developers to certain preferred tenants
16  which these tenants use to finance the construction and
17  opening of the expensive retail concepts.  (*Id.*)
18     In May, 2007, SCHUSSLER CREATIVE, INC., contracted
19  with shopping mall developer RED Development ("RED") to
20  develop certain new theme restaurants.  Under this contract
21  SCHUSSLER CREATIVE, INC., secured a $20 million line of
22  credit.  (*Id.* ¶ 7.)  This contract, like all Plaintiffs'
23  contracts, contains a provision representing that SCHUSSLER
24  CREATIVE, INC., owns all rights, trademarks, or patents in
25  the concepts it is developing.  (*Id.* at ¶ 6.)  One
26  restaurant concept that Plaintiffs are developing under the
27  contract with RED is called the HOT DOG HALL OF FAME
28  ("HDHF"), a restaurant featuring hot dog memorabilia and

1  merchandise.  (*Id.* ) The HDHF has been in research and
2  development at SCHUSSLER CREATIVE, INC., for ten years and
3  SCHUSSLER CREATIVE, INC., currently owns the U.S. Trademark
4  Application for the concept.  (*Id.*)  The first unit of the
5  HDHF is scheduled to open in Kansas City in the spring of
6  2008; the second unit will open in Sparks, Nevada, shortly
7  thereafter.  *Id.* at ¶ 8.  All told, SCHUSSLER CREATIVE,
8  INC., and RED plan to open 200 units of HDHF over the next
9  ten years.  *Id.* at ¶ 7.  In order to open these restaurants
10 SCHUSSLER CREATIVE, INC., and RED must enter into licensing
11 agreements with each city to secure the public financing
12 necessary to fund the massive shopping mall construction
13 projects.  *Id.* at ¶ 5.

14      Defendant J. FRANK WEBSTER, who calls himself "Mr. Hot
15 Dog," and "Uncle Frank," is a resident of El Cajon,
16 California. He owns a large personal collection of hot dog
17 themed memorabilia which he stores at his home at 1502 Via
18 Elisa Dr., El Cajon, California.  (*See* Pl.'s Ex. 4.)
19 Though he claims to have acquired a substantial collection
20 of memorabilia, WEBSTER does not operate any business in
21 relation to his collection.  Nor is WEBSTER's collection
22 commercially open to the general public as a museum.

23
24      **B.    Defendant WEBSTER's Campaign to Disrupt
              Plaintiffs' Business**

25      Beginning in June 2007, WEBSTER embarked upon a
26 campaign to ruin Plaintiffs' business.  He began to contact
27 media organizations and hospitality companies by e-mail,
28 alleging that the concept, name and related intellectual

1  property of the HDHF belonged to him.  He alleged that

2  Mr. Schussler and SCHUSSLER CREATIVE, INC., stole the

3  concept of the HDHF from him. The media organizations and

4  hospitality companies to which WEBSTER made these

5  allegations included Host Marriott, Levy Restaurants,

6  Success Magazine, The Hartford Courant, The Rocky Mountain

7  News, The Chicago Sun Times, The San Diego Union Tribune

8  and Chain Leader Magazine.  (*Id.* ¶ 9.and Ex. 2.)

9      By letter dated June 11, 2007, SCHUSSLER CREATIVE,

10  INC.'s legal counsel contacted WEBSTER and informed him

11  that SCHUSSLER CREATIVE, INC., is the owner of the U.S.

12  Trademark for "The Hot Dog Hall of Fame," (*Id.* ¶ 10 and

13  Ex. 3.) and requested that WEBSTER stop sending false,

14  misleading, and defamatory statements regarding SCHUSSLER

15  CREATIVE, INC.  (Schussler dec. ¶ 10).

16      Thereafter, WEBSTER began to contact Plaintiffs'

17  business partners directly for the express purpose of

18  disrupting Plaintiffs' business.  Between June and

19  September 2007, WEBSTER contacted RED several times by e-

20  mail calling Mr. Schussler a "liar," a "thief" and a "con

21  man," and claiming that Mr. Schussler was attempting to

22  steal the concept and name of the HDHF from him.  (*Id.*,

23  ¶ 14 and Exhibits 5 and 7.)

24      WEBSTER maintains an online newsletter at his website,

25  http://www.thehotdoghalloffame.com/, which he calls "The

26  Frankfurter Chronicle."  In a newsletter dated June 14,

27  2007, WEBSTER described his intention to damage

28  Mr. Schussler and SCHUSSLER CREATIVE, INC., and stated that

1   he planned to "poison the well" by contacting SCHUSSLER

2   CREATIVE, INC.'s current business partners, potential

3   business associates, and the media to accuse SCHUSSLER

4   CREATIVE, INC., of theft of intellectual property and to

5   threaten legal action.  (*Id.*, ¶12 and Ex. 8.)  Further, on

6   his website under date of June 16, 2007 WEBSTER posted a

7   copy of a letter he had previously sent to one of SCHUSSLER

8   CREATIVE, INC.'s business partners, James Rittenberg, in

9   which WEBSTER threatened: "be advised that we plan to first

10  blacken both of your eyes (yours and Mr. Schussler's)

11  professionally, first in the papers and on TV, then we will

12  see you in court."  (*Id.*, ¶13 and Ex. 6.)

13       Further, in an e-mail dated September 18, 2007 which

14  WEBSTER sent to The Mayor and City Council of the City of

15  Sparks, Nevada, WEBSTER again called Mr. Schussler a

16  "liar," a "thief" and a "con man," and claimed that

17  Mr. Schussler had stolen the concept and name of THE HDHF

18  from him.  WEBSTER threatened to go "VERY public" with

19  these accusations and warned the Mayor and City Council of

20  the "fallout this will cause."  The e-mail also contained

21  links to WEBSTER's website where he published similar false

22  and defamatory allegations.  (*Id.*, ¶14 and Ex. 7).

23       Finally, on June 16, 2007 WEBSTER posted on his

24  website an "edition" of the Frankfurter Chronicle in which

25  he repeated his allegations that Plaintiffs had stolen his

26  intellectual property.  He again expressly stated his

27  intention to damage Plaintiffs' business through extra-

28  legal means:

1
… we can't possibly hope to prevail in
the legal system as he's far more
2
affluent then we are or ever really hope
to be.  Instead, we are going to "poison
3
the well" so to speak.  If he thinks he
can steal from us, he had another thing
4
[sic] coming.

. . .

5

6
every time he uses our name, concept,
variants of our URL, etc., we will e-mail
these individuals . . . and point out that
7
they are being conned . . . and that WE
are the Hot Dog Hall of Fame and have
8
fulfilled all of the duties of the Hot Dog
Hall of Fame for almost 30 years now.
9
(Ex. 6 to Schussler dec.)

10

11      Since WEBSTER began his tortious and defamatory e-mail

12  campaign SCHUSSLER CREATIVE's business associates,

13  including RED and city officials in Sparks, Nevada have

14  expressed their concern and hesitancy to proceed with the

15  relationship.  Schussler Dec. ¶ 15.  Their concern directly

16  implicates a key representation made by SCHUSSLER CREATIVE,

17  INC., in its contracts with its business partners – that

18  is, that SCHUSSLER CREATIVE owns the rights to the HOT DOG

19  HALL OF FAME.  *Id.*  Because cities finance RED's

20  development projects with public funds they are

21  particularly sensitive to any potential liability issues

22  such as those threatened by WEBSTER.  *Id.*  RED is concerned

23  that the city will refuse to license their shopping mall

24  developments if city officials believe that litigation may

25  arise over the rights to the HOT DOG HALL OF FAME.  *Id.*

26  Consequently, RED has determined that it will not proceed

27  with proposed licensing agreements with Kansas City until

28  this matter is resolved.  *Id.*  This delay in turn threatens

1    SCHUSSLER CREATIVE, INC., with a potential to default on

2    its line of credit with RED.    *Id.*  Loss of line of credit

3    will further impair Plaintiffs' ability to develop his

4    restaurant openings.    *Id.*

5         Leasing anchor tenant space is a very competitive

6    enterprise involving a high degree of risk to developers.

7    *Id.* at ¶ 17.  SCHUSSLER CREATIVE, INC., has succeeded in

8    the franchise restaurant industry by securing anchor tenant

9    space and the highly-coveted tenant allowances that come

10   with it.    *Id.*  This has only been possible because of

11   SCHUSSLER CREATIVE, INC.'s excellent reputation as a

12   successful developer of new and original concepts.    *Id.*

13   Because of the prospective and uncertain nature of the mall

14   development industry, developers award tenant allowances

15   based entirely on the reputation of franchises.    Reputation

16   is everything in this business.    *Id.*

17        Plaintiffs' reputations have benefitted immeasurably

18   from receiving good press.    *Id.* ¶ 18.  While achieving a

19   good reputation will enhance one's business in this

20   industry, the converse is also true.    A bad reputation can

21   devastate a franchise.    WEBSTER's defamatory e-mail

22   campaign has reached many people in the industry and has

23   begun to spark a domino effect.    *Id.*  Plaintiffs' business

24   is beginning to suffer due to delay.    The delay and

25   subsequent negative impact on Plaintiffs' reputation has

26   and will continue to affect the quantity and quality of

27   tenant allowances SCHUSSLER CREATIVE, INC., is capable of

28   securing in the future.    *Id.*  If SCHUSSLER CREATIVE, INC.,

1  cannot secure a critical number of these prime tenant
2  leases, it faces potential default on its line of credit.
3  *Id.*  The potential damages caused by WEBSTER's baseless
4  defamatory e-mail campaign may well exceed $100 million.
5  *Id.*

6       In addition, Plaintiffs have spent time, money, and
7  resources responding to inquiries and assuring SCHUSSLER
8  CREATIVE, INC.'s business associates of our rights to the
9  concept as provided in its contracts.  *Id.* at ¶ 19.
10 Plaintiffs have received dozens of calls and e-mails from
11 concerned business associates since WEBSTER first began
12 sending his defamatory messages.  *Id.*  Each call represents
13 a negative mark on Plaintiffs' reputation.  As already
14 noted, WEBSTER's campaign has caused a halt to the first
15 restaurant set to be opened.

16
17    **III.    PLAINTIFFS ARE ENTITLED TO A TEMPORARY
            RESTRAINING ORDER TO PROTECT SCHUSSLER
            CREATIVE's REPUTATION, GOODWILL, AND PRESENT
18          AND PROSPECTIVE BUSINESS RELATIONSHIPS**

19      Generally, courts grant equitable relief in the event
20 of irreparable injury and the inadequacy of legal remedies.
21 *Burnett v. Rowzee*, No. SA CV 07-641DOCANX, 2007 WL 2735682,
22 at *5 (C.D.Cal. Aug. 28, 2007); *See Stanley v. Univ. of S.*
23 *Cal.*, 13 F.3d 1313, 1320 (9th Cir.1994); *see also Weinberer*
24 *v. Romero-Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72
25 L.Ed.2d 91 (1982) ("[T]he basis for injunctive relief in
26 the federal courts has always been irreparable injury and
27 the inadequacy of legal remedies."). Plaintiffs have the
28 burden of showing that they are entitled to preliminary

1  relief. The "traditional test" requires that Plaintiffs

2  demonstrate (1) a strong likelihood of success on the

3  merits; (2) a significant threat of irreparable injury; (3)

4  greater hardship to Plaintiffs than Defendants; and (4)

5  that the public interest favors granting the injunction.

6  *See American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965

7  (9th Cir.1983).

8        Courts have also applied an "alternative test" which

9  permits the plaintiff to meet its burden by showing either

10  "(1) a likelihood of success on the merits and the

11  possibility of irreparable injury or (2) the existence of

12  serious questions going to the merits and the balance of

13  hardships tipping in [the plaintiff's] favor." *Nike, Inc.*

14  *v. McCarthy*, 379 F.3d 576, 580 (9th Cir.2004) (internal

15  quotation marks omitted). "These two formulations represent

16  two points on a sliding scale in which the required degree

17  of irreparable harm increases as the probability of success

18  decreases." *U.S. v. Nutri-cology, Inc.*, 982 F.2d 394, 397

19  (9th Cir.1992) (citations omitted). "The critical element

20  in determining the test to be applied is the relative

21  hardship to the parties. If the balance of harm tips

22  decidedly toward the plaintiff, then the plaintiff need not

23  show as robust a likelihood of success on the merits as

24  when the balance tips less decidedly." *State of Alaska v.*

25  *Native Vill. of Venetie*, 856 F.2d 1384, 1389 (9th Cir.1988)

26  (citations omitted).

27        Given the flagrant nature of Defendant's conduct,

28  SCHUSSLER CREATIVE, INC., has demonstrated more than a

1  reasonable likelihood of prevailing on the merits in this

2  action.   More importantly, due to the particularly

3  sensitive timing of Plaintiffs' current business

4  negotiations, SCHUSSLER CREATIVE, INC., is at a substantial

5  risk of irreparable injury to its reputation, goodwill and

6  present and prospective business relationships.   In

7  contrast, Defendant will suffer no legitimate harm from

8  entry of the temporary restraining order or, ultimately,

9  the injunction.

10

11     A.    **Plaintiffs Will Likely Succeed on the Merits in This Action**

12        Plaintiff has established the prima facie elements of

13  tortious interference with contract and tortious

14  interference with prospective economic advantage.

15        The elements of tortious interference with Contract

16  are: a) a valid contract between plaintiff and a third

17  party; b) defendant's knowledge of this contract; c)

18  defendant's intentional act designed to induce a disruption

19  of the contractual relationship; d) actual disruption of

20  the contractual relationship; and e) resulting damages.

21  *Pacific Gas and Electric Co. v. Bear Stearns & Co.*, 50

22  Cal.3d 1118, 1126 (1990); *Quelimane Co. v. Stewart Title*

23  *Guaranty Co.*, 19 Cal.4th 25, 55 (1998); *Reeves v. Hamilton*,

24  33 Cal.4th 1140, 1148 (2004).   The elements of a claim of

25  tortious interference with prospective economic advantage

26  are essentially the same as those for interference with

27  contracts with the exception that this latter cause of

28  action protects against injury to a prospective economic

1 relationship rather than to an existing contractual

2 relationship.  *Youst v. Longo*, 43 Cal.3d 64, 71, footnote 6

3 (1987); *Della Penna v. Toyota Motor Sales, U.S.A.*, 11

4 Cal.4th 376, 378 (1995).

5      On its face, Defendant's conduct clearly meets the

6 first three elements of both causes of action.  Defendant

7 was well aware of the current and prospective relationship

8 that Plaintiffs had with the cities in which they planned

9 to build, as well as the potential future economic rewards

10 that these relationships would generate.  Defendant

11 expressly stated his awareness of Plaintiffs' contractual

12 relationships after reading about the HDHF online (Exhibit

13 6 at p.2), expressly detailed his plan to "poison the well"

14 and disrupt those contracts by "e-mail[ing] these

15 individuals the link to the site and point out that they

16 are being conned by a one hit wonder … and that WE are The

17 Hot Dog Hall of Fame[.]"  (Ex. 6 at p.3).  Defendant has

18 executed his plan by contacting media organizations (Ex.

19 2), city government representatives (Ex. 7), and private

20 business partners of SCHUSSLER CREATIVE, INC., (Ex's. 5 and

21 8) and has indicated an intention to continue his campaign

22 to poison the well against SCHUSSLER CREATIVE, INC., with

23 any future public or private business partners.  (Ex. 6 at

24 p. 3.)

25      Courts have issued preliminary injunctions in cases

26 involving tortious interference with contract and

27 prospective economic advantage. *Robi v. Five Platters,*

28 *Inc.*, 918 F.2d 1439 (9th Cir. 1990). In *Robi*, the court

1  held that the Defendant engaged in intentional interference
2  with its former band member's contractual relationships
3  when it sent over 50 letters and telegrams written by
4  parties associated with the Defendant to numerous trade
5  magazines, booking agents, promoters, and performance
6  venues claiming that the Plaintiff had no right to perform
7  under the name "The Platters." *Id.* at 1442. The trial court
8  issued a preliminary injunction enjoining such activities.
9  *Id.*

10      In *Xcentric Ventures v. Stanley*, No. CV-07-00954-PHX-
11 NVW, 2007 WL 2177323 (D. Ariz. July 27, 2007), the trial
12 court issued a TRO to enjoin the Defendants from tortiously
13 interfering with the plaintiff's contractual relationships.
14 *Id.* at *1. Defendant had been making defamatory statements
15 about the Plaintiff's lawyer and law firm, sending spam
16 emails to the lawyers at her firm and multiple clients. *Id.*
17 According to the lawyer's testimony, "the purpose of this
18 conduct was to make it difficult for Plaintiffs to do
19 business by making it too costly for [the lawyer] and her
20 law firm to continue providing Plaintiffs with legal
21 services." *Id.*

22      Defendant's defamatory e-mail campaign has and will
23 disrupt Plaintiffs' contractual and prospective business
24 relationships.  First, Defendant's statements directly
25 imply that SCHUSSLER CREATIVE, INC., has breached its
26 contractual representations that it owns the rights to the
27 HDHF.  (Schussler dec. ¶ 15.)  Second, Defendant's acts
28 have already caused disruption of the contracting process

1   between SCHUSSLER CREATIVE, INC., and city officials in

2   Kansas City and Sparks, Nevada.  (*Id.*)  Prior to

3   Defendant's tortious acts, SCHUSSLER CREATIVE, INC., had

4   enjoyed a good business relationship with its contractual

5   partner RED Development.  Together this partnership was

6   steadily progressing toward the opening of the first HDHF

7   restaurant.  (*Id.* at ¶ 7.)  Following Defendant's tortious

8   acts, progress has been halted on the project and the

9   contracting necessary to secure financing from city

10  officials cannot be accomplished until Defendant's tortious

11  conduct is stopped.  (*Id.* at ¶ 15.)

12      Plaintiffs have amply demonstrated a likelihood of

13  success on the merits of both tortious interference causes

14  of action.

15

16      **B.    <u>Plaintiffs Will Continue to Suffer</u>
                 <u>Irreparable Harm if Relief is Denied</u>**

17      Damage to Plaintiff's reputation qualifies as

18  irreparable harm. *Futuredontics, Inc. v. Goodman*, No. 98-

19  55801, 1999 WL 848822, at *1 (9th Cir. Oct. 11, 1999) ("As

20  we have noted, damage to the reputation or goodwill,

21  because it is difficult to calculate, qualifies as

22  irreparable harm.") *Rent-a-Center, Inc. v. Canyon*

23  *Television & Appliance*, 944 F.2d 597, 603 (9th Cir.1991).

24  ("We have also recognized that intangible injuries, such as

25  damage to ongoing recruitment efforts and goodwill, qualify

26  as irreparable harm."); *Pioneer Military Lending, Inc. v.*

27  *Dufauchard*, No. CIV. S-06-1445 LKK/PAN, 2006 WL 2053486, at

28  *18 (E.D.Cal. July 21, 2006) ("Damage to a business' loss

1  of customers, loss of business and goodwill is typically an

2  irreparable injury because it is difficult to calculate

3  with reasonable certainty."); *Bell Atlantic Business*

4  *Systems, Inc. v. Storage Technology Corp.*, No. C-94-0235

5  MHP 1994 WL 125173, at *2 (N.D.Cal. March 31,1994)

6  ("Irreparable injury may take the form of damage to

7  reputation.")

8      Defendant's ongoing conduct has already caused

9  irreparable harm to SCHUSSLER CREATIVE, INC., by damaging

10  its reputation, goodwill, and interrupting its business

11  transactions. (Schussler dec., ¶¶ 15-21.)  Plaintiffs lease

12  "anchor" space in its business partners' large commercial

13  developments.  (*Id.* at ¶ 3.)  By building spectacularly

14  large and elaborate restaurants, Plaintiffs provide their

15  partners with a commercial attraction that draws consumers

16  and other popular retail stores. (*Id.*) In exchange,

17  Plaintiffs' partners provide them with tenant

18  allowances—low-interest or no-interest loans, or grants—in

19  order to finance the massive cost of building and initially

20  operating these restaurants.  (*Id.* at ¶¶ 3, 4.)  Leasing

21  anchor tenant space is a very competitive enterprise

22  involving a high degree of risk to developers.  (*Id.* at ¶

23  17.)  Because of the prospective nature of industry,

24  developers award tenant allowances based entirely on the

25  reputation of franchises.  (*Id.*)  Any sign that franchise

26  is experiencing needless delay has a negative impact on its

27  reputation and will spark a domino effect that will cause

28  developers to pass them over for anchor tenancies.  (*Id.* at

1  ¶ 18.)  Defendant has already caused Plaintiffs needless

2  delay that has affected their reputation.

3       Moreover, if Plaintiffs are unable to secure the

4  tenant allowances this will cause delay in its ability to

5  open and operate new restaurants or to obtain the favorable

6  financing necessary to the profitable operation of those

7  restaurants.  Because the particular restaurants at issue

8  in this case are an entirely new concept, the loss of

9  future profits from those restaurants is, as a legal

10  matter, difficult if not impossible to quantify.  As many

11  courts have found, lost future profits from a new business

12  are often too speculative to be recovered.  *Humetrix, Inc.,*

13  *v. Gemplus S.C.A.*, 268 F.3d 910, 920 (9th Cir. 2001); *Kids'*

14  *Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 887-88;

15  *Resort Video, Ltd. v. Laser Video,* Inc., 35 Cal.App.4th

16  1679, 1699 (1995);  *Gerwin v. Southeastern Cal. Assn. of*

17  *Seventh Day Adventists*, 14 Cal.App.3d 209, 222  (1971).

18  This is especially true in the restaurant industry, where

19  the success rate of new restaurants is low and the failure

20  rate high.  *Zeidler v. A&W Restaurants,* Inc., No. 99 C

21  2591, 2001 WL 561367, *3 (N.D.Ill. May 21, 2001); *Iron*

22  *Steamer, Ltd. v. Trinity Restaurant, Inc.*, 110 N.C.App.

23  843, 849, (1993). *Drews Company, Inc. v. Ledwith-Wolfe*

24  *Associates, Inc.*, 371 S.E.2d 532, 536 (1988), The inability

25  or difficulty of calculating future damages is a form of

26  irreparable harm that justifies the issuance of a TRO.

27  *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods,*

28  *Inc.*, 497 F.2d 203, 218 (9th Cir. 1974) (stating: "one

220304-1.wpd                          -18-

1 reason for issuing an injunction may be that damages, being
2 immeasurable, will not provide a remedy at law."); *Johnson*
3 *& Johnson v. Carter-Wallace*, 631 F.2d 186, 192 (2d Cir.
4 1980) (stating: irreparable injury for the purpose of
5 injunctive relief would be present for the very reason that
6 in an open market it is impossible to measure the exact
7 amount of (the competitor's) damages.") In this case the
8 lost future profits of this new business venture results
9 from Defendant's unlawful conduct is so difficult a
10 measurement, a TRO is warranted to prevent Defendant's
11 continued campaign to "poison the well." *Id.*; *Robi v. Five*
12 *Platters, Inc.*, 918 F.2d at 1442; *Treasure Valley Potato*
13 *Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d at 218.
14      The fact that Defendant's campaign of defamation is
15 electronic makes the harm all the more immediate and
16 irreparable.  By its nature, e-mail is inexpensive,
17 instant, ubiquitous, and easily duplicated.  Defendant
18 knows this and is exploiting it to his full advantage.
19 Literally at the press of a button, Defendant has sent
20 defamatory statements regarding Plaintiffs to five media
21 organizations, and current and prospective business
22 partners of Plaintiffs.  (Ex's. 2 and 5.) at original
23 message, CC:). Each of those recipients, in turn may
24 forward the message on to other third parties to inquire of
25 its truth.  This has in fact occurred at least once
26 already.  (Ex. 7, City of Sparks Information Officer Adam
27 Mayberry forwarding Defendant's message to RED
28 Development).

1     Further, Defendant shows every intention of continuing

2   his e-mail campaign.  In his newsletter Defendant states:

3   "I'm ready to stare [Schussler] down to the bitter end,"

4   and "he has placed us in the position of having NOTHING to

5   lose."  (Ex. 6 at ¶4)(emphasis in original).  These

6   statements show that Defendant will continue to interfere

7   with Plaintiffs' business for as long as he is allowed to

8   do so.

9     Plaintiffs attempt to remedy the situation by sending

10  Defendant a cease and desist letter (Ex. 4A) has had no

11  effect.  Defendant laughed in the face of this letter and

12  has vowed to continue to contact Plaintiffs' business

13  associates. Until Defendant is enjoined by this court, he

14  will continue to irreparably harm SCHUSSLER CREATIVE, INC.

15

16      **C.    <u>Defendant Will Suffer No Harm as a Result of
            an Order Granting Preliminary Relief</u>.**

17      Defendant does not operate a commercial enterprise

18  with his collection of hot dog memorabilia and does not

19  commercially compete with Plaintiffs in any way.  If

20  Defendant is enjoined from sending defamatory e-mails to

21  Plaintiffs' business partners, he will not be prevented

22  from running any legitimate business or from conducting any

23  appropriate activities as "Uncle Frank," or "Mr. Hot Dog."

24  He may continue to collect hot dog memorabilia, publish a

25  newsletter chronicling his articles for the amusement of

26  other hot dog enthusiasts, share hot dog recipes, present

27  his annual hot dog award (the "Frankie"), and build new hot

28  dog automobiles like his "Lamborweenie."

1    Plaintiffs requested injunction is not overbroad, it
2    asks only that Defendant be enjoined from making defamatory
3    statements to plaintiffs' current and future business
4    associates and from publishing his defamatory statements on
5    his website that interfere with Plaintiffs' HOT DOG HALL OF
6    FAME business ventures.  Defendant is free to compete,
7    legally, with Plaintiffs should he ever decide to do so in
8    the future.  Defendant is free to pursue litigation or
9    petition the U.S. Patent and Trademark Office to assert his
10   alleged rights to the HDHF concept.  By his own admission
11   (Ex. 6 at p. 3 and Ex. 8 at p. 6) Defendant has chosen not
12   to assert his rights through proper legal channels.
13   Instead, Defendant has chosen to pursue an illegal course
14   of action, the goal of which is not to build his business
15   enterprise or compete in the marketplace, but merely to
16   destroy Plaintiffs' business and damage Plaintiffs'
17   reputation.  This he cannot do.  The court may and should
18   restrain him from continuing to do so.
19   **IV.  CONCLUSION**
20       SCHUSSLER CREATIVE, INC., and STEVEN SCHUSSLER
21   respectfully ask this Court to issue a temporary
22   restraining order and after a hearing, a preliminary
23   injunction prohibiting Defendant from tortiously
24   interfering with plaintiffs' current and future business
25   ///
26   ///
27   ///
28   ///

1  activities and associates relating to the "HOT DOG HALL OF

2  FAME", as more particularly described above in plaintiffs'

3  Application and Notice of Motion.

4                              Respectfully submitted,

5  DATED: October 29, 2007     JAMES P. COLLINS, JR.
                                COTKIN & COLLINS
6                              A PROFESSIONAL CORPORATION

7

8                         By

9                              James P. Collins, Jr.
                                Attorneys for Plaintiffs
10                              STEVEN SCHUSSLER and SCHUSSLER
                                CREATIVE, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF STEVEN SCHUSSLER IN SUPPORT OF PLAINTIFFS'
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND FOR A
PRELIMINARY INJUNCTION**

STEVEN SCHUSSLER declares:

1.    I am an individual plaintiff in this action.    I am also Chairman of the Board and Chief Executive of SCHUSSLER CREATIVE, INC., a Minnesota corporation ("SCHUSSLER CREATIVE"), the other Plaintiff. I make this declaration of my own knowledge, and in support of Plaintiffs' motion for a temporary restraining order and a preliminary injunction against defendant J. FRANK WEBSTER aka "MR. HOT DOG" aka "UNCLE FRANK" ("WEBSTER").    If called to the stand, I could and would testify to the truth of the facts stated herein.

2.    SCHUSSLER CREATIVE specializes in the development of innovative concepts for restaurants and entertainment venues. Though we are headquartered in Golden Valley, Minnesota, we conduct business throughout the United States. With its business partners, SCHUSSLER CREATIVE has developed several successful restaurant concepts, such as The Rainforest Café, and T-Rex, a dinosaur themed restaurant. The Rainforest Café recreates a tropical rainforest indoors with tropical plant and animal life, and large aquariums with live tropical fish. T-Rex features life-sized, animatronic dinosaurs.

3.    Our business model is different from other chain restaurants in that the restaurants we design are sought after by shopping mall and entertainment venue developers

1  as "anchor" tenants. They are designed to be an elaborate

2  attraction and to draw large numbers of consumers as well

3  as other popular retail stores to the shopping center.

4  These restaurants are very expensive to build and could

5  never be run profitably without the developer providing a

6  tenant allowance agreement.

7      4.    SCHUSSLER CREATIVE uses tenant allowances to

8  finance its concept restaurants. In a tenant allowance

9  agreement, a developer will cover the cost of building the

10  anchor store by lending the tenant the necessary funds on

11  very good terms, often forgiving the debt entirely.

12      5.    The developer, in turn, finances the entire

13  shopping center through a complicated system of private and

14  public financing. The public financing requires licensing

15  agreements with the city or municipality in which the

16  shopping center is to be built and is integral to the

17  financing of the entire project.

18      6.    A new restaurant concept, "HOT DOG HALL OF FAME,"

19  has been in research and development at SCHUSSLER CREATIVE

20  for ten years. A prototype of that restaurant has been

21  built at SCHUSSLER CREATIVE's warehouse facility in Golden

22  Valley. SCHUSSLER CREATIVE is the owner of U.S. Trademark

23  Application Serial No. 78/591560 for the HOT DOG HALL OF

24  FAME trademark for restaurant services, retail store and

25  wholesale distributorship services.  All SCHUSSLER CREATIVE

26  contracts assert that SCHUSSLER CREATIVE owns all rights,

27  trademarks, or patents in the concepts it is developing.

28  Attached hereto as Exhibit 1 is a true and correct copy of

1  the U.S. Trademark Application described in this

2  paragraph.[1]

3      7.   In May of 2007, SCHUSSLER CREATIVE entered into a

4  contract with RED Development, LLC, ("RED") a developer of

5  retail centers and shopping malls. The HOT DOG HALL OF FAME

6  is one of ten concepts that SCHUSSLER CREATIVE has agreed

7  to develop with RED and will be an anchor store attraction

8  at RED's shopping centers. The contract also provides for a

9  $20 million line of credit to SCHUSSLER CREATIVE in

10 exchange for SCHUSSLER CREATIVE's promise to indemnify RED.

11 Together, RED and SCHUSSLER CREATIVE plan on opening 200

12 units of the HOT DOG HALL OF FAME over the next ten years.

13     8.   SCHUSSLER CREATIVE and RED plan on opening the

14 first HOT DOG HALL OF FAME in Kansas City in the spring of

15 2008 and will open its second unit in Sparks, Nevada. RED

16 is currently drafting licensing agreements to secure public

17 funding from those municipalities.

18     9.   Soon after SCHUSSLER CREATIVE partnered with RED

19 under the contract, defendant WEBSTER sent an e-mail dated

20 June 10, 2007, to me as well as to several media

21 organizations and to SCHUSSLER CREATIVE's business

22 partners. In the e-mail, writing under the name "Uncle

23 Frank," WEBSTER claimed that the HOT DOG HALL OF FAME

24 concept was his intellectual property. He demanded

25 SCHUSSLER CREATIVE cease and desist developing the concept

26

27

28
   [1] Most of the exhibits to this declaration are also
   attached as exhibits to plaintiffs' Complaint on file
   herein and bear the same exhibit numbers used in the
   Complaint.

1  and threatened to file a lawsuit.  WEBSTER also sent RED a

2  copy of this e-mail. Attached hereto as Exhibit 2 is a true

3  and correct copy of the e-mail described in this paragraph.

4      10.  SCHUSSLER CREATIVE immediately had its legal

5  counsel, Maslon Edelman Borman & Brand, LLP, contact

6  WEBSTER via e-mail on June 11, 2007 and inform him of

7  SCHUSSLER CREATIVE's legal rights to the HOT DOG HALL OF

8  FAME concept.  (Exhibit 3.)  In a letter dated June 11,

9  2007 from the Maslon law firm attached to that e-mail,

10 counsel informed WEBSTER that SCHUSSLER CREATIVE owns the

11 U.S. Trademark application for the HOT DOG HALL OF FAME

12 trademark, instructed WEBSTER on intellectual property law

13 regarding trademark, and further informed WEBSTER that his

14 correspondence with the media and hospitality companies

15 with which SCHUSSLER CREATIVE has current or economic

16 relationships was defamatory.  The Maslon firm's June 11,

17 2007 letter closed by asking WEBSTER to give his assurance

18 that he would stop sending defamatory statements, and to

19 take responsibility for his misrepresentations.  Since

20 counsel for SCHUSSLER CREATIVE was unaware of "UNCLE

21 FRANK's" true identity at the time, the June 11, 2007

22 letter was addressed to the record owner of the domain name

23 http://thehotdoghalloffame.com/, Steven Bernier.  The

24 correspondence however, was in fact sent to WEBSTER's e-

25 mail address.  A true and correct copy of the June 11, 2007

26 letter is attached as Exhibit 4A.[2]  After discovering that

27 

28      [2]  Exhibit 4 to the Complaint includes the same
   letter, with the incorrect date of September 19, 2007.  The
   computer gave it the wrong date when the letter was printed

1  "UNCLE FRANK" was in fact WEBSTER, counsel sent another

2  copy of that letter, via e-mail, to WEBSTER demanding that

3  he cease and desist making defamatory statements regarding

4  Mr. SCHUSSLER and SCHUSSLER CREATIVE.

5      11.  Despite receiving our demands that he cease and

6  desist, WEBSTER has continued to send defamatory statements

7  regarding SCHUSSLER CREATIVE to our contractual partners.

8      12.  For example, on June 14, 2007, WEBSTER sent

9  another e-mail to RED containing a copy of his newsletter

10  "The Frankfurter Chronicles (The Newsletter with Relish)"

11  in which he again alleged that SCHUSSLER CREATIVE had

12  stolen the concept of the HOT DOG HALL OF FAME from him. A

13  true and correct copy of this e-mail with WEBSTER's

14  newsletter is attached as Exhibit 8.  Apparently, WEBSTER

15  learns of SCHUSSLER CREATIVE's contractual relationships

16  through press releases in trade publications and from

17  searching the internet. In the e-mail sent to RED on

18  June 14, (Exhibit 8), WEBSTER describes his plan to contact

19  business associates of SCHUSSLER CREATIVE and allege that I

20  have stolen his concept from him.  WEBSTER further states

21  in Exhibit 8 that he "has nothing to lose" and will "poison

22  the well" by defaming SCHUSSLER CREATIVE.  WEBSTER's June

23  14 email to RED (Exhibit 8) is currently posted online at

24  Defendant's website http://www.thehotdoghalloffame.com/.

25      13.  WEBSTER's online newsletter is maintained on his

26  website address above.  Attached hereto as Exhibit 6 is a

27  true and correct copy of his webpage dated June 16, 2007

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

out of the firm's computer system on September 19, 2007.

1   containing his statements to "poison the well" and his

2   threats to one of SCHUSSLER's business partners, James

3   Rittenberg, to "blacken his eyes ("both yours and Mr.

4   Schusslers") professionally . . . ."

5        14.  On September 18, 2007, WEBSTER sent an e-mail to

6   RED in which he accused Mr. SCHUSSLER of being a "liar", a

7   "thief", and a "con man."  A true and correct copy of

8   WEBSTER's September 18, 2007 e-mail is attached as Exhibit

9   5.  On the very same day WEBSTER sent an e-mail to Gino

10  Martini, Mayor of Sparks, Nevada, and a city council member

11  in which WEBSTER again accused me of being a liar, thief,

12  and con man and threatening to go "VERY" public with this

13  allegation.  A true and correct copy of WEBSTER's September

14  18, 2007 e-mail to the mayor is attached as Exhibit 7.

15       15.  Since WEBSTER began his e-mail campaign defaming

16  SCHUSSLER CREATIVE, RED as well as other business

17  associates of SCHUSSLER CREATIVE and city officials in

18  Sparks, Nevada have expressed their concern regarding our

19  business relationship. They are concerned because WEBSTER's

20  defamatory statements imply that SCHUSSLER CREATIVE has

21  breached its contractual representation that it owns the

22  rights to the HOT DOG HALL OF FAME. Because cities finance

23  RED's development projects with public funds they are

24  understandably sensitive to any potential liability issues.

25  RED is concerned that the city will refuse to license the

26  shopping mall development because of WEBSTER's false

27  accusations. Further, officials at RED have refused to

28  present Kansas City officials with proposed licensing

1   agreements until this matter with WEBSTER is resolved.

2   WEBSTER has continued to send defamatory messages and has

3   contacted the press as recently as October 10.

4       16.  SCHUSSLER CREATIVE has been harmed by the action

5   of WEBSTER. He has caused delay and interfered with this

6   company's contracts, business partners, and potential

7   licensing agreements with cities. The delay caused by

8   WEBSTER could potentially cause SCHUSSLER CREATIVE to

9   default on its line of credit with RED. Further, any delay

10  will be incredibly expensive in terms of lost future

11  profits.

12      17.  In terms of future profits, leasing anchor tenant

13  space is a very competitive enterprise involving a high

14  degree of risk to developers. SCHUSSLER CREATIVE has

15  succeeded in the franchise restaurant industry by securing

16  anchor tenant space and the coveted tenant allowances that

17  come with it. This is only possible because of SCHUSSLER

18  CREATIVE's excellent reputation as a successful developer

19  of new and original concepts. Because of the prospective

20  nature of the industry, developers award tenant allowances

21  based on the reputation of franchises as reflected in the

22  industry press.

23      18.  To my knowledge, the industry press has never

24  published a negative article about SCHUSSLER CREATIVE. Our

25  reputation has benefitted immeasurably from receiving good

26  press. Conversely, a bad reputation can be devastating to a

27  franchise.  WEBSTER's defamatory email campaign has reached

28  many people in the industry and, in terms of damages, has

sparked a domino effect. Already, our business is beginning to suffer financially due to delay. The delay and subsequent negative impact on our reputation will affect the quantity and quality of tenant allowances SCHUSSLER CREATIVE is capable of securing in the future. If SCHUSSLER CREATIVE cannot secure a sufficient number of leases, it could default on its line of credit. If it defaults on its line of credit, Schussler creative will be unable to open HOT DOG HALL OF FAME restaurants. The potential damages caused by WEBSTER's baseless defamatory e-mail campaign may well exceed $100 million. Because the restaurants are a new concept it is extremely difficult to calculate the full amount of damage WEBSTER's conduct will cause.

19. I have already spent time, money, and resources responding to inquiries and assuring SCHUSSLER CREATIVE's business associates of our rights to the concept as provided in our contracts. I have received dozens of calls and e-mails from concerned business associates since WEBSTER first started sending defamatory messages in June. Each call represents a negative mark on our reputation which had previously been spotless.

20. Many new restaurants fail. In the restaurant industry, many restaurants operate at a loss for years before becoming profitable because of the massive expense of initially opening and operating the enterprise. Before opening a restaurant, licensing agreements must be negotiated and signed with municipal governments; contracts with developers must be negotiated and signed; the

220304-1.wpd

1  restaurant itself must be designed and constructed; staff
2  must be hired and trained; the restaurant must be marketed,
3  promoted and advertised locally which requires further
4  contracting with media companies and ad agencies. All these
5  activities must be precisely timed and organized and a
6  delay or interruption in one step of the initial process in
7  opening a restaurant will affect all others. Even once the
8  restaurant is opened its success and profitability are not
9  assured. Service, reputation, food quality and a host of
10 functions will influence whether the restaurant will be
11 profitable and to what degree. The Hot Dog Hall of Fame is
12 a new concept. While we predict its future success, it is
13 currently at a preliminary stage of development. To
14 quantify that harm in the form of lost future profits at
15 this stage of development would be difficult.

16      21.  SCHUSSLER CREATIVE's reputation and goodwill are
17 invaluable to us and our business partners and are
18 essential to the continued success of SCHUSSLER CREATIVE.
19 WEBSTER's e-mail campaign has damaged the reputation and
20 goodwill of SCHUSSLER CREATIVE and those damages are
21 difficult to calculate.

22      FURTHER YOUR AFFIANT SAYETH NAUGHT.

23      I declare under penalty of perjury under the
24 ///
25 ///
26 ///
27 ///
28 ///

laws of the United States of America that the foregoing is
true and correct and that this Declaration was executed
this ___26th___ day of _October_, in the City of
_Golden Valley_ County of _Hennepin_, State of
Minnesota.

                                        Steven Schussler

220304-1.wpd

# EXHIBIT 1

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2007-10-07 14:57:08 ET

Serial Number: 78591560 Assignment Information          Trademark Document Retrieval

Registration Number: (NOT AVAILABLE)

Mark

# HOT DOG HALL OF FAME

(words only): HOT DOG HALL OF FAME

Standard Character claim: Yes

Current Status: A request for the third extension of time to file a statement of use has been granted.

Date of Status: 2007-05-29

Filing Date: 2005-03-21

The Notice of Allowance Date is: 2006-03-14

Transformed into a National Application: No

Registration Date: (DATE NOT AVAILABLE)

Register: Principal

Law Office Assigned: LAW OFFICE 106

Attorney Assigned:
FOSTER STEVEN R Employee Location

Current Location: 700 -Intent To Use Section

Date In Location: 2006-09-21

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

1. Schussler Creative, Inc.

Address:

EXHIBIT    1              -33-

Schussler Creative, Inc.
858 Decatur Avenue North
Golden Valley, MN 55427
United States
**Legal Entity Type:** Corporation
**State or Country of Incorporation:** Minnesota

## GOODS AND/OR SERVICES

**International Class:** 035
**Class Status:** Active
Retail store and wholesale distributorship services in the field of clothing, namely, pants, shirts, hats, sweatshirts, shorts, swimwear, t-shirts, jackets of all types, sports caps, boxer shorts, gloves, sweat pants, tank tops, jerseys, pajamas, sweaters, belts, nightshirts, head bands, wrist bands, shoes and sandals, jewelry, key chains, minerals, stones, figurines, plush animals, puppets, science tools, namely microscopes and metal detectors, toys, namely character toys and branded toys, drinkware, books, music and videotapes, home accessories, body care items, food products, clocks, watches, games, and electronic gadgets
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

**International Class:** 043
**Class Status:** Active
Restaurant services for consumption on the premises
**Basis:** 1(b)
**First Use Date:** (DATE NOT AVAILABLE)
**First Use in Commerce Date:** (DATE NOT AVAILABLE)

## ADDITIONAL INFORMATION

**Disclaimer:** "HOT DOG"

## MADRID PROTOCOL INFORMATION

(NOT AVAILABLE)

## PROSECUTION HISTORY

2007-05-29 - Extension 3 granted

2007-05-29 - Extension 3 filed

2007-05-29 - TEAS Extension Received

2007-01-18 - Extension 2 granted

2007-01-18 - Extension 2 filed

2007-01-18 - TEAS Extension Received

2006-09-21 - Extension 1 granted

2006-08-25 - Extension 1 filed

2006-08-25 - PAPER RECEIVED

2006-03-14 - Notice of allowance - mailed

2005-12-20 - Published for opposition

2005-11-30 - Notice of publication

2005-10-29 - Law Office Publication Review Completed

2005-10-21 - Assigned To LIE

2005-10-18 - Examiner's amendment mailed

2005-10-18 - Approved for Pub - Principal Register (Initial exam)

2005-10-18 - Examiners Amendment -Written

2005-10-13 - Assigned To Examiner

2005-03-28 - New Application Entered In Tram

---

## ATTORNEY/CORRESPONDENT INFORMATION

---

**Correspondent**
JOHN W PROVO
MASLON EDELMAN BORMAN & BRAND LLP
3300 WELLS FARGO CTR
90 S 7TH ST
MINNEAPOLIS MN 55402
Phone Number: (612) 672-8331

**Domestic Representative**
John W. Provo
Phone Number: (612) 672-8331

---

Side - 1



NOTICE OF APPROVAL
OF EXTENSION REQUEST
MAILING DATE: May 31, 2007

A Notice of Allowance issued for the trademark application identified below on Mar 14, 2006. The THIRD request for extension of time to file a Statement of Use has been approved. Applicant must continue to file extension requests every 6 months calculated from the date the Notice of Allowance was issued until a Statement of Use is filed. Please note that a Statement of Use cannot be filed more than 36 months from the issuance date of the Notice of Allowance.

For further information, visit our website at: http://www.uspto.gov or call the Trademark Assistance Center at 1-800-786-9199.

SERIAL NUMBER:    78591560
MARK:             HOT DOG HALL OF FAME
OWNER:            Schussler Creative, Inc.

Side - 2

UNITED STATES PATENT AND TRADEMARK OFFICE
COMMISSIONER FOR TRADEMARKS
P.O. BOX 1451
ALEXANDRIA, VA  22313-1451

FIRST-CLASS MAIL
U.S POSTAGE
PAID

JOHN W PROVO
MASLON EDELMAN BORMAN & BRAND LLP
3300 WELLS FARGO CTR
90 S 7TH ST
MINNEAPOLIS, MN  55402

# EXHIBIT 2

**From:** Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
**Sent:** Sunday, June 10, 2007 1:22 PM
**To:** Steve Schussler
**Cc:** ir@hosthotels.com; reuteman@RockyMountainNews.com; readerep@courant.com;
dhoekstra@suntimes.com; peter.rowe@uniontrib.com
**Subject:** Dear Mr. Schussler:

CEASE & DESIST:

This is the SECOND time we've had to advise you that the concept, name, URL and good reputation of **The Hot Dog Hall Of Fame** is solely our intellectual property(s).

To refresh your memory a bit: we met at the Fisherman's Wharf location of **The Rainforest Cafe** shortly after it opened.

You tried to buy our collection and then, when we mentioned our obligation to the hundreds of contributors that made our World Class collection possible, you told us that you were just going to take our concept.

Shortly after that meeting, we discovered that you had one of your minions from **Gold Coast Hot Dogs** register several versions of our URL.

We responded with a formal demand that you Cease & Desist at that time.

If your memory is a little hazy, we'd be glad to forward that letter to you and all of the addressees above.

However, if you'd like to eventually fund it all for **US**, just keep doing what you're doing and we'll turn the lawyers loose on you...

You have been warned, AGAIN!

CEASE & DESIST

**With Relish,**

**Uncle Frank**



EXHIBIT 2

-37-

The Hot Dog Hall Of Fame

www.thehotdoghalloffame.com


PS: We've already contacted Host Marriott, Levy Restaurants, Success Magazine, The Hartford Courant, Rocky Mountain News, The Chicago Sun Times, The San Diego Union Tribune and Chain Leader Magazine.


NOTE: For those of you who received this as a BCC file (Blind Copy), you can see what Mr. Schussler is attempting to do in this article: http://www.successmagazine.com/article.php?article_id=54

There's another one here: http://www.chainleader.com/web-exclusives/schussler.asp

And Mr. Schussler's web site: www.schusslercreative.com

# EXHIBIT 3

**From:** John Provo [mailto:John.Provo@maslon.com]
**Sent:** Monday, June 11, 2007 6:02 PM
**To:** Mr.HotDog@Cox.Net
**Cc:** Holod, Doug; Steve Schussler
**Subject:** Response to Demand Letter

Dear Mr. Bernier:

This firm represents Schussler Creative, Inc.  Please see the attached response to your demand regarding our client's "HOT DOG HALL OF FAME" service mark for restaurant services, retail store and wholesale distributorship services.

**John Provo | Partner**
john.provo@maslon.com | bio
(p) 612.672.8331 | (f) 612.642.8331

MASLON
Maslon Edelman Borman & Brand, LLP.
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
www.maslon.com | map/directions
**When it matters most.**

**CIRCULAR 230 DISCLOSURE:** Pursuant to Circular 230 promulgated by the Internal Revenue Service, if this email, or any attachment hereto, contains advice concerning any federal tax issue or submission, please be advised that it was not intended or written to be used, and that it cannot be used, for the purpose of avoiding federal tax penalties unless otherwise expressly indicated.

**CONFIDENTIALITY NOTICE:** This e-mail transmission and any attachments accompanying it contain confidential information belonging to the sender that may be protected by the attorney-client or work product privileges. The information is intended only for the use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Any unauthorized interception of this transmission is illegal. If you have received this transmission in error, please notify the sender by reply e-mail, and then destroy all copies of this transmission.

EXHIBIT 3

–39–

# EXHIBIT 4A

# MASLON
MASLON EDELMAN BORMAN & BRAND, LLP

p 612.672.8200        3300 WELLS FARGO CENTER
f 612.672.8397        90 SOUTH SEVENTH STREET
www.maslon.com        MINNEAPOLIS, MINNESOTA
                      55402-4140

June 11, 2007

**John W. Provo**
Direct Phone: (612) 672-8331
Direct Fax: (612) 642-8331
John.Provo@maslon.com

SENT VIA ELECTRONIC MAIL AND CMRRR
Steven Bernier
1030 Whistler Drive
Suisun, CA  94585

    Re:    HOT DOG HALL OF FAME Trademark

Dear Mr. Bernier:

    This firm represents Schussler Creative, Inc., the owner of U.S. Trademark Application Serial No. 78/591560 for the "HOT DOG HALL OF FAME" trademark for restaurant services, retail store and wholesale distributorship services. Your e-mail correspondence addressed to Steve Schussler and sent to various media organizations and hospitality companies with which Schussler Creative has current or anticipated future economic relationships have been provided to us for consideration and response.

    As the creator of some of the nation's most innovative restaurants, Schussler Creative has great respect for the intellectual property rights of others. After careful review and investigation, however, Schussler Creative cannot agree that you own any rights in the "HOT DOG HALL OF FAME" trademark.

    It is well-settled law that trademark rights are established only through use for an actual product or service. Such use must be genuine for products or services offered to the public, and not a mere fantasy or ambition to launch a business at some future date. Similarly, mere self-promotion does not create such rights. Your website consists of personal journal entries and blog entries about cars, movie reviews, people, family members' library cards, etc., rather than a business. While no doubt of personal interest to you, these personal narratives about your hobbies and interests do not provide a legal basis for you to prevent others from pursuing commercial business endeavors.

    Your claim ". . . that the concept, name, URL and good reputation of The Hot Dog Hall Of Fame is solely our intellectual property(s).[sic]" vastly overreaches any legitimate rights that you may have. As noted above, ownership rights derive from actual ". . . use [of a trademark] on a commercially realistic scale, in the ordinary course of trade," and not merely as an attempt to appropriate such rights for future use. Sporadic or casual use of a name also creates no enforceable rights. As your website indicates, you have assembled a personal collection of hot dog memorabilia as a hobby, and not as a business. A variety of media sources document the personal, noncommercial nature of your collection.

527926.1



Steven Bernier
June 11, 2007
Page 2

# MASLON

Your correspondence also overlooks the fact that other organizations have and continue to use the slogan "Hot Dog Hall of Fame" for wiener eating contests, promotions and similar events, including the following businesses:

1.    The Corner Bar, Rockford, Illinois, which maintains a "Hot Dog Hall of Fame" consisting of the names of over 5,000 participants in the bar's competitive eating event (see Exhibit A attached).

2.    Vienna Beef Limited, Chicago, Illinois, which maintains a "Vienna Beef Hot Dog Hall of Fame" recognizing delicatessen operators that sell Vienna beef products (see Exhibit B attached).

3.    Lancaster Jet Hawks, Lancaster, California, which offers induction into its "Wienie Wednesday Hot Dog Hall of Fame" to any customer who "buy(s) 15 hot dogs at one time (see Exhibit C attached).

This is an important issue for our client. Your deliberate publication of false and misleading statements to media organizations and companies in the hospitality industry with whom Schussler Creative has either current or anticipated future economic relationships defames Schussler Creative and Steve Schussler individually. To start with, we have two demands:

1.    Your immediate assurance that you will cease and desist sending defamatory statements regarding Schussler Creative or any of its principals or agents; and

2.    Your apology and agreement to take responsibility for all such misrepresentations.

I look forward to hearing from you.

Sincerely,

John W. Provo

JWP/cw
Enclosures

cc:    Doug Holod
       Steve Schussler

527926.1

Hot Dog Hall of Fame - Rockford Corner Bar                    Page 1 of 2

*EXHIBIT A*



**THE CORNER BAR**
**A ROCKFORD TRADITION**
*Food. Friends. Fun.*

**GIFT CARDS**
**MERCHANDISE**
**HOT DOG HALL OF FAME**
**OUR MENU**
**WHAT'S HAPPENING**
**CONTACT US**
**HISTORY**
**DAILY SPECIALS**
**LOCATION**

## Hot Dog Hall of Fame

The Corner Bar's Hot Dog Hall of Fame was established in 1
Since then, more than 5,000 names have been added to th
Dog Hall of Fame. Our longest-reigning champion was Shar
VanDuinen who ate 42 ½ chili dogs in the four-hour time
allotment in March 1982 - a record that stood for 23 years.

In December 2005, Balinda Gould gulped down 43 hot dogs
pass Sharon and be crowned our Amateur Champion. Then
March 2006, a number of competitors from the Internation
Federation of Competitive Eating descended to take on wha
perhaps the world's only chili-dog competition. Tim Janus b
Joey Chestnut, Patrick Bertoletti and Hall Hunt to eat 43 1/
and become the reigning Professional Champion.

**Amateur Champion - Balinda Gould**

    

**Professional Champion - Tim Janus**

 

E-newsletter Signup    **Email Address**

**The Corner Bar - 31 N Main St - Rockford, MI 49341 - Restaurant 616.866.9866 - C**

©2007 Rockford Corner Bar

http://rockfordcornerbar.com/hall_of_fame.asp                    6/11/2007





EXHIBIT B

| PRODUCTS | ABOUT US | SHOP | HOT DOG CULTURE |

## Hall of Fame

**The Vienna Beef Hot Dog Hall of Fame**

Vienna Beef has been around for over 100 years and has gained a reputation "Chicago's Hot Dog™". In honor of this, Vienna has started to recognize the F stands that have been great customers and great friends.

Hot dog and delicatessen operators become eligible for induction into the Hall based on a variety of criteria including how long they have been representing Beef products. The youngest of the bunch having been around for about 20 y the oldest almost 50.

Criteria also considered include the vendor's contribution to their community, philanthropic leadership and overall commitment to the quality of their produ satisfaction of their customers.

**Click on the pictures below for an in depth look at each Hall of Fame S**

**Hot Dog Culture**

History of the Chicago
Hot Dog

Building a Chicago
Style Hot Dog

Vienna Beef Hot Dog
Stand Gallery

Family Fun

Hall of Fame


**Arnies**


**Bob O's**


**Chuc**


**Fratello's**


**Herm's Palace**


**Hot**


**Hot Dog Island**


**Mickey's Hot Dogs**


**Origi**

1 2 3 4 | Next >>

**HOME    CAREERS    CAFE MENU    VIENNA BEEF LOCATOR    PRIVACY**

Lancaster JetHawks - News - Photo Galleries                                     Page 1 of 2



## HOT DOG HALL OF FAME

Celebrate Weenie Wednesday's by getting hot dogs for just $1 throughout the game. Buy 15 hot
dogs at one time, and you'll be inducted into the Weenie Wednesday Hot Dog Hall of Fame!



BECOME A PART OF

http://www.jethawks.com/news/photos/view/?id=4                          6/11/2007

# EXHIBIT 5

**From:** Dave Claflin [mailto:dclaflin@reddevelopment.com]
**Sent:** Tuesday, September 18, 2007 1:47 PM
**To:** Steve Graham; Steve Schussler
**Subject:** FW: Again, We are The Hot Dog Hall Of Fame

**From:** Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
**Sent:** Tuesday, September 18, 2007 11:18 AM
**To:** Dave Claflin
**Subject:** Again, We are The Hot Dog Hall Of Fame

Please be advised that WE are The Hot Hog Hall Of Fame, not that liar, thief and con man Steve Schussler.

We've been doing this since 1976 and he is attempting to steal our concept, good name, business name, URL's, etc.

We made the mistake of telling him about us at a meeting we had with him at the Grand Opening of the Fisherman's Wharf (San Francisco) Rainforest Cafe in 2000.

We have also been talking to someone within his organization who tells us that he may not actually own another one of the concepts he's currently touting.

You can read all about it (we've already served him 2 Cease & Desist demand letters) on our web site: www.thehotdoghalloffame.com

Go to "**About Us**" and select the hyperlink in the body of the text portion of that page for "**Hot Dogs In A Cold World**".

**With Relish,**

**Uncle Frank**



# EXHIBIT 6



Airbrush rendering by Joe Roche

**"HOT DOGS IN A COLD WORLD" - The Final Chapter?**

**16 June 2007**

**Dear fellow hot dog lovers, family, friends, contributors and supporters:**

As most of you know, we've been working on our book ("Hot Dogs In A Cold World") for at least the last 15 years now, from before we got our first PC in 1996. You've seen much of the material in various other forms, but mainly in our newsletter "**The Frankfurter Chronicles**" (who'd have ever thought that I could write about hot dogs for 11 plus years now?). The part that had eluded us all of this time was the ending, as none of us can see into the future...

We may now have that ending although it isn't anything we'd have ever imagined and it's certainly nothing that any of us, including you, our wonderful fellow hot dog lovers, family, friends, supporters and contributors, deserve.

Back in the Spring of 2000, we became aware of an up-and-coming phenomena: the Rainforest Cafe.

It combined spectacular design, state-of-the-art animatronics, first class marketing with mediocre, mostly frozen fare and people were spending hours waiting in line just to see the place. That wasn't the main appeal to us however; it was the man behind it all and his innovative way of making his point. **Steve Schussler**, the founder, had spent several hundred thousand dollars to convert his house into a working model of the chain he hoped to build.

For years, we had resisted doing the same in our house as I'm claustrophobic just to start with, we'd seen other of our friends go the same route and besides, who wants to be known as that weirdo who lives in a museum?

We emailed Mr. Schussler, telling him how much we respected his accomplishments, that we were a struggling Hall Of Fame and that we were looking for a partner to help bring it all to life. To our surprise, Mr. Schussler responded and we traded slightly over 60 emails in a couple of weeks, describing who we are and what we do.

Then he invited us to meet him at the Grand Opening of their new location at Fisherman's Wharf in San Francisco.

Needless to say, we were ecstatic (but after years of similar meetings, so far resulting in absolutely nothing, we were cautiously optimistic at best).

Around the same time, an old friend was just starting his new job at that Rainforest Cafe location, a likable guy who had once been our boss when the wife and I worked at Denny's.

I won't name him at this time but if we ever wind up in court, he did witness it all...

The day before the meeting, our son had come down with the flu and I got hit with it full force the morning of that meeting, but I was going anyway. How often do you get to meet a guy worth an estimated half a billion bucks (at the time) who also seems to appreciate what you do? I rented a car and drug myself to the meeting (...wild horses and all that...). When we got there, Mr. Schussler wasn't there and I sat around waiting almost an hour before he finally showed up. I spent much of that time talking to our friend who worked there and soon discovered that Mr. Schussler and several of his officers had taken off moments before I had arrived. When he finally showed up, he almost immediately brushed me off. He said he was going to build **The Hot Dog Hall Of Fame** himself; what does he need me for (then why am I even here)? I left, thinking it a huge waste of my time and what an arrogant little asshole...

A few weeks later, **Chris Masterson** in Seattle emailed to say he'd "Googled" us and that someone had set up several very similar web sites (www.hotdoghalloffame.com, www.hotdoghalloffame.net & www.hotdoghalloffame.org).

After a bit of research, we discovered it to be an employee of Mr. Schussler's chain of weenie stands in the Chicago area, **Gold Coast Hot Dogs**, and sent him a "Cease & Desist" demand letter (See **EXHIBIT A** below).

We also contacted **ICANN**, the internet governing body to protest these infringements and apparently, they eventually abandoned these names and it was all over, so we thought...

Over the years, we've had to defend a number of our business names and that's a nasty process and we were glad this problem had just went away.

**Fast Forward: 7 Years Later**

Last Saturday, I "Googled" **The Hot Dog Hall Of Fame** to see if I could find a link to an internet news agency that had done several features about us only to discover that Mr. Schussler was back at it again. He'd done interviews in several online and print publications, asserting it was he who had come up with the name, concept, URL's, etc and that he had the world's largest collection of hot dog stuff...

I should probably point out a couple of things here:

1) I don't think he has the World's largest collection as we've acquired this stuff since approximately **1977** (besides, that's not really important) as

2) there's a bit more to being a true Hall Of Fame than the collection (there are certain PUBLIC obligations, just to start with or have you overlooked that, Mr. Schussler?), and

3) there are at least a dozen other people out there seriously collecting hot dog stuff (just check out the hot dog action on Ebay).

4) One of the ideas he's touting, a veritable wall of mustards from around the world, is a "throw out" concept I gave him during our brief meeting, a tactic the CIA calls "disinformation", which we sometimes use to check someone's trust-worthiness (we've been seriously ripped off before and can show you several other examples of it on certain other web sites) and

5) we long ago donated all of our mustard stuff to the **Mount Horeb Mustard Museum** and they already have the "Wall of Mustard"...

Needless to say, after discovering that he was up to his same old tricks again, we emailed him another "Cease & Desist" (See EXHIBIT B below).

We also emailed everyone listed in the article as well as the publishers themselves to say that WE are The Hot Dog Hall Of Fame.

He emailed back, attempting to assert his right to the name, concept, URL's, etc and threatening to sue US...

Over the next few days, we talked to a number of lawyers and if we decide to go that route, it generally boils down to whose wallet is bigger. We've had a few days to think about it now and we've come to a decision: we can't possibly hope to prevail in the legal system as he's far more affluent than we are or ever really hope to be. Instead, we are going to "poison the well" so to speak. If he thinks he can steal from us, he has another thing coming. We didn't spend most of our lives doing this, at enormous expense to ourselves, just to roll over and play dead so he can walk right in and take whatever he wants.

After a quick look through our (print) files, we came up with literally hundreds of letters from the years we've been in The Hot Dog Hall Of Fame business. We had planned on adding several dozen of them to this web site but halfway through scanning them all, I saved them to an email message and will show them to anyone who hasn't watched us do what we do for the last 30 years or so..

A partial list:

A letter from The National Hot Dog & Sausage Council (1980)
A letter to the the Founder / President of the Doggy Diner chain (1981)
A letter from Edelman Public Relations (1981)
A "Cease & Desist" letter from our attorney, John Pope of San Jose (1982)
A letter to The McFly Restaurant Group (1983)
A letter to David Letterman's head writer (1983)
A letter from J Michael Zabkar, the Founder / President of Zab's White Hots in Rochester, New York (1983)
A letter to Nolan Bushnell, creator of Pong, Atari and Pizza Time Theater (1983)
A letter to "Evening Magazine" (1983)
A letter to "The San Francisco Chronicle (1983)
A letter from The Reagan White House (1983)
Several letters from KTEH Channel 54 (PBS) in San Jose (1983)
Another letter to "The San Francisco Chronicle" (1983)
A second letter from The Reagan White House (1983)
A letter from Donald Trump (1990)
A letter from The Clinton White House (1995)
Numerous mentions in Herb Caen's column in "The San Francisco Chronicle" (early 1990's)
A letter from author Michael Karl Witzel (1993)
A letter from mega producer Jeffrey Katzenberg and mega director Steven Spielberg (1995)
A letter to actor Bruce Willis (1996) and
Numerous letters from Center for the Arts in San Francisco's Yerba Buena Gardens (1996) from Hall Of Fame Hall Of Fame, a show featuring exhibits from 54 halls of fame all across the US.

Then there are the several hundred newspaper articles, radio spots, tv appearances and promotional stunts we've participated in over the years.

And I should probably point out that Mr. Schussler was approximately 14 years old in 1980 so I sincerely doubt he can stake any sort of claim that far back...

Then, every time he uses our name, concept, variants of our URL, etc, we will email these individuals the link to the site and point out that they are being conned by a one hit wonder (Rainforest Cafe really wasn't all that successful when you look under the financial hood) and that WE are The Hot Dog Hall Of Fame and have fulfilled all of the duties as The Hot Dog Hall Of Fame for almost 30 years now.

Essentially, he has placed us in the position of having **NOTHING** to lose now and we **WELCOME** him to sue us.

I'm old and have been sick (with numerous serious health issues) for the past 10 years now, I'm unemployed, I'm broke, I don't even have a car at the moment, much less own a house, the wife is only working 2 shifts a week as a part time waitress at a small, downscale, tourist cafe, we have no money, $7000 plus of credit card debt and neither of us are eligible for welfare, unemployment or Social Security. The only thing keeping us afloat is the fact that our son has been kind enough to loan us a truck and we couldn't even pay our rent without his (and the rest of the family's) help as it costs us twice as much to live here as it did up north, so I'm ready to stare him down to the bitter end (and I'm hoping he is dumb enough to have me arrested).

And talk about a real **David-vs-Goliath** scenario; the newspapers would love this story, especially if he's foolish enough to stay this course to disaster, legally harassing us after he's already stolen from us (and adding insult to injury)...

And, as many of you know, we had planned on leaving this wonderful collection to The Smithsonian should we fail to give it the home it deserves (they say they'd love to have it) but it could end up in crates in the basement so we're now thinking of giving it to a very well known restaurateur in New York City (and all attendant rights to the name, concept, URL's etc) so Mr. Schussler will have someone his own size to pick on (if he actually had the balls for it).

Anyone who knows us can also attest to the fact that we are meticulous record keepers as well (you have to be, with the nature of what we are doing, the business climate in general and our own personal finances, etc) but what Mr. Schussler may not be aware of is that we also saved the 60 some email messages we sent him (and his replies to them) and can prove what he knew and when he knew it.

We will produce them when and if he dares to drag us into court.

With Relish,

Uncle Frank

PS: And doesn't this also go to show what this concept is really worth, if a guy with that much to lose is willing to steal it from us and risk **everything** that he owns?

I mean, I'm kind of flattered, but...

---

**EXHIBIT A:**

**27 July 2000**

**Mr. James Rittenberg**
**State & Hubbard Corp.**
**5 W. Hubbard St.**
**Chicago, IL 60610**

**Dear Mr. Rittenberg:**

Apparently you are confused and do not realize that we plan to sue you and Mr. Schussler back into the stone age should this farce of an attempt to usurp our URL, our business concepts and our good name continue.

We know Mr. Schussler could stand to lose a few million one way or the other, but the question you must ask yourself is whether you can stand to lose everything you have worked for all of your life, Mr. Rittenberg.

Abandon the URL's, and the use of our name and our concept immediately or suffer the dire legal consequences.

We did not spend over half of our lives putting this together to roll over and play dead when someone takes a liking to our concept and name and decide to appropriate them for themselves, no matter how much money they may have.

I am, among many other things, a writer Mr. Rittenberg and have friends in high places in major newspapers all over the country (including **The Chicago Sun Times**). Would you like to see this story on the front page there (ask **Dave Hoekstra** if he knows **Uncle Frank**)?

And, having used and vigorously defended the name of **The Hot Dog Hall Of Fame** for over 20 years, you really don't have a prayer of prevailing, legally. If you insist in continuing this folly, be advised that we plan to first blacken both of your eyes (yours and Mr. Schussler's) professionally, first in the papers and on TV, then we will see you in court.

In this particular instance, we can not only prove what Mr. Schussler knew, but when he knew it.

For example, he registered (through your offices as an employee of a company he holds) these URL's after he had read our material (and before we had met in San Francisco, where he obviously forgot to tell us he was planning on stealing us blind).

By the time this is over, should you continue in this manner, we will be the owners of Gold Coast Hot Dogs and hopefully a substantial share of Rainforest Cafe and maybe even a house or two as well (both yours and Mr. Schussler's).

Is it really worth it to you, Mr. Rittenberg?

Are you going to follow Mr. Schussler into a fight neither of you can win and risk losing everything you have or will you do the right thing, abandon our concept, name and URL and walk away?


You have been warned.


The next time you will hear from us will be through our attorneys.

We won't have a bit of trouble finding a real mean lawyer when they realize how much money is in Mr. Schussler's pocket.

Can you afford the legal bills this may cost you?


Cease and Desist.


**J Frank Webster**
**President**
**The Hot Dog Hall Of Fame**
**PO Box 658**
**Fairfield, Ca. 94533**

**The Hot Dog Hot Line**
**(707) 426-4618**


PS: We have already contacted www.register.com and explained that we own the URL www.thehotdoghalloffame.com and that your registering the domain names you did is

A) too similar as to be confusing and essentially the same name and

B) done in Bad Faith as Mr. Schussler had received certain materials from us before that date (we have copies of all of our correspondence with Mr. Schussler to substantiate our position) and that he knew these concepts, names and URL's were our intellectual property.


You will also notice that this message has been sent to multiple addressees.

Some of them are stalwarts within the industry, and others are business writers or television people.


http://www.thehotdoghalloffame.com/page15.htm                                    10/4/2007

Several copies will follow this via regular mail and Registered Mail with Return Receipt Requested which hereby effectively constitutes legal delivery.

Again, we admonish you Mr. Rittenberg, Cease & Desist.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**EXHIBIT B:**

**10 June 2007**

**Dear Mr. Schussler:**

**CEASE & DESIST:**

This is the **SECOND** time we've had to advise you that the concept, name, URL and good reputation of **The Hot Dog Hall Of Fame** is solely our intellectual property(s).

To refresh your memory a bit: we met at the Fisherman's Wharf location of The Rainforest Cafe shortly after it opened.

You tried to buy our collection and then, when we mentioned our obligation to the hundreds of contributors that made our World Class collection possible, you told us that you were just going to take our concept.

Shortly after that meeting, we discovered that you had one of your minions from **Gold Coast Hot Dogs** register several versions of our URL.

We responded with a formal demand that you **Cease & Desist** at that time.

If your memory is a little hazy, we'd be glad to forward that letter to you and all of the addressees above.

However, if you'd like to eventually fund it all for US, just keep doing what you're doing and we'll turn the lawyers loose on you...

You have been warned, AGAIN!

**CEASE & DESIST**

**With Relish,**

**Uncle Frank**

**PS:** We've already contacted Host Marriott, Levy Restaurants, Success Magazine, The Hartford Courant, Rocky Mountain News, The Chicago Sun Times, The San Diego Union Tribune and Chain Leader Magazine.

http://www.thehotdoghalloffame.com/page15.htm                                    10/4/2007

# EXHIBIT 7

**From:** Mayberry, Adam [mailto:amayberry@cityofsparks.us]
**Sent:** Tuesday, September 18, 2007 12:49 PM
**To:** Dave Claflin
**Cc:** Carey, Shaun
**Subject:** FW: Hello from The Hot Dog Hall Of Fame

Hi Dave - The Mayor received this message from the noted individual.

Just wanted to let you know about it.  Let me know if you have any additional insight.

Adam

**From:** Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
**Sent:** Tuesday, September 18, 2007 9:10 AM
**To:** Martini, Geno
**Cc:** Chris Masterson
**Subject:** Hello from The Hot Dog Hall Of Fame

18 September 2007

The Honorable Geno Martini
Mayor
Sparks, Nevada

Dear Mayor Martini:

Please be advised that WE are The Hot Hog Hall Of Fame, not that liar, thief and con man Steve Schussler.

We've been doing this since 1976 and he is attempting to steal our concept, good name, business name, URL's, etc.

We made the mistake of telling him about us at a meeting we had with him at the Grand Opening of the Fisherman's Wharf (San Francisco) Rainforest Cafe in 2000.

file://C:\Documents and Settings\jdarda\Local Settings\Temp\XPGrpWise\46F7D0E5MAS...  9/27/2007

EXHIBIT 7    -52-

We have also been talking to someone within his organization who tells us that he may not actually own another one of the concepts he's currently touting.

You can read all about it (we've already served him 2 Cease & Desist demand letters) on our web site: www.thehotdoghalloffame.com

Go to "About Us" and select the hyperlink in the body of the text portion of that page for "Hot Dogs In A Cold World".

In the near future, we plan to go VERY public with this situation and are letting your office know about it so that you will be properly prepared to deal with the fallout this will cause.

With Relish,

**Uncle Frank**

PS: Most of my wife's family is from Nevada and you may recognize some of their names (previous office holders, car dealership owners, etc).



www.thehotdoghalloffame.com

# EXHIBIT 8

-----Original Message-----
From: Dan Lowe <DLowe@reddevelopment.com>
To: Steve Schussler
Sent: Fri Jun 15 10:25:33 2007
Subject: RE: From the next issue of "The Frankfurter Chronicles' (The Newsletter with Relish)

Doesn't look like they are even a restaurant?

Dan Lowe
RED Development, LLC
4717 Central
Kansas City, MO 64112
816.777-2833 direct
816-777-3501 fax
dlowe@reddevelopment.com
www.reddevelopment.com


This electronic mail message contains CONFIDENTIAL information which is
(a) ATTORNEY-CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY
IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b)
intended only for the use of the Addressee(s) named herein. If you are
not an Addressee, or the person responsible for delivering this to an
Addressee, you are hereby notified that reading, copying or distributing
this message is prohibited. If you have received this communication in
error, please immediately notify us by telephone, and return the
original message to us at the above address via the U.S. Postal Service.
Thank you.



-----Original Message-----
From: Steve Schussler [mailto:steven@schusslercreative.com]
Sent: Friday, June 15, 2007 10:26 AM
To: Dan Lowe
Subject: Re: From the next issue of "The Frankfurter Chronicles' (The
Newsletter with Relish)

Already have my attorney on it!
----------------------------
Sent using BlackBerry


-----Original Message-----
From: Dan Lowe <DLowe@reddevelopment.com>
To: Steve Schussler



EXHIBIT 8

Sent: Fri Jun 15 10:02:08 2007
Subject: FW: From the next issue of "The Frankfurter Chronicles' (The Newsletter with Relish)

See below.  I will follow with another email we received.  Strange, but we ought to discuss.  dan


Dan Lowe

RED Development, LLC

4717 Central

Kansas City, MO  64112

816.777-2833 direct

816-777-3501 fax

dlowe@reddevelopment.com <mailto:dlowe@reddevelopment.com>

www.reddevelopment.com <http://www.reddevelopment.com>


This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY-CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying or distributing this message is prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.

---

From: Dave Claflin
Sent: Friday, June 15, 2007 8:14 AM
To: Dan Lowe
Subject: FW: From the next issue of "The Frankfurter Chronicles' (The Newsletter with Relish)

From: Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
Sent: Thursday, June 14, 2007 7:49 PM
To: Dave Claflin
Subject: PS: From the next issue of "The Frankfurter Chronicles' (The
Newsletter with Relish)

Dear fellow hot dog lovers, family, friends, contributors and
supporters:

As most of you know, we've been working on our book ("Hot Dogs In A Cold
World") for at least the last 15 years now, from before we got our first
PC in 1996. You've seen much of the material in various other forms, but
mainly in our newsletter "The Frankfurter Chronicles" (who'd have ever
thought that I could write about hot dogs for 11 plus years now?). The
part that had eluded us all of this time was the ending, as none of us
can see into the future...

We may now have that ending although it isn't anything we'd have ever
imagined and it's certainly nothing that any of us, including you, our
wonderful fellow hot dog lovers, family, friends, supporters and
contributors, deserve.

Back in the Spring of 2000, we became aware of an up-and-coming
phenomena: the Rainforest Cafe.

It combined spectacular design, state-of-the-art animatronics, first
class marketing with mediocre, mostly frozen fare and people were
spending hours waiting in line just to see the place. That wasn't the
main appeal to us however; it was the man behind it all and his
innovative way of making his point. Steve Schussler, the founder, had
spent several hundred thousand dollars to convert his house into a
working model of the chain he hoped to build.

For years, we had resisted doing the same in our house as I'm
claustrophobic just to start with, we'd seen other of our friends go the
same route and besides, who wants to be known as that weirdo who lives

in a museum?

We emailed Mr. Schussler, telling him how much we respected his accomplishments, that we were a struggling Hall Of Fame and that we were looking for a partner to help bring it all to life. To our surprise, Mr. Schussler responded and we traded slightly over 60 emails in a couple of weeks, describing who we are and what we do. Then he invited us to meet him at the Grand Opening of their new location at Fisherman's Wharf in San Francisco. Needless to say, we were ecstatic (but after years of similar meetings, so far resulting in absolutely nothing, we were cautiously optimistic at best). Around the same time, a friend of ours was just starting his new job at that same Rainforest Cafe location, a very likable guy who had once been our boss when the wife and I worked at Denny's. I won't name him at this time but if we ever wind up in court, he witnessed it all...

The day before the meeting, our son had come down with the flu and I got hit with it full force the morning of that meeting, but I was going anyway. How often do you get to meet a guy worth an estimated half a billion bucks (at the time) who also seems to appreciate what you do? I rented a car and drug myself to the meeting (...wild horses and all that...). When we got there, Mr. Schussler wasn't there and I sat around waiting almost an hour before he finally showed up. I spent much of that time talking to our friend who worked there and soon discovered that Mr. Schussler and several of his officers had taken off moments before I had arrived. When he finally showed up, he almost immediately brushed me off. He said he was going to build The Hot Dog Hall Of Fame himself; what does he need me for (then why am I even here)? I left, thinking it a huge waste of my time and what an arrogant little asshole...

A few weeks later, Chris Masterson in Seattle emailed to say he'd "Googled" us and that someone had set up several very similar web sites (www.hotdoghalloffame.com, www.hotdoghalloffame.net & www.hotdoghalloffame.org).

After a bit of research, we discovered it to be an employee of Mr. Schussler's chain of weenie stands in the Chicago area, Gold Coast Hot Dogs, and sent him a "Cease & Desist" demand letter.

We also contacted ICANN, the internet governing body to protest these infringements and apparently, they eventually abandoned these names and it was all over, so we thought...

Over the years, we've had to defend a number of our business names and that's a nasty process and we were glad this problem had just went away.

Fast Forward 7 Years:

Last Saturday, I "Googled" The Hot Dog Hall Of Fame to see if I could find a link to a local internet news agency that had done several features about us only to discover that Mr. Schussler was back at it again. He'd done interviews in several online and print publications, asserting it was he who had come up with the name, concept, URL's, etc and that he had the world's largest collection of hot dog stuff...

I should probably point out a couple of things here:

1) I don't think he has the World's largest collection as we've acquired this stuff since approximately 1977 (besides, that's not really important) as

2) there's a bit more to being a true Hall Of Fame than the collection (there are certain PUBLIC obligations, just to start with or have you overlooked that, Mr. Schussler?), and

3) there are at least a dozen other people out there seriously collecting hot dog stuff (just check out the hot dog action on Ebay).

4) One of the ideas he's touting, a veritable wall of mustards from around the world, is a "throw out" concept I gave him during our brief meeting, a tactic the CIA calls "disinformation", which we sometimes use to check someone's trust-worthiness (we've been seriously ripped off before and can show you several other examples of it on certain other web sites) and

5) we long ago donated all of our mustard stuff to the Mount Horab Mustard Museum and they already have the "Wall of Mustard"...

Needless to say, after discovering that he was up to his same old tricks again, we emailed him another "Cease & Desist".

We also emailed everyone listed in the article as well as the publishers themselves to say that WE are The Hot Dog Hall Of Fame.

He emailed back, attempting to assert his right to the name, concept, URL's, etc and threatening to sue US...

Over the next few days, we talked to a number of lawyers and if we decide to go that route, it generally boils down to whose wallet is bigger. We've had a few days to think about it now and we've come to a decision: we can't possibly hope to prevail in the legal system as he's far more affluent than we are or ever really hope to be. Instead, we are going to "poison the well" so to speak. If he thinks he can steal from us, he has another thing coming. We didn't spend the majority of our lives doing this, at enormous expense to ourselves, just to roll over and play dead so he can walk right in and take whatever he wants.

In the near future, we plan to add several dozen letters to our web site which are to / from The Hot Dog Hall Of Fame and The National Hot Dog & Sausage Council (1980 ), the Founder / President of The Doggy Diner (1981), a letter from Edelman Public Relations (1981), a Cease & Desist" letter from our attorney, John Pope of San Jose (1982), a letter to the McFly Restaurant Group, another to David Letterman's head writer , one from J Michael Zabkar, the Founder / President of Zab's White Hots in Rochester, New York, a letter to Nolan Bushnell (creator of Pong, Atari and Pizza Time Theater),a letter to The San Francisco Chronicle, a letter to "Evening Magazine", a letter from the Reagan White House, a couple from KTEH Channel 54 (PBS) in San Jose, a second letter to The San Francisco Chronicle, a second letter from The White House, a job application from our first employee (all from 1983), a letter from Donald Trump (1990), a letter from the Clinton White House (1995), numerous mentions in Herb Caen's column in The San Francisco Chronicle (early 1990's), a letter from author Michael Karl Witzel (1993), a letter from mega producer Jeffrey Katzenberg and director Steven Spielberg (1995), a letter to actor Bruce Willis and  numerous letters from Center for the Arts in San Francisco's Yerba Buena Gardens (1996) from Hall Of Fame Hall Of Fame, a show featuring exhibits from 54 halls of fame all across the US (some say we stole the show).

I should probably point out that Mr. Schussler was approximately 14 years old in 1980 so I sincerely doubt he can stake any sort of claim that far back...

Then, every time he uses our name, concept, variants of our URL, etc, we will email these individuals the link to the site and point out that they are being conned by a one hit wonder (Rainforest Cafe wasn't all that successful when you look under the financial hood) and that WE are The Hot Dog Hall Of Fame and have fulfilled all of the duties as The Hot Dog Hall Of Fame for almost 30 years now.

Essentially, he has placed us in the position of having NOTHING to lose now and we welcome him to sue us.

I'm old and have been sick (with numerous serious health issues) for the past 10 years now, I'm unemployed, I'm broke, I don't even have a car at the moment, much less own a house, the wife is only working 2 shifts a week as a part time waitress at a small, downscale, tourist cafe, we have no money, $7000 plus of credit card debt and neither of us are eligible for welfare, unemployment or Social Security.

The only thing keeping us afloat is the fact that our son has been kind enough to loan us a truck and we couldn't even pay our rent without his (and the rest of the family's) help as it costs us twice as much to live here as it did up north, so I'm ready to stare him down to the bitter end (and I'm hoping they are dumb enough to have me arrested).

Talk about a real David-vs-Goliath scenario; The newspapers would love this story, especially if he's foolish enough to stay this course to disaster, legally harassing us after he's already stolen from us (and adding insult to injury)...

And, as many of you know, we had planned on leaving this wonderful collection to The Smithsonian should we fail to give it the home it deserves (they say they'd love to have it) but it could end up in crates in the basement so we're now thinking of giving it to a very well known restaurateur in New York City (and all attendant rights to the name,

concept, URL's etc) so Mr. Schussler will have someone his own size to pick on (if he actually had the balls for it)...

Anyone who knows us can also attest to the fact that we are meticulous record keepers as well (you have to be, with the nature of what we are doing, the business climate in general and our own personal finances, etc) but what Mr. Schussler may not be aware of is that we also saved the 60 some messages we sent him (and his replies to them) and can prove what he knew and when he knew it. We will produce them when and if he dares to drag us into court.

With Relish,

Uncle Frank

www.TheHotDogHallOfFame.com

PS: And doesn't this also go to show what this concept is really worth, if a guy with that much to lose is willing to steal it from us and risk everything that he owns (I mean, I'm kind of flattered, but...)?