JAMES P. COLLINS, JR. (SBN 47608)
COTKIN & COLLINS
A PROFESSIONAL CORPORATION
200 West Santa Ana Blvd., Suite 800
P.O. Box 22005
Santa Ana, CA 92702-2005
Telephone:    (714) 835-2330
Facsimile:    (714) 835-2209
Email:   jpc@cotkincollins.com


DAVID T. SCHULTZ (MN NO. 169730)
JOLYNN M. MARKISON (MN NO. 0386876)
JOHN K. DARDA (MN NO. 0388298)
MASLON EDELMAN BORMAN & BRAND LLP
3300 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402-4140
Telephone: (612)672-8200
Facsimile:  (612) 672-8397
Email:    david.schultz@maslon.com
          jolynn.markison@maslon.com
          john.darda@maslon.com

Attorneys for Plaintiffs STEVEN SCHUSSLER
and SCHUSSLER CREATIVE, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| STEVEN SCHUSSLER and SCHUSSLER CREATIVE, INC., | Case No. 07CV2016IEG (AJB) |
|---|---|
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| J. FRANK WEBSTER, aka "MR. HOT DOG," aka "UNCLE FRANK," | DATE:  August 18, 2008 TIME:  10:30 a.m. COURTROOM: 1 |
| Defendants. | |

///

///

///

///

1

### INTRODUCTION

2   Defendant J. Frank Webster, aka "Mr. Hot Dog, aka "Uncle

3   Frank" ("Mr. Webster") is an avid hot dog enthusiast and

4   collector of hot dog memorabilia, who has declared himself to

5   be the "official" "Hot Dog Hall of Fame." He believes he owns

6   the exclusive right to use the phrase, "Hot Dog Hall of Fame,"

7   even though he has made no identifiable commercial use of that

8   name and has not attempted to register it with any state or

9   federal agency. Plaintiff Steven Schussler ("Mr. Schussler"),

10  through his company Plaintiff Schussler Creative, Inc.

11  ("Schussler Creative"), is a highly successful restauranteur

12  who specializes in the development of theme-based restaurants.

13  His successes include the now famous Rainforest Café. When

14  Mr. Schussler began to develop his idea to open a hot dog

15  themed restaurant called Hot Dog Hall of Fame, Mr. Webster

16  took umbrage. Rather than seeking legal redress, however, Mr.

17  Webster made a conscious decision to embark on a personal

18  campaign to damage Mr. Schussler's business and reputation,

19  and to derail his business plan. Because Mr. Webster has no

20  right to prohibit Mr. Schussler's legitimate business

21  activities, Mr. Schussler and Schussler Creative are entitled

22  to summary judgment on their claims for declaratory relief,

23  defamation, and tortious interference.

24

25

### ARGUMENT

**I.   Schussler Creative Is Entitled to a Declaratory Judgment**
26  **That Its Use of "Hot Dog Hall of Fame" Does Not Infringe Any**
**Protectible Right Held By Mr. Webster**

27

28  **A. This Court Has Jurisdiction to Grant This**
   **Declaratory Relief**

1    Under the Declaratory Judgment Act ("DJA"), a federal
2  court may "declare the rights and other legal relations" of
3  parties in "a case of actual controversy."  28 U.S.C. §
4  2201; see *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d
5  887, 893 (9th Cir. 1986).  In the Ninth Circuit, trademark
6  disputes constitute an actual controversy under the DJA when
7  "the plaintiff has a real and reasonable apprehension that
8  he will be subject to liability."  *Chesebrough-Pond's, Inc.*
9  *v. Faberge, Inc.*, 666 F.2d 393, 396 (9th Cir. 1982)
10  (internal quotation omitted).  In determining whether the
11  plaintiff's perceived threat is real and reasonable, the
12  court focuses on the plaintiff's position and perceptions,
13  and examines the defendant's actions in light of their
14  probable impact on competition and the risk imposed on the
15  plaintiff. (*Id.*)  Further, if the plaintiff is engaged in
16  the ongoing use of the allegedly infringing mark, the
17  showing of apprehension "need not be substantial."  *See*
18  *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*,
19  655 F.2d 938, 944 (9th Cir. 1981) (patent infringement
20  case).

21    Here, Schussler Creative asks this Court to determine
22  the legal rights between itself and Mr. Webster in
23  accordance with the DJA.  Specifically, Schussler Creative
24  seeks a declaration that (1) Mr. Webster has no protectable
25  trademark right in his use of "The Hot Dog Hall of Fame;"
26  (2) Schussler Creative is not infringing any trademark
27  rights owned by Mr. Webster; and (3) Mr. Webster's use of
28  the name "The Hot Dog Hall of Fame" cannot prevent Schussler

1  Creative's use of the name Hot Dog Hall of Fame for its
2  restaurants.  Under the DJA, Schussler Creative has standing
3  to seek declaratory relief from this Court.  Mr. Webster's
4  cease and desist letters, as well as his continuing threats
5  of a trademark infringement lawsuit, have caused Schussler
6  Creative to develop a real and reasonable apprehension that
7  it will be subject to liability for its use of Hot Dog Hall
8  of Fame.  Schussler Creative's fears have been bolstered by
9  Mr. Webster's persistence in contacting Schussler Creative's
10 business partners, thereby overtly interfering with
11 Schussler Creative's business and damaging its reputation.
12 Mr. Webster's actions have caused future development of
13 Schussler Creative's Hot Dog Hall of Fame restaurants to be
14 placed at risk, as Schussler Creative relies heavily on its
15 strong business reputation to obtain tenant allowances.

16      Because Schussler Creative is engaged in ongoing use of
17 the trademark Hot Dog Hall of Fame—by preparing to open the
18 first unit of the restaurant this summer and by contracting
19 with chain restaurant and shopping mall developers such as
20 Red Development, Levy, and Landry's to secure additional
21 sites for future restaurants—Schussler Creative's
22 apprehension of liability does not need to be substantial.
23 See Societe, 655 F.2d at 944.  Mr. Webster's threats of
24 litigation, as well as his threats toward and harassment of
25 Plaintiffs' business associates, demonstrate the
26 reasonableness of Schussler Creative's apprehension of
27 liability. See Chesebrough-Pond's, 666 F.2d at 396.
28 Accordingly, this trademark dispute has ripened into an

1  actual controversy, giving this Court jurisdiction to grant

2  Schussler Creative's request for declaratory judgment.

3      **B.**   **Mr. Webster Has No Trademark Rights to "Hot Dog Hall of Fame"**

4

5      Schussler Creative has received notice of allowance of

6  its registration of the word mark Hot Dog Hall of Fame.   The

7  registration constitutes prima facie evidence of the validity

8  of Schussler Creative's Hot Dog Hall of Fame mark, and of

9  Schussler Creative's exclusive right to use that mark.   *See*

10  *Brookfield Comm., Inc. v. West Coast Entm't Corp.*, 174 F.3d

11  1036, 1047 (9th Cir. 1999); *Garden of Life v. Letzer*, 318

12  F.Supp.2d 946, 957 (C.D. Cal. 2004).   Mr. Webster—as a non-

13  registrant—may rebut the presumption of validity only by

14  demonstrating that he was the first to use the mark *in*

15  *commerce* and that he has used the mark *in commerce*

16  continuously since the date of his first use.  *Brookfield*, 174

17  F.3d at 1047; *Garden of Life*, 318 F.Supp.2d at 957.

18      For purposes of this motion, Schussler Creative does not

19  dispute that Mr. Webster used the phrase "The Hot Dog Hall of

20  Fame" to describe his activities prior to Schussler Creative's

21  adoption of that name.   Even so — *as a matter of law* — Mr.

22  Webster's use of that phrase in connection with his hobby has

23  not created trademark rights and cannot defeat

24  Schussler Creative's right to use Hot Dog Hall of Fame for

25  its restaurants.[1]

---

27      [1] Because Mr. Webster has never registered the name

28  "Hot Dog Hall of Fame" under any federal or state registration scheme, his trademark rights, if any, exist as a creation of common law.  In determining the existence of

1    Under both the Lanham Act and common law, the

2 touchstone of trademark rights is actual use of the alleged

3 mark *in commerce*, and the test for establishing commercial

4 use under either law is the same.  *Brookfield*, 174 F.3d at

5 1051.

6    Under the Lanham Act, "use in commerce" requires that

7 the mark be:

8
         used or displayed in the sale or advertising of
9        services and the services are rendered in commerce,
         or the services are rendered in more than one State
10       or in the United States and a foreign country and
         the person rendering the services is engaged in
11       commerce in connection with the services.

12 15 U.S.C. § 1127.  In fact, Congress amended the Lanham Act in

13 1988, in order to specifically strengthen the use in commerce

14 requirement, making clear that trademark rights can be

15 conveyed only through "the bona fide use of a mark in the

16 ordinary course of trade, and not [use] made merely to reserve

17 a mark."  *Brookfield*, 174 F.3d at 1051 (citing 15 U.S.C. §

18 1127).

19    Because Mr. Webster has never used the phrase "Hot Dog

20 Hall of Fame" in commerce, Mr. Webster has no trademark rights

21 in that name and thus cannot prevent Schussler Creative from

22 naming its restaurant Hot Dog Hall of Fame.

23         **1.   Mr. Webster's Lack of Sales Activity is Fatal
                 to His Claim that He Owns The Name "Hot Dog
24               Hall of Fame"**

25    Mr. Webster does not "own" the name "Hot Dog Hall of

26 _____

27 common law trademark rights, courts frequently rely on
   decisions arising under the Lanham Act.  *See Allard Entm't,*
28 *Inc. v. Advanced Programming Res.*, 146 F.3d 350, 357 (6th
   Cir. 1998).

Fame," because he never used that name in commerce. According
to the Ninth Circuit, ownership may be shown through evidence
of actual sales of goods or services that use or display the
mark. *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159
(9th Cir. 2001). Conversely, a lack of bona fide sales
activity—including mere token sales or sham sales designed to
circumvent the "use in commerce" requirement—is often fatal to
a party's claim to trademark rights. (*Id.* at 1157, 1159.)

In this case, Mr. Webster's activities under the name
"The Hot Dog Hall of Fame" have produced zero sales. (Webster
Dep. 63:14.) The Frankie Awards are given away (to a select
audience of hot dog enthusiasts), and the Frankfurter
Chronicles and WeenieGrams are distributed for free via the
internet and generate no revenues. (*Id.*) Nor does Mr. Webster
sell his "consulting" services or the services he provides at
hot dog stand grand openings. (*Id.*) Finally, Mr. Webster's
online "store," which at first glance may appear to
demonstrate sales activity, in reality falls far short of the
mark.

The full inventory of Mr. Webster's online store consists
of sixteen t-shirts and twelve ball caps - none of
which he has actually sold.[2] (*Id.* at 110:10-113:21.)

Instead, Mr. Webster has gifted away six t-shirts and
three ball caps, to friends and family. (*Id.* at 123:4-125:11.)

---

[2] The other "items" listed on Mr. Webster's website—a
movie entitled *The Weenie Roast Massacre* and a book called
*50 Ways to Top a Hot Dog*—are actually links to other
websites operated by the creators of those works. Mr.
Webster does not himself own any inventory in those items
and does not offer them for sale.

1   Even if an actual customer wished to purchase a ball cap or t-
2   shirt, however, Mr. Webster's website is not equipped to take
3   orders online.   Potential customers interested in making a
4   purchase are asked to e-mail Mr. Webster and he will "reply
5   with particulars." (*Id.*)   More importantly, Mr. Webster has
6   admitted that he only began to offer items for sale in
7   response to this lawsuit, when he heard counsel for Schussler
8   Creative argue that Mr. Webster had not made commercial use of
9   the name "Hot Dog Hall of Fame." (*Id.* at 125:6-15.) [3]

10      In short, because Mr. Webster can present no evidence of
11  bona fide sales activity associated with the name "The Hot Dog
12  Hall of Fame," he does not own trademark rights to that name
13  and cannot prevent Schussler Creative from using that name for
14  its restaurant.

15                  **2.   Mr. Webster's Claim of Ownership Also Fails
                    Under the Totality of the Circumstances Test**
16

17      Although the lack of any evidence of actual sales is
18  frequently dispositive, the question of use in commerce may
19  alternatively be decided on the facts of each case, as
20  trademark rights may occasionally vest prior to the sale of
21  goods or services if the totality of the alleged owner's
22  actions, taken together, establish a right to use the
23

24      _____
        [3] Even if Mr. Webster had made a few token sales from
25  his online "store," those sales would not constitute a bona
    fide use of the mark in commerce since, by his own
26  admission, Mr. Webster's sole purpose in offering t-shirt
    and ball cap sales was to dodge the "use in commerce"
27  requirement.   *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d
    1151, 1157 (9th Cir. 2001) (stating that sham attempts to
28  conform with statutory requirements do not constitute bona
    fide use of a mark in commerce).

1  trademark.  *Chance*, 242 F.3d at 1158-1159; *Brookfield*, 174
2  F.3d at 1052.  Under the totality of circumstances test,
3  courts are guided by non-sales activities, including the
4  following factors: (1) the genuineness and commercial
5  character of the activity; (2) the determination of whether
6  the mark was sufficiently public to identify or distinguish
7  the marked service in an appropriate segment of the public
8  mind as those of the holder of the mark; (3) the scope of the
9  non-sales activity relative to what would be a commercially
10  reasonable attempt to market the service; and (4) the degree
11  of ongoing activity of the holder to conduct the business
12  using the mark and the amount of business transacted.  (*Id.*)
13  Applying this test, no reasonable trier of fact could conclude
14  that Mr. Webster has used the mark, "The Hot Dog Hall of
15  Fame," in commerce.

16
                    **a.   Mr.   Webster's   activities   are   not**
17                        **commercial in character**

18       Under the first prong of the totality of the
19  circumstances test, Mr. Webster's activities are not
20  sufficiently "commercial" to vest any trademark rights in his
21  use of "The Hot Dog Hall of Fame."  Mr. Webster's various
22  activities include: (1) his hot dog memorabilia collection;
23  (2) his domain name and website; (3) his newsletter and
24  WeenieGrams; and (4) his barbeques and Frankie Awards
25  ceremonies.  None of these activities are "commercial" in
26  nature.

27       First, Mr. Webster's collection of hot dog memorabilia
28  does not constitute commercial activity.  The memorabilia is

1   not part of any regular trade or business, does not generate
2   any revenue, and is not on regular public display, either free
3   or for a charge.    The two times that portions of the
4   collection were on public display—in the "Hall of Fame Hall of
5   Fame" and at the "Hot Diggity Dogs" stand—were isolated, long-
6   ago instances that were not of a commercial character.
7   Finally, the fact that the memorabilia collection has been
8   stored in boxes for the past twenty-five years, unseen and
9   unused by Mr. Webster or anyone else, is further evidence that
10  the memorabilia collection is not of a commercial character.
11      Second, neither Mr. Webster's domain name registration
12  nor his corresponding website constitute "commercial use" for
13  purposes of acquiring trademark priority. Registration of a
14  domain name is insufficient to establish "use" for trademark
15  priority purposes.    *Brookfield*, 174 F.3d at 1051; *see also*
16  *Acad. of Motion Picture Arts & Scis. v. Network Solutions,*
17  *Inc.*, 989 F.Supp. 1276, 1281 (C.D. Cal. 1997) (mere
18  registration of a domain name does not constitute a commercial
19  use); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985
20  F.Supp. 949, 957 (C.D. Cal. 1997) (acceptance of a domain name
21  for registration is not a commercial use).    Accordingly, the
22  registration of Mr. Webster's domain name, by itself, does not
23  constitute commercial use.
24      In addition, even a cursory reading of the content of Mr.
25  Webster's website and his electronic publications demonstrates
26  the noncommercial nature of his web activities.    The website's
27  content—movie reviews, recipes, commentary of Mr. Webster's
28  family's eating habits during national hot dog month,

1  etc.—demonstrates that these activities are personal, not
2  commercial, and are simply born of Mr. Webster's fascination
3  with all things hot dog.   Further, as discussed above, Mr.
4  Webster's online "store" also fails to qualify as a commercial
5  use of the phrase "Hot Dog Hall of Fame," because it was
6  created  as  a  sham  attempt  to  conform  with  statutory
7  requirements and because it has produced zero sales since its
8  inception.

9      Finally, neither of Mr. Webster's last two activities can
10 be  considered  "commercial"  in  character.   Because  Mr.
11 Webster's newsletters and WeenieGrams are free, do not contain
12 any advertising, and are sent via e-mail, these publications
13 are not commercial in any sense of the term. *See Chance*, 242
14 F.3d at 1158 (stating that e-mail correspondence does not
15 constitute commercial use for trademark priority purposes);
16 *Brookfield*, 174 F.3d at 1052 (stating same).   Similarly, Mr.
17 Webster's sporadic barbecue parties at which he has (in the
18 past) given out the Frankie Awards were free, were not
19 sponsored, and were only attended by Mr. Webster's family and
20 personal  friends.   As  such,  those  barbeques  and  the
21 corresponding Frankie Awards ceremonies are not "commercial"
22 in nature because they have nothing to do with any "service"
23 that is offered "in commerce."   Rather, these activities—like
24 each of the prior activities engaged in by Mr. Webster—are
25 simply a part of his personal hobby.

26     As further evidence of the noncommercial character of Mr.
27 Webster's hobby, none of his "Hot Dog Hall of Fame" activities
28 has the normal indicia of commercial activity.   Not only does

226590-1.wpd

1   Mr. Webster's "Hot Dog Hall of Fame" generate no sales or
2   revenues, it has no paid employees, has never filed either
3   state or federal income taxes, has never possessed a
4   California sales tax registration certificate, and does not
5   enjoy non-profit status.  In short, Mr. Webster can produce no
6   evidence of any activity of a true commercial character.  His
7   "Hot Dog Hall of Fame" is just a personal hobby, the joy of
8   which Mr. Webster shares with a small band of like-minded hot
9   dog enthusiasts.

10              **b.    Mr. Webster's use of the mark is not**
                 **sufficiently public to create association**
11              **in the public mind**

12      Applying the second factor, Mr. Webster's use of "The Hot
13  Dog Hall of Fame" also fails to establish priority of use in
14  commerce.    A primary purpose of a trademark is to help
15  consumers identify the source of the product or service.
16  *Brookfield*, 174 F.3d at 1051.  A trademark cannot serve its
17  source-identifying function if the public has never seen the
18  mark.  (*Id.*)    Thus, a mark does not acquire trademark
19  protection until it is used in a public manner that creates an
20  association among consumers between the mark as used on goods
21  or services and the mark's owner. (*Id.*)  Here, Mr. Webster's
22  use of "The Hot Dog Hall of Fame" is not sufficiently public
23  to create that association.

24      Mr. Webster's various displays of the phrase "The Hot Dog
25  Hall of Fame" are insufficient to establish a
26  source-identifying function.  The words "The Hot Dog Hall of
27  Fame" appear only sporadically in the Frankfurter Chronicles
28  and on Mr. Webster's website, they have rarely appeared on the

226590-1.wpd                    -11-

1    WeenieGrams, and they have never appeared in association with

2    Mr. Webster's awards cookouts or on the Frankie Award.

3    (Webster Dep. at 113:21-114:3, 93:18-22, 117:10-14, 96:10-25.)

4    In fact, as Mr. Webster himself has admitted, he has

5    deliberately tried to keep the public from gaining access to

6    his newsletter and his website. (*Id.* at 110:10-113:21.)   The

7    Frankfurter Chronicles are distributed by invitation only, and

8    Mr. Webster has deliberately avoided registering his website

9    with internet search engines. (*Id.*)   Mr. Webster's "Hot Dog

10   Hall of Fame" activities—even when viewed in his favor—fall

11   far short of evidencing a public association between that

12   phrase and his activities.

13
                        c.    **Mr. Webster's has failed to make a**
14                            **commercially reasonable attempt to market**
                             **his "Hot Dog Hall of Fame"**
15

16       In some cases, the scope of non-sales advertising

17   activity can demonstrate a commercially reasonable attempt to

18   market one's services that is, in turn, sufficient to

19   establish trademark rights.[4]   *Chance*, 242 F.3d at 1160.   The

20   analysis is, of course, fact specific.   For example, in *Garden*

21   *of Life*, the court found that evidence that plaintiff had

22   spent approximately $6 million advertising its product to a

23   target market demonstrated use in commerce.   318 F.Supp.2d at

24   959-60.   In *New West Corp. v. NYM Company of California, Inc.*,

25   _____

26       [4] While advertising alone cannot establish priority of
     use, in some circumstances advertising in combination with
27   other non-sales activity may be sufficient to establish use
     in commerce.   *New West Corp. v. NYM Co. of Calif., Inc*, 595
28   F.2d 1194, 1200 (9th Cir. 1979).

1  the court determined that a publisher's direct mail
2  solicitations consisting of 430,000 "mock-ups" of its
3  forthcoming magazine cover to potential customers and
4  advertisers was sufficient to establish use in commerce where
5  the publisher spent $1.3 million in developing and advertising
6  the magazine.  595 F.2d 1194, 1199 (9th Cir. 1979).

7      Mr. Webster claims to have been cultivating "The Hot Dog
8  Hall of Fame" for the last 30 years.  However, unlike in
9  *Garden of Life* and *New West*, no reasonable fact-finder could
10 conclude, based on the undisputed facts in this case, that Mr.
11 Webster's activities constitute "commercially reasonable"
12 attempts to market a commercial venture.  Mr. Webster's
13 *Frankfurter Chronicles* and WeenieGrams are distributed
14 electronically to approximately 200 friends, relatives, and
15 acquaintances.  (Webster Dep.  108:23-110:8.)  They are
16 distributed free of charge at irregular intervals, and Mr.
17 Webster does not use them for advertising or to generate
18 sales.  Similarly, invitation to Mr. Webster's Frankie Awards
19 ceremony and/or his National Hot Dog Month barbecue (which
20 have not been held in any event for several years) were not
21 advertised and attendance was mostly limited to Mr. Webster's
22 friends, relatives, and acquaintances.  (*Id.* at 96:1-99:7.)  If
23 Mr. Webster's ultimate goal is to open a combination hall of
24 fame, museum, restaurant, gallery, and gift shop (which he
25 indicated during his deposition), then as a matter of law his
26 activities to-date are not a commercially reasonable attempt
27 to market toward that goal.
28      ///

1

        **d.    Mr. Webster is not engaged in ongoing**
        **activity using the alleged mark to conduct**

2

        **business**

3      Mr. Webster does not currently, nor has he ever, operated

4  a business under the trade name "The Hot Dog Hall of Fame."

5  His three hot dog stands were called "Frank's Quality Franks,"

6  "The Great American Hot Dog Machine," and "Hot Diggity Dogs."

7  (*Id.* at 29:2, 29:7, 33:10.)  Despite the fact that during the

8  six months Mr. Webster operated Hot Diggity Dogs, he displayed

9  a few items of memorabilia under a hand-painted sign reading,

10  "The Hot Dog Hall of Fame," this one-time use, now ancient, is

11  clearly insufficient to establish trademark rights. (*Id.* at

12  36:20-23.)  At best, this use is akin to putting one's mark on

13  a business office door sign or letterhead, which is

14  insufficient to establish trademark rights.  *See Brookfield*,

15  174 F.3d at 1052; *Steer Inn Sys., Inc. v. Laughner's Drive-In,*

16  *Inc.*, 405 F.2d 1401, 1402 (C.C.P.A. 1969).  Further, Mr.

17  Webster's Hot Diggity Dogs business failed in 1983, after only

18  six months of operation. (*Id.* at 35:9.)  Even if the hand

19  painted sign and display of memorabilia had been sufficient to

20  create trademark rights in 1983, Hot Diggity Dogs went out of

21  business 25 years ago and Mr. Webster has not operated a

22  business using the phrase "The Hot Dog Hall of Fame" since

23  that time.  Therefore, by any reasonable standard, Mr.

24  Webster's use of  "The Hot Dog Hall of Fame" over the years

25  lacks the continuous nature required to create trademark

26  rights.

27      Moreover, Mr. Webster's dream of one day opening a

28  restaurant, museum, hall of fame, gallery, and gift shop

1   cannot establish Mr. Webster's right to exclusive use of the
2   phrase "Hot Dog Hall of Fame." It is axiomatic that mere
3   goals and dreams to use a mark in commerce do not create
4   trademark rights. *Guichard v. Universal City Studios, LLLP*,
5   No. 06-6392, 2007 WL 1750216, at *3 (N.D. Cal. June 15, 2007);
6   *Matrix Motor Co., Inc v. Toyota Jidosha Kabushiki Kaisha*, 290
7   F.Supp.2d 1083, 1089 (C.D. Cal. 2003); *see also Brookfield*,
8   174 F.3d at 1052 (stating that trademark rights are not
9   acquired through mere intent to use a mark commercially).
10  Here, that is exactly what Mr. Webster's "Hot Dog Hall of
11  Fame" is—a future dream or ambition that exists only in Mr.
12  Webster's mind. Accordingly, Mr. Webster also fails on the
13  final factor in the totality of circumstances analysis.

14      Because, based on the undisputed facts and circumstances
15  of this case, Mr. Webster has no valid, protectible trademark
16  interest in the phrase "Hot Dog Hall of Fame," he cannot bar
17  Schussler Creative from using that name for its restaurant.
18  Accordingly, Schussler Creative is entitled to the requested
19  declaratory judgment.

20  **III. Steven Schussler is Entitled to Summary Judgment On His**
    **Defamation Claim**
21

22      As a matter of law, the e-mails Mr. Webster sent to
23  Plaintiffs' business partners, the industry press, and city
24  officials in Sparks, Nevada, as well as the messages he posted
25  on his website, constitute libel. Between May and October
26  2007, Mr. Webster published the following libelous statements:

27          (1) Mr. Webster told media organizations and
            hospitality companies, including Host Marriott, Levy
28          Restaurants, Success Magazine, The Harford Courant,

1    The Rocky Mountain News, The Chicago Sun Times, The
     San Diego Union Tribune, and Chain Magazine that the
2    concept, name, and related intellectual property of
     Hot Dog Hall of Fame belonged exclusively to him, not
3    to Mr. Schussler. (Pl.'s Ex. 7; Webster Dep. at
     171:18-172:8.)
4
     (2)    In an edition of his Frankfurter Chronicles
5    dated June 17, 2007, Mr. Webster again stated that
     Mr. Schussler had stolen his intellectual property.
6    (Pl.'s Ex. 10.)  He also posted a copy of a letter he
     had previously sent to one of Schussler Creative's
7    business  partners,  in  which  Mr.  Webster  had
     threatened his plan to "first blacken both of your
8    eyes  (yours  and  Mr.  Schussler's)  professionally,
     first in the papers and on TV, then we will see you
9    in court." (Id.)

10   (3) In September, 2007, Mr. Webster began contacting
     Schussler Creative's business partners in an effort
11   to disrupt Schussler Creative's business.  In an e-
     mail dated September 17, 2007, Mr. Webster told Red
12   Development  that  Mr.  Schussler  was  a  "liar,"  a
     "thief," and a "con man," because Mr. Schussler was
13   attempting to steal the concept and name of Hot Dog
     Hall of Fame from him. (Pl.'s Ex. 11.)
14
     (4) In an e-mail dated September 18, 2007, sent to Red
15   Development, Mr. Webster wrote, "[Mr. Schussler] may
     not own another one of the concepts he's currently
16   touting." (Pl.'s Ex. 10.)  Mr. Webster claimed he
     received this information from an anonymous source,
17   but did nothing to verify the truth of this statement
     before publishing it. (Webster Dep. at 187:18-188:14,
18   192:7-13.)

19   (5) On September 18, 2007, Mr. Webster sent an e-mail
     to the Mayor and City Council for the City of Sparks,
20   Nevada,  in  which  he  again  called  Mr.  Schussler  a
     "liar,"  a  "thief,"  and  a  "con  man,"  because  Mr.
21   Schussler had stolen the concept and name of Hot Dog
     Hall of Fame from Mr. Webster. (Pl.'s Ex. 11.)  The
22   e-mail also contained links to Mr. Webster's website
     where he published similar defamatory allegations.
23   (Id.)

24   (6) On October 10, 2007, Mr. Webster posted an edition
     of the Frankfurter Chronicles on his website in which
25   he wrote that Schussler Creative had stolen his
     intellectual property. (Pl.'s Ex. 10.)
26

27        California Civil Code Section 45 provides: "Libel is a

28   _false_ and _unprivileged_ publication by writing . . . which

1  exposes any person to hatred, contempt, [or] ridicule . . . or

2  which causes him to be shunned or avoided, <u>or which has a</u>

3  <u>tendency to injure him in his occupation</u>." (emphasis added).

4

5  **A.  Mr. Webster's Written Statements About Mr. Schussler Are False**

6  Mr. Webster has admitted that he authored and sent e-

7  mails to Schussler Creative's business partners and to city

8  officials, calling Mr. Schussler a "liar, thief and con man,"

9  and alleging that Mr. Schussler stole the concept and name Hot

10  Dog Hall of Fame from him. (Webster Dep. 183:-186:11.)  Mr.

11  Webster posted similar statements on his website and in the

12  Frankfurter Chronicles, and told Red Development that Mr.

13  Schussler might not own another one of the concepts he was

14  claiming to own. (*Id.* at 187:18-188:14, 192:7-13.)  Because,

15  based on the undisputed facts of this case, Schussler Creative

16  does in fact have the right to use Hot Dog Hall of Fame name

17  on its restaurants, has not infringed on any trademark rights

18  owned by Mr. Webster, and is not "touting other concepts that

19  it might not actually own,[5] Mr. Webster's statements are false

20  as a matter of law.

21  **B.  Mr. Schussler's Damages Are Presumed Because Mr. Webster's Statements Are Libelous Per Se**

22

23  Libel per se is "libel which is defamatory of the

24  plaintiff without the necessity of explanatory matter, such as

25  an inducement, innuendo or other extrinsic fact." Cal. Civ.

26

27  _____

[5] In his deposition, Mr. Webster admitted that he now

28  believes that his representation was untrue. (Webster Dep. At 192:8-23.)

1  Code § 45a. As stated by the California Court of Appeals, "If
2  [] a reader would perceive a defamatory meaning without
3  extrinsic aid beyond his or her own intelligence and common
4  sense, then there is a libel per se." *Barnes-Hind, Inc. v.*
5  *Allergan Pharmaceuticals, Inc.*, 226 Cal.Rptr. 354, 356 (Cal.
6  Ct. App. 1986). In other words, publications that are
7  libelous per se have a natural tendency to injure. Cal. Civ.
8  Code, §§ 45, 46; *Mann v. Quality Old Time Service, Inc.*, 15
9  Cal.Rptr.3d 215, 224 (Cal. Ct. App. 2004). For instance,
10 calling someone a "thief" has a natural tendency to injure
11 that person's reputation. *Smith v. Airborne Freight, Co.*, No.
12 C-95-1299 SI, 1996 WL 207760, at *2 n.2 (N.D. Cal. Apr. 19,
13 1996). Likewise, calling someone a "liar," where that
14 accusation is based on conduct capable of being proved false,
15 also injures a person's reputation. *See Carver v. Bonds*, 37
16 Cal. Rptr.3d 480, 494-95 (Cal. Ct. App. 2005). Where a
17 statement is defamatory per se, actual damages are presumed so
18 that a cause of action is conclusively established from the
19 false statement itself. *Burdette v. Carrier Corp.*, 71 Cal.
20 Rptr.3d 185, 205 (Cal. Ct. App. 2008); *Contento v. Mitchell*,
21 104 Cal.Rptr.591, 592 (Cal. Ct. App. 1972).

22     Here, Mr. Webster's statements are defamatory per se and
23 he is entitled to a presumption of damages. The defamatory
24 meaning of Mr. Webster's words is clear on their face: Mr.
25 Schussler is dishonest—specifically, a "liar," "thief," and
26 "con man." Anyone reading these words would understand their
27 meaning and would be able to see that such words, by their
28 very nature, would injure a person's reputation. Mr.

1   Webster's defamatory statements go even further than this

2   threshold, alleging that Mr. Schussler is a "liar," "thief,"

3   and "con man" because he stole the concept and name, Hot Dog

4   Hall of Fame, and because he may not actually own another of

5   the concepts he is touting.  Because Mr. Webster's allegations

6   are defamatory on their face and are based on facts that can

7   be proven false, his name-calling and bad-mouthing constitute

8   libel per se.    Consequently, Schussler need not present

9   evidence of actual injury or damages.  *See Burdette*, 71 Cal.

10  Rptr.3d at 205.

11  **IV.   Schussler Creative Is Entitled to Summary Judgment On Its
         Claim for Tortious Interference With Contract**

12

13      The elements of a claim for tortious interference with

14  contract are: (a) a valid contract between plaintiff and a

15  third party; (b) defendant's knowledge of that contract; (c)

16  defendant's intentional act designed to induce a disruption of

17  the contractual relationship; and (d) resulting damages.

18  *Pacific Gas and Electric Co. v. Bear Stearns & Co.*, 791 P.2d

19  587, 589 (Cal. 1990); *Reeves v. Hamilton*, 95 P.3d 513, 517

20  (Cal. 2004).

21      Schussler Creative's claim against Mr. Webster meets each

22  of these elements.  It is undisputed that Schussler Creative

23  has valid contracts with Red Development and that Mr. Webster

24  had knowledge of those contracts when he sent his e-mails to

25  Schussler Creative's business partners. (Schussler Decl. ¶ 10;

26  Webster Dep. 184:1-5.)  In fact, Mr. Webster has admitted that

27  he sent the defamatory e-mails in order to prevent Mr.

28  Schussler from opening Hot Dog Hall of Fame and to convince

1   Red Development not to work with Schussler Creative. (Webster
2   Dep. at 184:22-185:14, 192:14-17.)    In other words, by
3   contacting Schussler Creative's business associates, Mr.
4   Webster was intentionally trying to frustrate and disrupt
5   Schussler Creative's contractual relationships.

6       As a result of Mr. Webster's interference, Schussler
7   Creative has sustained damages. By sending e-mails accusing
8   Mr. Schussler of stealing his intellectual property, Mr.
9   Webster implicated a key representation that Schussler
10  Creative made in its contracts—that Schussler Creative has the
11  right to use the name Hot Dog Hall of Fame. (Schussler Decl.
12  ¶ 28.)    Because Mr. Webster's e-mails directly implied that
13  Schussler Creative's representation to Red Development was
14  false, Red Development became concerned that the City of
15  Sparks would refuse to license its planned shopping mall
16  developments due to the potential for litigation that could
17  arise over Hot Dog Hall of Fame. (*Id.*)    Consequently, Red
18  Development had refused to proceed with proposed licensing
19  agreements with Kansas City and Sparks, Nevada until this
20  matter was resolved. (*Id.*)    Thus, Mr. Webster's conduct
21  effectively forced Schussler Creative to initiate this legal
22  action, as its only other option was to face potential loss of
23  business and potential default on its $20 million line of
24  credit with Red Development. (*Id.*)

25      Indeed, this was the precise damage Mr. Webster intended
26  to inflict. Mr. Webster's plan was to provoke Mr. Schussler
27  into filing this lawsuit. (*See* Transcript of Order to Show
28  Cause Hearing at 20:2-3 ("My entire purpose [in sending the e-

1  mails] was to get Mr. Schussler to sue me.")) As a result of
2  Mr. Webster's conduct, Schussler Creative has spent over
3  $50,000 in legal fees to secure a preliminary injunction
4  against Mr. Webster and to fully and finally resolve this
5  issue. In addition, Schussler Creative has spent time, money,
6  and resources responding to inquiries and assuring its
7  business associates of its right to the concept and name Hot
8  Dog Hall of Fame as provided in its contracts. (*Id.* at ¶ 32.)
9  Accordingly, Schussler Creative is entitled to summary
10 judgment on is claim for tortious interference with contract.

11 **V. Mr. Webster Is Liable For Tortious Interference With**
12 **Prospective Business Relations**

13     The elements of a claim for tortious interference with
14 prospective economic relations mirror those of interference
15 with contract, with one exception. Because the latter
16 protects against injury to a prospective economic
17 relationship, it requires the plaintiff to demonstrate that
18 the defendant engaged in conduct that was wrongful by some
19 legal measure other than the fact of interference itself.
20 *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740,
21 751 (Cal. 1995). "[A]n act is independently wrongful if it is
22 unlawful, that is, if it is proscribed by some constitutional,
23 statutory, regulatory, common law, or other determinable legal
24 standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d
25 937, 954 (Cal. 2003). It is well established that defamation
26 constitutes independently wrongful conduct. *Visto Corp. v.*
27 *Sproqit Tech. Inc.*, 360 F.Supp.2d 1064,1067 (N.D. Cal. 2005).
28     Here, Schussler Creative has prospective business

1  relationships with both Red Development and the City of
2  Sparks, Nevada.  These entities have contracted with Schussler
3  Creative to open and operate Hot Dog Hall of Fame at Red
4  Development's Legends at Sparks Marina in 2009. (Schussler
5  Decl. ¶ 11.)   As stated above, the undisputed facts
6  demonstrate that Mr. Webster had knowledge of this contract
7  and sent defamatory e-mails to Red Development and the City of
8  Sparks expressly for the purpose of disrupting their
9  relationship with Schussler Creative, thereby causing
10  Schussler Creative to file the present lawsuit and incur both
11  monetary damages and damages to its reputation.  Because the
12  undisputed facts also establish that Mr. Webster's conduct was
13  independently wrongful (i.e. his conduct constituted libel),
14  Schussler Creative is entitled to summary judgment on its
15  claim for intentional interference with prospective business
16  relations.
17
18  **VI.  Schussler Creative Is Entitled to Permanent Injunctive Relief**
19      Permanent injunctive relief is necessary to deter Mr.
20  Webster from continuing his tortious and defamatory behavior.
21  Once a statement is judicially determined to be defamatory,
22  permanent injunctive relief is appropriate to prevent a
23  defendant from repeating that statement.  *See Balboa Island*
24  *Village Inn, Inc. v. Lemen*, 156 P.3d 339, 350-51 (Cal. 2007)
25  (recognizing that once the court finds published statements to
26  be false, the plaintiff may seek a permanent injunction
27  restraining any further publication of the defamatory matter);
28  *see also MAI Sys., Inc. v. Peak Computers, Inc.*, 991 F2d 511,

1   520 (9th Cir. 1993) (stating that a permanent injunction is
2   particularly appropriate once liability has been established
3   and the threat of continuing violations remains ongoing);
4   *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001,
5   1022 (9th Cir. 1985) ("An injunction may be framed to bar
6   future violations that are likely to occur").

7      A permanent injunction is even more necessary where an
8   award of damages is insufficient to deter the defendant from
9   continuing the tortious behavior. *Balboa*, 156 P.3d at 351
10   (stating that if the court could not award injunctive relief,
11   "a defendant harmed by a continuing pattern of defamation
12   would be required to bring a succession of lawsuits . . . to
13   deter the defendant from continuing the tortious behavior").
14   Damages are an insufficient deterrent when the defendant is
15   either "so impecunious as to be 'judgment proof,' or so
16   wealthy as to be willing to pay any resulting judgments."
17   (*Id.*)

18      Absent a permanent injunction, Mr. Webster will
19   undoubtedly resume his defamatory e-mail campaign. Indeed,
20   Mr. Webster testified in his deposition that he intends to
21   continue defaming Schussler Creative. Mr. Webster stated,
22   "I'm going to tell the public, one way or another, this is the
23   story that's going on. [Mr. Schussler] has a choice of doing
24   the right thing with us or else I'm going public with this at
25   some point." (Webster Dep. at 200:22-25.) Mr. Webster
26   specifically stated that he will go public with his story once
27   this lawsuit has ended - "When this is all over, the public is
28   going to decide who was right. This is a matter of public

1   record when this is done.  And then there is the book.[6]  If

2   Mr. Schussler does not understand that he's not playing nice,

3   we're not playing nice, either."  Mr. Webster has stated "[Mr.

4   Schussler] has placed us in the position of having NOTHING to

5   lose" and that he plans to "poison the well" by defaming

6   Schussler Creative. (*Id.* at ¶ 25; Pl.'s Ex. 9 at 4-5.)  By his

7   own words, Mr. Webster has established that nothing short of

8   a court order will prevent him from continuing to assert that

9   Mr. Schussler has stolen Hot Dog Hall of Fame from him.

10          Indeed, the necessity for court intervention has already

11  been proven once before, in relation to Schussler Creative's

12  motion for a temporary injunction.    Initially, Schussler

13  Creative contacted Mr. Webster to request that he stop sending

14  defamatory e-mails.  Instead, however, Mr. Webster continued

15  to send defamatory e-mails and to post defamatory statements

16  about Schussler Creative on his website, even after he was

17  served with Schussler Creative's Complaint. (Schussler Decl.

18  ¶¶ 24, 28.)   Only after this Court issued a preliminary

19  injunction did Mr. Webster remove the defamatory material from

20  his website and cease sending defamatory e-mail messages.  As

21  before, a court order is necessary to prevent Mr. Webster from

22  following through on his threats of "going public" with his

23  false and defamatory statements or otherwise interfering in

24

25

26          [6] The "book" Mr. Webster is referring to is a work-in-
27  progress that Mr. Webster is creating.   The book is
    comprised largely of various segments from different issues
28  of the Frankfurter Chronicles.   (Webster Dep. At 99:10-16,
    100:11-12.)

1  Schussler Creative's legitimate business enterprises.  *See*
2  *Balboa*, 156 P.3d at 350-53.

3      In addition, a permanent injunction is necessary because
4  monetary damages are unlikely to deter Mr. Webster from
5  continuing his tortious activity.  Schussler Creative is well
6  aware that Mr. Webster is probably not in a financial position
7  to pay the damages for which he is liable.  If Schussler
8  Creative's hunch is correct, then Mr. Webster is essentially
9  "judgment proof."  Absent a permanent injunction, there will
10  be nothing preventing Mr. Webster from resuming his defamatory
11  campaign against Schussler Creative.  Consequently, a
12  permanent injunction is all the more necessary to ensure that
13  Schussler Creative sustains no further injury.  *See Balboa*,
14  156 P.3d at 151.

15      Accordingly, Schussler Creative requests that this Court
16  order a permanent injunction barring Mr. Webster from further
17  publishing his defamatory statements or otherwise interfering
18  with Schussler Creative's business enterprises.

19                          **CONCLUSION**

20      For each of the foregoing reasons, Schussler Creative
21  respectfully requests that this Court GRANT its Motion for
22  Summary Judgment in its entirety.

23  DATED: June 27, 2008        JAMES P. COLLINS, JR.
                                COTKIN & COLLINS
24                              A PROFESSIONAL CORPORATION

25                              DAVID T. SCHULTZ
                                MASLON EDELMAN BORMAN & BRAND LLP
26

27                          By _____
                                James P. Collins, Jr.
28                              Attorneys for Plaintiffs