JAMES P. COLLINS, JR. (SBN 47608)
COTKIN & COLLINS
A PROFESSIONAL CORPORATION
200 West Santa Ana Blvd., Suite 800
P.O. Box 22005
Santa Ana, CA 92702-2005
Telephone:  (714) 835-2330
Facsimile:  (714) 835-2209
Email: jpc@cotkincollins.com


DAVID T. SCHULTZ (MN NO. 169730)
JOLYNN M. MARKISON (MN NO. 0386876)
JOHN K. DARDA (MN NO. 0388298)
MASLON EDELMAN BORMAN & BRAND LLP
3300 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402-4140
Telephone: (612)672-8200
Facsimile:  (612) 672-8397
Email:   david.schultz@maslon.com
         jolynn.markison@maslon.com
         john.darda@maslon.com

Attorneys for Plaintiffs STEVEN SCHUSSLER
and SCHUSSLER CREATIVE, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| STEVEN SCHUSSLER and SCHUSSLER CREATIVE, INC., | Case No. 07CV2016IEG (AJB) |
|---|---|
| Plaintiffs, | PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| J. FRANK WEBSTER, aka "MR. HOT DOG," aka "UNCLE FRANK," | DATE:  August 18, 2008 TIME:   10:30 a.m. COURTROOM: 1 |
| Defendants. | |

///

///

///

///

///

1        **SUMMARY**

2        This case involves a dispute over the right to use the

3   name "Hot Dog Hall of Fame."  On one hand, Mr. Schussler has

4   registered that name with the United States Trademark and

5   Patent Office in conjunction with a chain of restaurants he

6   is developing.  On the other hand, Mr. Webster has long used

7   that name to refer to his personal collection of hot dog

8   memorabilia and his various non-commercial activities.

9        Mr. Webster first came up with the name "The Hot Dog

10  Hall of Fame" in or around 1982 when he was inspired by a

11  menu at a Denny's® Restaurant that described its hamburgers

12  under the banner "The Hamburger Hall of Fame."  (Deposition

13  of J. Frank Webster ("Webster Dep.") at 87:20-88:12.)  As its

14  self-proclaimed    "President,"    Mr.    Webster    alternately

15  describes "The Hot Dog Hall of Fame" as "a loose affiliation

16  of hot dog lovers" and as the activities which he conducts

17  for his and their amusement.  (*Id.* at 59:17-60:4, 261:9-

18  262:14.)   Mr. Webster hopes to one day open a restaurant,

19  museum,   hall   of   fame,   gallery,   and   gift   shop,   as   the

20  permanent embodiment of "The Hot Dog Hall of Fame."  (*Id.* at

21  71:8-10, 58:23-59:4.)  He has not yet done so due to his lack

22  of monetary resources and his inability to attract investors

23  willing to fund his dream.   (*Id.* at 71:14-18.)   Thus, despite

24  the persistence of his hobby, Mr. Webster has never operated

25  any commercial enterprise using the name "Hot Dog Hall of

26  Fame," nor has he ever applied to register a trademark for

27  "Hot Dog Hall of Fame."  (*Id.* at 61:21-62:10.)   Nonetheless,

28  Mr. Webster asserts that he has an exclusive common law right

1    to that name by virtue of the non-commercial activities he
2    has conducted. (*Id.* at 61:7-14.)

## I.    MR. WEBSTER'S "HOT DOG HALL OF FAME"

### A.    Mr. Webster's Memorabilia Collection

Sometime between 1976 and 1979, as a result of his personal love of and fascination with hot dogs, Mr. Webster began collecting hot dog memorabilia. (Webster Dep. at 53:23-54:8.) The first item he obtained was a friction-drive toy car catering wagon with a hot dog on top. (*Id.* at 54:1-3.) By 1979, Mr. Webster had amassed 800 pieces of hot dog memorabilia, most of which were given to him by friends or acquaintances, including by his wife Darla, whom he credits as the biggest contributor to his collection. (*Id.* at 76:17-18.)

Today, Mr. Webster's hot dog collection comprises all sorts of items, including toy model Oscar-Meyer Wienermobiles, hot dog shaped coin banks, hot dog shaped telephones, hot dog themed jewelry and clothing, decorative plates and platters, salt and pepper shakers and cookware, hot dog shaped radios and music boxes, and signage and statues from hot dog stands that have gone out of business. (*Id.* at 77:23-79:1.) This collection has never been open to the general public and Mr. Webster has never charged admission to view it. (*Id.* at 54:14-55:10, 53:23-25.)

In fact, the last time Mr. Webster has even seen the entire collection was in 1979 at his home in Santa Clara. (*Id.* at 55:5-16.) Since 1979, the collection has been stored in boxes. (*Id.* at 58:1-6, 75:20-76:14.) Miscellaneous pieces of

220303-1.wpd

1    the collection have been displayed only twice: once in 1983
2    at a hot dog stand operated by Mr. Webster, called Hot
3    Diggity Dogs, and once in 1996 at a pop culture art exhibit
4    called the "Hall of Fame Hall of Fame," at the Yerba Buena
5    Center for the Arts in San Francisco.   This kitsch pop-art
6    exhibit exhibited items from 54 different kinds of hall's of
7    fame, including about 50 pieces from Mr. Webster's Hot Dog
8    Hall of Fame collection.   (Webster Dep. at 81:17-20, 58:8-
9    11.).[1] (*Id.* at 57:14-15, 80:20-22.)   Mr. Webster received no
10   compensation from the Yerba Buena Center for participating in
11   the exhibit, nor was he reimbursed for any expenses he
12   incurred in transporting his items to the show. (*Id.* at 81:3-
13   16.)

14       In November of 2006, Mr. Webster sold his entire hot dog
15   collection to his brother James Webster for one dollar, in
16   order to protect it from being seized. (*Id.* at 73:1-17,
17   74:21-23.)   Despite having sold it, Mr. Webster retains
18   possession of the collection, which he stores at his home in
19   El Cajon, California. (*Id.* at 73:3-7).   Mr. Webster believes
20   his brother would "donate" it back to him if Mr. Webster were
21   able to find a permanent home for it. (*Id.*)

22       B.   **Mr. Webster's Commercial Activities**

23       Between 1976 and 1983, Mr. Webster operated a series of
24   unsuccessful hot dog stands in central California.   His first
25   hot dog stand was a three-wheeled motorcycle equipped with a
26
27   _____
     [1] The exhibit included items from, for example, the
28   Poultry Hall of Fame, the Burlesque Hall of Fame and the
     International Towing and Recovery Hall of Fame, to name a
     few (Id., Ex. 17).

1  hot dog steamer and an ice chest. (Webster Dep. at 26:12-
2  27:5.)  For approximately two weeks—until a traffic accident
3  totaled his motorcycle and put him out of business—Mr.
4  Webster sold hot dogs and canned soft drinks under the name
5  "Frank's Quality Franks" to customers at car dealerships on
6  El Camino Real in San Jose and Sunnyvale, California. (*Id.* at
7  27:8-13, 28:15-17, 29:2.)  This first business was never
8  called "The Hot Dog Hall of Fame," nor was that phrase
9  associated with the business through signage, advertising, or
10 any other means. (*Id.* at 29:5-6.)

11      In 1978, Mr. Webster made a second attempt at operating
12 a mobile hot dog sales business. (*Id.* at 29:7-12.)   This
13 time, he called it "The Great American Hot Dog Machine," and
14 rather than using a motorcycle, Mr. Webster sold hot dogs
15 from the back of a Datsun pick-up truck outfitted with a hot
16 dog steamer and an ice chest.[2]  (*Id.* at 29:11-12, 17-23).
17 Mr. Webster operated this second hot dog stand for
18 approximately six to eight months. (*Id.* at 30:18-19.)  Mr.
19 Webster never called this business "The Hot Dog Hall of
20 Fame," nor did he use that phrase on any signage or

21 _____

22    [2]Mr. Webster generically refers to each iteration of
   his mobile hot dog sales vehicle as "The Great American Hot
23 Dog Machine." For example, Mr. Webster refers to his three-
   wheeled motorcycle, from which he sold hot dogs under the
24 name "Frank's Quality Franks," as The Great American Hot
   Dog Machine No. 1, and the Datsun pick-up truck as The
25 Great American Hot Dog Machine No. 2. (Id. at 26:8-13,
   29:7-12.)  Between 1982 and 2006, Mr. Webster has
26 sporadically worked on building four more great American
   hot dog machines. (Id. at 30:20-31:9 (machine no. 3 in
27 1982), 31:25-32:9 (machine no. 4 in 1985), 40:21-41:24
   (machine no. 5 circa 1988), 48:15-50:24 (machine no. 6 in
28 2006 - also called "the Woodie Weenie Wagon").)  Mr.
   Webster never completed any of these four vehicles nor did
   he ever sell hot dogs from them.  (Id.)  Mr. Webster never
   called any of the vehicles The Hot Dog Hall of Fame. (Id.)

1    advertising associated with "The Great American Hot Dog
2    Machine." (*Id.* at 29:24-30:1.)

3        For approximately six months in 1983, Mr. Webster
4    operated a 23-seat hot dog stand called "Hot Diggity Dogs" on
5    El Camino Real in Santa Clara, California. (*Id.* at 35:8-13,
6    33:9-20.) Mr. Webster did not own the hot dog stand or the
7    building in which it was located, but merely "took it over"
8    from the owner. (*Id.* at 33:15-35:7.) While operating the hot
9    dog stand, Mr. Webster displayed approximately 40 items of
10   hot dog memorabilia on one interior wall of the restaurant,
11   over which he placed a hand-painted sign that said "The Hot
12   Dog Hall of Fame." (*Id.* at 36:21-22, 37:6-8.) The hot dog
13   stand itself was not called "The Hot Dog Hall of Fame" and
14   Mr. Webster did not charge customers to see the memorabilia
15   displayed at the hot dog stand. (*Id.* at 36:18-20, 37:9-13.)
16   Ultimately, Hot Diggity Dogs "barely paid the bills."
17   Because this restaurant "didn't turn out to be worth doing,"
18   Mr. Webster ceased operations when the building was sold in
19   1983. (*Id.* at 33:12-14, 34:6-7.) Mr. Webster has not
20   operated any hot dog stand—either mobile or stationary—in the
21   quarter century since Hot Diggity Dogs went belly-up. (*Id.* at
22   52:24-53:20.)

23        c.    **Mr. Webster's Other Activities**

24        Over the past twenty-five years, Mr. Webster has engaged
25   in several non-commercial activities that he claims
26   constitute the "true" "Hot Dog Hall of Fame." Generally
27   speaking, these activities fall into two broad categories:
28   (1) dissemination of hot dog related "news" and information,

1   and (2) ceremonial duties designed to promote interest in hot
2   dogs.  In addition, Mr. Webster has ideas for future hot dog
3   items that might one day contribute to "The Hot Dog Hall of
4   Fame," specifically the creation of a hot dog vehicle.    The
5   thrust of Mr. Webster's activities is to amuse persons who
6   share his passion for all things hot dog.
7           1.    **Dissemination of Hot Dog News and Information**
8        Mr. Webster has disseminated limited hot dog news and
9   information through various media outlets.    First,  Mr.
10  Webster has sporadically produced a newsletter, dubbed "The
11  Frankfurter Chronicles, The Newsletter with Relish." (Webster
12  Dep. at  105:7-25.)    In  addition,  Mr.  Webster  has  sent
13  "WeenieGrams"   to   persons   who   receive   the   Frankfurter
14  Chronicles. (*Id.* at 115:14-17, 116:15-117:10.)   Mr. Webster
15  also maintains a website, where he posts hot dog recipes,
16  personal anecdotes, photos of pieces from his collection, and
17  other hot dog oddities that are not a part of his collection.
18  *See* http://www.thehotdoghalloffame.com. Finally, Mr. Webster
19  is  attempting  to  write  a  book,  which  will  incorporate
20  elements and excerpts from his various newsletters. (*Id.* at
21  101:15-20, 103:22-105:6.)
22       In Mr. Webster's words, the Frankfurter Chronicles is
23  "the official organ of The Hot Dog Hall of Fame," and "it
24  speaks for us and our pursuit of The Hot Dog Hall of Fame."
25  (*Id.* at 108:15-23.) The newsletter generally contains Mr.
26  Webster's commentary on movies and television shows that
27
28

contain references to or relate in some way to hot dogs,[3] hot
dog recipes, narratives of family events and activities that
take place in July during national hot dog month,[4] letters
from friends, as well as news and jokes. (*Id.* at 107:5-24.)
Mr. Webster produced his first newsletter sometime in early
1996, and printed a total of 24 issues at irregular intervals
from that time until 1998. (*Id.* at 105:12-19, 114:25-115:6).
In 1998, Mr. Webster stopped printing the newsletter due to
the expense of mailing it and due to poor health. (*Id.* at

---

[3] For example, in the July 2004 edition of the
Frankfurter Chronicles (Id., Ex. 13 at p. DEFT 000007) Mr.
Webster reviewed an episode of The Jimmy Kimmel Show:

Did you happen to catch the recent episode of **The Jimmy
Kimmel Show** where his **Uncle Frank** auditioned to take
over the role of spokesman for **Ball Park's Grill Master
Franks**?

That's the same product that their current spokesman
(**Larry Jo Campbell**) promotes with the "Be big, be meaty,
be frank" commercials.

**Larry Jo** was a guest on the show that night (which I
caught purely by accident as I'm never up that late) and
he says that they have already shown 5 of 33 commercials
they've have already filmed for the campaign.

It was all an elaborate ruse and they "**Punk'd**" Jimmy's
**Uncle Frank** and made him think he was going to get the
job (he was horrible at it).

[4] Similarly, in the July 2004 edition of the
Frankfurter Chronicles, Mr. Webster described his family's
activities during National Hot Dog Month (Id., Ex. 13 at
DEFT 000011): It was a very low key **National Hot Dog Month**
for us this year, with half a dozen **WeenieGrams**, **Frankie
Awards** (very late this year, on the 15th of July), the
Italian sausage pizza experiment on the 3rd (for some
strange reason, the Boy had never had a sausage pizza
before), we did the Great Johnsonville Brat Experiment (the
Boy had to admit that he liked this despite his aversion to
onions in almost any form and his general ambivalence to
the great ales of the world, unlike his dear ol' dad), on
the 4th after watching the Nathan's Contest, we passed
along several articles (courtesy of Alan Pesetsky), and a
great photo courtesy of Marti Marek, one of Uncle Frank's
buddies from the war, a teaser for this issue…"

1 | 114:9-22.)

2    In 2003 Mr. Webster resumed the newsletter, distributing
3 it monthly by e-mail. (*Id.* at 110:1-8, 114:9-10.)   Although
4 Mr. Webster boasts 200 readers of his newsletter, the
5 recipients are primarily his friends and family, his college
6 roommate, and individuals to whom Mr. Webster sends
7 unsolicited copies of the newsletter. (*Id.* at 108:23-110:8.)
8 The newsletter is sent by invitation only, and is not
9 available to the general public. (*Id.* at 60:17-18, 110:18-
10 25).   Further, the newsletter is not of a commercial nature.
11 Mr. Webster does not sell advertising space or run classified
12 ads in the newsletter, nor does he sell subscriptions to the
13 newsletter itself. (*Id.* at 114:6, 116:2, 116:13.)   The words
14 "The Hot Dog Hall of Fame" appear on the newsletter only
15 sporadically. (*Id.* at 113:21-114:3.)

16    In addition to the Frankfurter Chronicles, in about 1996
17 Mr. Webster started sending "WeenieGrams" to persons who also
18 receive the Frankfurter Chronicles newsletter. (*Id.* at
19 116:15-117:10.)   According to Mr. Webster, he sends
20 WeenieGrams (which are short, mass e-mails) to announce time-
21 sensitive hot dog news. (*Id.*)   For example, Mr. Webster once
22 used a WeenieGram to announce that a hot dog eating contest
23 would be broadcast on television the following day: "Hey,
24 don't forget to watch the Nathan's Hot Dog Eating Contest
25 tomorrow!"   (*Id.*)   Mr. Webster only sends WeenieGrams on a
26 "very sporadic" basis and, like the Frankfurter Chronicles,
27 entirely discontinued sending them between 1998 and 2003.
28 (*Id.* at 118:22, 117:10-14.)   Mr. Webster distributes

1   WeenieGrams for free and the words "The Hot Dog Hall of Fame"
2   seldom appear in them. (*Id.*)

3       Although Mr. Webster's website has an online "store,"
4   Mr. Webster only recently added that component sometime
5   during the second half of January 2008. (*Id.* at 124:7.) Mr.
6   Webster created this "store" because he heard Plaintiffs'
7   counsel say to the Court during the early neutral evaluation
8   that in order to have trademark rights one must have a
9   commercial use. (*Id.* at 125:6-15.) There are four items
10  listed as being for sale on the store webpage: (1) a movie
11  called *The Weenie Roast Massacre*; (2) a book called *50 Ways*
12  *to Top a Hot Dog*; (3) "The Hot Dog Hall of Fame" t-shirts;
13  and (4) "The Hot Dog Hall of Fame" ball caps. (*Id.* at 121:20-
14  125:4.) Although Mr. Webster lists these items as being for
15  sale, Mr. Webster has sold nothing from the website since
16  starting the online store. (*Id.*)

17      Further, with respect to the movie and book, Mr. Webster
18  is not operating as a retailer. (*Id.*) He does not have an
19  inventory of the movie and book items and he does not sell
20  them. (*Id.*) His online store merely contains links to other
21  websites operated by the creators of the book and the movie
22  where the items can be purchased. (*Id.*)

23      With respect to the t-shirts and baseball caps, Mr.
24  Webster has not even sold one of these products. Mr. Webster
25  ordered sixteen screen-printed t-shirts that have "Approved:
26  Hot Dog Hall of Fame" printed on them. (*Id.*) Of the sixteen
27  shirts that he ordered, Mr. Webster has given away six and
28  sold none. (*Id.*) Mr. Webster gave shirts to his brother

1  James Webster, his neighbor Neil, "Sam the Cooking Guy" (who
2  is the host of a local cooking program), and Mr. Webster's
3  friend, "Hamburger" Harry Sperl. (*Id.*) Similarly, Mr. Webster
4  ordered 12 embroidered ball caps from a local store. (*Id.*)
5  Just as with the t-shirts, Mr. Webster has not sold any hats
6  but has given away three—one each to his brother James, his
7  neighbor Neil, and his friend Alan Pesetsky. (*Id.*)

8      Though he claims to be holding items out for sale on his
9  website, Mr. Webster stated that he has deliberately tried to
10 keep his website from the general public by not listing the
11 name "The Hot Dog Hall of Fame" with internet search engines,
12 in order to keep the public from linking to his website. (*Id.*
13 at 110:10-113:21.)

14     Finally, since 1994 Mr. Webster has been working on a
15 book, entitled "Hot Dogs in a Cold World." (*Id.* at 99:10-16.)
16 This book consists primarily of excerpts from past
17 newsletters. (*Id.* at 100:11-12.) In addition, the book will
18 eventually include hot dog recipes, "certain elements of hot
19 dog humor," jokes, Mr. Webster's reviews of movies and
20 television, and a list of songs which Mr. Webster calls
21 "Tubesteak Tunes." (*Id.* at 104:8-13.) Although Mr. Webster
22 claims that the book is 75 to 80 percent complete, its
23 various components have not been edited or assembled. (*Id.* at
24 104:3-8) Various parts of the book are "in files all over,"
25 and consist of "pieces of this, pieces of that." (*Id.*) Mr.
26 Webster has not yet found a publisher for the book. (*Id.* at
27 103:8-12.)

28

1

## 2. Ceremonial Activities

2    Mr. Webster's ceremonial activities include (1) issuing
3 hot dog awards; (2) appearing in a white tuxedo with his wife
4 (who wears a hot dog costume and waves at traffic) at "grand
5 openings" of new hot dog stands and shaking hands with
6 customers; (3) offering free advice to any hot dog stand
7 operators who seek his counsel; and (4) looking for
8 electronic greeting cards that have hot dog themes and
9 sending them to his friends and acquaintances.

10    Every year, during July (National Hot Dog Month),[5] Mr.
11 Webster issues an award, which he has named "The Frankie."[6]
12 The Frankie Award is embodied in a statuette that consists of
13 a plastic gold-colored hot dog on a wooden base. The words
14 "The Frankie" are printed on a plaque attached to the base.
15 (Webster Dep. at 93:18-22.) None of the awards have the
16 words "The Hot Dog Hall of Fame" printed on them. (*Id.*)

17    According to Mr. Webster, The Frankie is given to
18 recognize "excellence in the field of hot dogs." (*Id.* at
19 87:7-8.) Mr. Webster believes that giving out the award is
20 one of the most important activities of "The Hot Dog Hall of
21 Fame:" "that's what a hall of fame does. It appreciates
22 excellence in the field. It celebrates these individuals."
23 (*Id.* at 87:16-18.) According to Mr. Webster, "The [Hot Dog]
24 Hall of Fame is The Frankie Award for Hot Dog Excellence. [It

25
_____

26    [5] Mr. Webster estimates that he conducts 70 percent of
27 his activities during national hot dog month. (Webster Dep.
at 262:15- 23.)

28    [6] A photo of The Frankie can be seen at Webster Dep.,
Ex. 13, p. DEFT 000012.

1  is t]he people who have made the wonderful world of wieners

2  what it is." (*Id.* at 59:7-10.)   Mr. Webster and his family

3  (his mother, brother, wife, and son) decide who should

4  receive a Frankie Award. (*Id.* at 94:20-21.)   Since 1982, Mr.

5  Webster has bestowed approximately 37 Frankies in ad-hoc

6  categories such as outstanding contribution to hot dog

7  history, artist of the year, and push cart operator of the

8  year. (*Id.* at 86:14-16, 93:11-12, 93:20, 89:10-14.)   However,

9  most of the awards are generically presented for "hot dog

10  excellence." (*Id.* at 89:16-20.)   The number of awards that

11  Mr. Webster bestows varies from year to year, and there was

12  at least one year when Mr. Webster made no award at all. (*Id.*

13  at 92:5-10.)

14      Several Frankie Award recipients are members of Mr.

15  Webster's family, some are operators of hot dog stands, and

16  still others are people Mr. Webster has admired but has never

17  been able to locate. (*Id.* at 94:2-4, 92:11-14.)   For example,

18  one year Mr. Webster heard about a lottery winner who had

19  bought a winning ticket and a hot dog at a convenience store.

20  (*Id.* at 90:3-7.)   Mr. Webster wanted to award him a Frankie,

21  but unfortunately, could not locate him.  (*Id.*)   Mr. Webster

22  also wanted to give a Frankie to Takeru Kobayashi, the former

23  hot dog eating contest champion, but, like the lottery

24  winner, Mr. Webster was unable to locate him. (*Id.* 92:20-

25  93:2.)   Mr. Webster awarded a Frankie to a friend he calls

26  "Mr. Potato Head" for giving Mr. Webster a toy figurine. (*Id.*

27  at 90:9-91:1.)   Mr. Webster explained: "Mr. Potato Head gave

28

1  us the Frankie Frank, which is Mr. Potato Head's mutant
2  wiener cousin." (*Id.* at 90:9-91:1.)

3      The first seven times that Mr. Webster presented his
4  Frankie Awards (from 1982 to 1989), he hosted a 4th of July
5  barbeque at a public park for his friends. (*Id.* at 96:10-
6  98:17.)   Mr. Webster did not print flyers or otherwise
7  advertise the barbeque.  Though the public was not invited,
8  several curious on-lookers did happen by. (*Id.* at 98:20-
9  99:7.)  Mr. Webster has not held an awards party since 1989.
10 (*Id.* at 96:10-25.)

11     Mr. Webster also claims that he performs certain other
12 "official" duties on a voluntary basis. (*Id.* at 157:22-25,
13 158:15-20.)  These duties have included coaxing his wife to
14 don a hot dog costume and wave at traffic during "grand
15 openings" of new hot dog stands while Mr. Webster, wearing a
16 white tuxedo, shakes hands with customers. (*Id.* at 151:5-11,
17 160:6-12.)   He has also called local community newspapers to
18 encourage them to send reporters to cover the grand openings.
19 (*Id.*)   These ceremonial duties are strictly voluntary, and
20 though Mr. Webster has attended "four or five" grand
21 openings, he has not attended one since 2003. (*Id.* at 159:3-
22 7.)

23     In addition, Mr. Webster offers free advice to any hot
24 dog stand operators who seek his counsel and looks for
25 electronic greeting cards that have hot dog themes (e.g.,
26 "Happy Hallowienie," "Wiener Wonderland") and sends them to
27 his friends and acquaintances. (*Id.* at 158:8-20, 262:2-12.)

28

1

### 3.    The Hot Dog Vehicle

2    Mr. Webster has dreamed of building a hot dog shaped
3 vehicle, which he would use to promote his restaurant, when
4 and if it he opened one. (Webster Dep. at 58:20-22.)    His
5 plan was to build a hot dog shaped body out of fiberglass and
6 install a Volkswagen stock engine—it would be called the
7 "Lamborweenie." (*Id.* at 128:14-130:25.)    The Lamborweenie
8 would seat two, and Mr. Webster envisioned himself giving
9 rides to customers and members of the press. (*Id.* at 130:17-
10 25.)    Mr. Webster also dreamed of one day challenging the
11 Oscar Meyer Wienermobile to a drag race. (*Id.* at 130:6-8.)
12 In 1985 Mr. Webster began building the Lamborweenie, but
13 abandoned the project in 2003 due to a lack of funding. (*Id.*
14 at 31:21-32:8, 130:13-16.)

15    As detailed in the preceding paragraphs, Mr. Webster
16 claims that the activities he conducts as "The Hot Dog Hall
17 of Fame" are broader than his collection.    He has described
18 "The Hot Dog Hall of Fame" as a "loose affiliation of hot dog
19 lovers." (*Id.* at 53:19-24.)    Though it is difficult to
20 understand what Mr. Webster's "Hot Dog Hall of Fame" is, it
21 is easy to see what it is not.    It is not any recognized form
22 of business.    Mr. Webster's "Hot Dog Hall of Fame" does not
23 have paid employees. (*Id.* 63:21-23.)    It has never filed
24 either state or federal income taxes nor does it have a
25 California sales tax registration certificate. (*Id.* at 63:11-
26 14, 18-19.)    Mr. Webster has never had any earnings
27 conducting business as "The Hot Dog Hall of Fame." (*Id.* at
28 63:14-17.)    "The Hot Dog Hall of Fame" is not a non-profit

1  organization. (*Id.* at 151:4.)   It does not have a written
2  business plan or marketing plan. (*Id.* at 64:6-7, 21-23.)   Mr.
3  Webster has never operated a restaurant, gallery, or museum
4  called "The Hot Dog Hall of Fame." Thus, in effect, "The Hot
5  Dog Hall of Fame" has no commercial presence whatsoever.

6  II.  **Mr. Schussler And Schussler Creative, Inc.'S Commercial**
7  **Use Of "Hot Dog Hall Of Fame"**

8      Mr. Schussler and Schussler Creative, Inc. (collectively
9  referred to as "Schussler Creative") specialize in the
10 development of innovative concepts for restaurants and
11 entertainment venues such as "The Rainforest Café" and "T-
12 Rex," for which Schussler Creative has come to be known.
13 (Declaration of Steven Schussler ("Schussler Decl."), ¶¶ 1-
14 4.)   Mr. Schussler, the Chairman of the Board and Chief
15 Executive of Schussler Creative, Inc., is the main creative
16 force responsible for generating these innovative restaurant
17 concepts and turning them into actual businesses. (*Id.*)

18     Schussler Creative's business model is unique in that
19 the restaurants it designs are elaborate attractions that are
20 very expensive to construct and to initially operate. (*Id.* at
21 ¶ 14.)   The restaurants are often located in large shopping
22 malls or other expensive venues such as the Rainforest Café
23 at The Mall of America in Bloomington, Minnesota. (*Id.*)   In
24 order to be profitable, Schussler Creative must secure
25 financing in the form of tenant allowances from shopping mall
26 developers or other favorable beneficial arrangements. (*Id.*
27 at ¶ 15.)   Tenant allowances are low-interest or no-interest
28 loans or grants provided by developers to certain preferred
tenants, which these tenants then use to finance the

1  construction and opening of the expensive retail concepts.
2  (*Id.* at ¶¶ 15, 16.)

3     In 1998, Schussler Creative began research and
4  development on a new restaurant and retail store called HOT
5  DOG HALL OF FAME. (*Id.* at ¶ 17.)  In developing Hot Dog Hall of
6  Fame, Schussler Creative spent over $200,000 building a
7  prototype of the restaurant at its headquarters in Golden
8  Valley, Minnesota. (*Id.* at ¶ 6; Pl.'s Ex. 1.)  Potential
9  investors and business partners are invited to a weekly
10 "show" which consists of turning the prototype into a fully
11 functioning restaurant with a test menu. (*Id.*)  Producing
12 each show costs between $750 and $1,000 for labor, food
13 supplies, utilities, and set-up and break-down expenses.
14 (*Id.*)  Major hot dog and condiment brands, such as Chicago-
15 based Vienna Beef, Inc. and Hunts, Inc., as well as gourmet
16 brands such as Allen Brothers, send complementary products
17 for use in the shows.  These companies are negotiating with
18 Schussler Creative in an effort to have their products
19 included on HOT DOG HALL OF FAME's menu. (*Id.*)  Schussler
20 Creative also uses these weekly shows to conduct market
21 research by testing menu items on focus groups. (*Id.*)
22 Volunteer participants are paid $10 to $20 to sample foods
23 and to complete a survey, which Schussler Creative and its
24 business partners then use to develop Hot Dog Hall of Fame's
25 menu.  (*Id.*)

26    In 2005, Schussler Creative hired Cunningham Architects,
27 Inc. to help develop Hot Dog Hall of Fame's trade dress and
28 branding. (*Id.* at ¶ 7; Pl.'s Ex. 2.)  The two companies have

1   thereafter engaged in a collaborative design review process,
2   which includes drafting designs of the exterior and interior
3   spaces and developing Hot Dog Hall of Fame characters such as
4   an anthropomorphic hot dog, and mustard and ketchup
5   characters designed to appeal to children and to strengthen
6   brand identification. (*Id.*)  These characters will be
7   displayed prominently on building signage and facades and in
8   printed material such as brochures, menus, and advertising.
9   (*Id.*)  This effort to build a brand is essential to creating
10  a successful restaurant concept. (*Id.*)  To date, Schussler
11  Creative has spent $150,783 on design review for Hot Dog Hall
12  of Fame. (*Id.*)

13      Hot Dog Hall of Fame will serve gourmet food items
14  including nine varieties of hot dogs, nine varieties of
15  sausage, varieties of French fries, and nine varieties of
16  dumplings. (*Id.* at ¶ 8.)  Hot Dog Hall of Fame will also
17  offer 3,700 varieties of mustard. (*Id.*)  In order to provide
18  such a large variety, Schussler Creative is negotiating the
19  purchase of the Mustard Museum in Mount Horeb, Wisconsin.
20  (*Id.*)

21      Integral to Schussler Creative's business concept is the
22  ability to use the name, Hot Dog Hall of Fame, in which
23  Schussler Creative has invested considerable time and money.
24  As part of its effort, Mr. Schussler applied for and obtained
25  U.S. Trademark Application Serial No. 78591560 for the Hot
26  Dog Hall of Fame trademark for restaurant services, retail
27  store and wholesale distributorship services and U.S.
28  Trademark Application Serial No. 77262782 for the ART OF

1    MUSTARD trademark for mustards, dipping sauces and restaurant

2    services for consumption on the premises. (*Id.* at ¶ 9; Pl.'s

3    Ex. 3.)[7]

4         In May 2007, Schussler Creative signed a $100 million

5    partnership agreement with shopping mall developer Red

6    Development, LLC ("Red Development") to develop ten new theme

7    restaurants including Hot Dog Hall of Fame. (*Id.* at ¶ 10.)

8    Under this contract Schussler Creative secured a $20 million

9    line of credit. (*Id.*)  This contract, like all of Schussler

10   Creative's contracts, contains a provision representing that

11   Schussler Creative owns all rights, trademarks, or patents in

12   the concepts it is developing. (*Id.* at ¶ 9.)

13        Hot Dog Hall of Fame will open its first restaurant this

14   summer at Red Development's Legends at Village West - a $500

15   million, 1.2 million sq. ft. shopping mall in Kansas City.

16   (*Id.* at ¶ 11.)  Hot Dog Hall of Fame will seat 50 customers

17   in the dining room and will also serve drive-thru customers.

18   (*Id.*)  The second Hot Dog Hall of Fame will open in 2009 at

19   Red Development's Legends at Sparks Marina - an 800,000 sq.

20   ft. outdoor mall just outside of Reno, Nevada. (*Id.*)  In

21   order to open these restaurants and malls, Schussler Creative

22   and Red Development have entered into licensing agreements

23   with each city to secure the public financing necessary to

24

25   _____

26        [7] Application No. 78591560 ("Hot Dog Hall of Fame"
     word) was approved subject to demonstration of actual use
27   in commerce on or before March 14, 2009.  Since Schussler
     Creative's first restaurant is scheduled to open in Kansas
28   City in summer 2008, this condition will be fulfilled.
     Similarly, Application No. 77328889 (Hot Dog Hall of Fame
     design) was published for opposition on May 7, 2008.

1  fund the massive shopping mall construction projects. (*Id.* at
2  ¶ 16.)

3       In addition to installing Schussler Creative restaurant
4  concepts at its Legends mall projects, Red Development is
5  currently brokering contracts to install Hot Dog Hall of Fame
6  restaurants at (1) the Meadowlands Xanadu, a six-story, 4.8
7  million sq. ft. shopping and entertainment complex in East
8  Rutherford, New Jersey; (2) the Mohegan Sun Casino, the
9  world's second largest casino located in Uncasville,
10 Connecticut; and (3) Harrah's Casinos at its Las Vegas and
11 Biloxi, Mississippi locations. (*Id.* at ¶ 11.)    All told,
12 Schussler Creative and Red Development plan to open 200 units
13 of Hot Dog Hall of Fame over the next ten years. (*Id.* at ¶
14 10.)

15      Schussler Creative has contracted with several other
16 well-established businesses in developing Hot Dog Hall of
17 Fame.    It has contracted with Levy Restaurants, Inc.,
18 ("Levy") to scout locations and market Hot Dog Hall of Fame
19 to large shopping centers and entertainment venues, as well
20 as to develop the Hot Dog Hall of Fame concept and menu. (*Id.*
21 at ¶ 12; Pl.'s Ex. 4.)    Levy, a Chicago-based restaurateur
22 and sports concessionaire, generated $1.17 billion in
23 revenues in 2006. (*Id.*)    Levy and Schussler Creative are
24 currently in license negotiations with Olympia Entertainment,
25 Inc., concessions operator for the Detroit Red Wings at Joe
26 Lewis Stadium and with Delaware North Companies, concession
27 operator for the Detroit Tigers at Comerica Stadium to
28 install Hot Dog Hall of Fame restaurants at those locations.

1  (*Id.*)

2      In promoting Hot Dog Hall of Fame, Schussler Creative

3  has organized a media campaign that has successfully

4  attracted the attention of the industry press and mainstream

5  media. (*Id.* at ¶ 13; Pl's Ex. 4.)

6  III.      **The Current Dispute**

7      Beginning in June 2007, Mr. Webster embarked on a

8  campaign to ruin Schussler Creative's Hot Dog Hall of Fame

9  business.  On June 10, 2007, Mr. Webster sent an e-mail to

10  Mr. Schussler demanding that Mr. Schussler immediately cease

11  and desist using the name Hot Dog Hall of Fame. (Pl.'s Ex. 7;

12  Webster Dep. at 172:9-13.)  In this e-mail, Mr. Webster

13  threatened to sue Mr. Schussler, stating his intention to

14  "turn the lawyers loose on him." (*Id.*)  Shortly thereafter,

15  Mr. Webster also contacted media organizations and

16  hospitality companies alleging that the concept, name, and

17  related intellectual property of Hot Dog Hall of Fame

18  belonged exclusively to him, and that Schussler Creative had

19  stolen the concept of the Hot Dog Hall of Fame from him.

20  (Pl.'s Ex. 7; Webster Dep. at 171:18-172:8.)[8]

21      In response, by letter dated June 11, 2007, Schussler

22  Creative's legal counsel contacted Mr. Webster and informed

23  him that Schussler Creative was the lawful owner of the U.S.

24  Trademark Application for Hot Dog Hall of Fame, and requested

25

26  _____

27      [8] The media organizations and hospitality companies to
    which Mr. Webster made these allegations included Host
    Marriott, Levy Restaurants, Success Magazine, The Harford

28  Courant, The Rocky Mountain News, The Chicago Sun Times,
    The San Diego Union Tribune and Chain Leader Magazine.
    (Pl.'s Ex. 7; Webster Dep. at 171:19-172:13.)

1   that Mr. Webster stop sending false, misleading, and
2   defamatory statements regarding Schussler Creative. (Pl.'s
3   Ex. 8; Schussler Decl. at ¶ 23.)    In the letter, Schussler
4   Creative's counsel explained that "it is well-settled law
5   that trademark rights are established only through use for an
6   actual product or service.    Such use must be genuine for
7   products or services offered to the public, and not a mere
8   fantasy or ambition to launch a business at some future
9   date." (Pl.'s Ex. 7.)

10      In an edition of his newsletter dated June 17, 2007, Mr.
11  Webster described his intention to damage Schussler Creative,
12  and stated that he planned to "poison the well" by contacting
13  Schussler Creative's current business partners, potential
14  business associates, and the media to accuse Schussler
15  Creative of theft of intellectual property and to threaten
16  legal action. (Pl.'s Ex. 10 at 3.)    In this same newsletter,
17  Mr. Webster posted a copy of a letter he had previously sent
18  to one of Schussler Creative's business partners, in which
19  Mr. Webster had threatened: "be advised that we plan to first
20  blacken both of your eyes (yours and Mr. Schussler's)
21  professionally, first in the papers and on TV, then we will
22  see you in court." (Pl.'s Ex. 10 at 5.)

23      In September, 2007, undeterred by the letters from
24  Schussler Creative's legal counsel, Mr. Webster began to
25  contact Schussler Creative's business partners directly for
26  the express purpose of disrupting Schussler Creative's
27  business. (Webster Dep. at 184:22-25.)    In an e-mail to Red
28  Development dated September 17, 2007, Mr. Webster stated that

1  Mr. Schussler was a "liar," a "thief," and a "con man," and

2  that Mr. Schussler was attempting to steal the concept and

3  name of Hot Dog Hall of Fame from him. (Schussler Decl. at ¶¶

4  24, 27; Pl.'s Ex. 11 at 3.)   Mr. Webster's entire basis for

5  calling Mr. Schussler a liar, thief, and con man was his

6  contention that Mr. Schussler did not have the legal right to

7  use the name Hot Dog Hall of Fame for a restaurant. (Webster

8  Dep. at 186:5-11.)   In an e-mail dated September 18, 2007,

9  sent to Dave Claflin of Red Development, Mr. Webster wrote,

10  "We have also been talking to someone within [Schussler's]

11  organization who tells us that [Mr. Schussler] may not

12  actually own another one of the concepts he's currently

13  touting." (Pl.'s Ex. 11.)   Mr. Webster claimed that he

14  received this information from an anonymous source but did

15  nothing to verify the truth of the information before

16  publishing it. (Webster Dep. at 187:18-188:14, 192:7-13.)

17  Mr. Webster sent these e-mails to Schussler Creative's

18  business partners with the deliberate intent to stop Hot Dog

19  Hall of Fame from opening and to convince Red Development not

20  to work with Schussler Creative. (*Id.* at 184:22-185:14,

21  192:14-17.)

22      That same day, September 18, 2007, Mr. Webster sent a

23  second e-mail, this one to the Mayor and City Council for the

24  City of Sparks, Nevada,  in which he again called Mr.

25  Schussler a "liar," a "thief," and a "con man," and claimed

26  that Mr. Schussler had stolen the concept and name of Hot Dog

27  Hall of Fame from him. (Pl.'s Ex. 11.)   Mr. Webster

28  threatened to go "VERY public" with these accusations and

1   warned the Mayor and City Council of the "fallout this will

2   cause." (*Id.*)    The e-mail also contained links to Mr.

3   Webster's website where he published similar false and

4   defamatory allegations. (*Id.*) Again, Mr. Webster's intention

5   was to disrupt Schussler Creative's development with the City

6   of Sparks. (Webster Dep. at 203:8-12.)

7       Finally, on October 10, 2007, Mr. Webster posted an

8   edition of the Frankfurter Chronicles on his website in which

9   he repeated his allegations that Schussler Creative had

10  stolen his intellectual property. (Pl.'s Ex. 10.)   He again

11  expressly stated his intention to damage Schussler Creative's

12  business through extra-legal means:

13          … we can't possibly hope to prevail in the legal
            system as he's far more affluent then we are or
14          ever really hope to be.  Instead, we are going to
            "poison the well" so to speak.  If he thinks he can
15          steal from us, he had another thing [sic] coming.
            We didn't spend most of our lives doing this, at
16          enormous expense to ourselves, just to roll over
            and play dead so he can walk right in and take
17          whatever he wants.

18                          .  .  .

            every time he uses our name, concept, variants of
19          our URL, etc., we will e-mail these individuals .
            . . and point out that they are being conned . . .
20          and that WE are the Hot Dog Hall of Fame and have
            fulfilled all of the duties of the Hot Dog Hall of
21          Fame for almost 30 years now.

22  (Pl.'s Ex. 10 at 6.)

23      As a result of Mr. Webster's e-mails, Schussler

24  Creative's business associates, including Red Development and

25  city officials in Sparks, Nevada, became concerned and

26  expressed their hesitancy to proceed with the relationship.

27  (Schussler Decl. ¶ 28.)  Their concern directly implicates a

28  key representation made by Schussler Creative in its

1  contracts with its business partners—that Schussler Creative
2  owns the rights to Hot Dog Hall of Fame. (*Id.*)   Because
3  cities finance Red Development's projects with public funds,
4  they are particularly sensitive to any potential liability
5  issues such as those threatened by Mr. Webster. (*Id.*)   Red
6  Development was concerned that the city would refuse to
7  license its shopping mall developments if city officials
8  believe that litigation may arise over the rights to Hot Dog
9  Hall of Fame. (*Id.*)  Consequently, Red Development had stated
10  that it would not finalize the projects until this matter is
11  resolved by court order.

12       Further, Schussler Creative's business niche is a very
13  competitive enterprise involving a high degree of risk to
14  developers. (*Id.* at ¶ 30.)  Schussler Creative has succeeded
15  by securing anchor tenant space and the highly-coveted tenant
16  allowances that come with it, as well as other favorable
17  financing arrangements. (*Id.*)  This has only been possible
18  because of Schussler Creative's excellent reputation as a
19  successful developer of original restaurant concepts. (*Id.*)
20  Because of the prospective and uncertain nature of the mall
21  development industry, developers award tenant allowances
22  based entirely on the reputation of franchises. (*Id.*)

23       Schussler Creative's reputation has benefitted
24  immeasurably from favorable media coverage. (*Id.* at ¶ 31.)
25  However, Mr. Webster's defamatory e-mail campaign has reached
26  many people in the industry and has begun to spark a domino
27  effect, blackening Schussler Creative's business reputation.
28  (*Id.*)  Schussler Creative's business is beginning to suffer

220303-1.wpd

1  from the delay caused by Mr. Webster's interference. (*Id.*)

2  The delay and subsequent negative impact on Schussler

3  Creative's reputation has and will continue to affect the

4  quantity and quality of tenant allowances Schussler Creative

5  is capable of securing in the future. (*Id.*)   If Schussler

6  Creative cannot secure a critical number of these prime

7  tenant leases, it faces potential default on its line of

8  credit.   (*Id.*)   As already noted, Mr. Webster's campaign

9  threatened to halt the first restaurant set to be opened.

10  Unless permanently enjoined, the potential damages caused by

11  Mr. Webster's defamatory e-mail campaign may well exceed $100

12  million. (*Id.*)   Because the stakes are so high, Schussler

13  Creative filed this lawsuit to obtain a declaratory judgment

14  that its use of Hot Dog Hall of Fame does not infringe upon

15  any protectible interest Mr. Webster has in the name Hot Dog

16  Hall of Fame.   To date, Schussler Creative has incurred

17  $44,296 in legal fees as a result of this litigation. (*Id.* at

18  ¶ 29.)

19  DATED: June 27, 2008   JAMES P. COLLINS, JR.
                             COTKIN & COLLINS
20                           A PROFESSIONAL CORPORATION

21                           DAVID T. SCHULTZ
                             MASLON EDELMAN BORMAN & BRAND LLP
22

23

24                           By
                             James P. Collins, Jr.
25                           Attorneys for Plaintiffs
                             STEVEN SCHUSSLER and SCHUSSLER
26                           CREATIVE, INC.

27

28

220303-1.wpd                -26-