1  JAMES P. COLLINS, JR. (SBN 47608)
   COTKIN & COLLINS
2  A PROFESSIONAL CORPORATION
   200 West Santa Ana Blvd., Suite 800
3  P.O. Box 22005
   Santa Ana, CA 92702-2005
4  Telephone: (714) 835-2330
   Facsimile: (714) 835-2209
5  Email: jpc@cotkincollins.com

6
   DAVID T. SCHULTZ (MN NO. 169730)
7  JOLYNN M. MARKISON (MN NO. 0386876)
   JOHN K. DARDA (MN NO. 0388298)
8  MASLON EDELMAN BORMAN & BRAND LLP
   3300 Wells Fargo Center
9  90 South 7th Street
   Minneapolis, MN 55402-4140
10 Telephone: (612)672-8200
   Facsimile: (612) 672-8397
11 Email:   david.schultz@maslon.com
            jolynn.markison@maslon.com
12          john.darda@maslon.com

13 Attorneys for Plaintiffs STEVEN SCHUSSLER
   and SCHUSSLER CREATIVE, INC.

14

              UNITED STATES DISTRICT COURT
15
             SOUTHERN DISTRICT OF CALIFORNIA
16

17 STEVEN SCHUSSLER and          Case No. 07CV2016IEG (AJB)
   SCHUSSLER CREATIVE, INC.,
18
                   Plaintiffs,   DECLARATION OF DAVID T.
19                               SCHULTZ IN SUPPORT OF
        vs.                      PLAINTIFFS' MOTION FOR
20                               SUMMARY JUDGMENT
   J. FRANK WEBSTER, aka "MR.
21 HOT DOG," aka "UNCLE          DATE:  August 18, 2008
   FRANK,"                       TIME:  10:30 a.m.
22                               COURTROOM: 1
                   Defendants.
23

24

25 ///

26 ///

27 ///

28

I, David T. Schultz, declare under penalty of perjury and state as follows:

1.    My name is David T. Schultz. I am an attorney duly licensed to practice law in the State of Minnesota and before this Court.

2.    I make this Declaration on the basis of my personal knowledge and in support of Steven Schussler and Schussler Creative, Inc.'s Motion for Summary Judgment herein.

3.    Attached hereto as Exhibit 12 is a true and correct copy of the February 25, 2008 deposition transcript of J. Frank Webster with exhibits.

4.    Attached hereto as Exhibit 13 is a true and correct copy of the unpublished opinion in *Smith v. Airborne Freight, Co.*, No. C-95-1299 SI, 1996 WL 207760, at *2 n.2 (N.D. Cal. Apr. 19, 1996)

5.    Attached hereto as Exhibit 14 is a true and correct copy of the unpublished opinion in *Guichard v. Universal City Studios, LLLP*, No. 06-6392, 2007 WL 1750216, at *3 (N.D. Cal. June 15, 2007).

FURTHER YOUR AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed this 25th day of June, in the City of Minneapolis, County of Hennepin, State of Minnesota.

David T. Schultz

Page 1

1               UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

4    STEVEN SCHUSSLER AND SCHUSSLER        )

     CREATIVE, INC.                        )

5                                          )

              Plaintiffs,                  )

6                                          )

        vs.                                ) Case No.: 07-CV-2016IEG

7                                          )

     J. FRANK WEBSTER, MR. HOT DOG, UNCLE )

8    FRANK,                                )

                                           )

9              Defendants.                 )

     ____                         ___      )

10

11

12

13           DEPOSITION OF J. FRANK WEBSTER

14              San Diego, California

15               February 25, 2008

16

17

18

19   REPORTED BY BRIDGET L. MASTROBATTISTA, CSR NO. 7715, RPR

20

21

22

23

24

25



EXHIBIT 12

3

Page 2

1         UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF CALIFORNIA
3
4  STEVEN SCHUSSLER AND SCHUSSLER   )
    CREATIVE, INC.             )
5                   )
      Plaintiffs,    )
6                   )
    vs.        ) Case No.: 07-CV-2016IEG
7                  )
    J. FRANK WEBSTER, MR. HOT DOG, UNCLE )
8  FRANK,           )
                 )
9     Defendants.    )
   —      —    )
10
11     DEPOSITION OF J. FRANK WEBSTER,
12 taken by the Plaintiffs, commencing at the hour of
13 9:00 a.m. on Monday, February 25, 2008, at 940 Front
14 Street, Room A, San Diego, California, before Bridget L.
15 Mastrobattista, Certified Shorthand Reporter No. 7715,
16 RPR, in and for the State of California.
17
18
19
20
21
22
23
24
25

---

Page 4

1       I N D E X
2
  WITNESS:  J. FRANK WEBSTER
3
4  EXAMINATION        PAGE
5  BY MR. SCHULTZ      7
6     E X H I B I T S
7  FOR PLAINTIFFS:     MARKED

8  1  Six-page document entitled   132
     "Defendant's Production of
9    Documents"
10  2  Eleven-page document entitled  154
     "Defendant's Initial Rule 26
11    Disclosure"
12  3  Four-page document entitled   167
     "Complaint for Monetary Damages
13    (Tort), Injunctive Relief; Demand
     for Jury"
14
   4  Two-page e-mail to Steve Schussler 169
15    from Mr. HotDog
16  5  Seven-page letter to Mr. Webster  175
     from John W. Provo
17
   6  One-page e-mail to Steve Graham,  182
18    Steve Schussler from Dave Claflin
     dated September 18, 2007
19
   7  The Hot Dog Hall of Fame web page 1 193
20   of 6
21  8  Two-page e-mail     201
22  9  Eight pages of e-mails   205
23  10  Ten-page document prepared by Mr.  207
     Webster
24
  11  Eleven page of miscellaneous   209
25    correspondence

---

Page 3

1  APPEARANCES:
2
3  For the Plaintiffs:
4    MASLON, EDELMAN, BORMAN & BRAND
     BY:  DAVID T. SCHULTZ, ESQ.
5    3300 Weiss Fargo Center, 90 South Seventh Street
    Minneapolis, Minnesota 55402
6
7
8  Also present:  Victor Renturia, Videographer
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1     E X H I B I T S (Continued)
2  FOR PLAINTIFFS:     MARKED

3  12  Seven pages of media resume   219
4  13  Multi-page document Bates stamped  220
     DEFT 000001 through 000086
5
  14  Documents Bates stamped DEFT 000087 223
6    through DEFT 000099
7  15  E-mail      225
8  16  Two-page e-mail    227
9  17  Documents Bates stamped DEFT 000104 240
     through DEFT 000120
10
  18  Documents Bates stamped DEFT 000121 241
11    through DEFT 000124
12  19  E-mail      249
13  20  E-mail with attachments   253
14
15
16
17
18
19
20
21
22
23
24
25

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 6

1     THE VIDEOGRAPHER: Okay. The time on the
2  record is 9:04 a.m. Today's date is February 25th,
3  2008.
4     My name is Victor Renturia contracted by
5  Peterson Reporting & Video Services.
6     The court reporter today is Bridget of Peterson
7  Reporting located at 530 "B" Street, Suite 350,
8  San Diego, California, 92101.
9     This begins the videotaped deposition of Steven
10  Schussler testifying --
11     MR. SCHULTZ: J. Frank Webster who is
12  testifying.
13     THE VIDEOGRAPHER: Oh, gee. Excuse me.
14     -- J. Frank Webster testifying in the matter of
15  Steven Schussler and Schussler Creative, Incorporated
16  versus J. Frank Webster, Mr. Hot Dog, Uncle Frank.
17     This case is in the United States District
18  Court, Southern District of California. And the case
19  number is 07-CV-2016IEG.
20     This deposition is taking place at 940 Front
21  Street, Room A, San Diego, California, 92101.
22     The video and audio recordings will take place
23  at all times during this deposition, unless counsel
24  agrees to go off the record. The beginning and end of
25  each videotape will be announced.

Page 7

1     Will counsel please identify yourself and state
2  whom you represent.
3     MR. SCHULTZ: Good morning.
4     David Schultz from the Maslon firm in
5  Minneapolis, Minnesota representing the plaintiff Steven
6  Schussler and Schussler Creative, Inc.
7     THE VIDEOGRAPHER: Thank you.
8     THE WITNESS: J. Frank Webster, The Hot Dog
9  Hall of Fame.
10     THE VIDEOGRAPHER: Thank you.
11     Would the court reporter please swear in the
12  witness.
13
14          J. FRANK WEBSTER,
15     having been first duly sworn, testified as follows:
16
17          EXAMINATION
18  BY MR. SCHULTZ:
19  Q.  Good morning, Mr. Webster.
20  A.  Good morning.
21  Q.  And will you state your full name for the
22  record, please.
23  A.  J. Frank Webster.
24  Q.  And is that initial "J"?
25  A.  Yes.

Page 8

1  Q.  Have you been deposed before?
2  A.  No.
3  Q.  Have you had your deposition taken?
4  A.  No.
5  Q.  All right. A few things that we'll go over
6  before we get into the questions.
7     You're appearing today without the benefit of
8  an attorney representing you; is that correct?
9  A.  That's correct.
10  Q.  And you understand that, if you wanted, you
11  could have an attorney here present, right?
12  A.  Well, I could have one, if I could get one.
13  Q.  Okay.
14  A.  Yes.
15  Q.  Well, you want to proceed without one --
16  A.  I have no choice.
17  Q.  -- correct?
18     One of the things that will happen today is I
19  will be asking you questions, and you are to give me
20  answers to those questions, unless you object and
21  believe them to be improper. And we happen to be taking
22  the deposition at the courthouse today, so if we have
23  any disagreements of that nature, we can have those
24  resolved quickly.
25     In addition, when I ask you a question, your

Page 9

1  answer has to be out loud. Okay?
2  A.  Yes.
3  Q.  All right. And not only does it have to be out
4  loud, but, as you're doing, it has to be actual words.
5  You can't say "uh-huh" or "huh-uh."
6  A.  Right.
7  Q.  All right. I will -- I can be kind of slow
8  asking my questions, so you're going to probably know
9  what the question is before I finish asking it, but I'd
10  like you to do me the favor of not answering before my
11  question is done. Okay?
12  A.  Sure.
13  Q.  Okay. And I will try and accord you the like
14  courtesy of not talking over your answer.
15     Fair enough?
16  A.  Sure.
17  Q.  If you need a break for any reason, you want to
18  just get up, stretch your legs, do whatever, just let me
19  know. We can do that. Okay?
20  A.  Okay.
21  Q.  And if you don't understand a question, tell me
22  that. Ask me to rephrase it, and I will do that so that
23  it is understood.
24     Is that fair?
25  A.  Yes.

Page 10

1    Q. Finally, we have -- under the Federal Rules of
2  Civil Procedure, this deposition allows me to take seven
3  hours of testimony. Now, I don't think it's going to go
4  that long, but that's how much time I have under the
5  Rules. So with -- if we stay on track, we'll probably
6  get done in half that time. Okay?
7    A. Okay.
8    Q. All right. Are there any other names that you
9  go by, Mr. Webster, besides J. Frank Webster?
10   A. No, sir. Just it's on my license and
11  everything else, you know. Yeah. People call me
12  Frankie and my old college roommate calls me Turk
13  because I used to live in Turkey when I went to high
14  school.
15   Q. How about the name Uncle Frank?
16   A. Oh, that, too, yes.
17   Q. Okay. That comes from your activities with The
18  Hot Dog Hall of Fame?
19   A. Yes.
20   Q. And how about Mr. Hot Dog?
21   A. That's my e-mail address.
22   Q. Okay. Do you call yourself Mr. Hot Dog?
23   A. No, I don't.
24   Q. Does anyone else call you that?
25   A. Not that I know of.

Page 11

1    Q. Are there any other names that you are known
2  by?
3    A. No.
4    Q. What did you do to prepare yourself for today's
5  deposition?
6      Did you look at any documents?
7    A. Only the ones we've already had.
8    Q. Okay. And what were they that you looked at?
9    A. The response to the request for documents and
10  the witness list.
11   Q. Anything else?
12   A. The other stuff that we had there. I had -- I
13  bought the book, but -- about civil procedure, but my
14  eyes are so far gone, I can't read now.
15   Q. Okay. Did you look at any of the -- say, The
16  Frankfurter Chronicles that you've produced, documents
17  like that?
18   A. Oh, yeah. I read -- I had to send a bunch of
19  them to you and the other attorneys, so I looked at them
20  while I was doing it, you know, because it's been 12
21  years since we started that thing. And, you know, I
22  looked at them just for fun more than anything else.
23     But, you know, there are a few things that
24  popped up that I had forgotten all about, you know, like
25  right before we left Fairfield, we tried to set up a

Page 12

1  show at COPIA. It's called The American Center for
2  Food, Wine and Arts in Napa.
3      And a friend of the wife's ex-boss, actually,
4  he was in charge of the Julia Child grill, and we were
5  going to do a good-bye to the Bay Area kind of thing for
6  all of her friends up there, since we've been up there
7  30 years. But the person in charge of the exhibits, she
8  was on vacation first. And then when she got back, I
9  found out they're booked too far in advance, so we
10  couldn't do it.
11   Q. Okay. Now, any other documents that you read
12  in order to prepare for your testimony today?
13   A. No.
14   Q. Did you talk to anybody before today's
15  deposition in order to prepare for it?
16   A. Oh, just the wife. I mean, my brother, too,
17  because he's been with us forever. You know, he's
18  invested in the second Great American Hot Dog Machines.
19  And then he -- basically, he put together the money for
20  the Woody Weenie Wagon project.
21   Q. Okay. What did you talk about with your wife
22  relative to today's deposition?
23   A. Not too much, other than the fact that it's
24  stressing me out pretty severely.
25   Q. Okay. How about your brother? Did you talk to

Page 13

1  him about the deposition today?
2    A. Just in the vaguest of terms because, you know,
3  he's -- he's -- he's retired Army, Navy, post office,
4  and he lost his foot to -- due to complications of
5  diabetes last year or so. So after -- right after
6  moving to Cleveland. So I can't get too deep into
7  anything with him right now. It's his health.
8    Q. You said that you're stressed out about the
9  deposition; is that right?
10   A. Yes.
11   Q. Are you able to continue answering questions?
12   A. Yeah. I feel like I can now. I mean, the
13  heart's doing this (indicating), but other than that,
14  you know.
15   Q. Okay. Any -- is there anything -- any
16  medication that you're under today --
17   A. No.
18   Q. Let me finish the question.
19   A. Oh, I'm sorry.
20   Q. Okay. Anything that would prevent you from
21  giving full, fair and accurate testimony?
22   A. No.
23   Q. All right. And if I understand your -- you
24  said your heart is racing; is that right?
25   A. Yes.

4 (Pages 10 to 13)

Page 14

1    Q.   Anything else happening as you sit here that --
2    A.   Oh, well, I'm sweating and slightly nauseous
3  and my bowels aren't quite settled and, you know, the
4  normal stress things.
5    Q.   Okay.  Do you want to take a break now --
6    A.   Oh, no.
7    Q.   -- or do you want to keep going?
8    A.   No.  Keep going.
9    Q.   Okay.  All right.  Why don't you tell me,
10  Mr. Webster, some of your personal background.
11       Where do you currently live?
12    A.   We're in El Cajon.
13    Q.   And what is the street address?
14    A.   1502 Via, V-i-a, Elisa, E-l-i-s-a, two words.
15    Q.   All right.  You're married, correct?
16    A.   Yes.
17    Q.   And you have one son; is that right?
18    A.   Yes.
19    Q.   And what are your wife's and your son's name?
20    A.   My wife is Darla and my son is Moon, M-o-o-n.
21    Q.   Okay.  Both Webster?
22    A.   Yes.
23    Q.   All right.  And what is your educational
24  background, Mr. Webster?
25    A.   I have approximately seven to nine years of

Page 15

1  college in various backgrounds.  I started off wanting
2  to be an architect at SIU, Southern Illinois University,
3  under Arbuch, Mr. Fuller.
4       Then I went to --
5    Q.   So you're a Salucki?
6    A.   Yes, I am.  And so is my son.
7       And after I got out -- back from Vietnam, I
8  went to De Anza College for philosophy, art, electronics
9  and logic.
10    Q.   Did you obtain a degree --
11    A.   No.
12    Q.   -- from Southern Illinois?
13    A.   No.  And there's more.  There's -- I've been
14  to, like, five different colleges.
15    Q.   Okay.  Let me -- but let me do this in
16  sequence.
17       What years were you at Southern Illinois
18  University?
19    A.   June of '67 to June of '69.
20    Q.   All right.  And from there you went into the
21  service?
22    A.   Yes.
23    Q.   And how long were you in the service?
24    A.   Four years, three months, six days and ten
25  hours.

Page 16

1    Q.   Who's counting, right?
2    A.   Well, I would have been smarter and went in the
3  Air Force.  My dad was career Air Force.
4    Q.   Okay.  Which branch of the service were you in?
5    A.   Navy.
6    Q.   And did you serve in Vietnam?
7    A.   Yes.
8    Q.   How many tours of duty did you do there?
9    A.   Three.
10    Q.   Total time in country?
11    A.   Oh -- well, I was on amphibious, so we were in
12  and out a lot.  But then the last ship I was on set at
13  the mouth of the river between North and South Vietnam
14  for five months.
15       So I'd say less than a year total, you know.
16  No way of saying because we do five-months deployments
17  from San Diego to Japan, to the Philippines, to Vietnam
18  and then back.  We'd take the new Marines in; bring the
19  old ones back.
20    Q.   All right.  And so you were in the Navy serving
21  from 1969 to 1973; is that right?
22    A.   Yes.
23    Q.   And what was your -- first of all, what was the
24  highest rank you achieved?
25    A.   Radioman, third class.

Page 17

1    Q.   Slow down a second.  I'm sorry.
2    A.   Oh, I'm sorry.
3    Q.   What was it?
4    A.   Radioman, third class.
5    Q.   Okay.
6    A.   And teletype repair specialty.
7    Q.   And if I can ask, why did you go into the
8  service?  Didn't you have a college deferment?
9    A.   I -- I did and I didn't.  I did and I didn't.
10  My father, like I said, was career military and he seems
11  to have irritated the woman that was in charge of the
12  draft board.  And so every other semester, I'd get
13  reclassified.  I finally got tired of it.
14    Q.   Reclassified how?
15    A.   From whatever it was for student deferment to
16  not.  I was working full time one semester, working part
17  time the second semester, and my grades were suffering
18  for it.  I had no scholarships or anything like that.  I
19  put myself through as far as I could.
20    Q.   All right.  So was your -- was it your
21  full-time work status or the grade performance that you
22  think kept you off deferment?
23    A.   It was grades.  It was the grades more than
24  anything else.  I wasn't getting bad grades, but at a
25  certain point I'd have to withdraw from a class, you

5 (Pages 14 to 17)

7

Page 18

1  know, and then I wasn't full time.
2  Q.  I see.  All right.
3      So you ended up at times -- during the years
4  that you were at Southern Illinois University, you
5  wouldn't be a full-time student?
6  A.  Yes.
7  Q.  Okay.  Did you have a major at Southern
8  Illinois University?
9  A.  Architectural design.
10  Q.  Okay.  And how many credits toward a degree did
11  you complete there?
12  A.  I really have no idea anymore.  Probably 70 or
13  80 out of 120.
14  Q.  Were you honorably discharged from the Navy?
15  A.  Yes.
16  Q.  And what is your date of discharge?
17  A.  It's in June of '73.  It's either the 4th or
18  the 10th.  I'm not sure.
19  Q.  All right.  What did you do after you were
20  discharged from the Navy?
21  A.  We immediately went back to Toledo, Ohio.  I
22  worked in a gas station for a while.  I went to -- I
23  work- -- I drove a limousine for a while for railroad
24  crews.  Then I went to production machine setup school.
25  Q.  What is production machine setup school?

Page 19

1  A.  It was a program funded -- I don't know who by,
2  but the City ran it.  And they would teach you how to
3  operate lathes and drill presses and mills and all that.
4  Q.  So it's kind of a technical college?
5  A.  Yes.  It was like a six-month program,
6  something like that.
7  Q.  And was there a -- is there a name of the place
8  that you went to for that?
9  A.  I can't remember that anymore.
10  Q.  But it was in Ohio?
11  A.  Yes, in Toledo.
12  Q.  Okay.  And did you get a certificate of
13  completion there?
14  A.  No.
15  Q.  Why not?
16  A.  Because I came back to California.
17  Q.  When did you come back to California?
18  A.  It was the day my son was six weeks old and the
19  doctor cleared him to travel.  And that would have been
20  August, September -- middle of September 1974.
21  Q.  All right.  I take it you were married.  Were
22  you married while you were in the service?
23  A.  Just before I got out.
24  Q.  All right.  When you moved back to California,
25  where did you move to?

Page 20

1  A.  Silicon Valley.
2  Q.  Specifically what town?
3  A.  San Jose.
4  Q.  Okay.  And what did you do there?
5  A.  I can't remember what I did to start with.  Oh,
6  yeah, yeah.  I was teletype repairman there again, yeah.
7  Q.  Teletype repairman?
8  A.  Yes.
9  Q.  And in the 1974 time frame, what did a teletype
10  repairman repair?
11  A.  Teletypes.
12  Q.  Okay.  Which is like what?  At that time, I
13  don't even remember.
14  A.  Way before even the line printers and Singer
15  come out with -- they basically put the teletype
16  business out of business, you know.  But they were these
17  old mechanical things.  The Navy uses them.  The Marines
18  were still using them at the time.  But I don't think
19  anybody has them anymore.
20      I know people that are blind -- blind or is it
21  deaf? -- have the teletype terminals in their house
22  still.  But other than that, that is a dead industry.
23  Q.  Okay.  Who did you work for?
24  A.  They were called Dal Data.  They were a
25  startup.  D-a-l, hyphen, D-a-t-a.

Page 21

1  Q.  Okay.
2  A.  One of about 15 startups I worked for.
3  Q.  How long did you work for Dal Data?
4  A.  It was like a week short of a year.
5  Q.  Okay.  So from September or so 1974?
6  A.  Somewhere in there, yes.
7  Q.  Until about September '75?
8  A.  Yes.
9  Q.  Okay.  Just -- just so you know, she has to
10  take down everything we say, and we're starting to talk
11  a little bit over each other, so let's just --
12  A.  Oh, I'm sorry.
13  Q.  -- slow it down between you and me.
14      What did you do next after working for Dal
15  Data?
16  A.  Oh, I was unemployed for a couple years there.
17  And we -- you know, the wife was making good money being
18  a server, so I basically baby-sat.  You know, looked for
19  a job.  I was underqualified for a lot of things I
20  thought, and what I come to realize after a while was I
21  was overqualified.
22      And computers were pretty simple creatures back
23  then.  And so I ended up going to work in the Convergent
24  Technologies, which is now Unisys.
25  Q.  When did you go to work for Convergent

6 (Pages 18 to 21)

Page 22

1    Technologies?
2        A.  I have no real idea on that.  It's in the
3    distant fog there somewhere, you know.  Probably, oh --
4    okay.  I got a good beat on it.  Let's see.  '78, '79,
5    something like that.
6        Q.  Okay.  Did you hold any jobs between leaving
7    Dal Data in 1975 and starting with Convergent
8    Technologies?
9        A.  I did a few things.  I did landscaping for a
10   friend of ours.  And I did carpet cleaning with another
11   friend.  But all minor stuff.  It never led anywhere,
12   you know.  It wasn't any money to speak of.
13       Q.  Anything else that you did in that time period?
14       A.  I can't remember.  You know, I did a succession
15   of just nothing jobs, you know.  And none of them are
16   any real importance that I can even -- you know, I don't
17   even have a list of that sort of thing.
18       Q.  Okay.  What did you do after -- well, first of
19   all, how long did you work for Convergent Technologies?
20       A.  It was less than a year.
21       Q.  And what did you do after that?
22       A.  I went to work for another startup.  It was
23   called Gavilan Computer Corporation.  And they built the
24   world's first laptop.
25       Q.  What did you do for them?

Page 23

1        A.  I was assembler, tester, repairman.  I liased
2    between us and the engineers, because when I first got
3    there, the loop took six weeks when something happened
4    to go wrong on the floor before they even knew what was
5    going on.
6            I learned to work the machine enough to send
7    them reports on a daily basis, you know.  And it was
8    a -- pretty much in vain because they spent $50 million
9    and went down the toilet.
10           You can still see their computer on the T.V.
11   program.  It was featured on -- what was it called?
12   Anyway, it was three detectives on a boat with a pink
13   helicopter and a Corvette and a robot.  And that was the
14   Gavilan computer that they used.
15           "Riptide."  Was it "Riptide"?  Yeah, I think
16   that's it.
17       Q.  Okay.  How long did you work for Gavilan
18   Computer?
19       A.  Up until the very end.  Maybe six, seven months
20   after I got there.
21       Q.  Okay.  I don't understand.
22       A.  They went under.  They had spent $50 million,
23   had sales offices, had -- in Hong Kong, San Francisco,
24   somewhere in Texas and somewhere on the East Coast.
25   They had a 50,000 square foot plant going together in

Page 24

1    Los Gatos, another one down in Alabama.  And they spent
2    all that money and nothing.
3        Q.  Okay.  And so you -- you left the company when
4    they closed?
5        A.  Yeah.
6        Q.  And when was that?
7        A.  Oh, let's see.  I was out of Frank Avenue by
8    then.  So it had to be '83 or '84.  Or maybe '82,
9    because the Hot Diggity Dogs was in there, too,
10   somewhere.
11       Q.  Okay.  Just so that I have my time frame right,
12   in approximately 1978 or '79, you went to work for
13   Gavilan Computer?
14       A.  Yes.
15       Q.  And you worked for them until '82 or '83?
16       A.  No.
17       Q.  One year?
18       A.  No.  One year.  Whatever it was.
19       Q.  Okay.  So 1980?
20       A.  Yeah.  Somewhere in there, yeah.
21       Q.  Okay.  And what did you do after Gavilan
22   Computer went out of business?
23       A.  I went to work for the same team that I had
24   worked for at Gavilan and Convergent.  They were doing
25   the world's first voice-activated telephone.  I was a

Page 25

1    technical illustrator, technical writer.
2            And we were dealing with manufacturing in
3    China, so that was a language barrier-and-a-half thing
4    there.  And I did that freelance.  And I never got paid
5    for my last assignment.  They went out of business.
6        Q.  What was the name of the company?
7        A.  Got no idea anymore.
8        Q.  Okay.  Let me finish my question --
9        A.  I'm sorry.
10       Q.  -- before you answer.
11           All right.  And how long did you do that?
12       A.  Probably six months.
13       Q.  And what did you do after that?
14       A.  I think that's about the time we moved to
15   Fairfield.  I think so.  I think that's about then.
16           And I was a waiter at Denny's in Fairfield.
17       Q.  All right.  Just, again, so I can get my time
18   frame down, you lived in San Jose from approximately
19   1974 until about 1981 --
20       A.  '88.
21       Q.  -- correct?
22       A.  '88.
23       Q.  Well, we're missing some years, then.
24           You moved to Fairfield in 1988?
25       A.  Yes.

7 (Pages 22 to 25)

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

9

Page 26

1    Q.   According to the job history we've just gone
2  through, let me just --
3    A.   Oh.
4    Q.   -- recite it, or have you figured out where we
5  missed the years?
6    A.   Yes, sir.
7    Q.   Okay.
8    A.   The Great American Hot Dog Machines 1, 2 and 3
9  and 4.  Hot Diggity Dogs.
10    Q.   Okay.  You worked for or at someplace called
11  the Great American Hot Dog Machine?
12    A.   That was my first three-wheel motorcycle with
13  the hot dogs, steam and ice chest.
14    Q.   Okay.  And you did that while you were living
15  in San Jose?
16    A.   Yes.
17    Q.   For how long?
18    A.   It took us five months to build the thing,
19  raise the money and all that.  And then in -- I wrecked
20  it almost immediately.  So less than a year.
21    Q.   What years did you do that?
22    A.   That started in 4th of July, 1976.  I worked
23  two things most of my life.  So has my wife.
24    Q.   All right.  So let me see if I understand this.
25      The Great American Hot Dog Machine was,

Page 27

1  essentially, a motorcycle with a hot dog --
2    A.   Steamer and ice chest.
3    Q.   -- steamer and ice chest on the back of it,
4  right?
5    A.   Yes.
6    Q.   And how would you -- what you would do with
7  that?  Would you drive around or how would it work?
8    A.   We were doing the car dealerships on El Camino
9  Real.  And we'd drive in there, and they'd see me and
10  they'd come over and have a hot dog, have a soda.  And
11  that was it.  And then we'd go on to the next one.  We
12  only did that a little time.  Like I said, I wrecked the
13  thing.  I wasn't much of a mechanic at the time.
14    Q.   When you say you wrecked it, what do you mean?
15    A.   I was pulling off the freeway into
16  San Francisco to go up and see a friend in San Rafael,
17  and I hit the brake and nothing happened.  And I hit the
18  rear of a rental car with my left tire, and it threw me
19  up on to the trunk of the rental car.  Tore the frame
20  right between my legs.  Bent the rear axle.  You know, I
21  was able to drive it to a welding shop and have them fix
22  it enough to get it home.
23    Q.   Okay.  This was the Great American Hot Dog
24  Machine No. 1?
25    A.   No. 1.

Page 28

1    Q.   Okay.  So you used that from July 4th of
2  1976 until when?
3    A.   Somewhere in the spring of the next year.  Like
4  I say, it took the first five months just to build it.
5  I know I finished it on election day in November of
6  1976, because I drove it down to the polls to vote that
7  night.
8    Q.   How did you fund the construction of the Great
9  American Hot Dog Machine No. 1?
10    A.   Most of it was what we had, but a friend of
11  ours, he put in a thousand bucks or something like that
12  and a friend of his put in, like, 900 bucks.
13    Q.   Okay.  And how much money did you make while
14  you were running it?
15    A.   Not very much.  You know, I was doing a couple
16  hundred dollars a day, but like I say, we wrecked it
17  right at the start, maybe two weeks into it.
18    Q.   Okay.  Did you have any logos on the bike?
19    A.   We had signs that we could take on and off,
20  because it was kind of -- I don't know if you've seen
21  it.  It's on the website there.  But, you know, the
22  thing's kind of folksy, sea cab.  It's something, an
23  image, one part Joe Palooka, one part from an
24  underground comic book that I had at the time.
25    Q.   What did the sign say that you could put on the

Page 29

1  bike?
2    A.   Frank's Quality Franks.
3    Q.   Any others?
4    A.   No.
5    Q.   Did you ever call it The Hot Dog Hall of Fame?
6    A.   No.
7    Q.   Okay.  Then you said you apparently had Great
8  American Hot Dog Machines 2, 3 and 4?
9    A.   Yes.
10    Q.   And in what time frame did you have those?
11    A.   Okay.  The Great American Hot Dog Machine No. 2
12  was 1978.  We had four of those.
13    Q.   Okay.  At the same time or were they --
14    A.   Sequentially.  We bought one.  We started doing
15  it and then we bought three more.
16    Q.   Okay.  And what were they?
17    A.   They were Datsun pickups with a module on the
18  back.
19    Q.   And the module had a hot dog steamer and ice
20  chest?
21    A.   Yes.
22    Q.   And what was -- what signs were on --
23    A.   The Great American Hot Dog Machine.
24    Q.   Okay.  And it didn't have the name Hot Dog Hall
25  of Fame?

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 30

```
1      A.  No.
2      Q.  And how long did you have the Great American
3   Hot Dog Machine No. 2?
4      A.  We had most of them for about a year, because
5   one of them was my mother's and we gave that back to her
6   when we bought the others.  And two of them had
7   problems.  They were used.  And we sent them back to the
8   dealership.  And we still have the third one.  The
9   fourth one now, it would be.
10     Q.  Okay.
11     A.  Yes.
12     Q.  Are you still using it --
13     A.  No.
14     Q.  -- to sell hot dogs?
15     A.  No.
16     Q.  How long did you sell hot dogs from Machine
17  No. 2?
18     A.  Maybe six months, eight months, something like
19  that.
20     Q.  All right.  Tell me about the Great American
21  Hot Dog Machine No. 3.
22     A.  That is a V-Dub three-wheeler.  And we never
23  finished that.
24     Q.  A Volkswagen three-wheeler?
25     A.  Yes.  I build those on the side.  I also used
```

Page 31

```
1   to do Volkswagen repair and, you know, work out of my
2   garage, buy and sell Volkswagens, that sort of thing.
3      Q.  Okay.  And why did you never finish that one?
4      A.  I got to the point of realizing that I couldn't
5   hire anybody to drive the thing because of liability.
6      Q.  Okay.  When did you abandon the project for the
7   Great American Hot Dog Machine No. 3?
8      A.  Oh.  Well, it was before we got Hot Diggity
9   Dogs, which was approximately 1983.  So I would say '82.
10     Q.  And I assume -- well, you never sold any hot
11  dogs --
12     A.  No.  No.
13     Q.  -- using the Great American Hot Dog Machine
14  No. 3?
15     A.  No.
16     Q.  Okay.  Correct?
17     A.  Yes.
18     Q.  When did you have Great American Hot Dog
19  Machine No. 4?
20     A.  That was probably, I'd say, '85, somewhere in
21  there.
22     Q.  And how long did you have that?
23     A.  We never finished that one, either.
24     Q.  What was it intended to be?
25     A.  It was a -- we started off with two different
```

Page 32

```
1   brand-new motorcycles.  One of them was a little Honda
2   MB5, which is a 50 cc thing, and it just didn't have the
3   power.  And then we bought a new Honda 125, and I ended
4   up swapping that to somebody that had a MB -- I mean,
5   I'm sorry, a -- what's it -- what is it called?  It's a
6   Nighthawk custom that he'd wrecked the front end, and I
7   was looking at building the first Lamborweenie with
8   that.
9          COURT REPORTER:  Lamborweenie?
10         THE WITNESS:  Lamborweenie, the Hot Dog Hot
11  Rod, the Frankfurter Funny Car, the Porschefurter, the
12  Wood -- the Weenie Wagon, Wurst Wagon.  I'm sorry.
13  Wurst Wagon, W-u-r-s-t.
14         Those are -- it was for -- meant to be a promo
15  vehicle for The Hot Dog Hall of Fame.
16         MR. SCHULTZ:  I will give you spellings later.
17  BY MR. SCHULTZ:
18     Q.  Okay.  Why did you never finish the Great
19  American Hot Dog Machine No. 4?
20     A.  By then -- we started off with the original
21  Great American Hot Dog Machine thinking I couldn't
22  afford a restaurant.
23     Q.  Okay.
24     A.  Then I got a restaurant.  And I realized at
25  that point that this is kind of silly to be standing out
```

Page 33

```
1   here in the rain in the winter.
2      Q.  Okay.  You never sold any hot dogs --
3      A.  No.
4      Q.  -- from the Great American Hot Dog Machine
5   No. 4, correct?
6      A.  No.
7      Q.  Correct?
8      A.  Yes.  Correct.
9      Q.  All right.  You said that you -- in between
10  here in 1982, you started with Hot Diggity Dogs,
11  correct?
12     A.  1983.
13     Q.  1983?
14     A.  Yes.
15     Q.  What is Hot Diggity Dogs?
16     A.  It was a 23-seat, four parking spaces hot dog
17  stand that was on the El Camino Real in Santa Clara.
18  Another person had started it up, but he was in his late
19  '60s and wanted to retire, so we took it over.
20     Q.  Who owned it?
21     A.  He did and then the guy that owned the whole
22  building.  I don't know his name.  I can't remember it
23  anymore.  The guy that owned it was Joe Pena, P-e-n-a.
24  I don't remember his partner's name.
25     Q.  All right.  And when you took it over, did you
```

9 (Pages 30 to 33)

Page 34

1  buy the restaurant or the building, or both?
2      A.  None.  We were going to, but it was like
3  driving around with your car wound out in first gear.
4  We had fistfights in the parking lot for parking spaces.
5  There were two adult bookstores down three -- three
6  shops one way and three shops the other.  It didn't turn
7  out to be worth doing.  We were barely paying the bills.
8      Q.  All right.  How did you -- you ran it,
9  you didn't have an ownership interest in it?
10     A.  We were going to buy it, but it didn't happen.
11 You know, I was -- my father had recently died.  My aunt
12 had recently died.  And I thought I was going to get
13 some inheritance money there, and I did, but it wasn't
14 near enough, you know.
15     We spent thousands of dollars just bringing the
16 place up to cleanliness standards.  We spent a week
17 alone pulling grease and things out of that place to --
18 you know, it was more sweat equity than anything else.
19     And the owner, he was there all the time when
20 we were doing this.  So he knew everything we did.  It
21 wasn't like, you know, we were taking the cash or not
22 paying him or anything.  We were just operating it.  And
23 if it paid, fine.  If it didn't, I got out.
24     Q.  Okay.  I just want to make sure I understand
25 what your interest was in the place.

Page 35

1      You were operating it --
2      A.  Yes.
3      Q.  -- with the intention of someday buying it?
4      A.  Yes.
5      Q.  The owner, who continued to own it, was -- was
6  that Joe Pena?
7      A.  Joe Pena, yeah.
8      Q.  Okay.  And how long did you operate it?
9      A.  About six months.
10     Q.  From when to when?
11     A.  Sometime in early '83 to sometime in maybe fall
12 of '83.
13     Q.  And the name of the restaurant was Hot Diggity
14 Dogs?
15     A.  Yes.
16     Q.  Do you know if that was a registered name?
17     A.  I'm pretty certain he did, but I can't be 100
18 percent sure.
19     Q.  Okay.  In any event, it was registered in the
20 name of Joe Pena, if it was registered?
21     A.  And his partner, yes.  Whatever his partner's
22 name was.  I can't remember.
23     Q.  All right.  And that restaurant was never
24 called The Hot Dog Hall of Fame, correct?
25     A.  No.  What was happening there is at first they

Page 36

1  told me that they thought that the guy that owned the
2  bar next door -- we had a pass-through window to it --
3  would sell to me.  And when he didn't -- wouldn't agree
4  to it, it was pointless from that point on, because like
5  I say, it's driving around in first gear in your car
6  fully wound out.
7      We were getting great growth there, but at the
8  end, there were fistfights in the parking lot.  And the
9  Chinese place that had been next door forever, it was
10 complaining because we wouldn't let his customers park
11 in our parking spaces.
12     And it just -- it got to be just a big mess.
13 And we sold it for the guy or we introduced him to the
14 people that bought it, and that was that.
15     It's now a Chinese or Vietnamese or Cambodian
16 restaurant last time I was -- I was in Silicon Valley
17 maybe five years ago.
18     Q.  Okay.  The restaurant Hot Diggity Dogs was
19 never operated under the name The Hot Dog Hall of Fame?
20     A.  No.  We had a sign painted up -- I still have
21 that -- that said, "The Hot Dog Hall of Fame" and we put
22 that on the wall with maybe 30 or 40 pieces of -- from
23 the collection, and that was it.
24     And if we had gotten the bar, we would have, of
25 course, made the whole thing Hot Dog Hall of Fame,

Page 37

1  knocked out the wall, expanded the kitchen, that sort of
2  thing.  But that didn't happen.
3      Q.  All right.  The items that were on display at
4  Hot Diggity Dogs were items taken from your collection?
5      A.  Of hot dog art, yes.
6      Q.  Okay.  And was the sign "Hot Dog Hall of Fame"
7  posted near those items?
8      A.  Yeah.  Right above it.
9      Q.  Okay.  Did people -- were people charged any
10 admission to see --
11     A.  No.
12     Q.  -- the items?
13     A.  No.
14     Q.  Okay.  It was just a -- an area of the
15 restaurant that you displayed these items in?
16     A.  It was to the left of the door as you walked
17 in.  That whole wall, there was nothing there.
18     Q.  All right.  And then that ended in the fall of
19 1983?
20     A.  Yes.
21     Q.  Okay.  Between the ending of Hot Diggity Dogs
22 in the fall of 1983 and 1988 when you moved to
23 Fairfield, what did you do?
24     A.  I went to college again at West Valley College,
25 Mission College.  And there was one other.  I can't

10 (Pages 34 to 37)

Page 38

1 remember its name anymore.
2     Built Great American Hot Dog -- started to do
3 Great American Hot Dog Machine No. 5.
4     Q.   Okay. Let's take these in order.
5     West Valley College is where?
6     A.   Saratoga.
7     Q.   And when did you attend?
8     A.   Oh, somewhere between '85 and '88. I know
9 that. Same with Mission.
10    Q.   Where is Mission College?
11    A.   In Santa Clara.
12    Q.   Okay. How do you know those dates, '85 --
13 between '85 and '88?
14    A.   That's where I was living at the time, you
15 know.
16    Q.   Okay. Did you -- what did you pursue -- what
17 studies did you pursue at West Valley College?
18    A.   That was business management mainly.
19    Q.   Did you get a degree?
20    A.   No.
21    Q.   How many courses did you take?
22    A.   Oh, probably seven or eight.
23    Q.   And how about Mission College?
24    A.   That was marketing, things related to that. I
25 really can't remember anymore.

Page 39

1     Q.   No degree?
2     A.   No degree.
3     Q.   Any idea how many courses?
4     A.   Maybe four or five. I'm not sure exactly.
5     Q.   Did you complete all those courses?
6     A.   Most of them. Most of them.
7     Q.   How about the courses at West Valley, did you
8 complete all of those?
9     A.   Yes. And those were hotel and restaurant
10 management, if I didn't already say that.
11    Q.   And then you mentioned one other college that
12 you attended in this time frame, but you don't remember
13 the name of it.
14    A.   There's De Anza, Mission, West Valley. And I
15 might have that written down somewhere, but, you know,
16 at the moment, it escapes me, you know. It's all junior
17 colleges, you know. And it wasn't that I was there for
18 the grade so much as, you know, for the knowledge.
19    Q.   Where is De Anza College?
20    A.   Cupertino.
21    Q.   And what course of study did you pursue there?
22    A.   That's the one where I did the art, philosophy,
23 logic, electronics.
24    Q.   All right. How many courses?
25    A.   I was there over a year. So probably 12, 15,

Page 40

1 somewhere in there.
2     Q.   Were you a full-time student?
3     A.   No. I was working at the teletype repair place
4 and other things besides.
5     Q.   Well, the teletype repair place, according to
6 my notes, was back in the late '70s.
7     A.   Right.
8     Q.   And I thought De Anza was --
9     A.   No. That's what it was. And De Anza was in
10 the late '70s or whatever that was.
11    Q.   Okay. And did you receive a degree from
12 De Anza?
13    A.   No.
14    Q.   Why did you pursue the particular course of
15 study that you pursued at De Anza College?
16    A.   I was in the middle of Silicon Valley at the
17 time, and there were things I didn't get when I was at
18 Southern Illinois if I was going to get a bachelor. You
19 know, general studies courses, that sort of thing. The
20 electronics part was because of where I was.
21    Q.   All right. You said also in this time frame
22 from 1985 to 1988, you began work on the Great American
23 Hot Dog Machine No. 5.
24    A.   Yes.
25    Q.   What was that?

Page 41

1     A.   That was a 650 Honda Nighthawk -- not
2 Nighthawk -- 650CB custom, which I had bought the stuff
3 for a hot dog, you know, a dog costume, you know. And I
4 was going to build a hot dog and a bun sidecar. And
5 that's about the time I decided, I'm done with all of
6 the mobile stuff, except for the Lamborweenie.
7     That's when I also made the deal for the
8 remains of Great American Hot Dog Machine No. 4 for
9 the -- what I thought was going to be the Nighthawk, two
10 in the front, one in the back configuration. But, you
11 know, that didn't work, either. So I went back to
12 eventually, for the Lamborweenie, what I know best,
13 which is Volkswagens.
14    Q.   Okay. And we'll get to the Lamborweenie --
15    A.   Right.
16    Q.   -- in a little bit.
17    On the Great American Hot Dog Machine No. 5,
18 was that the last Great American Hot Dog Machine
19 No. 5 --
20    A.   No.
21    Q.   -- that you worked on?
22    A.   No.
23    Q.   Okay. Well, did No. 5 ever go into operation?
24    A.   No.
25    Q.   Okay. Have we covered everything that you did

11 (Pages 38 to 41)

Page 42

1 both from an employment perspective and from a student
2 perspective in the time that you lived in the San Jose
3 area?
4    A.  Yes.
5    Q.  All right.  And, again, just so that my records
6 are clear, San Jose covered the period from '74 to '88?
7    A.  Yes.
8    Q.  Okay.  Let's move on to Fairfield, 1988.
9       Did you have any jobs --
10       Well, first of all, how long did you live in
11 the Fairfield area?
12    A.  '88 to 2003.  So 15 years.
13    Q.  Okay.  In those 15 years, take me through your
14 employment history, if you might.
15    A.  I was a waiter at Denny's there.  It was a
16 franchised Denny's, not a company Denny's.
17       And then I did some housecleaning for a while
18 with a friend of mine who had started up his own
19 business.  That didn't last very long.
20       Then I started buying and selling Volkswagens
21 because I'd gotten good enough at what I was doing there
22 doing repair jobs, that sort of thing.
23    Q.  Any other jobs that you held in that 15 years?
24    A.  Yeah.  I worked for a -- my wife's cousin over
25 the Internet.  We worked on what would have -- if they

Page 43

1 had made it happen, it would have been the world's first
2 Internet in the Sky project.
3    Q.  And what is that?
4    A.  On an airplane.  Sit down and the laptop would
5 have folded out of the seat back in front of you.  And
6 it was, you know, wired to transmit to servers on the
7 ground.
8    Q.  Okay.  Any other jobs you held in that period
9 from '88 to 2003?
10    A.  No.  At least I'm fairly certain.  I can't
11 remember anything.
12    Q.  Okay.  All right.  How long were you a waiter
13 at Denny's?
14    A.  Oh, probably six months to a year, at the most.
15 I -- you know, that is distant history there for me.
16    Q.  Is that the same Denny's that your wife worked
17 at?
18    A.  One of them, yes.
19    Q.  Okay.  What was the name of the housecleaning
20 business?
21    A.  I can't even remember.  I met the guy.  He was
22 a cook at Denny's at the time and, you know, he got out
23 of there and started doing that.  And then I worked for
24 him for a while, but there was no money in it.  Weird
25 hours, because who wants to work at night, you know.

Page 44

1 You know, graveyard shift for right above minimum wage.
2 So that was that for that.
3    Q.  How long did you work --
4    A.  Maybe a month or two.
5    Q.  All right.  You bought and sold Volkswagen
6 parts?
7    A.  Yes.  Well, Volkswagens.
8    Q.  Volkswagens?  Okay.
9    A.  Yes.
10    Q.  Did you have a business name for that --
11    A.  No.
12    Q.  -- venture?
13    A.  No.  No.  I'd buy them, drive them around for a
14 while.  Somebody would want to buy it, and I would sell
15 it to them, you know.  I must have moved one or two a
16 year, at the most.
17    Q.  How long did you do that?
18    A.  Oh, probably seven or eight years.
19    Q.  And then the Internet in the Sky project --
20    A.  Yeah.
21    Q.  -- how long did you do that?
22    A.  Less than a year.  I can't be sure.  I saw the
23 files when I was looking through everything else the
24 other day, but --
25    Q.  Did you make any money at that?

Page 45

1    A.  Yeah.  Not a lot, though.  But, you know, he
2 was paying me 40, 50 bucks an hour; but, you know, I was
3 mainly doing graphics for him and slipping them to him
4 in an e-mail.
5    Q.  All right.  By my count, then, of the 15 years
6 that you spent in Fairfield, we have about 10 years'
7 employment experience.
8    A.  Maybe even less than that.  I was sick the last
9 five years I was in Fairfield, and I ended up getting
10 pneumonia shortly before we moved here.
11    Q.  Okay.  Were there any other jobs you held
12 during that 15 years in Fairfield?
13    A.  I can't think of any.
14    Q.  Okay.  All right.  Did you then embark on a
15 Great American Hot Dog Machine No. 6 while you were in
16 Fairfield?
17    A.  No.  That was here.
18    Q.  Okay.  All right.  Did you have any sales of
19 hot dogs when you were in Fairfield?
20    A.  No.
21    Q.  So you weren't involved in the business of
22 selling hot dogs?
23    A.  I was in the hot dog business, but I wasn't
24 selling.
25    Q.  All right.  And when you say you were involved

12 (Pages 42 to 45)

Page 46

1  in the hot dog business, what are you referring to?
2      A.  The Hot Dog Hall of Fame.  We've been
3  persistent and consistent about that.
4      Q.  All right.  And I am going to get to that
5  specifically --
6      A.  Right.
7      Q.  -- but for the moment, let's keep going the way
8  we're going.
9          You moved to El Cajon in 2003?
10     A.  I think so, yes.  2003.
11     Q.  All right.  And you've lived in the same
12  residence --
13     A.  Yes.
14     Q.  -- since?
15     A.  Yes.
16     Q.  All right.  In that time that you've been in
17  El Cajon, what jobs have you held?
18     A.  None.
19     Q.  Why not?
20     A.  I've been sick.  I -- you know, it's a pretty
21  tight job market out there.  I'm -- I'm really only good
22  for two or three, maybe four hours a day physically.
23  You know, I'm just -- I'm not what I used to be.  I used
24  to be healthy as a horse until I was 50.
25     Q.  And then what happened?

Page 47

1      A.  It all went to hell.  I mean, you can see my
2  teeth.  You can see my weight.  You know, you know about
3  the hypertension.  You know about the insomnia.  You
4  know about the eye strain thing.  I am a mess.  I have
5  other things wrong with me, too.
6      Q.  Well, what other things?
7      A.  Well, I don't -- do I have to answer that here?
8      Q.  Well, I tell you why I ask.  If this is
9  something -- if any of these things are things for which
10  you claim Mr. Schussler is either responsible --
11     A.  No, they're not.
12     Q.  -- or has exacerbated, then yes.
13     A.  No.  Just --
14     Q.  But if they're not --
15     A.  Just the stress and the eye strain part.
16     Q.  Okay.  All right.  If I can ask, how do you
17  make a living in this time from 2003 to the present?
18     A.  Well, for the large part of it, my wife has
19  worked at some fairly upscale country clubs and made
20  fair money, enough to pay the bills.  But, you know,
21  other than that, that's it.
22     Q.  Okay.
23     A.  My son kicks in some money for rent.  He just
24  got his M.B.A. and he's looking for the big job now.
25     Q.  Okay.  I saw a reference in one of the

Page 48

1  documents to the fact that your son worked in the
2  aerospace industry.
3      A.  Yes.
4      Q.  Does he?
5      A.  Yes.  Still does.
6      Q.  Okay.  Here?
7      A.  Yes.
8      Q.  Does he live at home still?
9      A.  Yes.
10     Q.  What does he do in the aerospace industry?
11     A.  Right now, he's the -- I can't remember the
12  exact title, but he's the guy you go to down there for
13  shipping and receiving.  He handles both.  He is in
14  charge of both sides of it.
15     Q.  Okay.  You said that Hot Dog -- Great American
16  Hot Dog Machine No. 6 --
17     A.  That's also known as the Woody Weenie Wagon.
18  That's also known as Darla's Dogs.
19     Q.  Okay.  What is that project?
20     A.  That's -- it's show-quality V.W. mechanicals,
21  with the Model T hood, grille and fenders, various
22  little things like carriage lamps and headlights and all
23  that.  And it would have had a Woody body on it --
24  Woody-style body with a hot dog steamer and ice chest.
25     Q.  Okay.  Model T.  I need to slow you down.

Page 49

1          "Show-quality V.W. mechanicals" meaning the
2  engine and things like that?
3      A.  Frame and all that, yes.  Powder-coated and
4  chromed.
5      Q.  All right.  Model T grille, headlights?
6      A.  Hood, fenders, carriage lamps.
7      Q.  Okay.  Woody body?
8      A.  Right.
9      Q.  And then, obviously, a hot dog steamer?
10     A.  And ice chest, yes.
11     Q.  Okay.  How much was this going to cost?
12     A.  We were 15- into it, and it would have been
13  another 20- or so to finish it and another 10- for
14  operation funds.
15     Q.  When did you start it?
16     A.  February 1st, 2nd or 3rd of 2006.  I can't
17  remember what.  I have it written down somewhere because
18  I -- you know, we have every single penny we've spent on
19  the thing, we have the receipts and everything else, and
20  I totaled it as it went along.
21     Q.  Okay.  When did you stop working on it?
22     A.  When I discovered what Mr. Schussler was doing
23  again.
24     Q.  Well, what do you mean by that?
25     A.  Going everywhere on the Internet and saying

13 (Pages 46 to 49)

Page 50

1  that he's the Hot Dog Hall of Fame. It's his concept.
2       No, it's not.
3  Q.  When did you discover that?
4  A.  June of 2007.
5  Q.  Okay. So you started work on the Woody Weenie
6  Wagon February 1 of 2006 and stopped June of 2007?
7  A.  Yes.
8  Q.  And why did Mr. Schussler's decision to open a
9  restaurant called the Hot Dog Hall of Fame cause you to
10  stop work on the Woody Weenie Wagon?
11  A.  That's our name. That's our concept. And I
12  knew this was coming. And so there's no sense in
13  building it up just for him to take it away if he
14  prevails here in court.
15  Q.  What was -- what were you going to call the --
16  what was the sign you were going to put on the Great
17  American Hot Dog Machine No. 6?
18  A.  It depends. This was being built specifically
19  for my wife. So this probably would have been called
20  Darla's Dogs. That's what we discussed.
21  Q.  That's what would be displayed on the bike --
22  A.  Yes.
23  Q.  -- itself or the car itself?
24  A.  Yes.
25  Q.  All right. Have we covered your employment

Page 51

1  history comprehensively?
2       Is there anything else you've done?
3  A.  Close enough. I'm sure there's stuff I've
4  missed, but it's minor, you know. It's -- like I said,
5  the wife and I both have done, you know, two jobs -- two
6  or three things at a time.
7       Now, she's in school now doing her Bachelor of
8  Science, hotel and restaurant management degree. And
9  she's probably got a job lined up here -- we don't know.
10  We're still waiting to hear -- at a country club. But
11  she's done that. I've done that. And for the most
12  intents and purposes, so has my son. You know, two or
13  three things at a time forever, you know. It's the way
14  you can float, you know.
15  Q.  Okay. So if there are other things that you've
16  done, they'd be sort of odd jobs here and there --
17  A.  Yeah.
18  Q.  -- kind of thing?
19  A.  Yes.
20  Q.  Okay. Do you have any criminal record,
21  Mr. Webster?
22  A.  No.
23  Q.  Ever been arrested for a crime?
24  A.  No. I've -- you know, I'm not -- you know, I'm
25  not into the street thing. I'm not a, you know, career

Page 52

1  biker or anything else like that. I was a biker for a
2  while, but never got into any trouble for that. You
3  know, never did anything weird.
4  Q.  All right. Have you ever been a party to a
5  lawsuit before this one?
6  A.  No.
7  Q.  All right. Let's -- hang on one second.
8       All right. I'm about to turn to The Hot Dog
9  Hall of Fame. Why don't we take a brief break, stretch
10  your legs --
11  A.  Sure.
12  Q.  -- and let everybody catch up. Okay?
13  A.  Sure.
14       THE VIDEOGRAPHER: Going off the record.
15       The time is 9:57 a.m.
16       (A recess was taken.)
17       THE VIDEOGRAPHER: We're back on the record.
18       The time is 10:04 a.m.
19  BY MR. SCHULTZ:
20  Q.  Mr. Webster, I said before the break
21  that I was about to turn to The Hot Dog Hall of Fame,
22  but before I do that, let me just close the loop on
23  something we've been talking about.
24       Have we discussed every restaurant or hot dog
25  machine that you have been involved in in which you sold

Page 53

1  hot dogs?
2  A.  Yes, for the ones that we've sold, but no, we
3  haven't discussed the Lamborweenie, which was supposed
4  to be the promo vehicle for The Hot Dog Hall of Fame.
5       And then there was a second Great American Hot
6  Dog Machine No. 6, which we had started. Somebody was
7  going to pay us to build it for them. But since this is
8  no longer happening, I just started selling off the
9  stuff from that yesterday. I sold the pan and the
10  transaxle for that.
11  Q.  Okay. I just want to make clear on the record
12  what I'm asking about in terms of -- well, let's just
13  start with fixed location restaurants.
14       Have we discussed every fixed location
15  restaurant that you've been involved in operating?
16  A.  Yes.
17  Q.  Okay. And then in terms of selling hot dogs
18  out of a mobile unit, have we discussed every one that
19  you've been involved in?
20  A.  Yes.
21  Q.  Okay. In your own words, would you just tell
22  me what The Hot Dog Hall of Fame is.
23  A.  The Hot Dog Hall of Fame started sometime after
24  we began the first Great American Hot Dog Machine.
25  People started giving me all this little stuff, you

14 (Pages 50 to 53)

Page 54

1  know, Matchbox cars. Like the first one anybody gave me
2  was a little friction-drive catering wagon with a hot
3  dog on top.
4       And I said, "That's pretty cool." Threw it in
5  the shelf in my garage. Didn't think anything more of
6  it. And then somebody else gave me a little
7  three-wheeler. And since we were doing it with the
8  three-wheeler, "That's nice." Stuck it up there.
9    Q.  Slow down.
10   A.  I'm sorry. I'm sorry.
11   Q.  She's taking down everything that you say.
12   A.  Yeah.
13   Q.  Go ahead.
14   A.  Then it started to the point of where it took
15  over my shelf in my garage. And besides that, it was
16  collecting dust, so I put it in a box and didn't think
17  much about it. But it just kept coming. And pretty
18  soon, it was pretty impressive.
19       This is approximately 1978 or 1979 when we were
20  living in a house on Frank Avenue. I had some built-in
21  shelves. I had a closet that had a top. You know, it
22  didn't go all the way to the ceiling there. And I had
23  blank walls.
24       And somebody had given me a 16-foot
25  Wienerschnitzel sign, so that covered one wall. And

Page 55

1  then I put a replica of the Weenie Wagon up there on the
2  top of the closet and all these little built-in shelves
3  had it.
4       And at that point, we must have had about 800
5  pieces. And that's the last time we have seen the
6  collection in its entirety.
7       And then I started getting serious about
8  salting it away to protect it, because UV affects some
9  of the stuff. And it just kept growing and growing and
10 growing.
11   Q.  Okay. Let me stop you for a second.
12      That was the last time you saw the collection
13 in its entirety?
14   A.  Yes.
15   Q.  Was in about when?
16   A.  1978, 1979.
17   Q.  You lived in a house on Frank Street?
18   A.  Frank Avenue.
19   Q.  Frank Avenue?
20   A.  Yes.
21   Q.  In Fairfield?
22   A.  In Santa Clara.
23   Q.  Santa Clara.
24      Okay. And was that on display to the public or
25 just in your home?

Page 56

1    A.  It -- some people were allowed in, but the
2  public, generally, no, because no place to park. It was
3  a one-block-long street. We rented the house just
4  because it was on Frank Avenue.
5    Q.  Okay. Reference to Frankfurters?
6    A.  Yeah, exactly. Exactly.
7       Changed my name to Frank. The whole thing, you
8  know. It was John F. and now it's J. Frank, you know.
9  And same initials. No big deal. You know, people have
10 called me Franks for so long that you eventually yield
11 to the inevitable there.
12   Q.  Okay. In terms of this display, when you said
13 some people were allowed in, those were friends of
14 yours?
15   A.  Reporters, that sort of thing, you know.
16      But it wasn't a very good house, you know.
17 We'd have major structural problems, and so you couldn't
18 have anybody over in the winter because the crack that
19 ran through the slab, the carpet would soak the mold up,
20 and so we eventually had to move because of that. I got
21 lung problems from that.
22      We found that they had not vented the heater
23 properly, so we were breathing all of that stuff. And
24 the -- what gave it off was one winter morning, I looked
25 in the mirror and my lips were blue from the carbon

Page 57

1  monoxide. That was it for Frank Avenue. You know, it
2  was like "I don't need this."
3       The -- we'd messed up and didn't pay the gas
4  bill on time. They shut it off. When they come back,
5  they found what was going on. And I've had lung
6  problems ever since.
7    Q.  Going back to this display on Frank Avenue, did
8  you charge admission to it?
9    A.  No. No.
10   Q.  Okay. All right. I didn't mean to interrupt
11 your description. Go ahead and finish.
12   A.  Okay. After Frank Avenue, like I say, we
13 started off thinking we couldn't afford a restaurant,
14 and then we got that restaurant. We put a display up
15 there. Had a custom-built oak table with a Bugs Bunny
16 and Elmer Fudd hot dog jigsaw puzzle under glass with a
17 condiment thing right there. Just minor things. You
18 know, maybe 40, 50 pieces that we showed there.
19      And that's when we realized we could have a
20 restaurant. It's just that that wasn't the one. And I
21 kind of back-pedaled on the Great American Hot Dog
22 Machine. But this stuff just kept coming, because by
23 then, everybody that knew me realized that that's what I
24 did.
25      And, you know, it got out of hand. And when

15 (Pages 54 to 57)

**17**

Page 58

1  eBay happened, that really went crazy there. We ended
2  up having to build a shed out back just to take the
3  household goods that the collection had displaced
4  because we couldn't risk putting the collection stuff --
5  parts out there because, you know, weather and all that,
6  you know, vermin. Because Fairfield, you get ants and
7  everything up there.
8      And, you know, we did the 1996 Hall of Fame
9  Hall of Fame in San Francisco, and they only showed
10  about 50 parts of it there, fifty pieces of the
11  collection there.
12      And then, like I say, we tried to do that one
13  at COPIA. And then we had one scheduled for -- or we
14  were in a tentative stage of discussing it for Grossmont
15  College, this little museum here, for this next July in
16  National Hot Dog Month, but that's not going to happen.
17      But after we realized we could afford a
18  restaurant, we started going -- well, you know, if I'm
19  not going to sell them mobile, I can at least build
20  something nice. And that's where the concept of
21  Lamborweenie came from is to promote the thing when we
22  do get the restaurant.
23      Q. Okay. Is it a fair description to say that,
24  ultimately, your vision for The Hot Dog Hall of Fame is
25  to have a physical location that would include a

Page 59

1  restaurant, a gift shop, a museum?
2      A. Gallery and Hall of Fame.
3      Q. And Hall of Fame?
4      A. Yes.
5      Q. Okay. And the Hall of Fame would feature the
6  items from your collection?
7      A. No. That's the museum part. The Hall of Fame
8  is The Frankie Award for Hot Dog Excellence. And the
9  recipients of it, the people who have made the wonderful
10  world of wieners what it is. There's some wild people
11  out there. I'm conservative compared to some of these
12  people, you know. It's -- I couldn't have thought of
13  this in a thousand years, you know.
14      Q. Okay. Do you remember when we had a conference with
15  the magistrate judge's clerk a little while ago?
16      A. Yes.
17      Q. All right. And I believe during that
18  conference you were asked what The Hot Dog Hall of Fame
19  is, and I think you gave the description "It's a loose
20  affiliation of hot dog lovers."
21      Do you recall saying that?
22      A. Yes. Yes. Yes.
23      Q. And is that an accurate description?
24      A. Fairly accurate. Fairly accurate. Some of
25  them were in the business. Some of them just love good

Page 60

1  hot dogs, you know. There is others that, I don't know
2  where they come from. There is artists, you know.
3  They've done hot dog art for us, that sort of thing.
4  But it's hard to describe it.
5      In the last issue, I turned around and looked
6  at our newsletter. I turned around and looked at who
7  exactly reads us nowadays, and I'd done that years ago
8  in the print version. And I'm impressed. You know,
9  it's like, you know, Herb Caen from the San Francisco
10  Chronicle, he was one of our readers from Issue 1. That
11  does a lot for your ego there to realize that guy is
12  reading you, you know.
13      And we've got others that are, you know,
14  Internet-content providers, that sort of thing. And
15  very little comes of it because for most of the time we
16  were doing this, we were afraid of getting ripped off.
17  So we were keeping it very, very low key. And to this
18  day, the newsletter is by invitation only.
19      Q. Okay. We'll get to the newsletter as well.
20      Now, it's true that you claim to have a
21  trademark in the phrase "The Hot Dog Hall of Fame,"
22  correct?
23      A. No. I don't claim to have the trademark, but
24  what -- from my understanding of when we first had to
25  defend this back in 1978, I was told, "You either have

Page 61

1  to use it and defend it over the years," which we've
2  done, "or register it." And, in fact, on the patent and
3  trademark website, it says you don't have to have a
4  trademark.
5      Q. Okay. Yeah. We're actually kind of speaking
6  past each other.
7      You claim to have rights to the name --
8      A. Yes.
9      Q. -- The Hot Dog Hall of Fame --
10      A. Yes.
11      Q. -- correct?
12      A. Yes.
13      Q. Okay. And that's going back to the time that
14  you first started using that name, correct?
15      A. Yes. At least 1 June, 1978 when I had to sue a
16  potential partner or started to sue, you know. It never
17  got there. He immediately abandoned it, because he went
18  out and had his girlfriend register the Great American
19  Hot Dog Machine and several other of our names in her
20  name.
21      Q. Okay. And when you and I were just talking a
22  minute ago about not having a trademark, what you were
23  saying is you haven't registered --
24      A. Right.
25      Q. -- or applied for --

Page 62

1  A. Yes.
2  Q. -- a registered trademark on the name, correct?
3  A. Yes. You're correct.
4  Q. Okay. You haven't done that with the United
5  States Patent and Trademark Office, correct?
6  A. That's right.
7  Q. And you haven't applied for any kind of
8  trademark on that name in the State of California,
9  correct?
10  A. No, I have not.
11  Q. Okay. All right. So whatever rights you have
12  or do not have exist as a matter of common law through
13  your usage, correct?
14  A. To the best of my understanding, you're
15  absolutely correct, sir.
16  Q. Okay. Now, you've started using it in June.
17  June 1, 1978 is what you say, correct?
18  A. That's my earliest recorded incident of it.
19  But it had to have happened before that because of the
20  fact that this guy knew that when it -- the lawyer had
21  the right to cease and desist to -- knew that that was
22  what we were doing. Because this was a two- to
23  three-month process where this guy and I discussed
24  becoming partners.
25  Q. Okay. I will get to that letter in a little

Page 63

1  bit.
2  Have you ever incorporated The Hot Dog Hall of
3  Fame?
4  A. No.
5  Q. Have you ever registered a -- an assumed name
6  for The Hot Dog Hall of Fame?
7  A. No.
8  Q. So let me go through it. Let me get the
9  question out before you answer it.
10  A. Okay. I'm sorry.
11  Q. All right. Have you ever filed income taxes,
12  either state or federal, in the name of The Hot Dog Hall
13  of Fame?
14  A. No. We've never had any earnings.
15  Q. Okay. You've never had any earnings conducting
16  business through The Hot Dog Hall of Fame?
17  A. That's correct.
18  Q. I assume, then, you don't have a sales tax
19  registration certificate for The Hot Dog Hall of Fame?
20  A. No, I don't.
21  Q. The Hot Dog Hall of Fame does not have paid
22  employees, does it?
23  A. No.
24  Q. So it doesn't have a payroll?
25  A. No.

Page 64

1  Q. You don't pay payroll taxes?
2  A. No, sir.
3  Q. Does The Hot Dog Hall of Fame have a business
4  plan?
5  A. What do you mean by that?
6  Q. Well, do you have a written business plan?
7  A. No. What has gone on all this time is we've
8  looked for potential celebrity partners, that sort of
9  thing. That's the entire reason we contacted
10  Mr. Schussler back in 19- -- 2000.
11  Q. You've looked for either celebrity or wealthy
12  partners in order to invest in the concept of The Hot
13  Dog Hall of Fame?
14  A. Yes, while simultaneously trying to raise money
15  ourselves through the Great American Hot Dog Machines
16  before. And then now, or up until June, that was what
17  the Woody Weenie Wagon was about, because we were going
18  to get it open and running and then get us a commissary
19  somewhere. And between the two, what we could sell
20  there, we could expand on that.
21  Q. Okay. Does The Hot Dog Hall of Fame have a
22  marketing plan?
23  A. No.
24  Q. Does it have an advertising budget?
25  A. Absolutely not. We believe in guerilla

Page 65

1  marketing.
2  Q. What do you mean by "guerilla marketing"?
3  A. Well, we have Hot Diggity Dollars. They have
4  my picture on them. "You never sausage a deal," "Uncle
5  Frank wants you," the whole thing. They have various
6  denominations.
7  When we were running --
8  COURT REPORTER: I'm sorry. You're going to
9  have to slow down for me.
10  THE WITNESS: I'm sorry.
11  They have, "You never sausage a deal" on them,
12  that sort of thing. They have the official seal of The
13  Hot Dog Hall of Fame on them.
14  And we started out when it had Hot Diggity
15  Dogs's test marketing this thing. And we'd go to the --
16  we'd get off work in the afternoon and we'd take a
17  one-block area, and each -- myself, Arthur Lechuga, who
18  worked for us, the wife, we would walk around these
19  blocks handing these things out. And if I met you, I --
20  personally, I'd give you one that had a different mark
21  on the edge of it so I could tell where it came from.
22  And they also were marked according to what
23  block we handed them out so we could see where our
24  customers were all coming from. It's a fairly upscale
25  apartment area in Santa Clara where this thing was. And

17 (Pages 62 to 65)

Page 66

1    that way we knew where our customers were. And that
2    worked very well. We were getting about 15 percent
3    return on a month, and that's high for marketing.
4         And then the other concept would have been
5    Lamborweenie. The third leg of that was free publicity,
6    because the press loves us.
7    BY MR. SCHULTZ:
8         Q. Okay. The first leg of those three legs, the
9    Hot Diggity Dollars?
10        A. Yes.
11        Q. That's referring to when you had the restaurant
12   Hot Diggity Dogs?
13        A. Right.
14        Q. Okay. And you handed out these phony
15   dollars --
16        A. Yes.
17        Q. -- that would be redeemable for hot dogs in
18   your restaurant?
19        A. Yes. They had different denominations of
20   stamps that went on the back. If you were the local
21   business owner, I'd give you one that said, "Have a free
22   lunch on a Hot Dog" -- "on Hot Diggity Dogs" at the
23   time.
24        And if you, you know -- like you say, if I met
25   you personally, give you a dollar off or "Try the

Page 67

1    world's best hot dog free," that sort of thing.
2         And then if you were a return customer, I'd
3    give you one good for 39 cents off your next visit. You
4    know, because you get them in there two or three times,
5    they're yours for life, because we have a serious
6    product.
7         Q. Okay. Do you hold any licenses that are
8    related to The Hot Dog Hall of Fame?
9         A. Not now. I had -- I'd registered the Great
10   American Hot Dog Machines when I was doing those. I
11   still have the paperwork.
12        Q. Motor vehicle registrations?
13        A. Well, yeah. But I'm saying, you know, the --
14   whatever -- the thing to sell, the Health Department,
15   the whole thing. The Franchise Tax Board thing and all
16   that.
17        Q. Well, I need to slow down a minute and find out
18   about this.
19        What licenses or certificates did you have
20   related to the Great American Hot Dog Machine?
21        A. The local business permit, whatever that was,
22   in Sunnyvale, because that's where we were doing the car
23   dealerships.
24        Q. Okay. What else?
25        A. Oh, whatever it took at the State Board of

Page 68

1    Equalization. I can't remember. I think my mother did
2    the paperwork on that. But Health Department stuff.
3    You know, they inspect it and all that when you first
4    start out.
5         Q. Okay. So that was for the one that you
6    actually sold hot dogs from?
7         A. And the second one, too.
8         Q. Because you also sold hot dogs with this?
9         A. Yes. Yes.
10        Q. Do you have any of that documentation still?
11        A. Yes.
12        Q. Okay. You don't hold any licenses or
13   certificates like that currently, correct?
14        A. Right.
15        Q. All right. How long has it been since you've
16   held such licenses or certificates?
17        A. Oh, the Great American Hot Dog Machine No. 2,
18   which is '78, '79, somewhere in there.
19        Q. So it's been about 30 years, 29?
20        A. Twenty something, yeah.
21        Q. All right. I assume you have no articles of
22   incorporation for The Hot Dog Hall of Fame?
23        A. No.
24        Q. No, you don't?
25        A. No, I don't.

Page 69

1         Q. Okay. You don't hold annual board meetings of
2    any kind, do you?
3         A. No.
4         Q. All right. Do you sell any products as The Hot
5    Dog Hall of Fame?
6         A. Yes. We just recently started doing T-shirts
7    and ball caps. We're working on a line of bumper
8    stickers and decals. We're going to have patches.
9    We're going to have sweatshirts and windbreakers.
10        Q. Okay. When you say you recently started that,
11   when did you start that?
12        A. Oh, last month, maybe.
13        Q. "Last month" meaning January of 2008?
14        A. Yes. Yes.
15        Q. All right. We're going to come back to that as
16   well.
17        Do you have any contracts or business
18   agreements in which The Hot Dog Hall of Fame is one of
19   the signatories to the agreement?
20        A. No.
21        Q. Do you have any business contracts in which The
22   Hot Dog Hall of Fame is a beneficiary of the agreement?
23        A. No.
24        Q. Is The Hot Dog Hall of Fame registered as a
25   501(c)(3) tax-exempt organization?

18 (Pages 66 to 69)

Page 70

1    A.  No.
2    Q.  In terms of the current activities that are
3  associated with The Hot Dog Hall of Fame, I'm going to
4  list them.  Well, you tell me which of these are
5  currently activities that are being run associated with
6  The Hot Dog Hall of Fame.  Okay?
7    A.  Sure.
8    Q.  Do you currently run a restaurant?
9    A.  No.
10   Q.  You have memorabilia, correct?
11   A.  I had.
12   Q.  Okay.  Had.  We'll come back to that as well.
13      Right now you do not own the memorabilia,
14  correct?
15   A.  That's correct.
16   Q.  Do you currently publish The Frankfurter
17  Chronicles?
18   A.  Yes, I do.
19   Q.  Do you currently publish what you've called
20  WeenieGrams?
21   A.  We haven't in several months.  But, yes,
22  they're still -- you know, there's nothing been worth
23  sending one out for.
24   Q.  Do you currently give out Frankie Awards?
25   A.  Every July in National Hot Dog Month.

Page 71

1    Q.  Okay.  Are there any other activities that
2  you're currently participating in that you associate
3  with The Hot Dog Hall of Fame?
4    A.  No.
5    Q.  All right.  Are there any other activities that
6  you're planning on doing that you're not currently doing
7  that will be associated with The Hot Dog Hall of Fame?
8    A.  Well, depending on how this thing goes, I hope
9  to open the restaurant, museum, Hall of Fame, gallery
10  and gift shop.
11   Q.  Okay.  That concept, opening a venue that would
12  be a restaurant, Hall of Fame, gallery, gift shop and
13  museum, how long have you had that concept?
14   A.  Since at least 1 June, 1978.  Says so right in
15  that letter from the attorney there, I think.
16   Q.  All right.  And -- but you've never actually
17  opened that, correct?
18   A.  No.  I haven't had the money.
19   Q.  Okay.  Have you kept that concept a secret or
20  have you told people about it?
21   A.  I tried to keep it a secret for the longest
22  time, only telling people that we, you know, had to
23  approach for some reason or another, like potential
24  investors.
25      Then after 1996 when they invited us to do Hall

Page 72

1  of Fame Hall of Fame, I realized it was going to get
2  out, anyways, so that's when we started doing the
3  website and the newsletter.
4    Q.  All right.  And so from that point forward,
5  this concept has been known publicly through the
6  website --
7    A.  Yes.
8    Q.  -- correct?
9    A.  Yes.  Through -- like CNN did a feature on Hall
10  of Fame and they focused on our exhibit.  It was in
11  about 50 newspapers nationally.
12   Q.  Why have you never acted on the concept?
13   A.  Money.
14   Q.  Meaning what?
15   A.  I don't have any.
16   Q.  Are there any activities that are associated in
17  your mind with The Hot Dog Hall of Fame that you used to
18  do that you don't do now?
19   A.  I can't think of any.
20   Q.  All right.  Make sure I'm covering these.
21      You've never run a restaurant under the name
22  The Hot Dog Hall of Fame?
23   A.  No, I have not.
24   Q.  Let's talk about your memorabilia collection.
25      I think you said when we were out here for the

Page 73

1  initial TRO that you had sold it to someone, correct?
2    A.  One of our long-term supporters, yes.
3    Q.  Okay.  Where is it physically today?
4    A.  It's still in my house.
5    Q.  Okay.  You have possession of it, but you don't
6  own it?
7    A.  Yes.
8    Q.  All right.  To whom did you sell it?
9    A.  Do I have to answer that?
10   Q.  Yes, you do.
11   A.  My brother.
12   Q.  Okay.  James?
13   A.  James.
14   Q.  In Ohio?
15   A.  Yes.
16   Q.  For a dollar?
17   A.  Yes.
18   Q.  Okay.  Did he actually send you the dollar?
19   A.  Yes.
20   Q.  Okay.  Do you have a written agreement that
21  James will return it to you at some time in the future?
22   A.  There's no such agreement, sir.
23   Q.  Okay.  But you have an expectation that he
24  will?
25   A.  He's retired.  He's got major health problems.

19 (Pages 70 to 73)

Page 74

1  He didn't really want it. But when my mother died and
2  our friend, Mr. Potato Head, who is the country's
3  national Potato Head Collector No. 1 guy, he donated his
4  collection to the Children's Museum in Providence, Rhode
5  Island. And Hasbro built a display around it.
6      And that just really impressed me how selfless
7  that was. And we started thinking about what happens if
8  something happens to me because of my health. And
9  that's when we decided, my mother and my brother and I,
10 that -- basically, sell it to my brother until he can
11 come out and pick it up, because of his foot thing --
12 that's the reason he hasn't done it yet -- just for
13 safekeeping, because he's got the space.
14     Q. Why did you sell it to him?
15     A. Because if something were to happen to me
16 because of my health. You know, my son doesn't want to
17 do it. He's into the things he's doing. We've never
18 had the money. My brother has the money, if he wanted
19 to do it, but he doesn't because of his health and --
20 you know.
21     So, basically, it's for safekeeping. It's
22 there, you know. He owns the thing. You know, I'm sure
23 he would give it back if we could provide it the home.
24     But we'd also been approached by Frankfort,
25 Indiana, that has the Hot Dog Festival there. They

Page 75

1  wanted it. And then Armour, South Dakota, they wanted
2  it. But neither of those towns were large enough to see
3  the tourist flow that you would want for something like
4  this, which is the main reason we moved back to
5  San Diego, besides the fact that we've always liked this
6  place. You know, it's big enough to support the thing,
7  if and when it happens.
8      Q. When did you sell the memorabilia collection
9  you've --
10     A. Well, it was shortly after my mother died, and
11 that was November of 2006.
12     Q. Okay. So your sale of the memorabilia to your
13 brother had nothing to do with this lawsuit?
14     A. No. No. That pulling the plug on the Weenie
15 Wagon did, you know, because I can't go forward.
16 There's no point in it now.
17     Q. All right. The memorabilia collection
18 physically is still in your house, correct?
19     A. Yes.
20     Q. And is it all within your home or are there
21 other outbuildings where it's physically stored?
22     A. There may be some of it in the garage. I can't
23 remember. But everything is in boxes. It always has
24 been. And, you know, we've moved -- oh, well, like I
25 said, we were military brats when we were young and then

Page 76

1  a youngin' -- when we got back out here, we were poor,
2  so we moved a lot.
3      And there are things I haven't seen in 30
4  years. Like I haven't seen my cassette collection since
5  1981 or '82, something like that. You know, it's just
6  that's the way it is.
7      We call it the Wiener Warehouse because there's
8  room to move sideways in rooms, and that's it. You
9  know, it's just stacked to the ceiling with stuff.
10     Q. In your home?
11     A. Yes.
12     Q. All right. So this stuff is not on display?
13     A. No. There's no room for it. Besides that,
14 it's just an old funky house.
15     Q. Where did you get the items that are in the
16 memorabilia collection owned by your brother?
17     A. Hundreds of different donations over the years.
18 My wife is probably the No. 1 contributor. My mother
19 put a lot of money into the Great American Hot Dog
20 Machine No. 2, the Woody Weenie Wagon and the
21 collection. My brother donated items as well.
22     But there's dozens and dozens of people still
23 on our newsletter mailing list that still contribute.
24 It's more or less peaked out. You know, we've gotten
25 most everything there is to have out there.

Page 77

1      You know, I did this big splurge on eBay when I
2  first discovered it and I spent a lot of money and got
3  in a lot of trouble with the wife for that, but
4  there's -- it's a mature collection. There is not much
5  more. I can't remember. I mean, I know we get a piece
6  or two in every month or so, but that's it, you know.
7  It's down to a trickle again.
8      Q. Okay.
9      MR. SCHULTZ: Are you doing okay?
10     COURT REPORTER: Uh-huh.
11 BY MR. SCHULTZ:
12     Q. All right. So can you give me a general
13 description of what's in the -- well, actually, let me
14 stop for a second.
15     If you don't own the memorabilia collection,
16 what happens to items that are currently donated?
17     A. They go into the pile with it.
18     Q. But -- so they belong to your brother?
19     A. Yes.
20     Q. Can you give me a general description of what
21 the contents of the memorabilia collection is by
22 category or --
23     A. Oh. Okay. Well, we have a Wienermobile
24 collection that's second only to John Masters' of
25 Wichita, Kansas. All the little banks and all that. We

20 (Pages 74 to 77)

Page 78

1   have the three-foot pedal job and all that.
2       We have various hot dog shaped items like with
3   three versions of the hot dog telephone, a couple
4   different versions of hot dog radios, piggy banks, music
5   boxes. We have maybe 30 decorative platters from the
6   '50s on.
7       We have things from -- little bitty things you
8   can barely see to the -- there's a six-foot tall hot dog
9   statue shoved over in the corner of the living room out
10  of no place else to put it, you know.
11      We have a Surf Dog sign that's on our website
12  that somebody in North County gave us when they went out
13  of business here.
14      We have a thing from a restaurant that went out
15  of business in Campbell called Hot Dog Heaven. It's
16  this big -- about eight-foot-long display sign with
17  weenies playing harps and floating through the clouds.
18      We have jewelry, clothing, cookware,
19  promotionals from various other companies. Probably a
20  quarter of the collection is various brand names of
21  companies. And some of them are still in business.
22  Some of them aren't. Toys.
23      We have a nice collection of other -- it's
24  called "Not the Oscar Mayer Wienermobile Collection."
25  And we have a collection of toy push carts, salt and

Page 79

1   pepper shakers. Just on and on and on.
2       It's pretty wild. It's across the spectrum.
3   You know, some of the collectors that we know are very
4   specific. Like Rick Savage down in Florida, he has
5   Armour hot dog coins from the '50s on. And his whole
6   collection fits in two books. Two notebooks. And I
7   wish I could say that our collection was as concise as
8   that, but it's across the spectrum. Others -- other
9   collectors out there have, like, only this or only that.
10  Like -- you know, but we have one of each is, basically,
11  what we've got.
12      Q. Okay. So there are other collectors --
13      A. Oh, yeah.
14      Q. -- around the country --
15      A. Oh, yeah.
16      Q. -- who collect hot dog memorabilia?
17      A. Yes. You go on eBay and punch it in and watch
18  that for a week or so. You get a real education on how
19  many people collect that stuff.
20      Q. Okay. Do you know the size of other people's
21  collections?
22      A. No. I do know John Masters'. He has almost
23  every Wienermobile out there. And like I say, Rick
24  Savage's collection is complete. He gave us one. Some
25  of those plastic coins, they were in Armour hot dogs in

Page 80

1   the '50s. They, you know, were throw-aways back in -- I
2   had a couple when I was a kid and forgot all about them
3   until I discovered him. And he gave us one for the
4   collection. But his most expensive one is about $1,000
5   for a little plastic coin. That's just too rich for me.
6       Q. Okay. All right. Over the course of time
7   since you have been collecting this memorabilia, it's
8   been on display publicly at Hot Diggity Dog, correct?
9       A. Right.
10      Q. For approximately six months?
11      A. Not even that. Part of that.
12      Q. Okay. And that was in the '70s or '80s?
13      A. '83 or so.
14      Q. Okay. And it's been on display at the Hall of
15  Fame Hall of Fame exhibit at the Yerba Buena Center in
16  San Francisco --
17      A. Yes.
18      Q. -- correct?
19      A. Yes.
20      Q. And other than those two times, has any portion
21  of your memorabilia collection been on public display?
22      A. No.
23      Q. Okay. Let's talk about the Yerba Buena Art
24  Center display. I assume they contacted you --
25      A. Yes.

Page 81

1       Q. -- rather than vice versa, correct?
2       A. Yes.
3       Q. All right. Did they pay you to exhibit your
4   items?
5       A. No.
6       Q. Did you pay them to exhibit them?
7       A. No.
8       Q. Did you receive any portion of the gate
9   receipts from people visiting the display?
10      A. No.
11      Q. All right. Did you ship items up or drive them
12  up?
13      A. I drove them -- rented a car to drive them,
14  because I didn't have a car worth doing it at the time.
15      Q. Okay. Was that expense reimbursed?
16      A. No.
17      Q. Okay. Did you -- well, the Hall of Fame Hall
18  of Fame, the point of it was to display various items
19  from a wide range of, quote, Hall of Fames, correct?
20      A. Fifty-four across the United States.
21      Q. Okay. You also mentioned that you had a plan
22  or you had had a plan to display it at two other
23  locations.
24      A. Yes.
25      Q. What was the first one?

21 (Pages 78 to 81)

Page 82

```
1      A.  COPIA American Center for Food, Wine and the
2   Arts in Napa.
3      Q.  In Napa.
4          And that never came to pass, correct?
5      A.  Because they ran out of time before we moved
6   down here.
7      Q.  Okay.  All right.  Did you receive any payment
8   from anybody for that concept?
9      A.  No.  No.
10     Q.  Okay.  And then you were going to display it at
11  Grossmont College?
12     A.  Yes.
13     Q.  That's here in San Diego?
14     A.  Yes.  El Cajon.  La Mesa, El Cajon, somewhere
15  over in there.
16     Q.  Okay.  And you were going to put it on display
17  there during July of 2008, this year?
18     A.  Yes.
19     Q.  And July is the National Hot Dog Month?
20     A.  Yes.  We were going to feed the public for
21  free, do the whole thing, you know.  We're about
22  popularizing it more than making money off of this
23  thing.  That's never been our goal.  The restaurant and
24  the gallery and a gift shop would have supported the
25  museum and Hall of Fame.  That's our plan.
```

Page 83

```
1      Q.  All right.  Why did the Grossmont College
2   exhibit never come to pass?
3      A.  Because of Mr. Schussler's activities.
4      Q.  How was that?
5      A.  Well, I'm done.  You know, he's basically taken
6   what's ours.  And, you know, try getting investment
7   money when they go, "Oh, yeah, this guy over here's got
8   that."  You know, it's not going to happen.
9      Q.  Well, did you need investment money in order to
10  put this on display at Grossmont College?
11     A.  No.  But if I can't use my own name, what's the
12  point?
13     Q.  All right.  And when you say what Mr. Schussler
14  has done, you're referring to this lawsuit, correct?
15     A.  No.  The fact that he seems to find it
16  perfectly acceptable to take something that he knows is
17  ours, claim it as his, and tell the whole world that's
18  what's going on.
19     Q.  Okay.  So when you say what Mr. Schussler is
20  doing, what you're referring to is the fact that he's
21  opening restaurants called the Hot Dog Hall of Fame,
22  correct?
23     A.  Yes.
24     Q.  All right.  Now, has Mr. Schussler ever said
25  you couldn't display your items at Grossmont?
```

Page 84

```
1      A.  It's not up to him to tell me that.
2      Q.  Well, and he's never said that, has he?
3      A.  Well, it was like he was saying, "Well, we
4   don't care if you run your news- -- little newsletter
5   and all that."  That's insulting just to start with.
6   And he knows we did this back in 2000 when he first met
7   us.  He didn't say, "Cease and desist" us.  We told him,
8   "Cease and desist."
9      Q.  What I'm trying to get at is Mr. Schussler has
10  never said to you, "You can't show your memorabilia at
11  Grossmont College," correct?
12     A.  No.  No, he hasn't.
13     Q.  And he's never --
14     A.  He doesn't know about it.
15     Q.  And he's never said to you, "You can't show
16  your memorabilia at other locations," correct?
17     A.  That's correct.
18     Q.  And he's never said to you, "You can't publish
19  your newsletter, The Frankfurter Chronicles," correct?
20     A.  That's correct.  But I don't need his
21  permission.
22     Q.  Well, all right.  So -- fine.
23         You haven't -- he's never told you that you
24  can't build this Woody Weenie Wagon?
25     A.  No.  What he told us on our initial meeting is
```

Page 85

```
1   "We're going to do this without you."  That's what he
2   told us.
3      Q.  And when you say the "initial meeting," you're
4   referring to the meeting in 2000 at Fisherman's Wharf in
5   San Francisco?
6      A.  At the grand opening of the Rainforest Cafe
7   there.
8      Q.  All right.  Now, over the years you've
9   approached several venues or looked at several buildings
10  to build a restaurant, correct?
11     A.  Yes.  A number of them.
12     Q.  But you've never actually done that?
13     A.  No.
14     Q.  Why not?
15     A.  Money.
16     Q.  Didn't have any?
17     A.  No.  Didn't have enough.
18     Q.  Okay.  So you never had enough to invest in a
19  restaurant location?
20     A.  Oh, I've had enough, but not the restaurant
21  location.  There's a number of reasons why you don't
22  choose certain buildings.  You know, one of them is
23  location.  One of them is that -- the standard thing in
24  the restaurant business is never build on the bones of a
25  dead restaurant.  You know, so a lot of what you look at
```

22 (Pages 82 to 85)

Page 86

1    is somebody else failed there, too.
2        I looked at that -- I showed you the file about
3    the one in Suisun, that old bank building. And like it
4    says in there, the guy jerked me on the last few minutes
5    and instead of it being the price he stated, it was the
6    price, plus I'm going to say the alcohol and liquor
7    license and the furnishings separate. You know, changed
8    the deal at the last minute.
9        I didn't have any more money. That was it.
10   You know, he just priced himself out of it. That's up
11   to him. You know, he lost it. Up to him. He could
12   have sold it.
13   Q.  Let's talk about The Frankie Award.
14       When did you first start giving out The Frankie
15   Award?
16   A.  1982.
17   Q.  And what prompted you to do that?
18   A.  We had been looking for quite some time because
19   we realized that there was quite a number of colorful
20   individuals in the hot dog business and some of them did
21   great, great things. There was a place in San Francisco
22   called Franks for the Memory. It was architecturally
23   stunning. They won one for the World's Most Beautiful
24   Hot Dog Restaurant.
25       You know, of course, the people that took it

Page 87

1    over drove it into the ground and it's no longer there.
2    But that's common in this business as well.
3        Terry with the banana, Terry Atcherson, he won
4    the first Artist of the Year because he built us that
5    first hot dog telephone that's on our website.
6        Let's see. Who else won that year? I can't
7    remember. But the point is it's for excellence in the
8    field of hot dogs, is what this is all about, you know.
9    And there's some places out there that serve great
10   product. There's some places out there that are just
11   great people. So they won, too.
12   Q.  Excellence in the field of hot dogs?
13   A.  Yes.
14   Q.  And why did you want to issue awards for
15   excellence in the field of hot dogs?
16   A.  Because that's what a Hall of Fame does. It
17   appreciates excellence in the field. It celebrates
18   these individuals.
19   Q.  Whose idea was it to start The Frankie Awards?
20   A.  Mine. In fact, we'd had it since before we'd
21   come up with the name for The Hot Dog Hall of Fame. And
22   then we finally found the trophy that was usable.
23   Q.  What do you mean you came up with the idea
24   before you had the name The Hot Dog Hall of Fame?
25   A.  I knew I had this great thing happening here,

Page 88

1    but I didn't have a name for it. And then one day I'm
2    sitting at the counter at Denny's waiting for my wife to
3    get off work, and they taped up the new menu on the
4    backsplash there and it said, "The Hamburger Hall of
5    Fame." Their new half-pound burgers. And I go, "That's
6    it. It's The Hot Dog Hall of Fame." That's where that
7    came from.
8    Q.  You had the idea of The Frankie Award before
9    you had --
10   A.  Yes.
11   Q.  -- the name The Hot Dog Hall of Fame?
12   A.  Yes, because I was getting all these stories
13   of, you know, like famous people that were hot dog
14   lovers, you know, and -- like Richard, oh, Harris, the
15   actor, he came to the United States shortly after World
16   War II. And his story relates how, you know, they had
17   been deprived of meat all the time in England. And he
18   said the best thing he ever found was hot dogs on the
19   streets of New York, and sometimes he'd eat seven of
20   them.
21       You know, and then you get the Babe Ruth story
22   about how many hot dogs that guy could eat. In fact, if
23   you look on our website, you'll see the one that he
24   choked on at the very bottom. There's a place in L.A.
25   It's called the Baseball Reliquary. And they collect

Page 89

1    sports things like that, and this guy just happened to
2    get the thing. You know, it's a pretty
3    grotesque-looking thing, but --
4    Q.  The actual hot dog?
5    A.  Oh, yeah.
6    Q.  Okay. Are there established categories for the
7    issuance of The Frankie Awards?
8    A.  Yes, there are.
9    Q.  What are the categories?
10   A.  Artist of the Year. Oh, most of them nowadays
11   are either outstanding contribution or just for
12   excellence, because sometimes they don't fit into neat
13   categories. We had earlier categories such as Push Cart
14   Operator of the Year, but that just didn't sing, you
15   know.
16       So a lot of them even -- don't even say "For
17   Outstanding Contribution" or "For Excellence." They
18   just say "The Frankie Award" or the -- or "Frankie
19   19-" -- whatever it is, "2000," whatever it is.
20       So they're, basically, less specific. Like you
21   can only have one World's Most Beautiful Hot Dog
22   Restaurant, you know, and they got it. They had it.
23   That was beautiful.
24   Q.  Is there a set number of Frankie Awards that
25   are given each year?

23 (Pages 86 to 89)

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 90

1　　A. No.
2　　Q. It all depends on what?
3　　A. Well, what happens out there, like we tried to
4　award the ones that the guy that bought the hot dog at
5　the 7/11 and did the scratch -- or scratch-off,
6　whatever, and walked away with $23 million. Never could
7　track him down. Of course, anybody with any money, you
8　can't get to them, anyway. You know, it's impossible.
9　　　　You know, some are as simple as when Mr. Potato
10　Head gave us The Frankie Frank, which is the Mr. Potato
11　Head's mutant wiener cousin. We met bidding against
12　each other on eBay, and he beat me. And so I contacted
13　him, said, "Hey, what -- will you sell that to me at the
14　price you spent, $127.50 for a little hot dog statue?"
15　　　　And he said, "No, but I will give it to you."
16　　　　And -- most generous man. And he wanted the
17　cardboard box, and that's the only thing his collection
18　didn't have at the time.
19　　　　And after a while, he even sent us the
20　cardboard box when he found one in better condition.
21　Plus Mr. Potato Head's boat and trailer and car. And
22　Mr. Mustard Head. And there was one other there.
23　Mr. Pickle Head or something like that.
24　　　　But he gave it to us, so we gave him a Frankie
25　for that one year. Just 'cause he's the kind of

Page 91

1　contributor you would really like to have, you know.
2　　　　He's contributed things from his travels over
3　the years. Like we sent him to the Andy of Mayberry
4　themed hot dog restaurant down in South Carolina when he
5　lived down there. And then he moved to Chicago, and so
6　he's tasted a few places for us there. And he's from
7　Cleveland. So he visited Drew Carey's favorite weenie
8　stand when the Drew Carey Show was hot.
9　　　　In fact, since my brother lives there in
10　Cleveland now, he's getting ready to go there and do a
11　follow-up report.
12　　Q. Follow-up report on what?
13　　A. On -- the place is called somebody's Lunch. I
14　can't remember who. What the heck is it? But, anyway,
15　my brother is going to go visit that.
16　　　　My brother, like I say, he got his foot cut off
17　from the diabetes, and so he's stuck inside. He's
18　basically now just starting to get out and get around
19　again. And so he's been making up for lost time. He
20　went and visited the hot dog shop down in Warren just
21　when he's trying out his new GPS in his truck, that sort
22　of thing, you know.
23　　　　And we have people like that in most of the
24　major cities that go out and try things for us. Like
25　when -- oh, what's his name? Oh, anyway, it's in

Page 92

1　your -- the -- one of The Frankie of the last year. The
2　guy in New York City went out and tasted Shake Shack for
3　us, and we gave Shake Shack a Frankie based on his
4　report.
5　　Q. Since 1982, have you given out a Frankie Award,
6　at least one, every year?
7　　A. No. We missed one year.
8　　Q. What year?
9　　A. I don't know. Maybe '89 or '90, something like
10　that. I think it was when I was sick. I'm not sure
11　exactly when that was, but we did miss one year. And
12　then we've had one or two occasions where we couldn't
13　contact the person that we wanted to give The Frankie
14　to. Like we wanted to give one to Takeru Kobayashi, the
15　hot dog --
16　　　　COURT REPORTER: I'm sorry.
17　　　　THE WITNESS: I'm sorry.
18　　　　COURT REPORTER: You need to really slow down.
19　　　　THE WITNESS: I'm sorry. I'm sorry.
20　　　　Takeru, T-a-k-e-r-u, Kobayashi, the world's hot
21　dog eating champ up until this last time when Joey
22　Chestnut took it. But we tried to give one to him.
23　BY MR. SCHULTZ:
24　　Q. Keep slowing down.
25　　A. Okay. We tried to give one to him, and we

Page 93

1　never did hear back from him. You know, language
2　barrier. I'm sure his whole website is almost all in
3　Japanese.
4　　Q. Since 1982, how many Frankie Awards have you
5　given that have been accepted by the recipients?
6　　A. All of them.
7　　Q. Well, obviously not Mr. --
8　　A. You know, I had no mailing address, so I
9　couldn't actually give it to him.
10　　Q. Okay. How many is that number?
11　　A. At least 37 the last time I looked maybe two
12　years ago.
13　　Q. Okay. What is on -- there's a plaque --
14　　A. Right.
15　　Q. -- correct?
16　　A. Right.
17　　Q. What does the plaque say?
18　　A. Some of them say "The Frankie Award." Some of
19　them say "For Hot Dog Excellence." Some of them say
20　"For Outstanding Contribution to Hot Dog History."
21　　Q. Do any of them say "Hot Dog Hall of Fame"?
22　　A. No.
23　　Q. Of the -- did you say 37?
24　　A. At least.
25　　Q. At least 37. Of those at least 37, how many of

24 (Pages 90 to 93)

26

Page 94

1  them have gone to friends or relatives of yours?
2      A.  Well, my mother has won twice.  My wife has won
3  twice.  My son has won twice.  But other than that, it's
4  basically people out there.
5          And the reason they won is for -- like my wife
6  a couple of years ago, however many years, maybe five or
7  six years ago, Kraft Foods/Oscar Mayer decided to get
8  out of the catalog business, and so she went in and
9  bought everything that they had left for us.  And I
10  don't know what that cost.  She wouldn't tell me.  But
11  it had to be in the hundreds of dollars.  And so I gave
12  her one for that.
13         My mother funded the Woody Weenie Wagon
14  project.  She got one for that.
15      Q.  Who decides who gets the awards?
16      A.  The previous recipients are encouraged to
17  submit suggestions.  And then depending on who, I always
18  bring in at least one other person to decide the final
19  one at the end of the year.  So it -- that -- it's a
20  rotating kind of thing.  But ultimately it's the
21  immediate family, my brother, it was my mother, and me.
22      Q.  Who ultimately decides who will be the
23  recipient?
24      A.  Yes.  Yes.  Yes.  And we try to error on the
25  side of generous.  You know, some years we've given out

Page 95

1  as many as seven or eight of them.  Some years, like I
2  say, one.  And that one year, nothing.
3      Q.  Do people ever come to you sort of out of the
4  blue and suggest someone?
5      A.  Oh, yes.  Oh, yes.  And, in fact, sometimes
6  they send their publicist after me.
7      Q.  Okay.  Give me an example of that.
8      A.  Pink's.
9      Q.  Pardon me?
10      A.  Pink's in L.A.
11      Q.  Okay.
12      A.  Yeah.
13      Q.  Tell me about that.
14      A.  Well, yeah.  I just got an e-mail from her
15  going, "You ought to consider Pink's."  And when we
16  drove down there on our way here for the first time, we
17  stopped by and, yeah, it's -- it's a fun thing.  Have
18  you ever been there?
19      Q.  Nope.
20      A.  They have a Wall -- it's not a Hall of Fame.
21  It's a Wall of Fame.  And they have all of the actors
22  that have been in there.  And we set at the George
23  Costanza table from "Seinfeld," 'cause he's one of our
24  personal favorites, you know.  And we tried across their
25  menu.

Page 96

1          We went in there anonymously, so if we didn't
2  decide to give them one, their feelings wouldn't be
3  hurt, you know.  And we went in there a couple of times
4  just to be sure.
5          And it's a thing.  I mean, I love Pink's, you
6  know.  It's not the same products that we'd use or
7  anything else.  And Richard and Gloria are hardly ever
8  there, but it's a wonderful little place.  It's, you
9  know, 50 plus years in the business.
10      Q.  Are the awards, The Frankie Awards, presented
11  in a public setting?
12      A.  Sometimes they are.  Sometimes they aren't.
13  You know, in the last ten years or so, since I haven't
14  been feeling as well as I used to when I was a young
15  guy.  Most of the time we mail them, you know.
16  Sometimes, you know, we'll stop by wherever they're at,
17  but -- you know, we used to have cookouts and awards
18  ceremonies and all that, you know, but I can't afford
19  that anymore.
20      Q.  You haven't done that for ten years?
21      A.  More than that.  Let's see.  '89, maybe, is the
22  last time we did that.
23      Q.  All right.  '89 was the last time you had an
24  actual award ceremony?
25      A.  Cookout and all that, you know.  We have -- I

Page 97

1  have friends that have wild vehicles, like one of my
2  friends has a three-wheel banana.  The guy that did the
3  hot dog phone for us.  One of my other friends has a
4  guitar-shaped motorcycle.  And we'd invite these guys.
5  Sort of be like a car show, a cookout, an awards
6  ceremony.  We'd have live entertainment.
7          And one of the main reasons we quit doing the
8  cookouts is because we had this balloon toss thing
9  scheduled for later, and they found out where we had
10  stashed all of these water balloons.  They went crazy.
11  It was inside a gazebo.  They must have had that much
12  (indicating) water on the floor by the time the smoke
13  settled on that one.  You know, we decided, "We can't do
14  that one anymore."
15          And it was cold in the winter, even if it was
16  July -- in the summer, even if it was July.  So that
17  ended that one, you know, two or three hours early.
18          But, you know, we would like to bring that back
19  again.  It's just like now we don't have the money.  We
20  don't know anybody here to speak of.
21      Q.  When you did have those cookouts and awards
22  ceremonies, what venue would they be held in?
23      A.  Oh, parks, that sort of thing.  We took over a
24  park in Campbell for the fourth annual one.  And the one
25  we did in Fairfield was Dover Park.  It had a nice pond

25 (Pages 94 to 97)

Page 98

1 and everything else.
2 Q. Did you get a permit for those?
3 A. No. Didn't have to. We were under, you know,
4 50 to 100 people. They told us, "Don't worry about it,"
5 you know.
6 The first one we did, we only invited 29
7 people. And by the time it was over with, me must have
8 had 100 there, but it was friends of friends and
9 crashers and people just going through the park. And,
10 you know, we were at the point if we got the food, we'll
11 feed you, you know.
12 You know, we're a family of three, so we always
13 cook for four, so we almost always have somebody over
14 for dinner. Just, you know, I'm going to throw the food
15 away. The dog can't have it. So, you know, that's what
16 food is about, in my opinion. You know, it's the
17 commun- -- communal thing, you know.
18 Q. You didn't print flyers for any of these award
19 ceremonies?
20 A. Somebody printed one for us for one of them.
21 But, you know, that's not what we do. It was -- you
22 know, since -- we tried to be very closely held here, to
23 keep the lid on this thing for years. And so we know
24 the people that we know. And, you know, once it -- like
25 when we moved to Fairfield, it got out on the radio. I

Page 99

1 can't remember how that was, but all of a sudden I'm
2 getting phone calls from people, "Can I come?"
3 "Oh, yeah. Sure."
4 But it's, you know, not something that the
5 public, in general, is invited to so far because we've
6 never been able to afford to feed 500, 600 people for
7 free.
8 Q. Has anyone ever turned down the award?
9 A. No.
10 Q. Let's talk about your book "Hot Dogs in a Cold
11 World."
12 Is that the name of your book?
13 A. Yes, it is.
14 Q. When did you start it?
15 A. About two years before we got the computer. So
16 '94, somewhere in there.
17 Q. Okay. And why did you start it?
18 A. Well, because this -- this is overwhelming, the
19 stuff that you see out there. And -- and at first I'm
20 going, "Yeah, I'm going to write me a great book," you
21 know. And I started looking at all the other hot dog
22 books and they're all the same. They all have the
23 obligatory hot dog history about Tad Dorgan inventing
24 the hot dog.
25 THE COURT REPORTER: Sir, you need to slow down

Page 100

1 for me.
2 THE WITNESS: I'm sorry.
3 THE COURT REPORTER: You really do.
4 THE WITNESS: I'm sorry.
5 But about Tad Dorgan inventing the hot dog and
6 then, you know, certain recipes that show up in all of
7 them.
8 And I realize they're all the same. I don't
9 want to do that. And that's why we started the
10 newsletter at that point on is to learn -- you know, to
11 tell the rest of the story. And, basically, the
12 newsletter, to a large extent, is the bulk of the book.
13 BY MR. SCHULTZ:
14 Q. What is the story that you are telling in "Hot
15 Dogs in a Cold World"?
16 A. From when we first got into this thing to the
17 present. It's about the things -- the people we've met,
18 the adventures we've had, the -- you know, the great --
19 some of these are wonderful, wonderful people out there,
20 you know. And, you know, I feel honored to have met
21 these people, you know.
22 And some of them are very colorful characters.
23 Like one guy once told me that when he dies, he wants to
24 be ground into sausages and fed to his enemies.
25 Certainly something you'd never hear out of my mouth.

Page 101

1 Q. Well, where does he live?
2 A. Silicon Valley. He's dead. Quadruple bypass.
3 Q. When did he die?
4 A. Oh, probably early '80s.
5 MR. SCHULTZ: Let's go off the record for a
6 second.
7 THE VIDEOGRAPHER: Going off the record.
8 The time is 10:59 a.m.
9 (A recess was taken.)
10 THE VIDEOGRAPHER: We're back on the record.
11 The time is 11:04 a.m.
12 This marks the beginning of Videotape No. 2 in
13 the deposition of J. Frank Webster.
14 BY MR. SCHULTZ:
15 Q. And, Mr. Webster, before the break, we were
16 talking about the book "Hot Dogs in a Cold World." And
17 as I understand your testimony, it's essentially a
18 chronicle of the years that you've spent sort of
19 pursuing your hot dog interest?
20 A. The Hot Dog Hall of Fame, yes. Yes.
21 Q. Okay. Do you -- first of all, is it finished?
22 A. No.
23 Q. When will it be finished?
24 A. Sometime after this trial is over.
25 Q. Okay. And why will that be the end of it?

26 (Pages 98 to 101)

Page 102

1  A. Because that's the final chapter.
2  Q. Why is that the final chapter?
3  A. Because this is pretty dramatic for, you know,
4  what we've done all this time to be sued for, you know,
5  somebody thinking they can take over our concept and all
6  that.
7  Q. All right. Has the -- is the book for sale?
8  A. It will be.
9  Q. Okay. It's not currently?
10  A. No.
11  Q. One of the things that I think your website
12  recently says is that the -- among the products being
13  offered for sale is a book.
14  Is there some other book that's being offered
15  for sale?
16  A. Yes. That's that "50 Ways to Top a Hot Dog"
17  book. That doesn't belong to us. Basically, we're
18  pointing people to his website until we get our PayPal
19  set up.
20  Q. Okay. So if somebody wants to purchase that
21  book, they hit your website and can get redirected to
22  his website?
23  A. Yes. Yes. Yes.
24  Q. So you're not actually selling it?
25  A. No. Not at the moment. Only because we don't

Page 103

1  have the PayPal.
2  Q. And who publishes that book?
3  A. It's a self-published guy back in -- I think
4  he's in Florida. Florida, yeah. And he's sold about
5  25-, 30,000 out of the 50- so far. And he's got an
6  updating of that coming. And he's got several other
7  books that are in the same genre.
8  Q. Do you have a publisher for your book "Hot
9  Dogs" --
10  A. No.
11  Q. -- "in a Cold World"?
12  A. No.
13  Q. Do you have any advertising of the book other
14  than what's on your website?
15  A. No. And that's not on our website anymore.
16  Q. Well, right, because of the temporary
17  restraining order.
18  A. Right.
19  Q. Before the temporary restraining order,
20  excerpts from the book were available free to anyone who
21  cared to access your website, correct?
22  A. Just that one page, the "Hot Dogs in a Cold
23  World" page. And, you know, the readers of the
24  newsletter know what is going through the newsletter,
25  some of it is going to end up in the book, too.

Page 104

1  Q. Well, how much of the book is actually written
2  at this point?
3  A. Probably 75, 80 percent.
4  Q. Okay. And it's actually -- and when I say
5  that, I'm asking, is it actually written down on pages
6  similar to the page that was on your website"?
7  A. No. It's in files all over. It's pieces of
8  this, pieces of that. We have certain recipes which
9  we've time tested, and they will be in there. Certain
10  elements of hot dog humor, jokes, our reviews for the
11  movies, our reviews for the T.V., our, you know,
12  Tubesteak Tunes, that sort of thing. You know, that's a
13  list of songs is what that is.
14  Q. What eventually will happen is you'll take all
15  these files that you have and decide what goes in, what
16  goes out, and then --
17  A. Yeah.
18  Q. -- bring them all together into the form of an
19  actual book?
20  A. Yes. It's pretty much decided now. It's
21  only -- the history of this thing that we're doing now
22  is all that really lacks.
23  Q. Well, but you may have it in your mind what is
24  going to go in it, but you haven't --
25  A. No.

Page 105

1  Q. -- gone through the process of actually sitting
2  down and taking this page and this goes here and this
3  page goes there?
4  A. Right.
5  Q. You haven't done any of that, have you?
6  A. No, I haven't.
7  Q. All right. Let's turn to The Frankfurter
8  Chronicles. And that is a newsletter that is available
9  through you, correct?
10  A. Yes.
11  Q. When did you start The Frankfurter Chronicles?
12  A. It's somewhere between Christmas of 1995 and
13  the 2nd of February, 1996.
14  Q. And you are able to place that date on it
15  because?
16  A. The print version, the second one there points
17  out some of the things that we got for Christmas 1995.
18  And that, the files that I can't open, but I can see the
19  date when you hover over them, says "2/2/96."
20  Q. Okay. Now, by the way, I -- I mean no
21  disrespect. Is it okay to call them "The Frankfurter
22  Chronicles" or do you prefer that I say "The Newsletter
23  with Relish"?
24  A. Either way. Doesn't matter. It's
25  interchangeable.

. 27 (Pages 102 to 105)

Page 106

1　Q.　Okay.　Why did you start The Frankfurter
2　Chronicles?
3　A.　I knew I had this book in me, but I'd never
4　written anything before.　And, you know, tech writing
5　doesn't count.　That's not even English.
6　But I just wanted to learn to write.　And you
7　can see the evolution of my writing as it goes through
8　there, you know.　Some things I get better at and some
9　things I'm going, "I'm not doing that one again,"
10　because I'm just not good at some things, you know.
11　But, basically, I've came up to speed with my
12　writing.　I have no problem with it.　Other people seem
13　to think I'm pretty good at it.　I think that's fairly
14　subjective because, you know, some people look at me and
15　go, "What a toad of a human being" and other people go,
16　"He's a great guy."　You know, so it's really what they
17　think, you know.
18　And I'm pretty pleased with what the newsletter
19　has become.　People seem to love it.　Like I sent you
20　the advanced version of the one that I just put out this
21　weekend with the Wink's Cheeseburgers on that.　Those
22　guys love that thing, you know.　I'm going, "Hey, you
23　know, I'm just telling -- I'm just writing what you told
24　me, you know."
25　Q.　Okay.　Again, I am just going to remind you

Page 107

1　that she's really --
2　A.　Sorry.
3　Q.　-- working hard to keep --
4　A.　Staring daggers at me over there.　I'm sorry.
5　Q.　Is it -- at least as I read it, the general
6　content of The Frankfurter Chronicles is reviews of
7　movies, reviews of T.V., any of those that have hot dog
8　associations?
9　A.　Yes.
10　Q.　Discussions sometimes of recipes involving hot
11　dogs --
12　A.　Right.
13　Q.　-- correct?
14　A.　Right.
15　Q.　So sort of a chronicle of your family's events
16　over a certain period of time, particularly if it's
17　July, National Hot Dog Month, correct?
18　A.　Right.　Right.
19　Q.　What else is in there?
20　A.　News, jokes.　You know, just about anything
21　that somebody sends me.　You know, we're not too
22　particular.　You know, somebody writes us a funny
23　letter, we'll print it.　You know, we've got no problem
24　with that, you know.
25　You know, one part is to amuse the people that

Page 108

1　read the thing.　And that's how you get the more serious
2　parts to them, you know, is the little sugar with the
3　medicine, you know.　And so, you know, part of it is
4　about some of the people we've approached.　We have a
5　whole file of letters of people that have turned us
6　down.　And, you know, that's at some point, you know,
7　worth at least a chapter or a paragraph somewhere, you
8　know.　I've been turned down by the best of them.
9　Q.　People who have turned you down for what?
10　A.　You know, becoming involved with The Hot Dog
11　Hall of Fame, investing in it, that sort of thing.　Like
12　Donald Trump, for instance.　You know, I understand
13　their decisions.　You know, either you like me or you
14　don't.
15　Q.　What is the function of The Frankfurter
16　Chronicles?
17　A.　It's the official organ of The Hot Dog Hall of
18　Fame.　It says first paragraph, the first issue.
19　Q.　Okay.　What does it mean to be the official
20　organ of The Hot Dog Hall of Fame?
21　A.　It speaks for us and our pursuit of The Hot Dog
22　Hall of Fame.
23　Q.　All right.　Who gets The Frankfurter
24　Chronicles?
25　A.　Right now, we have about 200 readers.　And some

Page 109

1　of them are, you know, hot dog professionals.　Some of
2　them are just people that appreciate a good hot dog.
3　Some of them are friends from -- like my roommate from
4　college.　You know, some of them, like I say, are
5　artists.　Some of them, you know, it's hard to define
6　what they are.
7　Like Alan Pesetsky on the National Hot Dog
8　Month where he and Rosengarten -- David Rosengarten from
9　T.V. Food Network and the guy from the New York Post all
10　did that all sakes, wines and hot dogs thing, you know.
11　You know, Alan Pesetsky's read this thing for
12　years.　He contributes.　He looks out for us in New York
13　City.　But I don't even -- I couldn't tell what you he
14　does for a living, you know.　It's just he seems to find
15　us fascinating.　And his uncle, Harvey Kaplan, who lives
16　in Santa Fe, New Mexico, started reading us when we
17　first were mentioned in Out West, the newspaper that
18　roams, back in the mid '90s or so, you know.　And he's
19　retired, an architect, and that's why he reads it.
20　Q.　How do the readers get it?　Do you actually
21　have to send it to them?
22　A.　Yes.
23　Q.　And is it -- do you invite them to be readers,
24　or do they ask to be readers and you approve, or how
25　does this get determined?

28 (Pages 106 to 109)

Page 110

1    A.  Some of both.  Some of both.  Some of them, you
2  know, we've been to their website and we like what
3  they're doing and we send them a copy and say, "Hey, can
4  we sign you up?"  And we don't even ask them if we can
5  sign you up so much as go, "Hey, we can send them to
6  you."  And we send them a copy.  And if they never
7  respond, we drop it.  You know, we -- last thing I want
8  to do is clutter up somebody's e-mail in-box.
9         Some of them, you know, have approached us
10  directly.  Some of them we suspect are into just picking
11  our brains and seeing what we're doing, and so we -- we
12  may not let them be on the list.
13         We used to have -- when it was a print version,
14  we used to have about 500 readers, and then we found out
15  that some of what we were doing was popping up in other
16  people's websites without our permission.  And so we
17  pruned the list once.  It didn't stop it.  We pruned the
18  list again.  And that's when we went by invitation
19  e-mail only.
20    Q.  Okay.  So if, for example, I wanted to see it,
21  I couldn't just go to your website --
22    A.  No.
23    Q.  -- and get it?
24    A.  No.
25    Q.  Okay.

Page 111

1    A.  The one that's on the website is the best of
2  and that's just for people that wander in the place.  If
3  you look, the website has never been listed with any of
4  the search engines or anything like that.  We don't have
5  links to any other website.  It's strictly people that
6  we want to see the thing and that's it.
7    Q.  Well, I can access it on Google, right?
8    A.  Only because you know it's there.
9    Q.  Well, if I type in "The Hot Dog Hall of
10  Fame" --
11    A.  Now, yes.  But before, it wouldn't.
12    Q.  When wouldn't it?
13    A.  Before Mr. Schussler started registering
14  that -- or started doing those articles and everything.
15  And all of a sudden, it got drug into where Google could
16  find it.  For the longest time, you could not find that
17  on any of the search engines.
18    Q.  How did Mr. Schussler's --
19    A.  Because the websites he's registered with, the
20  search engine, what they call the robot, goes out and
21  looks at what's on certain websites and it remembers
22  that.  And so now that it remembers "Hot Dog Hall of
23  Fame," it sees "The Hot Dog Hall of Fame" as well.
24    Q.  Okay.  But prior to Mr. Schussler's publicizing
25  "Hot Dog Hall of Fame," is it -- is what you're telling

Page 112

1  me that Goggle's search engine would not pull up your
2  website?
3    A.  Pretty much.  Pretty much.
4    Q.  And that's because why?
5    A.  I never registered deliberately.
6    Q.  Okay.  So "Hot Dog" -- "The Hot Dog Hall of
7  Fame" was not language that you used on your website?
8    A.  It's on there once in a while.  It's on the --
9  under the official seal at the very bottom, the link to
10  our website --
11    Q.  Okay.
12    A.  -- you know.
13    Q.  It's -- when you say "It's on there" on our
14  official seal, "the link to our website," can you
15  describe specifically what you're saying?
16    A.  Okay.  At the very end of each of the e-mail
17  version of the newsletters is our official seal that
18  looks like a USDA meat stamp.  And it says, "Approved:
19  J. Frank Webster, President, The Hot Dog Hall of Fame."
20  And that's at the very bottom of every newsletter.
21         And then right underneath that is the link to
22  our website, you know.  And that's for people that read
23  the newsletter.  But if I go, "Hey, go take a look at
24  what we've done to the newsletter recently," they know
25  they can go to the bottom of the page and click on the

Page 113

1  link and they're there.
2    Q.  Okay.  But prior to Mr. Schussler publicizing
3  "Hot Dog Hall of Fame" for restaurants?
4    A.  Right.
5    Q.  The Google search engine wouldn't pull up your
6  website?
7    A.  As far as I know.  It may have at some point,
8  but I'd tried it before and it wouldn't do it.
9    Q.  Only occasionally?
10    A.  Well, I don't know occasionally or not.  But I
11  know as late as maybe a year and a half ago, it didn't
12  see it.  You know, I don't know since then.  I can't
13  even Google it myself right now because every time I
14  look at what your client is doing, I go crazy.
15    Q.  Did you do something different with your
16  website since Mr. Schussler started publicizing "Hot Dog
17  Hall of Fame" so that it now comes up on Google?
18    A.  No.
19    Q.  Did the words "The Hot Dog Hall of Fame" appear
20  on your website?
21    A.  On and off.  On the website, yes.  All the
22  time.  But in the newsletter, occasionally.
23    Q.  Okay.
24    A.  Most of the time.  Most of the time, I'd have
25  to say.

29 (Pages 110 to 113)

Page 114

1    Q.  All right.  Sporadically on the newsletter?
2    A.  Yeah.  Whenever it was relevant to something we
3  were doing.
4    Q.  Okay.  You don't sell any advertising in The
5  Frankfurter Chronicles?
6    A.  No.
7    Q.  How often do The Frankfurter Chronicles get
8  published?
9    A.  When they were in print, it averaged once every
10  45 days from 1995 going on to '96 until '98 or '99 when
11  we got out of it and started moving here.  I got sick.
12  We had to crate things up, that sort of thing.  And so
13  it dropped until we got here.  And then it's been
14  monthly since.
15    Q.  Okay.  But originally it was a print version,
16  correct?
17    A.  Yes.
18    Q.  Which meant, literally, you would print it off
19  and you would hand-mail copies --
20    A.  Yes.
21    Q.  -- to various recipients?
22    A.  Yes.  And it got too expensive.
23    Q.  Okay.  And it was a print version over what
24  period of time?  '95 to '98?
25    A.  January of '95, as best as I can determine, to

Page 115

1  somewhere in '98 or '99.  I'm not sure which.  But it's
2  there.  You know, I can look at the file for exact date.
3  But it -- I did the math and it averages out to I did 24
4  issues in 36 plus months.  Once every 45 days.  Some of
5  them were monthly.  Some of them were quarterly because
6  of the nature of the hot dog business.
7    Q.  Meaning there might not be enough to report on?
8    A.  Yeah.  Or we did a WeenieGram or just an e-mail
9  in some cases.
10    Q.  Okay.  From 1998 when you ceased printing the
11  print version of The Frankfurter Chronicles until you
12  moved here in 2003, am I correct that you did not print
13  in any form The Frankfurter Chronicles?
14    A.  Not under that name.  We did regular e-mails to
15  the people that we corresponded with and an occasional
16  WeenieGram, only it wasn't even called a WeenieGram
17  then.  It was just e-mail.
18    Q.  Okay.  So you would have ongoing dialogue --
19    A.  Yes.
20    Q.  -- with individuals?
21    A.  Yes.
22    Q.  But you wouldn't send a broadcast to 200
23  recipients?
24    A.  Right.  Right.
25    Q.  Okay.  Do you sell anything in The Frankfurter

Page 116

1  Chronicles?
2    A.  No.
3    Q.  So it doesn't generate any revenues?
4    A.  No.
5    Q.  If anything, it costs money?
6    A.  No.  It -- it takes my time and it feeds itself
7  nowadays.
8    Q.  What do you mean by "it feeds itself"?
9    A.  All the people that read it send me stuff.
10    Q.  Memorabilia?
11    A.  No.  Well, that, too, but items for the
12  newsletter.
13    Q.  Oh, okay.  Not money?
14    A.  No.
15    Q.  All right.  WeenieGrams.  What are WeenieGrams?
16    A.  They're for time-sensitive matters.  Like the
17  day before the Nathan's Hot Dog Eating Contest, we'll
18  e-mail everyone.  We'll go to the website to be sure
19  what time it's going to be on ESPN or ESPN2, and we'll
20  e-mail everyone in a WeenieGram and say "Hey, don't
21  forget to watch the Nathan's Hot Dog Eating Contest
22  tomorrow."
23    Q.  And the everyone you would e-mail are the same
24  people who would otherwise receive The Frankfurter
25  Chronicles?

Page 117

1    A.  Right.  Right.
2    Q.  Okay.  So a WeenieGram is just a short --
3  essentially, a broadcast e-mail?
4    A.  Yes.
5    Q.  Okay.  And how long have you been doing the
6  WeenieGrams?
7    A.  Probably since the same time we started the
8  newsletter.  Maybe slightly before.  Maybe slightly
9  after.  The e-mail version, I'm not sure exactly when.
10  There is 200 of them in the files right now.
11    Q.  Did you go through a similar period of
12  cessation where you didn't send WeenieGrams between
13  approximately 1998 and 2003?
14    A.  Yes.  In fact, before that there were only two
15  or three, and that was print versions.  And I sent you
16  the little half-pages there, and those were WeenieGrams
17  when they originally came out, but they were mailed
18  WeenieGrams.
19    Q.  Okay.  How often are WeenieGrams sent?
20    A.  Whenever something happens that has a
21  time-sensitive nature.  Like if something is going to
22  come up on T.V. the next day, I will send one out.  Or
23  if -- you know, when we -- we have already put -- we
24  tried to put the -- we used to try to put the newsletter
25  out on the first day of the month.

30 (Pages 114 to 117)

Page 118

1    And we tried to do The Frankie Awards on the
2 first day of July, National Hot Dog Month, so we could
3 possibly get better press for it because of the Nathan's
4 and the 4th of July thing generally preempting it
5 everywhere. They don't want to hear from me. They got
6 this wonderful hot dog eating contest to look at.
7    And so we were trying to do them both on the
8 1st. And we eventually got to the point of it's just
9 impossible.
10    We now are doing The Frankie Awards on the 1st
11 because we took control of the production of those. We
12 had two different vendors that were not honoring our
13 deadlines, and so we just went out and bought a bunch of
14 them. And so now we're in control of that.
15    So we can do a WeenieGram on the 1st of July,
16 National Hot Dog Month, to announce The Frankie Awards.
17 But at the end of the month, it's the summation of
18 everything we did during the National Hot Dog Month,
19 including the Nathan's thing. And sometimes we'll send
20 a WeenieGram announcing the Nathan's contest. Then
21 we'll send a second one announcing what happened.
22    That's the nature of it. Very sporadic, you
23 know. Sometimes I've sent seven or eight out in a
24 month. Sometimes I haven't sent any out for two or
25 three months.

Page 119

1    Q. So the WeenieGrams are best described as
2 sporadic?
3    A. Yes.
4    Q. Okay. Let's talk about other activities that
5 you engage in associated with The Hot Dog Hall of Fame.
6 At some point in some of the documents, I think I saw a
7 reference to a movie.
8    Do I have that wrong?
9    A. I'm not sure which movie.
10    Q. No. 1 -- okay. Let me -- that's a fair
11 clarification.
12    Are you planning on doing a movie?
13    A. No. We've have had several proposals, but, you
14 know, nothing's come of them, you know. Documentaries.
15 And I have these proposals still, but I'm not shopping
16 them or anything like that. You know, we have friends
17 that are in the business, but, you know, I'm past that.
18 You know, I wanted to do a thing coast to coast, and I
19 couldn't take that now, you know. I just -- physically,
20 I don't have the stamina anymore.
21    Q. Okay. The proposals were proposals that you
22 created and shopped around --
23    A. Right. Right.
24    Q. -- for people to do a documentary of you and
25 The Hot Dog Hall of Fame?

Page 120

1    A. Well, not so much me, but --
2    Q. The hot dog?
3    A. The beautiful thing that's out there, you know.
4 The hot dog thing in this country. I mean, it's -- it's
5 a beautiful thing. You know, it's weird, but it's
6 beautiful.
7    Q. Okay. Why do you like hot dogs so much?
8    A. It has to do with when I was born, you know,
9 and -- when I was born, you know, besides being a
10 military dependent and the old man having this thing for
11 chili cheese dogs, we went everywhere. We were all over
12 this country. We were out of the country.
13    And then the same thing happened when I was,
14 you know, in the Navy. You know, all of the guys that
15 I was with, they'd go to Hong Kong and they'd eat at
16 McDonald's. And I thought that was crazy, you know. I
17 go eat the best you can buy in Hong Kong and save my
18 fast food for when I got back here.
19    And it just sort of happened. It was the
20 bicentennial. I was at a vegetarian buddy of mine's hot
21 dog cookout, and he was serving vegetarian hot dogs.
22 And I just thought that was an insult, you know.
23    And next morning after I got over this huge
24 hangover, I realized, "Hey, I'm going into the weenie
25 trade."

Page 121

1    You know, I had just read "Zen and the Art of
2 Motorcycle Maintenance" at the time. Are you familiar
3 with that book?
4    Q. Uh-huh.
5    A. It's an excellent book. And then I had just
6 read Tom Robbins' "Another Roadside Attraction" about
7 some people up in Oregon doing it. And it kind of
8 rattled around in my head for a while.
9    And then I -- you know, I just had gotten fired
10 at Dal Data there after they made me train two
11 replacements for me.
12    And I'm going, "What can I do to ride a
13 motorcycle and listen to music and get paid for it?"
14    And I go, "I got it. I'm going to go in the
15 hot dog business."
16    And that was it. You know, it's been that way
17 ever since, you know. And I didn't start off to
18 be this. I wanted to be an architect, you know, and
19 here I am.
20    Q. Let's talk about the products that you're
21 currently offering for sale on your website. What
22 products are they?
23    A. It's that "50 Hot Dog Toppings" book and the
24 "Weenie Roast Massacre" DVD.
25    Q. What is that?

31 (Pages 118 to 121)

Page 122

1    A.  That's a film made by JFK, John F. Kerr, up in
2   Detroit.  And it's a horrible thing.  It -- it won't
3   even show up on Netflix or IMDb, but it's your basic
4   Michigan cookout and people starting dying and, you
5   know -- pointless brain-dead stuff, the kind we like the
6   best, you know.
7    Q.  And am I right that in terms of selling DVD
8   copies of the "Weenie Roast Massacre," it's the same
9   setup where somebody goes to your website and --
10   A.  Yes.
11   Q.  -- gets referred to --
12   A.  Yes, until we get a PayPal thing set up.
13   Q.  All right.  What else are you selling?
14   A.  T-shirts and ball caps right now.
15   Q.  Okay.  What do the T-shirts look like?
16   A.  So far we've had two different batches.  One of
17  them is white with the USDA stamp seal over the left
18  pocket area and -- and that purplish thing that they do
19  when they stamp it on the meat fat.
20   Q.  Okay.
21   A.  And then the ball caps are embroidered.
22   Q.  And what do the ball caps say?
23   A.  Same thing.  "Approved:  The Hot Dog Hall of
24  Fame."
25   Q.  How many -- first of all, where did you source

Page 123

1   the T-shirts and the ball caps?
2    A.  The T-shirts come from somebody off the
3   Internet that guaranteed quick delivery.
4    Q.  Do you actually have any in stock?
5    A.  Yeah.  Oh, yeah.  I have about ten left.  I got
6   about, I think, 16 of the first order and I've got about
7   ten left right now.
8    Q.  Who did you sell the six to?
9    A.  I didn't.  I've given them away so far to
10  people that supported us.  My brother, Sam, the Cooking
11  Guy.  Do you know him?
12   Q.  No.  Who is Sam, the Cooking Guy?
13   A.  He's from here, and he just got his program
14  syndicated on Discovery Health Channel.  So 2:00 on
15  Tuesday afternoons.  Funny guy.
16   Q.  Okay.  Who else?
17   A.  Hamburger Harry of The International Hamburger
18  Hall of Fame.
19   Q.  What is Harry's real name?
20   A.  Harry Sperl, S-p-e-r-l.
21   Q.  Okay.  Who else?
22   A.  I can't -- oh, my neighbor Neil.
23   Q.  Okay.  Anyone else you can think of?
24   A.  I'm sure there is, but --
25   Q.  In any event, you originally ordered 16. .

Page 124

1   You've given about six away --
2    A.  Yeah.
3    Q.  -- and you have 10 left for sale?
4    A.  Yeah.  Yeah.
5    Q.  Okay.  And how long have you they been
6   available for sale on your website?
7    A.  About a month, at the most.
8    Q.  Okay.  And how about the ball caps?  Where did
9   you source those?
10   A.  That's a local place in El Cajon.  And I won't
11  be going back there.
12   Q.  Why not?
13   A.  They tell you one thing.  They do another.
14   Q.  Okay.  What did they -- how many ball caps did
15  you source?
16   A.  I got a dozen of them so far.
17   Q.  Okay.  And how many are left?
18   A.  Oh, probably eight or nine, something like
19  that.  I gave one to my brother, one to the neighbor
20  Neil.  I'm supposed to send one to Harry, but I haven't
21  gotten around to doing that yet.  Oh, yeah.  One of our
22  readers, Alan Pesetsky of New York City.
23   Q.  You gave it to him or --
24   A.  Yeah.  Yeah.
25   Q.  Okay.

Page 125

1    A.  He -- I couldn't begin to pay him back for all
2   he's done for the newsletter and, to a lesser extent,
3   the collection.
4    Q.  Okay.  Have you sold any of the ball caps?
5    A.  No.
6    Q.  Why did you start doing this now?
7    A.  Well, because evidently that's what you
8   attorneys seem to think is critical there.  So, fine, I
9   will sell stuff.  This whole thing was never meant to be
10  commercial except for the hot dog, the gallery and the
11  gift shop to support the museum and Hall of Fame.
12   Q.  Okay.  So you started selling the T-shirts and
13  the ball caps because you heard me say to Judge
14  Battaglia, "You have to have a commercial use"?
15   A.  Yes.
16   Q.  And other than having the venue with the
17  restaurant, the museum, the gift shop, et cetera, this
18  was never intended to be a commercial venture, correct?
19   A.  No.  It was always intended to at least pay for
20  itself.
21   Q.  In that form of having the one location?
22   A.  Yes.  Yes.  Yes.  And I'd like to ultimately
23  make enough money -- I consider myself successful if I
24  made enough money to build a new Weeniemobile every
25  year, a display Weeniemobile, you know, something to

Page 126

1  promote the thing. Like I still would like to do the
2  Hot Dog on a Bun sidecar unit. You know, I'd like to
3  finish Lamborweenie one of these days, you know.
4      Q. Lamborweenie, we've not talked about that, have
5  we?
6      A. One other thing. When we were talking about
7  schools I went to, I also took a year of AutoCAD,
8  computer-assisted drafting. That was up in Fairfield.
9  And I did that because I have -- besides the -- the
10  computer startups and other small things I've done, I've
11  been a -- kind of a partner in this kit car design thing
12  for 20 plus years. And my partner, he's retired in the
13  Bahamas now, and he's a master automotive engineer.
14  Worked for Ford and Porsche and Custom Chrome and Harley
15  aftermarket people.
16      And, you know, he and I -- we worked together
17  first in Vintage Cycle Works in Campbell. And then
18  we -- he moved to Florida, I think it was then. And
19  he -- we'd design through the mail. We designed over
20  the Internet when that came in.
21      And I made very little money there, but it was
22  the choice of, you know, I know that I'm going into this
23  thing on speculation only.
24      And we had a great product, the first one we
25  did. It was a replica of the 1918 Harley with sidecar.

Page 127

1  I'm not a Harley guy. And this thing was so beautiful,
2  I wished I'd have owned one.
3      And the frames were powder coat. The
4  electronics were the modern digital stuff. The motor
5  was the new evolution motor that just had come out at
6  that time. And we sold about a dozen of those over the
7  year or so we were in business until Harley decided to
8  sue us for unfair competition because one of the
9  customers glued a Harley Davidson foot pad on his. And
10  basically, that put us out of business --
11      He went and hid out in the Bahamas the first
12  time, and I moved to Fairfield about that time. And
13  they weren't suing me. They were suing him. So that
14  wasn't the reason I did that.
15      But they were just gorgeous machines. And I
16  thought we had a real chance there. This was the same
17  time Buell, you know, that motorcycle, they came out.
18  And the Buells were so crude. I couldn't believe people
19  were buying those and not buying what we had. Sharper
20  Image wanted to list us. We had 29 full-color ads and
21  covers of the magazines that year.
22      And we sold maybe a dozen or so. The last one
23  went to one of the guys that helped my partner Ron get
24  into this thing, and he turned around and sold a year
25  later to who we think is Jay Leno. I've never been able

Page 128

1  to get Mr. Leno to tell me one way or another if he's
2  got that in his collection, but --
3      And then we turned around after that and sold
4  the molds and the jigs back to Arlan. That's the king
5  of the Harley customizers that had done a lot of the
6  work on those things, and he's still popping those
7  things out. We see them at the cars shows every year or
8  so. But they were gorgeous, you know. And I had never
9  lusted for a Harley before in my life.
10      Q. Okay.
11      A. But he sent me to the AutoCad. That's why I
12  did that.
13      Q. Okay. Tell me about the Lamborweenie.
14      A. Okay. It started off as -- like I say, I got
15  that wrecked Nighthawk CB. And I was going to do two in
16  the front and one in the year instead of one in the
17  front and two in the rear, because we've down a lot of
18  three-wheeler designs over the time on the kit car thing
19  and two in the front are actually more stable in a
20  four-wheel vehicle. The reason being that a four-wheel
21  vehicle, if your front end compresses, then it wants to
22  twist that rear axle and lift one wheel off the ground.
23      When you have a three-wheeler, that rear wheel
24  just leans. So you actually have more sticking power at
25  the time. And that's the reason I wanted to go there.

Page 129

1  But then I realized I didn't have the engineering chops
2  myself to build the rest of the frame. So I stepped
3  back one and I go, "Okay. What do I know?
4  Volkswagens."
5      And the first thing I did is I had a pan, the
6  Volkswagen frame powder coated. And it set against my
7  living room -- I mean, bedroom wall for five years
8  before we moved here.
9      And I built the motor up. It's all chrome and
10  powder coat. I had a brand-new transaxle torn apart,
11  and I chromed and powder coated all that. This would
12  have been a show-quality machine. The body is a thin
13  shell fiberglass drag-racing body. It's a Porsche body
14  with the flares and all that.
15      And I was going to tilt it up funny car style.
16  And -- well, the wiener down the middle. And I got to
17  where I was just going to start molding the wiener when
18  we moved here. And that's where it's set ever since.
19      And, you know, if and when we ever get The Hot
20  Dog Hall of Fame open, I will finish the thing. And
21  that's going to be a promo vehicle.
22      But besides that, I started building motors for
23  other guys. And, you know, really nice show-quality
24  V-Dub motors. And I got this deal on a box a few years
25  ago. It was a beast of a motor. Probably

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 130

1  200-horsepower. And, of course, in the Volkswagen
2  format, you'd have to change out the transaxle to
3  something that can handle that.
4      I'm sorry.
5      Q. Slow down.
6      A. But at some point, I'm going to build me
7  another big motor like that and I'm -- I mean to
8  challenge the Oscar Mayer Wienermobile to a drag race.
9  They've done -- they did the Indy oval there at
10  100 miles an hour in that thing. That's nothing. I can
11  do 115, 120 out of a stock motor V-Dub, especially when
12  you've got that little Porsche drag-style body on it.
13     Q. Okay. So if I'm understanding you, the
14  Lamborweenie what -- program was shelved in 2003 when
15  you moved here to El Cajon?
16     A. Yes. Just for the lack of money.
17     Q. Okay. And your vision is that you will restart
18  that project when and if you get The Hot Dog Hall of
19  Fame --
20     A. Yes.
21     Q. -- venue built?
22     A. Yes. Yes. And it's two-seater, so with the
23  stock motor in it, I can take customers and press and
24  all that for a ride, you know. Perfectly safe and have
25  the roll cage and everything else, you know.

Page 131

1      Q. Okay. Are there -- other than what we've
2  talked about so far today, are there any services you
3  provide as The Hot Dog Hall of Fame other than what
4  we've talked about?
5      A. Well, somebody calls me up and wants to get in
6  the weenie trade, we'll try to help them. You know,
7  we've done a number of grand openings of other hot dog
8  restaurants, that sort of thing. We have a hot dog
9  costume. My wife doesn't like it, but I talk her into
10  putting it on and going out there and waving at the
11  traffic.
12     We've loaned the Hot Diggity Dollar concept to
13  other people. So I even did the artwork for them here,
14  had these things printed up, put your stamp on it, and
15  you're good there, you know. Of course, don't have my
16  picture in it. They would put their picture it in. But
17  that sort of thing.
18     Just advisory. You know, if we see somebody
19  that's struggling and young, we'll try to help them.
20  But most people, you can't say, "Hey, I can help you."
21  They're not -- they think they know what they're doing.
22  So, fine. You know, if they're receptive, we'll help
23  them. If they're not, we won't.
24     Q. You don't charge for any of those services?
25     A. No. No. No.

Page 132

1      Q. Have you sold any other products in the past?
2      A. No.
3      Q. All right. Let's talk -- I'm going to -- I
4  have a bunch of documents here. I don't think I'm going
5  to spend a lot of time on them, but we need to walk
6  through a few of them, anyway.
7      MR. SCHULTZ: Would you mark that.
8      (Plaintiff's Exhibit 1 was marked.)
9      THE WITNESS: Well, let me get my glasses.
10  BY MR. SCHULTZ:
11     Q. All right. Mr. Webster, the court reporter has
12  handed you what's been marked as Exhibit No. 1.
13     You have that document in front of you?
14     A. Yes.
15     Q. This is your response to our request for
16  production of documents, correct?
17     A. Right.
18     Q. And in this response, is there anything that
19  you know of that is inaccurate?
20     A. Not that I know at the moment.
21     Q. Okay. You have -- in the first response to
22  Request No. 1, you've indicated that you have submitted
23  15 examples of the approximately 80 issues of The
24  Frankfurter Chronicles, correct?
25     A. Yes.

Page 133

1      Q. Okay. And the 15 that you've submitted were
2  from National Hot Dog Month?
3      A. Basically, yes.
4      Q. Okay. And do you submit those -- are they
5  representative of the contents of The Frankfurter
6  Chronicles?
7      A. Yes. Yes.
8      Q. All right. And then you also note that you
9  have submitted 14 out of close to 200 WeenieGrams,
10  correct?
11     A. Yes.
12     Q. And are those 14 representative of the
13  WeenieGrams you'd sent out?
14     A. Yes. Yes.
15     Q. All right. Would you turn to the second page.
16     In Request No. 3, your response states that,
17  quote, "All correspondence between us and all of the
18  others regarding this situation with the Plaintiff has
19  been deleted as a restraining order explicitly forbade
20  me in contacting anyone else, but I don't deny a thing."
21     Do you see that?
22     A. Yes, I do.
23     Q. So did you actually delete e-mails that had
24  already been sent from you to other people about
25  Mr. Schussler?

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 134

1    A.  Yes.  But before the restraining order thing.
2  And I didn't need them after that, anyway.
3    Q.  Well, but were -- to whom were the e-mails sent
4  that you've described?
5    A.  Well, there was RED Development and the Mayor
6  of Sparks, Nevada and several websites and newsletters
7  that carried the articles saying Mr. Schussler is the
8  Hot Dog Hall of Fame.
9    Q.  What websites and newsletters did you send them
10  to?
11    A.  I'm not sure anymore exactly what they are, but
12  basically, everything that was there.
13    Q.  Okay.  Let me ask it this way:  You remembered
14  during the TRO hearing we had attached to our papers
15  certain e-mails that had been sent by you, correct?
16    A.  Yes.  Yes.
17    Q.  Did you destroy any e-mails of this nature that
18  were not already included as part of our papers?
19    A.  I don't think so.  You know, I was -- every
20  time a new website would pop up saying "Steve
21  Schussler's Hot Dog Hall of Fame," I'd flip them a copy
22  of that thing.  And, you know, that's just the way it
23  was.  It was automatic.  And I'm also meticulous about
24  cleaning up my computer every day, you know.  And I'm
25  going, you know, "If this guy is going to sue me, like

Page 135

1  he said he was going to, then he'll keep copies."
2    Q.  Well, did you copy him on what you sent out?
3    A.  The first one.
4    Q.  But not the others?
5    A.  No.  No.
6    Q.  Okay.
7    A.  I told him I was going to do it.
8    Q.  So there were some that you have sent to
9  various people that we may not have copies of, correct?
10    A.  If they're on the website, if they're on the
11  Internet there, at that time, I -- you know, I haven't
12  done it since the restraining order thing, so I don't
13  know what is there since.  I haven't looked since.  I
14  can't look.
15    Q.  Okay.  Let me just caution you, Mr. Webster,
16  the Court's restraining order prevents you from
17  publishing the statements that we've talked about.
18    A.  Right.  Right.
19    Q.  But it does not require you and, in fact, it
20  would be a bad thing if you go back and destroy --
21    A.  Oh, I understand that, sir.
22    Q.  -- copies that have already existed.
23    A.  I understand that.  I understand that.  Yes.
24    Q.  Okay.  Did you destroy copies of what
25  existed --

Page 136

1    A.  No.  I had already gotten rid of it.
2    Q.  -- before the temporary restraining order?
3    A.  Yes.
4    Q.  Okay.  Turn to the next page, please.
5    A.  Okay.
6    Q.  In Request No. 7, your response says something
7  to the effect:  The jury will decide the matter based on
8  overwhelming evidence of our past 30 years of doing
9  this, the credibility of the witnesses to the meeting
10  Plaintiff and I had at Fisherman's Wharf, and the
11  actions of Plaintiff and his EMPLOYEES in concert with
12  the suspicious timing of these matters."
13      Do you see that?
14    A.  Yes, sir.
15    Q.  What are you referring to when you say "the
16  suspicious timing of these matters"?
17    A.  Mr. Schussler never said a thing about the Hot
18  Dog Hall of Fame before meeting us in 2000 at
19  Fisherman's Wharf.
20    Q.  He never said a thing to you?
21    A.  He didn't say it to me personally, and I think
22  he would have in the phone call, in the e-mails we
23  traded, and in the meeting we had itself.
24    Q.  But, in fact, you don't know what, if anything,
25  Mr. Schussler was doing prior to your meeting with him

Page 137

1  relative to the Hot Dog Hall of Fame?
2    A.  Yeah.  He was running the Rainforest Cafe.
3  That's what he was do doing.
4    Q.  Well, do you have any other information about
5  what he was doing relative to Hot Dog Hall of Fame prior
6  to 2000?
7    A.  No, and I really don't care, sir.
8    Q.  Why don't you care?
9    A.  Because I know what I did and I know there are
10  numerous witnesses to it and I know that a reasonable
11  juror would draw the same conclusions.
12    Q.  Which is what?
13    A.  That yes, indeed, he's appropriated our
14  intellectual properties.
15    Q.  And just so that I'm clear, what exactly is
16  your intellectual property in this case?
17    A.  Well, the concept of The Hot Dog Hall of Fame,
18  the URLs, which his employee registered as his own that
19  are so similar as to be confusing just dropping the
20  "The" off of it.  If you go back and look at various
21  letters and newspaper articles about it, invariably
22  everybody does that.  There is no difference between Hot
23  Dog Hall of Fame and The Hot Dog Hall of Fame, as far as
24  the average reasonable person is concerned.  And that's
25  ours.

35 (Pages 134 to 137)

Page 138

1    Q.  Anything else?
2    A.  I can't think of.
3    Q.  Okay.  All right.  If you turn to the next
4  page, the very top is a continuation of your answer
5  regarding your initial meeting at Fisherman's Wharf,
6  correct?
7    A.  Yes.
8    Q.  All right.  First of all, tell me how that
9  meeting came to occur.
10    A.  We saw something on T.V., "Extreme" something
11  or other.  I can't remember what it was, but it was a
12  story about the Rainforest Cafe.  And it just blew me
13  away.  I mean, that -- you know, the creativity involved
14  there was just -- you know, it was up there with Disney,
15  you know, where you create the whole environment.
16    And I started researching the Rainforest Cafe.
17  And the minute I got a website address, I flipped
18  Mr. Schussler a letter saying, "Hey, we really like what
19  you're doing," and we flirted with being the weirdo with
20  the museum in this house.  I have friends that have done
21  that.  I didn't want to do that.
22    But then when I realized what he'd done was
23  installed a professional grade facility in that house
24  for the sake of the investors, I'm going, "Well, maybe I
25  should rethink that and go in the opposite direction and

Page 139

1  do that."
2    And sent him a letter about it.  He called me
3  back --
4    Q.  Let me stop you for a second.
5    When was this?
6    A.  In spring of 2000.  That letter was dated --
7  oh, I can't remember.  I don't have it here.  But
8  February of 2000.  29th of February, something like
9  that.
10    Q.  Okay.  Did you produce that letter to us?
11    A.  Yes, I did.
12    Q.  Okay.  Then he returned your -- he called you
13  in response to your letter?
14    A.  Yes.  Yes.
15    Q.  Was your letter sent by e-mail?
16    A.  No.  It was regular post.
17    Q.  Okay.  And so initially you contacted
18  Mr. Schussler --
19    A.  Yes.
20    Q.  -- to get his ideas on --
21    A.  I just wanted to talk to the guy, pick his
22  brain, because --
23    Q.  About what?
24    A.  About what he -- what he -- how he did that.
25  What he'd advise me to do.

Page 140

1    You know, I was at the point where I knew we
2  were going to come down here.  And, you know, I
3  didn't -- you know, I had long ago approached people
4  straight out for investing, and that doesn't seem to be
5  the appropriate approach.  So, you know, I figured at
6  least I can get some input from the guy, you know,
7  because, obviously, he just did it.  He had the world by
8  the cajones at the time, you know.  I mean, I was really
9  impressed.
10    You know, we knew the guy that started all of
11  the Good Earth Restaurants.  We knew him personally.  We
12  knew his daughter and everything else.  And he sold out
13  for $200 million.  And that is -- you know, that's a
14  fraction of what Mr. Schussler was worth at that time,
15  you know.
16    And I'm going, "Man, that is the way to do it."
17  I thought he was, you know, just wonderful, you know.
18  And when he called us back, I was, you know, literally
19  blown away, you know.  Of course, having had meetings
20  with other people of affluence at that time, you realize
21  generally nothing happens.
22    Q.  So he called you back?
23    A.  Yes.
24    Q.  And how long did you speak?
25    A.  Just a few minutes.  And, you know, I was

Page 141

1  thunderstruck, is what I was.  And I go, "Hey, let me
2  send you some of the e-mails about what we do," because
3  we didn't have the website up and functioning at that
4  time.  And so I sent him a series of e-mails showing us
5  what we'd done -- showing him what we'd done before.
6    Q.  Why didn't you have the website up and
7  functioning at that time?
8    A.  I was learning to write HTML myself.
9    Q.  Okay.  So it was before your website was up?
10    A.  No.  We had one that was half up.  Had some 209
11  something or other.  You know, didn't have the title.
12  It just had the numbers.  And there was a page here and
13  a page there.  It wasn't anything I would show anybody.
14  It wasn't very attractive, you know.  Just now I was
15  learning to do this.
16    Q.  When did you register the URL for The Hot Dog
17  Hall of Fame?
18    A.  Oh, long before we actually got the thing up.
19  You know, I don't know how long ago that is.  It would
20  be '98, '99, something like that.
21    Q.  Okay.  But in terms of when you first used that
22  URL for your website, when was that?
23    A.  Somewhere in there between there and the time I
24  got the one actually working after we moved here.
25    Q.  Okay.  Now, so Mr. Schussler called you.  You

36 (Pages 138 to 141)

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 142

1  wanted to send him some of your e-mails?
2      A.  Yes.
3      Q.  What else occurred during that phone
4  conversation?
5      A.  Nothing else.  But after I sent him the
6  e-mails, I go -- and probably the last one I sent him, I
7  go, "I'd like to meet you some -- one of these days."
8          And I didn't think it was going to happen, and
9  then he e-mailed me back and said, "Hey, I'm doing the
10  grand opening at Fisherman's Wharf next weekend.  Come
11  on down."
12          So I did.
13      Q.  Staying with the phone call for a second.  What
14  did Mr. Schussler say to you?
15      A.  Said, "I really like what you're doing."
16      Q.  Meaning what?
17      A.  The whole concept.  The Hot Dog Hall of Fame,
18  the Great American Hot Dog Machine, all that.  'Cause I
19  showed him all of that.  I showed him virtually --
20  everything that you find on my website now, that's,
21  basically, what it was.  It started off -- you know, a
22  lot of companies use a website like a -- like a
23  billboard, you know.
24          And towards the other end of it -- like my
25  wife's website for -- has her rTsumT on it.  It's more

Page 143

1  like just a business card.  And that's basically what
2  this was about.  The website is -- it's explained what
3  we do.
4      Q.  When was your phone call?
5      A.  Sometime before the grand opening.  And I don't
6  even know what day that was.  I just know it was
7  sometime between the letter I sent to Mr. Schussler and
8  the -- when I noticed his -- well, my computer guy
9  noticed written verbiage having registered those three
10  URLs.
11      Q.  Anything else that you can recall about the
12  discussion between you and Mr. Schussler?
13      A.  On the phone?
14      Q.  On the phone.
15      A.  No.
16      Q.  Okay.  Did you have any other phone
17  conversations with him?
18      A.  No.
19      Q.  The e-mails that you claimed to have sent him,
20  are those the 60 e-mails that you --
21      A.  Yes.
22      Q.  -- cannot find now?
23      A.  I haven't -- I got the disk out at -- the guy's
24  trying to open it, that zip disk.  And he's opened two
25  more for me before, so, hopefully, it will be back soon.

Page 144

1  And I think they're on there, but I can't say for
2  certain.  And like I said, in the start of 2007, we got
3  a new computer system, too, so it could have been on the
4  old computer.
5      Q.  Okay.  The hard drive?
6      A.  Yes.
7      Q.  And if it's on the hard drive, they're gone, I
8  assume?
9      A.  As far as I know.  My son took it to work and
10  gave it to one of the guys that he works with, and
11  that's the last I heard of it.
12      Q.  Okay.  Do you still have the ability to access
13  that hard drive?
14      A.  I don't know.  I asked him if he knows who's
15  got it.  He said he'd ask, but he hasn't told me since,
16  you know, 'cause I think one of the employees there gave
17  it to one of the truck drivers.  That's what I think
18  happened to it.
19      Q.  Why would the employee give it to a truck
20  driver?
21      A.  It's old.  That was a -- the hard drive was 3.2
22  gigs.  Tiny, you know.  I mean, the new Windows
23  operating system takes up more space than that whole
24  hard drive had.
25      Q.  During your phone conversation with

Page 145

1  Mr. Schussler, did he say anything about what he had
2  been working on?
3      A.  No.
4      Q.  Did he say that he had had similar concepts?
5      A.  No.  But during the conversation at the
6  restaurant, he says, "I've got a warehouse full of stuff
7  like that."
8      Q.  Okay.  Well, let's go fast-forward, then, to
9  the meeting at Fisherman's Wharf.
10          Tell me -- he sent you an e-mail responding to
11  an e-mail from you?
12      A.  Yes.
13      Q.  And you had -- you had said, I'd like to meet
14  you someday, and he said, Well, it happens I'm going to
15  be in San Francisco, right?
16      A.  Yes.
17      Q.  And at the time you were living in San Jose?
18      A.  Fairfield.
19      Q.  Fairfield.  And Fairfield is north of
20  San Francisco?
21      A.  Yes.  Fifty miles.
22      Q.  Okay.  So you e-mailed back and said, "I will
23  meet you at the opening"?
24      A.  I didn't -- I don't think I e-mailed back, but,
25  you know, I was going.  He invited me, and I was going.

37 (Pages 142 to 145)

39

Page 146

1    Q.  Well, did he set up a particular time?
2    A.  Yes, he did.  And I got there, and he wasn't
3  there.  And so I sat around waiting for him for an hour.
4    Q.  Okay.  On his e-mail to you, he set a
5  particular time and place?
6    A.  The place, yes.  I can't remember specifically
7  whether he said exactly the time or just in the morning
8  or something like that, but that was it, you know.  He
9  said he'd be there that day and come on down.
10    Q.  Okay.  So you went down?
11    A.  Yes.
12    Q.  And you got there at what time?
13    A.  9:00.
14    Q.  All right.  Mr. Schussler wasn't there?
15    A.  No.
16    Q.  Okay.  What did you do?
17    A.  I sat around for an hour and waited.  I talked
18  to the guy that used to be my boss at Denny's in
19  Fairfield that now worked for Mr. Schussler there, and
20  he says, "Oh, he just left with" --
21    Q.  What was his name?
22    A.  Rene King.
23    Q.  Okay.  Keep going.
24    A.  It's on the witness list.
25    Q.  Yeah.

Page 147

1    A.  And he says, "He just left with one of the
2  partners or managers" or whatever.  And so I sat around
3  and waited for an hour for him to get back.
4    Q.  Something in some of the documents that you've
5  produced here suggests to me that you were offended by
6  having to wait for Mr. Schussler.  Were you?
7    A.  Let's put it like this:  I wasn't pleased, but
8  on the other hand, you know, he might have forgotten.  I
9  don't know.
10    Q.  Okay.  He was opening a brand-new expensive
11  restaurant?
12    A.  Oh, yeah.  Oh, yeah.
13    Q.  He was off with one of his business partners?
14    A.  Like we say, he had to have been busier than a
15  one-arm paper hangar.
16    Q.  Okay.  Anything else that Mr. King told you
17  while you were waiting for Mr. Schussler?
18    A.  No.  No.  He showed me around.  Showed me the
19  computer room.  Showed me the -- how nicely painted the
20  bathrooms were.
21      It was an impressive thing.  He showed me --
22  took me upstairs to the waterfall and all that, you
23  know.  And then I briefly looked at the gift shop and,
24  you know, sat there at the bar and drank a soda or
25  something.  I can't remember what it was.  Fruit juice

Page 148

1  or something.
2      I had the flu.  My son had the flu.  And I was
3  just sweating like a -- I was horrible.  I mean, I
4  wouldn't have went out in public if it hadn't have been
5  for that.
6    Q.  All right.  So, by the way, Mr. Schussler's
7  restaurant, which he created, was a restaurant that had
8  a theme to it, correct?
9    A.  Yes.
10    Q.  It had a gift shop --
11    A.  Yes.
12    Q.  -- correct?
13      What else was there?
14    A.  It had -- it was a restaurant.  And it was a
15  theme restaurant with a gift shop.  That's all I really
16  noticed.
17    Q.  Okay.  What happened when Mr. Schussler
18  arrived?
19    A.  Well, he almost walked right by me.  Basically,
20  "Hey, how are you?  You want to sell the collection?
21  We're going to do this without you."  And that was it.
22    Q.  Well, let's slow it down a little bit.
23      You're sitting in the bar drinking a juice?
24    A.  Right.
25    Q.  Mr. Schussler walks in?

Page 149

1    A.  Right.
2    Q.  Somebody must have introduced you to him,
3  right?
4    A.  Maybe Rene did.  I'm not sure.  I can't
5  remember.  You know, I was delirious that day, you know.
6    Q.  All right.  You probably didn't appear real --
7    A.  Oh, no.  I looked horrible.  I had a shirt
8  that -- you know, I gained some weight recently.  I had
9  a pair of pants that I hated.  I had shoes that hurt my
10  feet.  And, you know, I'm sweating.  I might have looked
11  like I was contagious.  That's how sick I was at that
12  time.
13    Q.  Okay.  You said "Hello" to Mr. Schussler?
14    A.  Yes.
15    Q.  He said "Hello" back?
16    A.  I don't think he recognized me to start with.
17  I had to refresh his memory.  "Yeah, I'm from The Hot
18  Dog Hall of Fame."
19      "Oh, yeah."
20    Q.  Okay.  And what exactly did he say after that?
21    A.  He says, "What do you want for that
22  collection?"
23      And I go, "It's not mine to sell."
24      You know, and he goes something along the lines
25  of "Well, we've thought about it and we're going to do

38 (Pages 146 to 149)

Page 150

1   it without you."
2       Q.  Is that your best --
3       A.  Yeah.
4       Q.  Is that a verbatim --
5       A.  Pretty close.  Pretty close.
6       Q.  "We've thought about it and we're going to do
7   it without you"?
8       A.  Yes.  Yes.
9       Q.  Did he say anything else?
10      A.  No.  That was it.
11          He said -- oh, he said, "Go ahead.  Have
12  something to eat."
13      Q.  Anything further happen?
14      A.  I -- nothing I can remember.  That's the extent
15  of it, you know.
16      Q.  So your conversation lasted approximately --
17      A.  Two minutes, maybe.
18      Q.  -- two minutes?
19      A.  Two minutes.
20      Q.  Okay.  He did offer to buy your collection?
21      A.  Yeah.
22      Q.  Did he name a figure?
23      A.  No.
24      Q.  Okay.  You wouldn't sell it to him?
25      A.  It's not mine to sell.

Page 151

1       Q.  Why isn't it yours to sell?
2       A.  Because it belongs to the people that made this
3   thing happen.  I'm the caretaker.  You know, what I'm
4   doing is quasi -- you know, I'm not a non-profit or
5   anything else, but the point is, is to bring this
6   collection to the people to see.  It's a beautiful
7   collection.
8       Q.  Do you have an ability to tell me the date of
9   that meeting?
10      A.  Somewhere between the letter there and June.
11  That's all I know.  You know, you can probably look it
12  up on the Internet and see when the grand opening of
13  that thing was.
14      Q.  Do you know how many days in advance of the
15  grand opening your meeting took place?
16      A.  Oh, it was the grand opening.
17      Q.  The day of the grand opening?
18      A.  Yes.  Yes.
19      Q.  Okay.
20      A.  I didn't even know he was building one there,
21  you know, until he told me that.
22      Q.  Anything else from that conversation that you
23  can recall?
24      A.  Nothing.
25          Oh, I know one other thing.  I asked him, "Are

Page 152

1   you German?"  The reason I asked is because I'm
2   German -- German-American, you know, and Hamburger Harry
3   is American-German, you know.
4           And at the point of that meeting, Harry and I
5   were discussing putting both of our collections under
6   the same roof to help raise the money because it's
7   the -- I mean, there's nothing more American than hot
8   dogs and hamburgers.  And with a name like Schussler,
9   I'm going, "Are you German?"
10          That's it.  I did ask him that.  I remember
11  that now.
12      Q.  What did he say?
13      A.  He didn't.  You know, and I'm hoping the heck
14  he's not Jewish and I offended him, because that was
15  never my intention.  I have Jewish friends, too, you
16  know.  I've got no problem.
17      Q.  Is -- you said you were German-American and
18  Hamburger Harry was American-German.  Are you making a
19  distinction there?
20      A.  Yeah, yeah.  Oh, yeah.  I was born here.  Harry
21  just moved here ten years ago, you know.
22      Q.  I see.
23      A.  That's why he's The International Hamburger
24  Hall of Fame, because he wants to open one in Germany at
25  some point, too.

Page 153

1       Q.  Would you turn to Page 6 of Exhibit 1.
2           In response to Request No. 15, you write that,
3   quote, "I no longer have any of the correspondence
4   between Mr. Schussler and myself (other than the first
5   letter to introduce ourselves to him and both Cease &
6   Desist letters)," close quote.
7       A.  Yes.
8       Q.  What other correspondence existed and why don't
9   you have it?
10      A.  The 30 or so -- 30 to 60 messages that he and I
11  traded to start with, I still haven't found those.  They
12  still may be there, you know.  I almost went blind
13  looking through those 700 diskettes, and I couldn't read
14  for two days after that.  And I've only now started
15  going back through the rest of what's there.
16      Q.  Going back through the rest of what's where?
17      A.  The zip disks and other things, you know, that
18  I'm actually reading, because some of those I still
19  haven't been able to open, the Print Shop and the Page
20  Maker files.
21      Q.  All right.  But so you understand you have a
22  continuing obligation --
23      A.  Yes.
24      Q.  -- to look for those documents?
25      A.  Yes.  Yes.

39 (Pages 150 to 153)

Page 154

1    Q.  And you'll produce them to me, if you find
2  them?
3    A.  Yes, I will.  I most certainly will.
4       (Plaintiffs' Exhibit 2 was marked.)
5  BY MR. SCHULTZ:
6    Q.  Okay.  Mr. Webster, the court reporter has
7  handed you Exhibit No. 2, which is a copy of your
8  Rule 26 disclosures in this case.
9    A.  Yes.
10    Q.  Do you recognize it as such?
11    A.  Yes, sir.
12    Q.  And I will tell you that, unfortunately, I
13  managed to also staple to it another copy of the
14  document production, which is Exhibit No. 1 in this
15  case.
16    A.  Okay.
17    Q.  Okay.  But I'm really focused on the Rule 26
18  disclosures.
19    A.  Yes.
20    Q.  In your fact witness disclosure, you identify
21  yourself and you say, "We have been working on" -- "We
22  have been working as The Hot Dog Hall of Fame since at
23  least 1 June, 1978, and have continuously used and
24  defended the concept and name since that time."
25       Do you see that?

Page 155

1    A.  Yes, sir.
2    Q.  I'm curious about the date of 1 June, 1978.  I
3  thought you said it was a July 4th vegetarian hot dog
4  cookout?
5    A.  No.  That was the Great American Hot Dog
6  Machine.
7    Q.  Okay.
8    A.  And then later on when we started getting all
9  of this stuff people were giving us, that's when I
10  realized we got to come up with a name with this.  I
11  came up with the name.  And then that ex- -- that
12  attempted partner went down and registered the Great
13  American Hot Dog Machine and several other of our names
14  in his girlfriend's name.  And then I hired Attorney
15  John Pope to send them a cease and desist.  And that was
16  dated 1 June, '78.
17    Q.  Okay.  So prior to -- the famous July 4th
18  vegetarian hot dog cookout was prior to this?
19    A.  Yes.  It was the 4th of July, 1976, the
20  bicentennial.
21    Q.  Okay.  I got you.
22       Would you turn to the second page of Exhibit 2.
23    A.  Okay.
24    Q.  I now think I know who Captain Ron Russell is.
25  Is that the guy you worked with --

Page 156

1    A.  Yes.
2    Q.  -- on the Harley replicas?
3    A.  Yes.  And other things, yes.
4    Q.  Okay.  No. -- I -- Person No. 6, Chris
5  Masterson, you write here, "Chris is a Frankie
6  recipient, our representative in the Pacific Northwest
7  and long-term contributor to The Hot Dog Hall of Fame
8  and The Frankfurter Chronicles."
9       Do you see that?
10    A.  Yes, sir.
11    Q.  What do you mean by he's our representative in
12  the Pacific Northwest?
13    A.  He sends us newsletter items, that sort of
14  thing.
15    Q.  Okay.  He's not -- he's not representing the
16  products or services.
17    A.  No.  No.  He is the wife's cousin as well.
18    Q.  You know, as you look at this list of, people
19  starting from No. 1, J. Frank Webster, and moving
20  through No. 15, Rene King, would you just identify for
21  me which of these people are related to you by blood or
22  marriage.
23    A.  Chris Masterson, Darla Webster, No. 6 and
24  No. 7.  No. 8, my brother.  No. 10, our son.
25       That's it.

Page 157

1    Q.  Okay.  Now, and when you say that Mr. Masterson
2  is a long-term contributor to The Hot Dog Hall of Fame
3  and The Frankfurter Chronicles, I assume you mean that
4  he has contributed items that were published in The
5  Frankfurter Chronicles?
6    A.  As well as --
7    Q.  Memorabilia?
8    A.  Yes.
9    Q.  Okay.
10    A.  He's the guy I worked with doing the Internet
11  in the Sky thing.  And between him and Tammy Kaiser,
12  that's where I learned all the computer programs and all
13  that I've gotten to to get this far.
14    Q.  Okay.  If you turn to Page 3 of this document
15  under "Wes Evans," you write that, quote, "He can tell
16  you that we've performed all of the duties of The Hot
17  Dog Hall of Fame during those years."
18       Do you see that?
19    A.  Yes.
20    Q.  What are the duties of The Hot Dog Hall of
21  Fame?
22    A.  Well, we're geared towards not only the
23  positive promotion of the hot dog industry itself, but
24  we perform certain ceremonial things besides The Frankie
25  Awards.  We go to grand openings of other hot dog

40 (Pages 154 to 157)

Page 158

1   restaurants. We do the cookout thing for the public.
2   It's just a whole bunch of small things like that. I
3   have a list of them at home, if you want me to e-mail
4   you that.
5       Q.  I do. But before you do that, I want you to
6   tell me as many as you can remember of the official
7   duties of The Hot Dog Hall of Fame.
8       A.  Well, it's our -- it's our -- more or less,
9   since we've been doing this for so long, if somebody
10  comes along, wants to open a weenie stand, we're more
11  than happy to help them with what we know. But, again,
12  it's up to them if they want to accept it or reject it.
13      Q.  That's the advice function?
14      A.  Yes.
15          We would also, you know, let them have the
16  newsletter, if they wanted it, you know. You know, I'm,
17  basically, Uncle Frank in that fashion, you know. You
18  know, I'm not asking for money from him. We never
19  would, you know. We do what we can do because we've
20  spent this time already.
21      Q.  And you say that you attend grand openings of
22  restaurants?
23      A.  Yes.
24      Q.  New hot dog restaurants?
25      A.  Yes.

Page 159

1       Q.  When's the last time you went to such a grand
2   opening?
3       A.  Well, we were too late to get to the two new
4   ones here, and they're gone now, but -- in Fairfield.
5   It's gone, too, now.
6       Q.  So before 2003?
7       A.  Yes.
8       Q.  And the grand openings that you did go to prior
9   to 2003, were you asked to do that or is --
10      A.  Yes. Oh, yes.
11      Q.  -- that something you just showed up --
12      A.  No. We were invited.
13      Q.  Let me finish the question.
14      A.  I'm sorry. I'm sorry.
15      Q.  You were invited to do that by the restaurant?
16      A.  Yes.
17      Q.  And was that invitation extended in response to
18  your having contacted them?
19      A.  No. This was a woman who used to work with the
20  wife and took over an existing stand there in Fairfield
21  and changed the menu. You know, did a few other things
22  like that to upgrade it and make it into her own.
23      Q.  So it was somebody who knew you already?
24      A.  Distantly. She didn't know anything about me
25  being in the hot dog business until the wife told her.

Page 160

1       Q.  All right. How many other restaurant grand
2   openings have you attended?
3       A.  Maybe four or five. It's not a lot because,
4   you know, a lot of times you get there after they're
5   already opened.
6       Q.  And what did you do at the restaurant grand
7   opening in Fairfield?
8       A.  Well, like I say, we put the wife in the
9   costume out there. I wore the white tuxedo. Went in
10  and shook hands, talked to the customers, that sort of
11  thing. I knew somebody in the local paper there, so I
12  got them to come down and cover it, that sort of thing.
13      Q.  Did either your costume or your wife's costume
14  say "Hot Dog Hall of Fame" on it?
15      A.  No. No. Only my business card has said that
16  forever.
17      Q.  Okay. You have business cards?
18      A.  Yes. Didn't I give you one in the judge's
19  chambers last time?
20      Q.  Probably.
21      A.  Yeah.
22      Q.  You also said you do these public cookouts as
23  part of the duties of The Hot Dog Hall of Fame, right?
24      A.  Yes.
25      Q.  Okay. What are those?

Page 161

1       A.  Well, like I mentioned, we have a lot of
2   friends with weird vehicles, and so we'll have them show
3   up and we'll feed people. There are times where we've
4   bought the beer. There are times when we don't buy the
5   beer. But cookouts, games. Like we did baseball,
6   Frisbees and all that. The first one, we did it. And
7   then the last one, like I say, that balloon toss that
8   went slightly sideways.
9       Q.  When was that?
10      A.  That was the year we first got to Fairfield on
11  that one, which was '88.
12      Q.  Was that the last time you've done one of these
13  public cookouts?
14      A.  No. We did another one at the same park, much
15  smaller, a few years after that. I can't remember when
16  it was exactly. But that was just a core group, maybe,
17  of two dozen people, at the most, on that last one.
18      Q.  And that core group were people that were your
19  friends?
20      A.  Yeah. And a few local people that we'd met
21  there since.
22      Q.  And "there" is Fairfield?
23      A.  Yeah. Fairfield, yeah.
24      Q.  So those -- the last cookout you did was before
25  2003 moving here?

41 (Pages 158 to 161)

Page 162

1    A. Yes. Yes.
2    Q. Okay. All right. If you would turn to Page 4
3  of this document, Exhibit No. 2. You're referencing --
4  above "Rene King," you're talking about a Ray Nelson
5  from Georgia.
6    A. Yes. Yes.
7    Q. And you say that Ray, quote, also participated
8  in a number of our official ceremonies, close quote?
9    A. Yes.
10    Q. And what are your official ceremonies that he
11  participated in?
12    A. Okay. The Fourth Annual Frankies, the Sixth
13  Annual, the -- I'm not sure what else. We did a whole
14  bunch of things together at that same time. He -- I was
15  acting as his kind of media manager at the time, and so
16  we did a bunch of things for him and parades and a T.V.
17  show in San Francisco and things like that. So it all
18  kind of blurs together back then.
19    But, you know, he could tell you more, you
20  know. And I can bring up a lot more of what we did
21  then, but, you know, this was before the computers, so a
22  lot of this stuff is just lost.
23    Q. Okay. When was the last time that --
24  Mr. Nelson, is it?
25    A. Yeah.

Page 163

1    Q. -- participated in a, quote, official ceremony,
2  close quote?
3    A. Probably the 1988 when we moved to Fairfield.
4    Q. Okay.
5    A. I may have invited him to that other one. He
6  may have made it without his guitar-shaped cycle, but I
7  can't remember then. I used to invite all of my art car
8  and hot rod buddies to these things. Some of them would
9  show up. Some of them would show up late and, you know,
10  I would be out of film by then. This was before digital
11  cameras. So I really can't tell you specifically there.
12    Q. You would invite the friends that you had met
13  through art car workings?
14    A. Yes.
15    Q. Is that it?
16    A. Yes.
17    Q. And you would invite them to public cookouts
18  and things like that?
19    A. Yeah. And so the crowd in the park would go,
20  "Hey, what's that over there?" And they would all come
21  over and we'd feed them, you know. Just goodwill, you
22  know.
23    Q. Okay. On this same page of this document,
24  you've got damage estimates.
25    Now, first of all, you understand that you have

Page 164

1  not actually brought a lawsuit against Mr. Schussler --
2    A. Right.
3    Q. -- right?
4    A. Right.
5    Q. And you have not made a claim against him in
6  this lawsuit?
7    A. Right.
8    Q. But I'm going to ask you what these damage
9  estimates are.
10    You say that Mr. Schussler's, quote, reckless
11  actions have cost the defendant approximately 50,000 to
12  date.
13    What is that?
14    A. Okay. When my mother knew she was going to
15  die, she made the funds available for us to build the
16  Woody Weenie Wagon.
17    And we were having a hard time with this place
18  here because it's expensive to live here. We're paying
19  twice the rent for half the house as we were up north
20  and you earn about 60 percent of what you did up north.
21  Difference of the cheap labor here.
22    And, basically, this was a plan. We'd thought
23  about it for quite some time. And we could have went in
24  another direction. I could have went in the kit car
25  thing again. And we decided, "No." The thing is to

Page 165

1  give my wife her own job where it doesn't matter. You
2  know, if she can't stand working for somebody and wants
3  to quit, it's not going to impact us.
4    And so we started on the course of the Woody
5  Weenie Wagon, slash, Darla's Dogs. And we got 15-,
6  20,000 into it, and then I discovered what was going on.
7  And so from that point on, that money's all went to pay
8  our rent, because she's still unemployed, you know.
9    And, you know, we bleed at the rate of about
10  $3,000 a month. Our rent is 1675, and that's all gone
11  now. And, you know, it's not going to come back. And
12  the time has passed and my physical ability to do this,
13  that's not going to happen.
14    Q. How did -- how did Mr. Schussler opening a Hot
15  Dog Hall of Fame restaurant cause your wife to lose her
16  job?
17    A. Well, it didn't cause her to lose the job. It
18  cost her to lose the job on the Woody Weenie Wagon.
19  That's not there.
20    Q. Because you're hesitant to follow through on
21  the Woody Weenie Wagon in the case you lose this
22  lawsuit?
23    A. It -- that's the day we pull the plug right
24  there. When Mr. Schussler says, "Hey, I'm going to sue
25  you."

42 (Pages 162 to 165)

Page 166

1    Q.  Which was at the end of 2007?
2    A.  No.  It was in June.
3    Q.  Of 2007?
4    A.  Yes.
5       I should also point out, we had agreed to build
6  a Woody Weenie Wagon for somebody else that was retiring
7  and moving to Missouri.  I had went out and bought the
8  pan and the transaxle and all that and had started on
9  that, too.  And I was going to make about 10- on it --
10  about $10,000 on it when that was done, and that's not
11  happening, either.  In fact, I sold the pan and the
12  transaxle yesterday.
13    Q.  Well, why didn't you finish that --
14    A.  I didn't have --
15    Q.  -- Woody --
16       Why didn't you finish that Woody Weenie Wagon?
17    A.  It was pointless, you know.  I wasn't going to
18  build the first one, so I sure, you know, wasn't going
19  to build the second one.  It gets cheaper every time you
20  build something.  The first time costs you a whole lot
21  of money.  The second one, I would have actually made a
22  profit on it.
23       The first one was meant to be the pattern for
24  the second one, you know.  And that's why they were one,
25  two like that.  And we were going to go from a Woody

Page 167

1  body to a fiberglass one-piece body on the second one,
2  you know, which means I'd have taken the body off the
3  first one, made a mold out of that and then shot that in
4  the -- for the second one.
5       And I -- you know, I couldn't make any money
6  doing it the Woody style for a second unit.  You know,
7  it would have cost me more than I would have sold it
8  for.  You know, as it was, I was going to ask $45,000
9  for it and that's up there.  You know, push carts you
10  can buy for $5,000.
11       (Plaintiffs' Exhibit 3 was marked.)
12       THE WITNESS:  Thank you.
13  BY MR. SCHULTZ:
14    Q.  Mr. Webster, the court reporter has handed you
15  Exhibit No. 3, which is a copy of your answer in this
16  case, correct?
17    A.  Yes.
18    Q.  And that's your signature on the last page of
19  Exhibit 3, correct?
20    A.  Yes.
21    Q.  To your knowledge, is everything in this answer
22  true?
23    A.  I have to read it here because I can't
24  remember.  But, yeah, I'm fairly certain it is.
25    Q.  Okay.  On the first page of this answer where

Page 168

1  you state:  "We have spent 31 years of our lives in
2  preparing to build our combination restaurant and
3  museum, Hall of Fame, gallery and gift shop and, as yet,
4  we have not raised the money.  We are not open to the
5  public, again, none of plaintiff's business."
6       Do you seen that?
7    A.  Yes, sir.
8    Q.  Have we talked about that today?  I mean,
9  that's the same thing we've been talking about?
10    A.  That's what we've always been talking about,
11  sir.
12    Q.  Okay.  How -- if you turn to Page 2 in
13  paragraph numbered 21, you write, "If anything,
14  Mr. Schussler's false statements constitute illegal and
15  unjustified interference with OUR business relationships
16  and have injured OUR reputation and have damaged,
17  disrupted and caused undue delay to OUR (The Hot Dog
18  Hall of Fame's) business affairs."
19       Do you see that?
20    A.  Yes, sir.
21    Q.  What are you referring to?
22    A.  Again, the purpose of building the Woody Weenie
23  Wagon was to generate enough cash flow to get a
24  commissary, to generate enough cash flow to expand into
25  some other location, and there would have been The Hot

Page 169

1  Dog Hall of Fame.
2    Q.  Well, what are Mr. Schussler's false statements
3  that you allege constituted --
4    A.  That's his concept.  That is not his concept.
5    Q.  What is not his concept?
6    A.  The Hot Dog Hall of Fame.  That's ours.  It's
7  always been ours.
8    Q.  Any other false statements that you allege
9  Mr. Schussler made that constitute illegal and
10  unjustified interference with your business
11  relationships?
12    A.  Nope.  That's more than enough.  That's done.
13  I'm done.
14       MR. SCHULTZ:  Okay.  Let's stop for a quick
15  second.  I want to ask everybody a question.
16       THE VIDEOGRAPHER:  Going off the record.
17       The time is 12:23 p.m.
18       (The lunch recess was taken.)
19       THE VIDEOGRAPHER:  Okay.  We're back on the
20  record.
21       The time is 1:08 p.m.
22       (Plaintiffs' Exhibit 4 was marked.)
23  BY MR. SCHULTZ:
24    Q.  Good afternoon, Mr. Webster.
25    A.  Hello.

43 (Pages 166 to 169)

Page 170

1    Q. The court reporter has just handed you what's
2  been marked as Exhibit No. 4 for this deposition.
3        You recognize this document as an e-mail that
4  you sent on June 10th, 2007, correct?
5    A. Yes.
6    Q. All right. And you sent it to Mr. Schussler,
7  correct?
8    A. Yes.
9    Q. But you also cc'd the people who are listed
10  under "cc" in the header of the e-mail, correct?
11    A. Right. Yes.
12    Q. All right. Who is in@hosthotels.com?
13    A. I have no idea. If it was on the website
14  saying that, that's what I sent it to.
15    Q. All right. Who is
16  reuteman@RockyMountainNews.com?
17    A. There was an article on that on some website,
18  and I sent it to him.
19    Q. All right. Who is readerep@courant.com?
20    A. Again, some website, I guess. I don't really
21  know those two, three.
22    Q. How about dhoekstra@suntimes.com?
23    A. That's Dave Hoekstra. He and I traded hot dog
24  things maybe ten years ago now. He was on some other
25  paper in Chicago at the time.

Page 171

1    Q. Okay. And this --
2    A. Peter Rowe.
3    Q. Hang on.
4        This indicates that he's at the Sun-Times in
5  Chicago, correct?
6    A. Yes.
7    Q. All right. And then who is Peter Rowe?
8    A. He's the guy that wrote the first article about
9  us or the only article about us since we've been here in
10  the local paper.
11    Q. The Union-Tribune is a local San Diego paper?
12    A. Yes. Yes.
13    Q. All right. You sent it to these cc'd -- these
14  other cc individuals because something appeared either
15  on their website or in their newspaper associating
16  Mr. Schussler with the concept that he was opening a Hot
17  Dog Hall of Fame restaurant, correct?
18    A. Yes.
19    Q. All right. If you would turn to the second
20  page of this exhibit, you have a postscript at which you
21  write, "We've already contacted Host Marriott, Levy
22  Restaurants, Success Magazine, The Hartford Courant,
23  Rocky Mountain News, the Chicago Sun-Times, The
24  San Diego Union-Tribune and Chain Leader magazine,"
25  correct?

Page 172

1    A. Yes.
2    Q. And that was a true statement by you, correct?
3    A. Yes.
4    Q. You had, in fact, contacted every one of those
5  individuals --
6    A. Yes.
7    Q. -- or magazines?
8    A. Yes.
9    Q. And you sent them a copy of this e-mail
10  indicating that Mr. Schussler did not have the rights to
11  use the name Hot Dog Hall of Fame in conjunction with a
12  restaurant, correct?
13    A. Yes.
14    Q. Why were you sending it to them telling them
15  that Mr. Schussler did not have that right, in your
16  opinion?
17    A. Because that's been ours since 1978 at least.
18    Q. Yes. But why were you telling these people
19  that?
20    A. Because these articles were in there. It's his
21  Hot Dog Hall of Fame. It's not his Hot Dog Hall of
22  Fame.
23    Q. So you wanted to publicly tell these folks and
24  their readership that Mr. Schussler was not allowed to
25  open a Hot Dog Hall of Fame restaurant, correct?

Page 173

1    A. Yes.
2    Q. All right. You also write below here, "Note:
3  For those of you who received this as a BCC file (Blind
4  Copy), you can see what Mr. Schussler is attempting to
5  do in this article," and then you reference an article
6  at Success Magazine, correct?
7    A. Yes.
8    Q. Who was bcc'd on this e-mail?
9    A. My wife, my brother, my son. Basically, a very
10  tight central group here, you know.
11    Q. Who in addition to your wife, your brother and
12  your son?
13    A. I can't remember. It's not very many people.
14  It's just I didn't want to put their e-mail addresses up
15  there. You know, it's -- I'm preserving their privacy.
16    Q. Can you recall any of the other bcc's?
17    A. Masterson, of course, because he knows
18  everything. He's the one that found the URLs back in
19  2000.
20    Q. Anyone else?
21    A. Not that I can remember.
22    Q. Do you have the ability to go back into your
23  files and determine who it was that was bcc'd on this?
24    A. No. In fact, it saves it without that. So
25  there's no way I can know now.

44 (Pages 170 to 173)

46

Page 174

1    Q.  In this e-mail, Exhibit 4, you also threaten
2  Mr. Schussler that you would, quote, turn the lawyers
3  loose on you, close quote.
4        Do you see that?
5    A.  Oh, yes, sir.  Yes.
6    Q.  Was that your intention or were you just
7  bluffing?
8    A.  That was my intention.  I've talked to
9  virtually everybody on findlaw.com, the local lawyer
10  referral service, the one that they are running at the
11  University of San Diego and one others.  I can't
12  remember what it is.  But I've been through them all.
13  You know, nobody wants to touch this.
14    Q.  All right.  I am not asking and I am not
15  entitled to know and I don't want you to tell me
16  anything about your conversations with any of the
17  lawyers you may have contacted.  Okay?
18    A.  Right.
19    Q.  All right.  But in any event, you threatened to
20  sue Mr. Schussler if he didn't cease and desist using
21  the name Hot Dog Hall of Fame, correct?
22    A.  Yes.
23    Q.  Who is Steve Bernier?
24    A.  That's the guy that -- at one point, he was my
25  ISP owner in Fairfield.  And he moved to Vacaville and

Page 175

1  he registered our URLs for us.  And he used to scan
2  things before we had a scanner and all that.  But -- you
3  know, no relationship to the business other than the
4  functions he performed at that time as my service
5  provider.
6    Q.  Okay.  As your service provider, what function
7  did he perform?
8    A.  He owned the server, and he went and
9  registered -- you know, it's a con they have in the ISP
10  game where, you know, everybody wants to sell you
11  "Here's your website" and they charge you 35 or 40 bucks
12  or more, and now you find you can get it for five bucks
13  at other places, you know.  That's what he was is he
14  stood between us and all those things that we didn't
15  know what we do ourselves.
16        And, you know, we were just starting out in the
17  computer thing in '95, '96.  And we went through a
18  number of local service providers up there because they
19  all were out all the time and that sort of thing.  So
20  he's one of about five or six.
21        (Plaintiffs' Exhibit 5 was marked.)
22  BY MR. SCHULTZ:
23    Q.  Mr. Webster, the court reporter has handed you
24  Exhibit No. 5, which is a multi-page letter -- copy of a
25  multi-page letter directed to you, and then enclosing

Page 176

1  with that a copy of a letter to Mr. Bernier.
2        Do you have that?
3    A.  Yes.
4    Q.  Do you recall receiving this letter from
5  Mr. Provo?
6    A.  I never actually opened it back then.  I was so
7  mad then that I just walked away from it.  I did get it
8  when you guys included it in that original stuff you
9  mailed me.
10    Q.  And it had been sent to you previously?
11    A.  Yes.
12    Q.  You just didn't --
13    A.  At least I assume that's what this was.  I
14  didn't recognize the name John W. Provo.  I didn't even
15  open it.
16    Q.  Okay.  But you did receive an e-mail from
17  Mr. Provo?
18    A.  Yes.  Yes.
19    Q.  All right.  If you would turn to the third page
20  of this exhibit, which at the bottom has some page
21  numbers from previously having been submitted and it
22  says "23" on it.
23        Do you have that?
24    A.  Yes.
25    Q.  Okay.  In this -- on this page of the

Page 177

1  September 19th, 2007 letter to Mr. Bernier from
2  Mr. Provo --
3    A.  Right.
4    Q.  -- you can see there are three paragraphs that
5  are numbered that talk about other people who have used
6  "Hot Dog Hall of Fame."
7        Do you see that?
8    A.  Yes.
9    Q.  Did you -- have you known of these prior to
10  this letter?
11    A.  Yes.  Yes, I knew of the Corner Bar one in
12  Rockford shortly after we surfaced in 1978 or 1979.  The
13  Frankfurter -- I mean, the National Hot Dog and Sausage
14  Council pointed me at them.  This was before the
15  Internet.  And, basically, they're a brass plaque on the
16  wall in this place.  If you eat 12 of their hot dogs or
17  whatever it is, you get your name on that brass plaque.
18  And that's the only function they perform as a Hot Dog
19  Hall of Fame.
20        The second one, the Vienna Beef, that's a new
21  thing.  That's only been out there the last maybe year,
22  at the most.  And it's a Vienna Beef, you know, not The
23  Hot Dog Hall of Fame.
24        And then the third use is generic.  You see
25  that in a lot of different things like somebody writes

45 (Pages 174 to 177)

Page 178

1    about a baseball game and, you know, they'll go, "He
2    should be sent to The Hot Dog Hall of Fame for that
3    spectacular catch" or somebody gets an "A" in school and
4    they go to their lunches Hot Dog Hall of Fame. That's
5    three different ways of using that.
6        Q.  Now, the Corner Bar reference in Rockford,
7    Illinois, you said that the National Sausage Council
8    pointed that out to you?
9        A.  Yes. Yes.
10       Q.  Why?
11       A.  Because she thought the name was familiar, and
12   then when she realized what it was, you know, they're
13   not doing what we're doing. They're just doing the
14   brass plaque on the wall. There's nothing else to do
15   with anything else other than if you eat 12 of their hot
16   dogs at such and such a time.
17       Q.  They are running a restaurant at that location?
18       A.  It's a bar.
19       Q.  Which serves food?
20       A.  Yeah, which serves hot dogs at least. I don't
21   know anything more than that about the place. They do
22   have a website online now and the founder passed away a
23   couple months ago, but that's basically all I know about
24   it. Never been able to get up there and visit the
25   place. And that's Rockford, Michigan, not Rockford,

Page 179

1    Illinois.
2        Q.  Do you see on the next page of this exhibit it
3    states that the Corner Bar's Hot Dog Hall of Fame was
4    established in 1968.
5        Do you see that?
6        A.  Yes, I know that.
7        Q.  Do you have any reason to believe that that
8    date is not accurate?
9        A.  No, I don't.
10       Q.  All right. So it's your belief and
11   understanding that that Corner Bar Hot Dog Hall of Fame
12   has been in existence longer than your Hot Dog Hall of
13   Fame?
14       A.  Yes.
15       Q.  Did you send a cease and desist letter to any
16   of these three entities listed here?
17       A.  No.
18       Q.  Why is that?
19       A.  Because I recognize the legitimacy of the
20   Corner Bar's doing it, because they did it before us
21   even though it's not the same as us.
22       Then the Vienna Beef, they modified the name
23   enough so it's not to be confused with us.
24       And then the third use is generic, and I would
25   be suing everybody if I tried to do that.

Page 180

1        Q.  The phrase "Hot Dog Hall of Fame" could be
2    generic?
3        A.  If -- as long as you're not calling it your
4    restaurant that.
5        Q.  Why? What's the difference?
6        A.  Because that's exactly what we're doing, too.
7    And we've been doing it a heck of a lot longer than
8    Mr. Schussler ever thought about it.
9        Q.  Well, why isn't it generic in that context?
10       A.  Because it's the formal name of the place. If
11   he called it something else and it was also a Hot Dog
12   Hall of Fame, that's another matter. Nothing I can do
13   about that. It's like all the people out there
14   collecting hot dog things, I can't stop that.
15       Q.  I'm not sure I follow the distinction.
16       A.  Okay. Vienna Beef called theirs "Vienna Beef."
17       Q.  I understand that, but we're talking about the
18   other one.
19       A.  Hot Dog Hall of Fame versus The Hot Dog Hall of
20   Fame? That's so close to be similar and misleading.
21       Q.  No. What I'm trying to get at is, you said
22   that one of these uses was purely generic.
23       A.  That's in the throw-away use of it. It's not a
24   specific place. There is no whatever this is, Hot Dog
25   Hall of Fame, Lancaster Jet Hawks, Wienie Wednesday Hot

Page 181

1    Dog Hall of Fame.
2        See, grade schools, high schools and colleges
3    do that all over the United States, you know. And it's
4    nothing more than a joke. In fact, the same statue that
5    we use as a Frankie, some of them have used that as
6    well. Nothing I can do about that. It's a publicly
7    available thing, and they're not doing what we're doing.
8    These aren't really Hot Dog Halls of Fame.
9        Q.  Why not?
10       A.  Well, they're not performing the function that
11   we are. We're -- we hope to eventually become a public
12   asset, you know, a national treasure. That collection
13   is a wonderful collection.
14       Q.  All right. So you hope to donate the
15   collection to some museum somewhere?
16       A.  Well, we've played with it. And, you know, the
17   Smithsonian says they will take it, but, you know, it's
18   no guarantee it won't end up in crates in the basement.
19   There's no permanent space for it.
20       Frankfort, Indiana said they'd give us space
21   there that -- right downtown or we can have this little
22   train station for a live-- -- work space, but we can't
23   support ourselves there. It's a small town. It's
24   16,000 people.
25       And then the Armour, South Dakota, 750 people

Page 182

1 and most of them work at the hot dog factory there. You
2 know, that's a good way to starve to death. One lane
3 in, one lane out, three to six foot of snow on the
4 ground most of the winter, you know. So we can't do it
5 in that fashion.
6 　　　　What we had hoped to do was establish it here
7 and at some point, basically -- you know, a lot of
8 places, they will take the food service end of it and
9 they'll contract that out. And when we're gone, there's
10 nothing we can do about that. But our ultimate goal was
11 to bring it here, open it up, and at some point when we
12 pass on is to leave it to the City of San Diego.
13 　　Q. Leave what to the City of San Diego?
14 　　A. The collection, the museum, everything there,
15 except for whatever they're going to do with the food
16 handling end of it, because, you know, we've tasted like
17 about a thousand places looking for the best, and that's
18 what we want to feature.
19 　　　　We also -- you know, because of the great
20 preponderance of ex-New Yorkers, ex-Chicagoans and, to a
21 lesser extent, the New Englanders, we wanted to offer
22 those options on our menu as well.
23 　　MR. SCHULTZ: Six?
24 　　(Plaintiffs' Exhibit 6 was marked.)
25 BY MR. SCHULTZ:

Page 183

1 　　Q. Mr. Webster, the court reporter has handed you
2 Exhibit No. 6, which is a one-page copy of an e-mail
3 that was forwarded from Dave Claflin at RED Development
4 to Steve Graham and Steve Schussler.
5 　　　　Do you see that?
6 　　A. Yes.
7 　　Q. And below that is the header of an e-mail and
8 the body of an e-mail from you to Dave Claflin, correct?
9 　　A. Right. Yes.
10 　　Q. And you did send this e-mail?
11 　　A. Evidently, I did. I didn't recognize the name
12 until I saw it in that list of plaintiffs' witnesses.
13 　　Q. Well, you knew you would send an e-mail and
14 you'd purposely sent an e-mail to someone at RED
15 Development?
16 　　A. Yes. Yes.
17 　　Q. Correct?
18 　　A. Yes. Exactly right.
19 　　Q. And as it turns out, the person that you sent
20 it to at RED Development is Dave Claflin, right?
21 　　A. Yes. Yes. Yes.
22 　　Q. All right.
23 　　A. I have to admit that. I couldn't recognize the
24 name to save my life until I got the papers from you
25 guys last time.

Page 184

1 　　Q. Okay. Now, at the time that you sent this
2 e-mail, you knew that RED Development was working with
3 Mr. Schussler to open restaurants called The -- called
4 Hot Dog Hall of Fame, correct?
5 　　A. Yes. Yes.
6 　　Q. And you sent this e-mail in order to dissuade
7 them from opening those restaurants, correct?
8 　　A. To warn them of their financial obligations if,
9 indeed, what I had heard was true that that's publicly
10 financed money.
11 　　Q. Warn them of their obligations, what do you
12 mean?
13 　　A. Don't -- does not a company such as that have
14 an obligations to their investors that, "Hey, this thing
15 is in contention. We should look at this more closely
16 before we invest these funds"?
17 　　Q. What did you expect that RED Development would
18 do upon receipt --
19 　　A. At least take a look at the website. Set
20 Mr. Schussler down and ask him if this is true that,
21 indeed, he heard of us in 2000.
22 　　Q. And it was, in fact, one of your goals that it
23 might delay or stop the opening of the restaurant the
24 Hot Dog Hall of Fame?
25 　　A. Yes. Exactly.

Page 185

1 　　Q. And it might cause RED Development not to work
2 with Mr. Schussler?
3 　　A. That's their decision.
4 　　Q. But that was one of the things you hoped might
5 happen?
6 　　A. Not so much hoped. I just wanted him to stop
7 doing what he was doing to us.
8 　　Q. You knew it might happen?
9 　　A. I thought it could possibly happen, but, you
10 know, I didn't know it would happen.
11 　　Q. But that was why you sent it, because --
12 　　A. Yeah.
13 　　Q. -- it might possibly happen?
14 　　A. Oh, yes. Yes.
15 　　Q. Okay. You write in this e-mail that
16 Mr. Schussler is a, quote, liar, thief and con man.
17 　　　　Do you see that?
18 　　A. Yes, I do.
19 　　Q. All right. Why is he a liar?
20 　　A. Because that's not his property.
21 　　Q. What's not his property?
22 　　A. The Hot Dog Hall of Fame.
23 　　Q. Okay. Why is he a thief?
24 　　A. Because that's not his property.
25 　　Q. What's not his property?

47 (Pages 182 to 185)

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

**49**

Page 186

1    A.  The Hot Dog Hall of Fame.
2    Q.  And why is he a con man?
3    A.  Because he's trying to sell something that
4    isn't his.
5    Q.  Okay.  So your entire basis for your statement
6    that "Mr. Schussler is a liar, thief and con man" is
7    your contention that he does not have a legal right to
8    use the name Hot Dog Hall of Fame for a restaurant?
9    A.  That's right.
10   Q.  Do you have any other basis for that statement?
11   A.  No.
12   Q.  Now, on this e-mail you say, "We've been doing
13   this since 1976."
14       I thought we looked at one of your documents
15   produced in this litigation earlier that said June 1 of
16   '78.
17   A.  Yeah.  Yes.
18   Q.  So which is it, '76 or '78?
19   A.  '76.  Oh, that's a blurry line because sometime
20   after we got into the Great American Hot Dog Machine, we
21   come up with the concept of The Hot Dog Hall of Fame.
22   And, you know, it had to be maybe '77 when that
23   happened.  But I know by June 1, '78 that it was set in
24   stone that's what we were going to do.
25       So somewhere in there between '76 and '78.

Page 187

1    That's all I can nail down.  I don't know for certain
2    what day it was.  I didn't write it down.  Didn't have a
3    computer or anything.  Didn't even have a camera back
4    then.
5    Q.  And the "this" that you've been doing since
6    that time frame was pursuing your idea of The Hot Dog
7    Hall of Fame?
8    A.  Yes.
9    Q.  Now, you also go on to say in this e-mail, "We
10   have also been talking to someone within his," meaning
11   Mr. Schussler's organization, "who tells us that he may
12   not actually own another one of the concepts he's
13   currently touting."
14       Do you see that?
15   A.  Yes, I do.
16   Q.  You're referring to Rene King, correct?
17   A.  No.
18   Q.  Oh?  Who are you referring to?
19   A.  I don't -- I never found his name out.  It was
20   one of those things.  We get a lot of these where people
21   probe us and they ask us things and they tell us things.
22   And this guy approached us over the e-mail and he was
23   talking that he knew somebody there that maybe going to
24   lose their rights to whatever it was they were talking
25   about.  He got no more specific than that.  It got to

Page 188

1    the point of after that, I go, "This guy's a -- you
2    know, jerking me around."  I, you know, never did find
3    out the guy's name, anything like that.
4    Q.  There was no specifics?
5    A.  No.  No.  He was probing us, is what he was
6    doing more than anything else.  And he was dropping just
7    enough to go, "Well, I'm afraid a friend of ours is
8    going to lose a concept he came up with."  After that, I
9    just ignored him.  You know, he went away.
10   Q.  Well, why did you pass on this information?
11   A.  Because I thought at this point he would
12   basically go, "No, I'm not part of it" or he would admit
13   who he was.  He backed off.  Said, "No, I'm not part of
14   it."  Never heard from him again.
15   Q.  "No, I'm not part of" what?
16   A.  Schussler's organization.
17   Q.  The guy that had been in contact with you?
18   A.  Yeah.  He's one of about a dozen since this all
19   started that have been probing us.
20   Q.  Did you do anything?
21       Did you send out any kind -- well, when did you
22   find out that he wasn't part of the organization?
23   A.  Right after I sent this.  I basically flipped
24   it to him.  I go, "Look, you are either going to talk to
25   me or you're not."  Never heard a word from him since.

Page 189

1    Q.  Did you send a correction to this?
2    A.  Yes.  Yes.
3    Q.  To Mr. Claflin?
4    A.  No.  I think that was to the Mayor of Sparks.
5    I'm not sure which.  But when I realized what was going
6    on there, you know, I basically stand there with egg on
7    my face.
8    Q.  Had you done anything to investigate whether or
9    not this was an accurate set of circumstances between --
10   A.  I did everything I could.  I had -- our
11   computer guy tried to check this guy's e-mail address
12   where he was e-mailing us from, the whole thing, you
13   know.  And it was probably a false name.  That's my best
14   guess.
15   Q.  So you couldn't verify --
16   A.  Yeah.
17   Q.  -- the truth of what he was saying?
18   A.  Yeah.  Yeah.  And eventually I go, "This guy's
19   either probing us for the opposition or" -- you know, I
20   don't know what his motives were, but we had a bunch of
21   things like this.  We had a guy come to the house that
22   swears he's an insurance agent, you know, and he asked
23   me all kinds of questions.  You know, I'm going, "What?
24   Get away from me," you know.
25   Q.  Well, did you do anything to verify the truth

48 (Pages 186 to 189)

Page 190

1  of this assertion before you sent this e-mail to
2  Mr. Claflin?
3      A. At that point, he seemed legitimate to me. He
4  just seemed like he wanted to preserve his anonymity.
5  And then a few more questions later, that was it, you
6  know. I don't -- to this day, I don't know what his
7  deal was. I bet -- my best guess is he was probing us.
8  That's it.
9      Q. What do you mean by "He was probing us"?
10     A. We get this all the time. We get -- like the
11 other day, some kid calls me from Texas and he's saying
12 he's thinking about opening a hot dog stand and, you
13 know, I asked him, "Where did you get our website
14 address?"
15         And he says, "Oh, you're on the Ipod things"
16 that they download.
17         I'm not, you know. And, in fact, that's the
18 whole thing with not having the newsletter widely
19 disseminated. That's the whole thing about not
20 registering the website with the search engines is
21 because we've gotten dozens of things like that over the
22 year, you know.
23         I don't know what they're up to. I don't care.
24 But leave me alone. You know, after a while, you go,
25 "I'm not listening to that." You put their name in the

Page 191

1  "delete automatically" and that's that.
2      Q. Well, somehow they get your name, right?
3      A. Well, yeah. But, you know, you can find
4  certain pages on that thing. Like we have a thing
5  called the Carbeque and that's -- you plug it into the
6  dash of your car.
7      Q. Slow down.
8      A. I'm sorry. I'm sorry.
9         But you plug it into the dash of your car and
10 it cooks two hot dogs at a time. And I get this e-mail
11 from this guy that found the website because only the
12 words "Carbeque" popped up. And evidently we're the
13 only website out there that the words "Carbeque" are in.
14 You know, so it found the word "Carbeque." It didn't
15 find specifically The Hot Dog Hall of Fame.
16     Q. But having found the website, it's the website
17 of The Hot Dog Hall of Fame?
18     A. Yes.
19     Q. Okay. So back to my question, which was
20 specifically, did you do anything before you sent this
21 e-mail to Mr. Claflin to verify the truth of what this
22 person was supposedly telling you?
23     A. Other than have the wife's cousin try to check
24 that e-mail address out and see if anything popped up.
25 And I can't even remember the guy's name anymore, but I

Page 192

1  did a Google search on him. Nothing, you know. And at
2  that point, I go, "This isn't true and I better stop
3  doing that," and I did.
4      Q. Yeah. But my question is very specific, and I
5  need to make sure I know the answer to my question,
6  which is, before you sent this e-mail to Mr. Claflin --
7      A. Oh, before? No. Right after.
8      Q. Okay. But before you sent it, you didn't do
9  anything to verify the truth of this?
10     A. What he said to me sounded very true at the
11 time. And I was pretty irate at the time, you know.
12 And I regret putting that in there now because I know
13 it's not true, or at least I don't think it's true.
14     Q. Okay. You put it in there in order to, again,
15 convince RED Development that they might be working with
16 somebody who was dishonest, correct?
17     A. Yeah. I'd say that's true, yes.
18     Q. Okay.
19     A. At that time it was the best of my knowledge
20 that guy did work for Mr. Schussler.
21     Q. And you acknowledge that this is not true
22 today?
23     A. Yes.
24     Q. And it wasn't true at the time that it was
25 sent?

Page 193

1      A. As far as I know, I can't prove it or disprove
2  it. I don't know who this guy is to this day. It was
3  a -- obviously, a phony name because he didn't show up
4  anywhere after I Googled him.
5      Q. And did you know it was a phony name before you
6  sent your e-mail?
7      A. No. No. No. I wouldn't have done that. And
8  it may be just a --
9      Q. Hold on. You can't do that while she's --
10     A. Oh, okay. I'm sorry.
11     Q. Yeah. Let her mark that and then --
12         (Plaintiffs' Exhibit 7 was marked.)
13 BY MR. SCHULTZ:
14     Q. Go ahead and finish your thought.
15     A. And it may actually be a real name, just that
16 he doesn't show up anywhere in the -- on the Internet,
17 because I know other people that they have -- their name
18 has never been on the Internet, you know. And it's
19 amazing to me sometimes that, you know, somebody can go
20 that far. It's like video cameras. They're everywhere
21 now, and I'm surprised.
22     Q. Do you remember the guy's name?
23     A. I think it was Stu, but I'm not sure, you know.
24 It was something like that. It -- it -- and it was
25 definitely something eastern European, the last name.

49 (Pages 190 to 193)

Page 194

1    You know, other than that, I can't remember.
2        Q.  Mr. Webster, the court reporter has handed you
3    Exhibit No. 7.
4        A.  Yes.
5        Q.  You recognize this as a portion of your book
6    "Hot Dogs in a Cold World," correct?
7        A.  Well, that's just the page on it, on the
8    website.
9        Q.  Okay.  And the page on the website is six pages
10   long if you print it out, correct?
11       A.  Yeah, approximately.  Yeah.  I've never printed
12   it before.
13       Q.  And this Exhibit 7 is what you pointed
14   Mr. Claflin to when you said in Exhibit 6, "We have
15   also" -- or "You can read all about it (we've already
16   served him 2 Cease & Desist demand letters) on our
17   website," correct?
18       A.  Yes.
19       Q.  All right.  So Exhibit 6, the e-mail to
20   Mr. Claflin, is directing him on how to find this page
21   of "Hot Dogs in a Cold World" on your website?
22       A.  Yes.
23       Q.  All right.  Mr. Webster, on Page 2 of
24   Exhibit 7, which has a Page No. 30 at the bottom of
25   this.

Page 195

1        A.  Yes.
2        Q.  In here you write about two-thirds of the way
3    down the page, "I should probably point out a couple of
4    things here."
5            See that?
6        A.  Yes.
7        Q.  And No. 2 under that, you reference that
8    "There's a bit more to being a true Hall of Fame than
9    the collection."
10           Do you see that?
11       A.  Yes.
12       Q.  "There are certain public obligations."
13           What do you mean?  What are the public
14   obligations?
15       A.  Well, you know, the whole thing of the museum,
16   Hall of Fame and all that is I don't think people should
17   pay to come see something like that.  I think it's a
18   gift to the public.  The newsletter, basically, is a
19   gift to those that have supported us all these years.
20           We do other things, which I couldn't remember
21   earlier to tell you about, but like on National Hot Dog
22   Month, we go out and have a hot dog, take our friends;
23   and wherever we go, we tip big.
24           You know, we -- when we're doing the cookouts
25   and all that, we'd invite the public over to have a hot

Page 196

1    dog with us for nothing, you know.  We -- it's just --
2    you know, it's a matter of the public face of the thing
3    as compared to the money making thing.  You know -- you
4    know, I'm not a greedy person, you know.  You can see by
5    the way I'm dressed.
6            And I think that you have an obligation to, if
7    you have something special, to share it with others.
8    And that's what this collection is about.  You know,
9    it's a beautiful thing, you know.  The world needs to
10   see this, you know.  It's never going to see it, you
11   know, in the basement of the Smithsonian or in a little
12   tiny town in Indiana.  That's why we're here, because
13   you get three million come through this county a year,
14   three million tourists.
15       Q.  Okay.  Would you turn to the next page of
16   Exhibit 7.
17       A.  Okay.
18       Q.  You're referring in this section, generally,
19   about having discovered that Mr. Schussler was going to
20   open up restaurants named Hot Dog Hall of Fame, correct?
21       A.  Yes.
22       Q.  And in the second paragraph on the page, you
23   say, "We also e-mailed everyone listed in the article,
24   as well as the publishers themselves, to say that we're
25   The Hot Dog Hall of Fame."

Page 197

1            Is that -- those are the people that we looked
2    at in Exhibit 5?
3        A.  Yes.  Yes.
4        Q.  Okay.  In a couple of paragraphs down, why
5    don't you just read it to yourself, and then I will ask
6    you some questions where it starts "Over the next few
7    days."
8        A.  Oh, okay.
9        Q.  Okay?
10       A.  Yes.  Okay.
11       Q.  In here you say that at the time you discovered
12   that Mr. Schussler was opening up a restaurant called
13   Hot Dog Hall of Fame, first you considered seeking legal
14   recourse against him, correct?
15       A.  Yes.
16       Q.  But then you decided you couldn't afford that,
17   right?
18       A.  Well, no.  That we'd already talked to maybe
19   three or four dozen lawyers in the few days we were
20   thinking about it.
21       Q.  Okay.  And you rejected pursuing legal
22   recourse, correct?
23       A.  Yes.  Yes.
24       Q.  All right.  And, instead, you decided to use
25   your words "poison the well," correct?

50 (Pages 194 to 197)

Page 198

1    A.  That's what he's doing to us.  Yes, sir.
2    Q.  Okay.  And by poisoning the well, you mean that
3    you decided to do things such as send e-mails to the
4    places like Sparks and Reno where he was going to open a
5    restaurant, correct?
6    A.  Not so much that.  It's after this is all over
7    and he's done suing me, this is all public record.
8    Q.  Well, you said, "Instead, we are going to
9    poison the well, so to speak."
10       So what did you mean when you said "We're going
11   to poison the well"?
12   A.  I'm going to stand on the ceiling -- on the
13   roof and tell everybody in the world what is going on.
14   Q.  And you started by telling RED Development?
15   A.  Yes.
16   Q.  And the Mayor of the City of Sparks?
17   A.  Yes.
18   Q.  The people who covered Mr. Schussler's
19   restaurant idea in magazines?
20   A.  Yes.
21   Q.  And those were all part of an ongoing effort
22   that you're going to poison the well?
23   A.  Yes.
24   Q.  All right.  And it's one of the goals of doing
25   that to stop his ability, if you can, to open the

Page 199

1    restaurant, right?
2    A.  The Hot Dog Hall of Fame restaurants.  I don't
3    care about his other restaurants.  It's just the Hot Dog
4    Hall of Fame.
5    Q.  Yeah.  But you want to stop that one?
6    A.  You bet I do.
7    Q.  Whether by telling his business partners to
8    stop dealing with him or whatever other means or --
9    A.  I didn't tell them to stop dealing with him.
10   That's their decision.  I just told them what is going
11   on.
12   Q.  In hopes that they might not deal with them?
13   A.  Or in the hopes that they would be informed
14   when they did it so when and if their -- their investors
15   come back on them, they can't deny it, either.
16   Q.  All right.  But, also, with the knowledge that
17   they might, as a result of sharing information --
18   A.  Yes.  Oh, yes.
19   Q.  -- decide not to deal with him?
20   A.  Oh, yes.  Oh, yes.
21   Q.  Okay.  On Page 4 of this exhibit, it's got
22   No. 32 at the bottom.  You began by saying, essentially,
23   "He has placed us in the position of having NOTHING,"
24   all caps, "to lose now, and we WELCOME," all caps, "him
25   to sue us."

Page 200

1        Do you see that?
2    A.  Yes, I do.
3    Q.  What do you mean by that?
4    A.  When this is all over, the public is going to
5    decide who was right.  This is a matter of public record
6    when this is done.  And then there is the book.  If
7    Mr. Schussler does not understand that he's not playing
8    nice, we're not playing nice, either.
9    Q.  Okay.  In the next paragraph, you write, "I'm
10   old and have been sick for the past ten years now,"
11   correct?
12   A.  Yes.
13   Q.  And that's true.  That's been true before
14   Mr. Schussler decided to open his restaurant, right?
15   A.  Oh, yes.
16   Q.  All right.  You also write, "I'm ready to stare
17   him down to the bitter end (and I'm hoping he is dumb
18   enough to have me arrested)."
19       Do you see that?
20   A.  Yes, I do.
21   Q.  What do you mean by that?
22   A.  Because I'm going to tell the public, one way
23   or another, this is the story that's going on.  He has a
24   choice of doing the right thing with us or else I'm
25   going public with this at some point.

Page 201

1    Q.  Well, and you understand that if the Court
2    issues a permanent injunction, that you're not going to
3    be allowed to go public with what you want to go public
4    with?
5    A.  So they're going to pre-censure my book?
6    Q.  If it violates -- if the Court enters a
7    permanent injunction and your book goes beyond what is
8    permitted by the injunction, yes.
9    A.  Isn't this a matter of public record?  Can't
10   anybody come look at this after this case is over?
11   Q.  Well, that's for the Court to decide.
12       MR. SCHULTZ:  All right.  I see that we have
13   five minutes remaining on the tape, so we need to stop
14   and change the tape.  Okay?
15       THE VIDEOGRAPHER:  This marks the end of
16   Videotape No. 2.
17       Going off the record.  The time is 1:46 p.m.
18       (Pause in the proceedings.)
19       THE VIDEOGRAPHER:  We're back on the record.
20       The time is 1:49 p.m.
21       This marks the beginning of Videotape No. 3 in
22   the deposition of J. Frank Webster.
23       (Plaintiffs' Exhibit 8 was marked.)
24   BY MR. SCHULTZ:
25   Q.  Mr. Webster, the court reporter has handed you

51 (Pages 198 to 201)

Page 202

1  what's been marked --
2      MR. SCHULTZ: Oh, sure. Hang on a second. I'm
3  apparently creating a buzz here.
4  BY MR. SCHULTZ:
5      Q.  Mr. Webster, the court reporter has handed you
6  what's been marked as Exhibit No. 8, which is a two-page
7  copy of an e-mail that you sent and then forwarding that
8  e-mail.
9          If you look at the first portion below the line
10  on the front page, you see this is an e-mail that you
11  sent on September 18th, 2007, correct?
12     A.  Yes.
13     Q.  And you sent it to Geno Martini, who you know
14  to be the Mayor of the City of Sparks, correct?
15     A.  Yes.
16     Q.  And you sent it to him because you knew that at
17  the time of this e-mail, the City of Sparks was working
18  with RED Development and Mr. Schussler to open a
19  restaurant Hot Dog Hall of Fame in the City of Sparks,
20  correct?
21     A.  Yes.
22     Q.  And in the e-mail, you told Mr. Martini that
23  Mr. Schussler was a liar, thief and con man, right?
24     A.  Yes, I did.
25     Q.  And for the same reasons that you already

Page 203

1  articulated in the e-mail that we've just talked about a
2  little bit ago, right?
3      A.  Yes.
4      Q.  All right. And so you sent this -- you accused
5  Mr. Schussler of stealing your concept for The Hot Dog
6  Hall of Fame, right?
7      A.  Right.
8      Q.  And you sent this to the City of Sparks hoping
9  that the City of Sparks might decide not to go forward
10  with the Hot Dog Hall of Fame opened by Mr. Schussler,
11  correct?
12     A.  That's correct.
13     Q.  Okay. And you also reference in here on the
14  next page this talking to someone within Mr. Schussler's
15  organization who you say "tells us that he may not
16  actually own another one of the concept he's currently
17  touting," correct?
18     A.  Yes.
19     Q.  And, again, you sent that or you forwarded that
20  accusation against Mr. Schussler as further evidence of
21  what you believe to be Mr. Schussler's dishonesty,
22  right?
23     A.  Yes.
24     Q.  And you then agreed -- then you directed the
25  Mayor of the City of Sparks to your website and the "Hot

Page 204

1  Dogs in a Cold World" that we were previously
2  discussing, right?
3      A.  Yes.
4      Q.  And then, finally, you ended this e-mail by
5  saying, "In the near future, we plan to go VERY," all
6  caps very, "public with this situation, and are letting
7  your office know about it so that you will be properly
8  prepared to deal with the fallout this will cause."
9          What did you mean by that?
10     A.  He's an elected official. He's an elected
11  official in Nevada where much of my wife and Masterson's
12  family are from. He may even be related to us, except
13  he says he isn't. I'm not sure. I don't know that side
14  of the family at all well, but most of the wife's and
15  Masterson's family basically ran most of western Nevada
16  at one point.
17     Q.  So you're threat to go public might be
18  intimidating to him?
19     A.  Not intimidating. Might cause him damage, and
20  so he's advised in advance what is -- what is happening.
21     Q.  And being forewarned of the damage it might
22  cause, he might decide to get out of business with RED
23  Development and Mr. Schussler?
24     A.  Well, it wasn't even that deep into that.
25  That's just the fact of it. If this guy's related to

Page 205

1  us, I don't want to damage him.
2      Q.  Okay. So your intent was not to damage him.
3  It was to damage Mr. Schussler from opening up the
4  restaurant?
5      A.  Yes. And to warn this guy that this is coming.
6          (Plaintiffs' Exhibit 9 was marked.)
7          THE WITNESS: Thank you.
8  BY MR. SCHULTZ:
9      Q.  Mr. Webster, the court reporter has handed you
10  what's been marked as Exhibit No. 9, which is a
11  multi-page document consisting of several e-mails.
12          If you would turn to the third page of this,
13  which is -- has a mark at the bottom of the page "56."
14          Do you see that?
15     A.  Right.
16     Q.  All right. And this is a copy -- or this is an
17  e-mail that you sent on June 14, 2007 to Mr. Claflin,
18  correct?
19     A.  I don't remember sending this, but that's
20  basically the -- from the website.
21     Q.  Okay. You recognize Mr. Claflin's name as an
22  individual --
23     A.  Yes.
24     Q.  -- at RED Development, right?
25     A.  Yes. I just don't remember sending this part

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 206

1  because that's -- I had sent people to the website to
2  look at that.
3      Q. Okay. Well, you see from the other portions of
4  the exhibit that this e-mail was then forwarded from
5  Mr. Claflin to others within RED Development and the --
6  then eventually to Mr. Schussler, correct?
7      A. Right. Right.
8      Q. And the portion of the e-mail that is listed
9  from you to Mr. Claflin is, essentially, a repeat of the
10  story that you told in "Hot Dogs in a Cold World,"
11  correct?
12     A. Yes.
13     Q. All right. So it's the same allegations about
14  Mr. Schussler's stealing your concept and being a liar,
15  con man and thief?
16     A. Yes.
17     Q. And the reason you sent it to Mr. Claflin at
18  RED Development is because you knew that RED Development
19  was in the business with Mr. Schussler in developing
20  these restaurants?
21     A. Yes. But like I say, I don't remember sending
22  this one to him. I must have, because it says I did,
23  but, you know, I don't remember doing that, actually.
24  Because that's -- that was -- this was all on the
25  website.

Page 207

1      Q. Well, and this is about three months before the
2  other e-mails that we looked at.
3      A. No way. I -- I -- I just found out about this
4  on June. And these are -- or September. Okay? Because
5  it kept happening. The things kept popping up on the
6  Internet. But I don't think it was a full three months.
7  But if that's what it says, it must have been. I was
8  just crazed at the time, you know. And so I don't know.
9  But, you know, I have to accept your word for it. I'm
10  not going to argue. It's like what do they call it? I
11  will stipulate. That's fine.
12     Q. You don't have any reason to believe that this
13  was --
14     A. No.
15     Q. -- that these dates are inaccurate, do you?
16     A. No, I don't.
17        Don't remember sending that as an e-mail. I
18  mean, I wrote it, you know, obviously, but --
19        (Plaintiffs' Exhibit 10 was marked.)
20        (Document handed to witness.)
21        THE WITNESS: Thank you.
22  BY MR. SCHULTZ:
23     Q. Mr. Webster, the court reporter has handed you
24  Exhibit No. 10.
25     A. Right.

Page 208

1      Q. And do you have that in front of you?
2      A. Yes, I do.
3      Q. This is a multi-page document that I believe
4  you created, correct?
5      A. Yes.
6      Q. And when did you create this document?
7      A. Well, it was after I was first served, so
8  somewhere in that time.
9      Q. Okay. So it was in response to the lawsuit?
10     A. Yes. There -- there was sections of this that
11  are from other things I've written in the past, but,
12  basically, the whole thing is in response to that. So I
13  put the whole thing together at that point, yeah.
14     Q. All right. If you turn to the third page of
15  this, which has at the upper right-hand corner
16  "Page 9 of 36.
17     A. Okay.
18     Q. Down about two-thirds of the way down the page,
19  you talk about the grand opening of the Rainforest Cafe
20  at Fisherman's Wharf.
21        Do you find that paragraph?
22     A. Yes.
23     Q. You said in here that Mr. Schussler told you he
24  has a warehouse full of stuff.
25     A. Yes.

Page 209

1      Q. And "he was going to do it without us."
2      A. Yes.
3      Q. So at that meeting, he already told you he
4  already had a warehouse full of hot dog --
5      A. He didn't say "hot dog." He said "stuff."
6      Q. What did you --
7      A. Well, he's got all kinds of stuff there. If
8  you look at what he did in the Rainforest Cafe and, you
9  know, the -- whatever he's got. You know, he was
10  telling me he runs around buying stuff all the time, you
11  know. And he says he's got a warehouse of stuff, is
12  what he said.
13     Q. Okay. That he would use in a Hot Dog Hall of
14  Fame?
15     A. He never connected those two up. He says, "We
16  have a warehouse" -- "I have a warehouse full of stuff."
17     Q. Well, you inferred from that that he was going
18  to use it in the Hot Dog Hall of Fame, right?
19     A. Well, at that point, yeah, I'm going, "What?"
20        (Plaintiffs' Exhibit 11 was marked.)
21  BY MR. SCHULTZ:
22     Q. Mr. Webster, the court reporter has handed you
23  Exhibit No. 11, which is a multi-page document that you
24  previously submitted in response to the TRO, correct?
25     A. Yes.

53 (Pages 206 to 209)

Page 210

1    Q.  And roughly speaking, it consists of a variety
2  of letters either written to you, by you or on your
3  behalf, correct?
4    A.  Yes.
5    Q.  And, in general, can you just tell me, what is
6  the -- what is it that these letters demonstrate, in
7  your mind?
8    A.  They showed that we've used and defended the
9  name since 1978.
10   Q.  All right.  The name The Hot Dog Hall of Fame?
11   A.  That's right.
12   Q.  All right.
13   A.  And, in fact, this second one from the National
14  Hot Dog and Sausage Council on November 20th, 1980,
15  that's where she attached the little sticker saying,
16  "Hey, do you know about this place in Rockford,
17  Michigan?"
18   Q.  Okay.  While we're looking at that letter, it
19  says in the first paragraph, "We were delighted to learn
20  about your venture the Great American Hot Dog Machine
21  and Hot Dog Hall of Fame and Museum and wish you every
22  success in establishing your restaurant."
23      It was not, in fact, established at that time,
24  correct?
25   A.  No.  We were looking at that time.  This was on

Page 211

1  Frank Avenue.  And that's just before we took over Hot
2  Diggity Dogs.
3    Q.  Right.  And at the time of this letter, the
4  point is it wasn't established, correct?
5    A.  No.  No.  We were looking to establish it.
6    Q.  All right.  And then if you look at the next
7  letter, it's a letter from you to Marvin Mohn,
8  President of Doggy Diners, Inc.
9    A.  Yes.
10   Q.  Who is -- who is that and why are you writing
11  him?
12   A.  Doggy Diners is a Bay Area chain, and they are
13  all gone but one of them right now.  And they have these
14  iconic 11-foot tall Dachshund heads that were on poles
15  out in front of each of them.  And they were starting
16  to -- the company was starting to go under back then in
17  1980, and so these were showing up in the hands of
18  collectors, and I was trying to get one for our
19  collection.
20   Q.  All right.  So you're writing to Mr. Mohn
21  hoping to get one of these Dachshund dog heads?
22   A.  Yeah.  He'd retired by then.
23   Q.  Okay.  And here you refer to The Hot Dog Hall
24  of Fame as your museum, correct?
25   A.  Yes.

Page 212

1    Q.  Which didn't exist at the time?
2    A.  Well, this was on Frank Avenue, too.  And like
3  I say, at a certain point there, we had maybe 5-, 6-,
4  700 of these pieces out on display, but it wasn't open
5  to the public.  But, yeah, that is what that is in.
6    Q.  On display, but not to the public?
7    A.  In the house, yes.
8       That's January, so, yeah.  We had put it all
9  away by then, then.
10   Q.  Okay.
11   A.  I don't know who typed this for me, though, but
12  they didn't capitalize the "the" in The Hot Dog Hall of
13  Fame in the text.
14   Q.  Right.
15   A.  And they spelled "believe" wrong, too.
16   Q.  Would you turn to the letter to you from Norma
17  Foerderer.  It has "Page 24 of 36" in the upper
18  right-hand corner.
19   A.  Norma Foerderer, that's -- is that the woman
20  from --
21   Q.  Donald Trump's organization.
22   A.  Oh, yeah.  Yeah.  Okay.  There we go.
23   Q.  This is written in April 10 of 1990, and it
24  says, "Mr. Trump has received your letter" --
25   A.  Yes.

Page 213

1    Q.  -- "inquiring about his interest in bringing
2  The Hot Dog Hall of Fame to New York City."
3       Did you write a letter to Donald Trump?
4    A.  Yes, I did.  Yes, I did.
5    Q.  Do you still have a copy of that letter?
6    A.  Maybe.  I'm not sure.  But he doesn't eat
7  lunch.  That was a rather waste of time there.  Nice
8  stationery.  They were nicer than the White House's.
9    Q.  Why do you say that?
10   A.  Oh, it's gold embossed.  The whole thing.  It's
11  very elegant, the stationery.
12   Q.  Why were you approaching Donald Trump?
13   A.  Because --
14   Q.  -- in 1990?
15   A.  Because a lot of people think that this should
16  have been located in New York City.  You know, that is
17  what people think of when they say "hot dog," in
18  general, except for the Chicago crowd, of course.  But,
19  you know, I was at that point, you know, let's --
20  let's -- I will give it a shot.  Let's see what happens.
21   Q.  What were you hoping that Mr. Trump would do?
22   A.  All right.  You know, "Yeah, we have a place."
23  You know, he's got a guy that has a push cart down at
24  the entrance of Trump Tower and that guy makes three
25  hundred thou a year, you know.

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 214

1    And I'm going, "Well, let's put this inside and
2  open it up, you know, not 24 hours a day, but the people
3  that live in those towers, they -- they eat all the
4  time. And if you put it down near the street level, you
5  get people off the street to eat there, too."
6    Q.  So your idea was that he would locate The Hot
7  Dog Hall of Fame in Trump Towers?
8    A.  Or one of his properties.
9    Q.  Okay. And was -- were you still going to run
10 it then?
11   A.  No. I was going to go set it up. And then
12 once everything was working, and then go back to California,
13 because I can't live in New York City. I have cars and
14 I like -- or had cars. I like my cars and I like the
15 weather in San Diego. I just cannot stand the gloom
16 back East. I've lived back East, and I can't do it
17 anymore.
18   Q.  All right. So you were going to set up the
19 restaurant and museum there?
20   A.  Yes.
21   Q.  And then you'd come back to California?
22   A.  Yes.
23   Q.  And then what would happen?
24   A.  Well, I would go back and do the ceremonial
25 thing for National Hot Dog Month every year and do the

Page 215

1  Nathan's Hot Dog Eating Contest personally and a few
2  other things, like stop by Indiana on the way back for
3  the Frankfort, Indiana Hot Dog Festival, that sort of
4  thing, you know. But, you know, this thing needs to be
5  seen by the public, and this was just a shot at "How do
6  I get it out there?" Because I don't have any money
7  myself.
8    Q.  Would you turn two more pages in to Page 26 of
9  36.
10   A.  Yes.
11   Q.  It's a letter from William H. Webster or
12 William M. Webster --
13   A.  It's William, yeah.
14   Q.  -- the Fourth, Director of Scheduling and
15 Advance?
16   A.  Yes.
17   Q.  And it says, "Thank you, Mr. Webster, for your
18 interest in meeting with President Clinton."
19     Why did you -- did you attempt to get a meeting
20 with Mr. Clinton?
21   A.  No. It was -- we had considered going back to
22 do the Nathan's Hot Dog Eating Contest and the
23 Frankfort, Indiana thing. My kid has never seen where
24 he's from. He was born in Toledo, Ohio. He's never
25 been there. We left when he was six weeks old to the

Page 216

1  day.
2    So we were discussing, you know, let's go back
3  there. Let's put together about a 10- to 15-minute
4  trailer to sell this documentary I wanted to do about
5  the great hot dog stands in the United States.
6    And one of the things was that -- is that way
7  back when Reagan was in office, we quoted him -- Nelson
8  Rockefeller -- we quoted Nelson Rockefeller. He said,
9  "No candidate for any public office can hope to be
10 elected without being photographed eating a hot dog in
11 this country."
12     And so we sent that letter to the Reagan White
13 House, and we got a letter back from him saying, "I'm
14 sorry, but yada, yada, yada."
15     And then the next day --
16   Q.  Slow down.
17   A.  I'm sorry. I'm sorry.
18   Q.  That's okay.
19   A.  The next day on the front page of USA Today in
20 color was Nancy eating a hot dog at a Camp Fire Girl
21 cookout, you know. And we saved all that. Of course I
22 can't find it now. But, otherwise, I would have given
23 you copies.
24     But that is what this was all about is we
25 decided that from that point on that we should always

Page 217

1  invite the President by for a hot dog. Part of the, you
2  know, public function of this thing, you know. And, you
3  know, it's kind of absurd now, but it's kind of a fun
4  thing, too. You know, that's why we write some of these
5  letters is just for the fun of them.
6    Q.  So did you send President Clinton a letter?
7    A.  Yes.
8    Q.  And what did you -- do you still have the
9  letter?
10   A.  Maybe. I don't know. We have a bunch of
11 things we can't find, you know.
12   Q.  All right. What did your letter say to
13 President Clinton?
14   A.  Something along the lines of -- I quoted the
15 Nelson Rockefeller bit there.
16     And then Richard Nixon says, "I come from
17 humble origins. We've got to look after the hot dog and
18 the hamburger," you know.
19     And it's, basically, for -- if he'd have
20 responded in a positive way, you know, we would have had
21 the newspapers down there when he come through and we'd
22 feed him a great hot dog.
23     And, you know, we know Mr. Clinton was a
24 serious junk food kind of guy, you know. And he even
25 mentioned it in one of the newsletters. "Hey, he'd make

55 (Pages 214 to 217)

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 218

1 a great partner in a weenie stand," you know. It's --
2 he's looking for something to do. He's unemployed now.
3 But that's basically all. There's nothing of
4 any real serious consequence. I expected them to say
5 no, you know. They're way too busy.
6 And, you know, I didn't ask President Bush
7 because of the war thing, you know. He's up to here
8 (indicating) in it right now. And, you know, that would
9 just be disrespectful.
10 Q. Okay.
11 A. By the way, this guy William W. Webster, I
12 think we're related. I don't think he knows it, but
13 we're from southern Illinois area of the Webster part of
14 the family and he's from 80 miles away. There's a whole
15 bunch of Websters. His dad was William H. Webster, the
16 FBI or CIA head, whatever he was.
17 Q. Right.
18 A. But that's who this guy is. You know, my
19 brother talked to him once, and he's going, "Well, you
20 know, have you -- have the Secret Service check you out
21 and see if we're related."
22 And my brother goes, "Why do I want to do
23 that?" You know.
24 MR. SCHULTZ: Off the record.
25 (A discussion off the record was held.)

Page 219

1 (Plaintiffs' Exhibit 12 was marked.)
2 MR. SCHULTZ: All right. Back on the record.
3 BY MR. SCHULTZ:
4 Q. Mr. Webster, the court reporter has handed you
5 Exhibit No. 12?
6 A. Yes.
7 Q. Can you just tell me what this document is.
8 A. It's our boiled-down media rTsumT. Just names
9 and titles and all that sort of thing. The things we've
10 done over the years. Some of them we have. Some we
11 don't have. Some of them we never had in digital.
12 Q. All right. So are you telling me that you
13 have, like, clips from news casts --
14 A. At some point.
15 Q. -- that kind of thing?
16 A. But we used to be beta, and there's no telling
17 what's there. We have -- we have hot dog songs from the
18 1920s on, but some of them, like the old cassettes, they
19 stick to each other after a while. They bleed through.
20 And we don't know what we've got now. It's a mess.
21 And some of these, it indicates that I have
22 them in digital format, or had them. I don't know if I
23 still do. But, you know, it's -- like I say, we've been
24 through four computer systems since we've been doing
25 this since '95.

Page 220

1 BY MR. SCHULTZ:
2 Q. We're getting near the end.
3 A. That's okay. I'm getting a second wind now. I
4 couldn't eat anything at lunchtime here, and so I'm
5 getting past all that. I get a little ringy-dingy in
6 the head after a while.
7 Q. All right. Well, if you need to take a break
8 or anything, just let me know.
9 A. Nothing I could eat downtown here.
10 Q. Why?
11 A. There's certain things I can't have.
12 Q. Oh. All right.
13 A. You did get that package of the print versions
14 of the newsletters, right?
15 Q. No.
16 A. No. Taking its time.
17 Q. Yeah. Snail mail.
18 (Plaintiffs' Exhibit 13 was marked.)
19 THE WITNESS: Thank you.
20 BY MR. SCHULTZ:
21 Q. Now, Mr. Webster, the court reporter has handed
22 you Exhibit No. 13, which is -- if I can see that for
23 just one second -- is a multi-page document. It has
24 Bates numbers on it Defendant, D-E-F-T, and 00001
25 through -- all the way to the end, it's 000086. Okay?

Page 221

1 A. Yes. What's Bates numbers?
2 Q. Those are -- well, actually, you shouldn't even
3 refer to them as Bates numbers, but they're control
4 numbers that you put on a document. Bates is a
5 trademark of a company.
6 A. Oh, okay.
7 Q. The -- that exhibit is -- tell me if I'm wrong,
8 but isn't that exhibit a collection of examples of
9 either WeenieGrams or The Frankfurter Chronicles?
10 A. Yes, showing all the way back when we did them.
11 Q. Okay. And I believe it's roughly organized
12 chronologically, correct?
13 A. I can't really tell from here, but -- let's
14 see. July 2004. I've never seen it in this format, so
15 it's kind of disorienting me.
16 Okay. This is 2005. 2006.
17 Q. So it's roughly in chronological order?
18 A. Yeah.
19 Q. Okay. Just generally, are these -- I think
20 I've asked you this before, but I just want to make
21 sure.
22 Are these, generally speaking, representative
23 of the content of The Frankfurter Chronicles?
24 A. Yes. Yes.
25 Q. Now, you've pulled out a page there. What is

Page 222

1 the number on that page?
2   A.  Thirty-four.
3   Q.  All right.  And what is that page?
4   A.  That looks like something out of the print
5 version.
6   Q.  Of The Frankfurter Chronicles?
7   A.  Yeah, that I sent you separately on Monday of
8 last week.
9   Q.  Okay.  So that was an earlier version of The
10 Frankfurter Chronicles?
11   A.  Yes.  The print version was from '95, late '95,
12 early '96, January at least, until '98 or '99.  There
13 were 36 issues and 24 -- I mean, 24 issues,
14 approximately 36 months or so.  It was actually 38 or 39
15 months, but I don't remember exactly anymore.
16     And, yeah, see, here's the first one
17 (indicating) when we come back doing, and that sets it
18 in November of 2003.
19   Q.  What page number was that?  What number?
20   A.  Forty-four.
21   Q.  Okay.
22   A.  Which I put the first one and the last one
23 there so you can get an accurate date on when we did
24 this.  We had been doing -- we do automotive writings as
25 well.  It's all e-mail.  And for the time when we got

Page 223

1 out of the print version, because we could no longer
2 afford it, until the time we went to the all e-mail
3 version, we'd send messages out.  And sometimes I would
4 be writing about food in one part of the message and
5 about cars in another part.  So we decided to split it
6 up, you know, because some of my car people don't care
7 about the food and some of the food people don't care
8 about the cars.
9     (Plaintiffs' Exhibit 14 was marked.)
10     (Document handed to witness.)
11     THE WITNESS:  Thank you.
12 BY MR. SCHULTZ:
13   Q.  Okay.  Mr. Webster, the court reporter has
14 handed you Exhibit No. 13.  Would you just --
15   A.  It's 14.
16   Q.  Oh, it's 14?  Never mind.
17     Would you tell me the control numbers on those
18 documents, front to back.
19   A.  Eighty-seven, eighty-eight.
20   Q.  You can just tell me the range.
21   A.  Okay.  The last one.  Okay.  Ninety-nine.
22   Q.  All right.  Am I correct that this is a
23 collection of articles written about you by various
24 newspapers?
25   A.  Yes.  I have to say some of them have a lot

Page 224

1 more accuracy than others.
2   Q.  Okay.  Which ones are inaccurate?
3   A.  Okay.  The one by Tracie Cone, she was a
4 reporter for the San Jose Mercury News.  She was being
5 sued by somebody.  I can't remember what.  And at the
6 same time, she was coming out of the closet as a
7 lesbian, and so we didn't have a lot of time to talk and
8 it was mostly wrong, but, hey, it's good publicity, you
9 know.
10   Q.  Which one is that?
11   A.  On -- let's see.  "On a Mission from Dog to
12 Establish" -- Page 97 -- "to Establish The Hot Dog Hall
13 of Fame in the South Bay."
14     See, I had already moved back to -- or moved up
15 to Fairfield by the time this went out.  She got that
16 wrong, too, you know.  Just wanted to do it somewhere in
17 the Bay Area because I had lived in San Francisco before
18 and they loved me there, you know, in the Hall of Fame
19 and all that.  And Silicon Valley is kind of a
20 cold-hearted place sometimes.  You know, if you're not
21 in the computer business, you might as well, you know,
22 move.  And, you know, that's what we ended up doing.
23   Q.  What else is inaccurate about that article?
24   A.  Well, the way she spelled Lamborweenie.  Oh, I
25 can't remember.

Page 225

1     I just noticed the other day when I read the
2 thing that she's -- let's see.  It says right there on
3 my web light -- website it's not online yet.  That's
4 accurate or was accurate at that time.  So that will
5 give you a fix on that date.
6     Oh, one of them said I -- one of these articles
7 said I was selling hot dogs off of a three-wheel Harley
8 Davidson.  I never owned a Harley Davidson.
9     (Plaintiffs' Exhibit 15 was marked.)
10     THE WITNESS:  Thank you.
11 BY MR. SCHULTZ:
12   Q.  Okay.  Mr. Webster, the court reporter has handed you
13 Exhibit No. 14 --
14   A.  Right.
15   Q.  -- which has Control --
16   A.  Fifteen.
17   Q.  Fifteen.  Well, I'm apparently behind one and
18 I'm not going to catch up.
19   A.  It's jet lag.
20   Q.  What are the numbers on that one?
21   A.  100 and 101.
22   Q.  Okay.  101 -- go back to it -- is an e-mail
23 from you to a David Bodamer, B-o-d-a-m-e-r.
24   A.  Yeah, I recognize the Penton, and I don't even
25 know what it is, but, yeah, this is probably something I

Page 226

1  sent, too. I have to admit it.
2      Q. Okay. Well, it's sent -- it was produced by
3  you. If I may reach across for a second. In response,
4  you said, "Stock message." So --
5      A. No, no. This is the one I sent you because
6  this is basically the message I sent to everybody.
7      Q. Okay.
8      A. And I don't even -- I can't recall Mr. Bodamer
9  or Penton on whatever it is. I had just found that in
10  the file, you know, because that's the one that I was
11  sending to everybody.
12      Q. About Mr. Schussler?
13      A. Yes.
14      Q. And how he's a liar, a thief and a con man?
15      A. Yes.
16      Q. Okay. Go back to it. I'm not quite done. I'm
17  sorry.
18          At the bottom of this, the second page, there
19  is your seal, correct?
20      A. Yes.
21      Q. "Approved: J. Frank Webster, President of The
22  Hot Dog Hall of Fame," correct?
23      A. Yes.
24      Q. Are there other officers of The Hot Dog Hall of
25  Fame?

Page 227

1      A. No. I figured, how often do you get a chance
2  to be the president, you know?
3      Q. Take it while you've got it.
4          (Plaintiffs' Exhibit 16 was marked.)
5          (Document handed to witness.)
6          THE WITNESS: Thank you.
7  BY MR. SCHULTZ:
8      Q. The court reporter has handed you Exhibit
9  No. 16, which is a two-page document. It's your
10  response to our Document Request No. 7.
11      A. Yes.
12      Q. And attached to it is an April 29th,
13  2000 letter to Mr. Schussler from you, correct?
14      A. Yes.
15      Q. And was this a letter that you sent in the mail
16  as opposed to via e-mail?
17      A. Yes. I'm fairly certain that is, but I can't
18  say for certain anymore because of the lapse of time.
19  You know, it's seven plus years, you know.
20      Q. Okay. This was your initial contact with him?
21      A. Yes. Yes.
22      Q. And it's your -- I guess what's confusing to me
23  is if this was sent, why is there no signature on it?
24          Do you know?
25      A. Yeah. I got no idea there. This may be a

Page 228

1  copy. This may be I saved this one to disk and then
2  signed the original one, because this was on disk. I
3  didn't even know I still had this.
4      Q. Okay. This, in any event, was the original
5  contact, which at least in your earlier testimony you
6  said, then generated the phone call by Mr. Schussler?
7      A. Yes. Yes.
8      Q. Okay. At this point, at the time you write
9  this letter, you say, "This is exactly what we are
10  preparing to do in San Diego within the year."
11      A. Yes.
12      Q. Okay. But it never happened within the year,
13  did it?
14      A. That's because I got pneumonia then. That and
15  the act of packing up and everything else. We had tried
16  floating the wife's rTsumT through e-mail. Wasn't
17  getting any response there, you know. And so we started
18  biding our time, starting slapping money away because
19  she was making serious money then. She ran a dining
20  room in a private country club up there. And she's
21  actually -- for the first time in her life, she was
22  making more than we could spend. That was a weird
23  thing. In a little town and that was the last job in
24  that town for her, because there was nowhere to go but
25  down from that point.

Page 229

1          So we put together about 10-, 12- cash and made
2  a move.
3      Q. When you say in here to Mr. Schussler, "We are
4  facing similar hurdles and can now point to your success
5  to justify the expense of this project," what are the
6  similar hurdles?
7      A. People look at you like you have a third eye in
8  your forehead, you know. Mr. Schussler and I at least
9  agreed that this is a million-dollar concept.
10  Otherwise, we wouldn't be here.
11          And, you know, when I first got into the hot
12  dog thing, as your poor stenographer can tell, I tend to
13  talk a lot and I talk fast. I was alienating more
14  people than I was attracting.
15          And I learned to tune that back, for the most
16  part, and do it all in writing, or eventually when the
17  website come along, it all speaks for what exactly I
18  hoped to do then. And I was -- you know, I had some
19  supporters initially that liked the concept, but, you
20  know, then, again, it's the -- you know the guy that
21  come up with "Jesus Christ Superstar" and "Cats"?
22      Q. Andrew Lloyd Webber.
23      A. Yeah.
24          Did you ever hear when some reporter
25  interviewed him, the reporter says, "Why do people take

Page 230

1    an instant dislike to you?"
2        And he says, "It takes -- it saves time."
3        And I kind of feel that same mojo sometimes,
4    you know, because I used to alienate people so bad, it
5    wasn't funny. They'd go, "Oh, God, here he comes. He's
6    going to talk about hot dogs again," you know.
7        And, you know, eventually you learn that only
8    two or three percent dig what you're saying, but that's
9    fine because, you know, one of these days somebody that
10   you start talking to is going to go, "Hey, that's a
11   wonderful idea. Let's do it," you know.
12       And that's the basis of our promotion in this
13   thing ever since I finally wised up and kept driving
14   everybody else around me crazy.
15       Q.  At the time of this letter, were there
16   particular investors that you were courting or working
17   with?
18       A.  Yes. Mr. Russell Harvey of the Nations hot dog
19   chain -- I mean, hamburger chain. In their Bay Area
20   thing, they have like 26 locations. And he used to own
21   the original -- before he got into Nations, he owned the
22   drive-through right -- drive-in right next to the high
23   school that I went to. And the guy that was running it
24   was going bankrupt from gambling.
25       And when I realized who Mr. Harvey was, we --

Page 231

1    we get along pretty nice. We never got to actually meet
2    because he was extremely old at the time, but we talked
3    for quite some time. And then after that, I realized,
4    "Hey, I'm moving to San Diego," you know. He's passed
5    away since, you know.
6        Q.  Any others whom you were courting at the time?
7        A.  Let me see. There was only a couple locations
8    in that town worth having, you know. The one I showed
9    you the pictures of in Suisun, which is right across the
10   railroad track and that.
11       So I can't say that there were, you know, in
12   that town. That was a small town, say 80,000 people.
13   And I lived there when I was a kid. My dad was
14   stationed there. And I moved back there to get out of
15   Silicon Valley because I thought it would be a great
16   place for my kid to go to high school.
17       Gang bangers and little thugs is what's in
18   there now. You get the gangs from Oakland and Richmond
19   and Sacramento hiding out in that town. And like one
20   night we had five Toyotas stolen on the street behind
21   us, you know. It was a crazy time, you know.
22       And I realized after we moved there that that
23   was a mistake, you know. It's three-month long tourist
24   season. Not a lot of work for the wife. I mean, she
25   had worked almost everyplace in the town that was worth

Page 232

1    working in by the time we left.
2        Q.  Okay. In this letter to Mr. Schussler, you
3    mention La Casa Weenie.
4        A.  Yeah.
5        Q.  What is that?
6        A.  That's our house. That's what we called it up
7    north. That's what we call it here. I was going to do
8    a miniature selection of the museum in the house.
9        Q.  To what end?
10       A.  To bring investors by, feed them a hot dog and
11   tell them what I want to do.
12       Q.  Okay. Below that you talk about sausage --
13       A.  Topiary.
14       Q.  -- topiary.
15       A.  Yeah.
16       Q.  What is all this?
17       A.  That's how we were going to decorate the house,
18   you know, just to suggest when you come up.
19       Q.  I see. Okay.
20       A.  Because you can't do a big sign on the roof or
21   anything like that, you know.
22       Q.  So what you were planning -- what you were
23   telling Mr. Schussler you were going to do is sort of
24   analogous to what he had done in his home --
25       A.  Yes. Yes.

Page 233

1        Q.  -- you were going to do --
2        A.  And I hope he wasn't offended by that. You
3    know, I really wasn't, you know, going, "Hey, I'm going
4    to steal your idea" or anything. It was just, you know,
5    it was a stroke of brilliance that he went the other
6    direction as far as he did to achieve what he did.
7        Q.  Mr. Webster, on this exhibit you have an
8    address for The Hot Dog Hall of Fame.
9        A.  Yes.
10       Q.  P.O. Box 658, Fairfield, California.
11       A.  Yes.
12       Q.  Was that also your personal address at the
13   time?
14       A.  No. That was for the benefit of the locals
15   there. Suisun used to be the poor stepbrother on the
16   other side of the train tracks when we lived there the
17   first time. And you tell them you live in Suisun and
18   they go, "Poo," you know. And it was mainly on the card
19   just mainly for the fact if I hand it out to anybody
20   locally, they would think I lived in Fairfield, not
21   Suisun.
22       Q.  Okay. Did you get your personal mail at this
23   address?
24       A.  No. Got it at the house.
25       Q.  Okay.

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 234

1   A.  Yeah.
2   Q.  So was this actually a post office box that you
3   did --
4   A.  Yes.
5   Q.  -- in fact, use?
6   A.  Yes.
7   Q.  For The Hot Dog Hall of Fame?
8   A.  Yes.  Yes.
9   Q.  Is that the only time that The Hot Dog Hall of
10  Fame address has been different from your personal
11  address?
12  A.  Yes.
13  Q.  And how long did you have that P.O. Box?
14  A.  Probably 12 years.
15  Q.  The entire time that you lived in --
16  A.  Most of it, yes.
17  Q.  -- Suisun or --
18  A.  Suisun.  Well, we lived in Suisun, but it's all
19  one big thing.  It's like, you know, the conjoined twin
20  thing.  This -- Suisun is the ugly boil on the neck of
21  Fairfield if you ask those people there.
22  Q.  Okay.  In here you go on to say, "We will soon
23  begin to raise the funds necessary to establish The Hot
24  Dog Hall of Fame."
25      Did you at that time then begin to raise those

Page 235

1   funds?
2   A.  No.  I meant after we moved to San Diego and
3   set up La Casa Weenie.
4   Q.  Okay.  You've never set up La Casa Weenie, have
5   you?
6   A.  No.  No.
7   Q.  Why not?
8   A.  Because I don't want to be the weirdo with the
9   museum in his house.  I can't have people in there.  You
10  know, you can't bring people in of any volume as far as
11  I could make money doing this.  You know, it's just not
12  possible.  I mean, I've had friends that have done that
13  and their lives were living nightmares.  There's a
14  guy -- he's in storage now, too.  And he used to run The
15  Unknown Museum in Mill Valley up near San Rafael.
16  Q.  Hold on.  Slow down for a second.
17  A.  I'm sorry.
18      MR. SCHULTZ:  Are you okay?
19  BY MR. SCHULTZ:
20  Q.  The what Museum?
21  A.  The Unknown Museum.  It had every toy from
22  the -- about the turn of the last century on.  It was a
23  beautiful collection.  He had no security, so people
24  would go in and put stuff in this -- their pockets.  He
25  was the only person there.

Page 236

1       He had a room dedicated solely to Barbie.  It
2   was all the way around and with a full bridal regalia
3   mannequin in the middle of the thing.  It was a
4   beautiful place.  And he had to move stuff over to sleep
5   on the bed there, he had so much stuff.
6       He had the first Frankie Frank I ever saw,
7   which is the Mr. Potato Head.  And that's almost the
8   Holy Grail of hot dog collecting.  That's the second
9   rarest thing out there.
10      The rarest is a 1967 Avon cologne decanter with
11  box.  Never actually laid my eyes on one.  I've only
12  seen pictures of them.  And, you know, what's that
13  worth?  I mean, they threw that stuff away way back
14  when, you know, but nobody's got one.
15  Q.  I assume that it's in the shape of a hot dog?
16  A.  Yeah.  Oh, yeah.  And in the brown glass that
17  they did and the little gold cap on one end, you know.
18  That -- that's unobtainable, you know.
19  Q.  So given that you haven't established La Casa
20  Weenie, what -- do you have a present plan to raise
21  funds?
22  A.  No.  I'm -- I'm at the end of the rope.  Either
23  this works for us or I'm done, you know.
24  Q.  Either what works for you?
25  A.  Either some -- some sort of compromise is

Page 237

1   reached here and we can go forward, or I'm done.  I'm 60
2   years old.  I don't think I'm going to live to be
3   another two or three years old.  You know, I've got a
4   lot of problems and this isn't helping, you know.  I
5   mean, this is beating me up.
6   Q.  In the cover letter to -- why don't you pull
7   that back for a second.
8       On Exhibit 16, you -- the front page, I think
9   you write, "It is totally consistent with what we've
10  been saying all along."
11      Do you see that?
12  A.  Yes.
13  Q.  What do you mean by that?
14  A.  We have always -- even the Great American Hot
15  Dog Machines and Hot Diggity Dogs were all with the
16  intents and purposes of establishing The Hot Dog Hall of
17  Fame at some point in the future.
18      I have a friend that for years tried to get
19  himself a Harley.  He's dead now.  Never did.
20      You know, it's like the dog bowl moving away
21  from your eating.  And I'm afraid that's what this is
22  coming for me -- coming to be for me.  You know, it's
23  like, I've tried, I've tried, I've tried, you know.  And
24  that's why you ultimately get desperate and go start
25  approaching other people that may get the concept, you

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 238

1 know, because for -- from '76 to '96, we kept it all
2 under wraps.
3 Q. Okay. And then in '96, you began to --
4 A. Hall of Fame Hall of Fame. Starting doing, you
5 know, newspaper things and, basically, go -- you know,
6 if somebody is going to steal it from us, you know, I
7 had a head -- I had about a 20-year head start on the
8 collection because I was the only one doing that until
9 eBay came along; and then all of a sudden, it went
10 crazy.
11 I mean, at first, you know, you -- eBay was
12 like a yard sale to where you'd pick the things up, only
13 instead of finding them at your local neighborhood swap
14 meet or whatever, you're buying them over the Internet.
15 And after a while, other people started doing this, too.
16 And I did some stupid things when we first
17 started doing the eBay thing. There is a
18 glow-in-the-dark Oscar Mayer Wienermobile whistle. I'd
19 never seen one before. I eventually paid $20 for that
20 thing. The guy puts the next one up and it goes for $5.
21 I didn't know he had more of them. So I got a -- burned
22 a little bit when they first started doing the eBay
23 thing, you know. I don't do that now. I don't even do
24 eBay anymore because -- like I will look every year or
25 so just to be sure, but I've got most everything.

Page 239

1 Q. I think in one of the documents that we've seen
2 in this case you said something to the effect that you
3 spent thousands of dollars on eBay.
4 A. Yes.
5 Q. How much total did you spend on eBay?
6 A. I don't know exactly, but the stack was like
7 that (indicating). And the wife wasn't speaking to me.
8 And I made the mistake of showing it to a reporter, and
9 he put that in an article about us. And it was about
10 eBay in general. And wife was not amused, you know.
11 But I -- I would say maybe $4,000 that year,
12 you know. And that was over almost a year, you know.
13 And I got a lot of things I didn't have before. And
14 like I say, I'm down to just a few things I'd really
15 like to have.
16 When we did the last eBay splurge last year, I
17 bought either 30 or 60, somewhere in there, items that
18 we didn't have. But it had been years. It had been
19 like five or six or seven, eight years since I had
20 looked at eBay. And that's all that popped up.
21 And it started with just a simple little
22 question. I was looking for the Oscar Mayer CD that
23 they do the Oscar Mayer Wiener song in about 30
24 variations. That's hard to find, too. But people have
25 it. It's not that I can't get it. But that's where it

Page 240

1 started.
2 And then I started, "Well, I don't have this
3 over here" and "I don't have that over there." And, you
4 know, probably $1,000 later, you know, I'm going, "Wife,
5 should I even look at eBay for another year?" you know.
6 And since I don't have any money, it's
7 pointless, anyway, now, you know.
8 (Plaintiffs' Exhibit 17 was marked.)
9 MR. SCHULTZ: Is that 17?
10 COURT REPORTER: Seventeen.
11 BY MR. SCHULTZ:
12 Q. Mr. Webster, the court reporter has handed you
13 Exhibit 17, which I am understanding is a collection of
14 newspaper articles regarding the Hall of Fame Hall of
15 Fame, correct?
16 A. Yes.
17 Q. Okay. What are the control numbers on the
18 document that you have there?
19 A. 104 through 120. Maybe one more. Maybe --
20 feels like it's two pages, but, yeah, it must be one
21 page. Yeah.
22 Q. Mr. Webster, the court reporter has handed you
23 Exhibit 18. The Bates numbers on that one are 121
24 through what?
25 A. 123, 124.

Page 241

1 (Plaintiffs' Exhibit 18 was marked.)
2 BY MR. SCHULTZ:
3 Q. Okay. Now, there are two cease and desist
4 letters --
5 A. Yes.
6 Q. -- attached to this, correct?
7 A. Yes.
8 Q. One is from July 27th of 2000 --
9 A. Yes.
10 Q. -- right?
11 And this relates to -- who was it that found
12 out about the URLs?
13 A. Chris Masterson in Seattle.
14 Q. All right. He discovered that Mr. Schussler's
15 employee had registered some URLs using The Hot Dog Hall
16 of Fame?
17 A. Yes. Yes.
18 Q. And you sent this first cease and desist letter
19 that has Nos. 122 and 123 on it to Mr. James Rittenberg,
20 correct?
21 A. Yes.
22 Q. Did you get any response to this?
23 A. No. What happened was after a while, those
24 URLs appeared to have been abandoned.
25 Q. Okay. You write in here on the second page

61 (Pages 238 to 241)

Page 242

1  that -- that "What was done was done in bad faith as
2  Mr. Schussler had received certain materials from us
3  before that date."
4      A.  Right.
5      Q.  "We have copies of all of our correspondence
6  with Mr. Schussler to substantiate our position and that
7  he knew these concepts, names and URLs were our
8  intellectual property."
9          Do you see that?
10     A.  Yes.
11     Q.  And, again, those certain materials that he
12  received were the e-mails that you and I have talked
13  about?
14     A.  Thirty to sixty e-mails, somewhere in there.
15     Q.  Okay.  And it also says that "You will also
16  notice that this message has been sent to multiple
17  addressees."  But it's not apparent from the face of the
18  document.
19     A.  Those are --
20     Q.  -- that that's the case.
21     A.  That was blind copy again.
22     Q.  And who were blind copied on that?
23     A.  Whoever we knew at the time, you know.  And
24  that was seven years ago, so, you know, I got no way of
25  really knowing.  I know I sent it to Masterson.  And I

Page 243

1  really can't say beyond him because he is -- he and the
2  wife and my son and my brother -- and my brother wasn't
3  e-mailing at the time, so it wasn't him.  My mother
4  never did.  But at least to Masterson.  Beyond that, I
5  really can't say more than that, you know.
6      Q.  Any news media?
7      A.  Oh, no, not that time, I don't think.
8      Q.  Okay.  If you would turn to the next page,
9  which has Bates No. 124.
10     A.  Right.
11     Q.  This is the June 10, 2007 cease and desist
12  letter --
13     A.  Right.
14     Q.  -- from you to Mr. Schussler?
15     A.  Right.
16     Q.  A couple things about this.  You say, "This is
17  the second time we've had to advise you that the concept
18  name, URL and good reputation of The Hot Dog Hall of
19  Fame is solely our intellectual property."
20         Do you see that?
21     A.  Yes.
22     Q.  First of all, there was -- at that time in June
23  of 2007, Mr. Schussler was not using your URL, correct?
24     A.  As far as I know, yes.
25     Q.  All right.  Then you go on to write that "To

Page 244

1  refresh your memory a bit, we met at the Fisherman's
2  Wharf location of The Rainforest Cafe shortly after it
3  opened."
4      A.  Right.
5      Q.  Well, was it shortly after it opened or was it
6  the grand opening?
7      A.  I'm fairly certain it was the grand opening,
8  but, again, the memory is foggy.  But, you know, my best
9  guess is he flew in for that grand opening that day and
10  that's -- it was, in fact, that day.
11     Q.  Okay.  And --
12     A.  I can ask Rene King.  He would know because he
13  was there during all of that.
14     Q.  And you also in this letter reference that
15  "We've already contacted Host Marriott, Levy
16  Restaurants, Success Magazine, The Hartford Courant,
17  Rocky Mountain News, Chicago Sun-Times, San Diego
18  Union-Tribune and Chain Leader Magazine."
19         Do you see that?
20     A.  Yes.
21     Q.  Was that true?
22     A.  Probably.  I'm fairly certain that is.  I have
23  no reason to doubt it.
24     Q.  Well, let me give you a reason to doubt it.
25  This "p.s." is on an e-mail that is dated June 10th of

Page 245

1  2007.
2      A.  Right.
3      Q.  And if we go back and look at the exhibits, the
4  one on which these entities that are listed here were
5  copied was in September, specifically September 18th of
6  2007.
7      A.  Right.
8      Q.  So had you contacted them another time as well?
9      A.  No. No. No.  This is -- this is the first
10  thing here, you know, is when I discovered that he was
11  doing these things, this is the first thing I did was
12  send him the cease and desist.  And then after he
13  basically told me to go (indicating) myself and that he
14  was going to sue me, I started putting these out there
15  and I -- you know.
16     Q.  So was this a lie that you had already
17  contacted --
18     A.  No, no, no.
19     Q.  -- Host Marriott?
20     A.  No, no, no.  If it said I did it there, then I
21  did it then.  You know, I -- I don't know why there was
22  a discrepancy there, unless maybe I cut and pasted one
23  from the other or something.  But, you know, let me see.
24     Q.  It would be around Exhibit 4 or 5 or somewhere
25  in there.

PETERSON REPORTING, VIDEO & LITIGATION SERVICES

Page 246

1    A.  Okay.  See, here's one September 18.  That
2  isn't it.
3    Q.  What exhibit number are you looking at?
4    A.  I'm at eight right now.  That's not it.  I
5  think it's before there.
6    Okay.  Here we go.  That is Exhibit 4.  Yes,
7  that's the same words.  And we must have cut and pasted
8  that out of there.  Which one was this?
9    Yeah, that's my best guess is I cut and pasted
10  out of there.
11    Q.  You cut and pasted out of Exhibit 4?
12    A.  Oh, this says, "10 June."  This says,
13  "10 June."
14    Q.  Okay.  May I see?
15    A.  Sure.
16    Q.  Oh, I see.  Okay.
17    So the cease and desist letter that we're
18  looking at that's a part of Exhibit 17 --
19    A.  Yeah.  Eighteen or seventeen, yeah.
20    Q.  -- has the same text as the Exhibit No. 4 of
21  the same date, correct?
22    A.  Yeah.  Probably.  Yes.
23    Q.  Okay.  And the "p.s." on Exhibit 17 is
24  identical to the "p.s." on Exhibit 4, correct?
25    A.  Yes.

Page 247

1    Q.  All right.  I see.
2    Exhibit 17 was probably sent by U.S. Mail,
3  correct?
4    A.  I'm not sure about that.  I think I just
5  e-mailed him on that one.
6    Q.  Well, Exhibit 4 appears to be an e-mail, but it
7  doesn't have the same heading as Exhibit 17.
8    A.  Oh, maybe I did this one in Word.  Maybe that's
9  what is going on.  I don't know --
10    Q.  Okay.
11    A.  -- you know.
12    I'm fairly certain I did it in Word because
13  after a while, you know, the e-mail -- what's it called?
14  The -- the editor -- the text editor e-mail thing lacks
15  certain things as far as formatting and all that.  And
16  so, you know, this probably very likely was done in
17  Word.
18    Q.  Okay.
19    A.  And it may have been -- yeah, that's got to be
20  it.  Yeah, because then I cut and pasted this onto the
21  website where it shows over here (indicating).
22    Q.  All right.  Mr. Webster, I just want to clean
23  up a couple things real quickly here.
24    Going back to the Casa -- La Casa Weenie, as a
25  way of attracting investors, that concept was one that

Page 248

1  you, in concept form, got from Mr. Schussler, right?
2    A.  Yeah, to a large extent, it was, you know, the
3  same as before, only in the opposite direction.
4  Because, you know, I really hate the whole living in the
5  museum kind of thing, you know.  If I had my druthers, I
6  would live in a room that had no furniture.  The T.V.
7  would be built in the wall, and that's it.  I'm a
8  minimalist by nature, you know.
9    And I've been stacked up to the ceiling with
10  the wiener warehouse for years now, you know.  I just
11  can't take it anymore, you know.  And the thing is, is
12  that, obviously, it worked very well for Mr. Schussler,
13  and I thought it was brilliant.
14    Q.  You know, Mr. Webster, I was noticing in The
15  Frankfurter Chronicles that you include a number of
16  photographs.
17    A.  Right.
18    Q.  Where do you get those photographs?
19    A.  Sometimes off the Internet.  Sometimes people
20  e-mail them to me.  Sometimes I take them myself.
21    Q.  The ones you got off the Internet, where on the
22  Internet do you get them from?
23    A.  A whole variety of places, you know.  Sometimes
24  I see an interesting website.  Like this next issue,
25  we're doing "Weenies in Space," and this guy that used

Page 249

1  to live in Cleveland Heights was an astronaut and took
2  up Stadium mustard with him.  And so I basically flipped
3  them an e-mail message going, "Hey, can we use the
4  photo, have a quick phone call interview?" kind of
5  thing.  And I haven't heard back from him.  I expect to
6  today.  But that sort of thing.
7    You know, we approach first.  We go, "Hey,
8  we're going to mention your website.  Can we use a
9  photo?"  If they tell us "No," generally we don't.  You
10  know, sometimes there are things out there that are
11  public domain or just thrown out there where -- you
12  know, like people air brush things and just post it up
13  there.
14    And if we can get an e-mail address, we'll ask
15  them.  If not, you know, if they ever say, "Hey, we
16  don't want that in there," we'll retract it.
17    Q.  But sometimes you do post things that you don't
18  have permission expressly for?
19    A.  Oh, once in a while.  Once in a while.  Nothing
20  of any real major consequence.  Nothing that's --
21  anybody's going to sue me for or anything, as far as I
22  can tell.  It's a newsletter.  There's a thing called --
23    (Plaintiffs' Exhibit 19 was marked.)
24  BY MR. SCHULTZ:
25    Q.  Hold on.

63 (Pages 246 to 249)

Page 250

1    A.  I'm sorry.
2    Q.  Go ahead.
3    A.  From what I understand, there's a thing called
4  "fair use" where you allude to it and you can show them
5  a picture or send them to the website, things like that.
6  And we do that sometimes.  But, basically, you know,
7  people send me the stuff.
8    Q.  The court reporter has handed you
9  Exhibit No. 19, I believe.
10    A.  Right.
11    Q.  This is an e-mail -- well, it's a response to a
12  Request No. 2 about plans to build The Hot Dog Hall of
13  Fame.
14    A.  Right.
15    Q.  And it says, "Attachments:  Why we moved to
16  Squarefield" because -- "(besides living here when I was
17  in High School)."
18      Do you see that?
19    A.  Right.
20    Q.  The text below the first part of this basically
21  talks about "A Tale of Several Cities."
22    A.  Yes.
23    Q.  Do you see that?
24    A.  Yes.
25    Q.  And this describes your efforts to locate The

Page 251

1  Hot Dog Hall of Fame in various other towns?
2    A.  Yes.
3    Q.  And none of them were successful, correct?
4    A.  Right.
5    Q.  And some of them approached you and you
6  approached others of them?
7    A.  Yes.  Yes.
8    Q.  Which ones approached you and which ones did
9  you approach?
10    A.  Okay.  Armour, South Dakota or North Dakota,
11  whatever it is, Frankfort, Indiana.  We were approached
12  by the Wienerschnitzel chain.  The Smithsonian, that was
13  a result of an article about us.  It mentioned us there.
14  Frankfort, Illinois we approached.  They never e-mailed
15  back.
16      Then there's West Frankfort, and that's a tiny
17  little place.  I'd been there before and forgotten all
18  about it.  And I saw this piece of real estate there.
19  It was five acres, a house, a barn and one other thing,
20  and it was like $8,000.  I'm going, "Ah," you know, but
21  I can't live there.  No tourists, you know.
22      Let's see.  Oh, and Frankfort, Kentucky.  I
23  talked to their mayor online a few times.  I approached
24  him, but nothing ever happened there.
25    Q.  Why not?

Page 252

1    A.  I'm not sure, you know.  He said that his
2  people were supposed to already be talking to us.  And
3  the same thing was with Frankfort, Indiana.  They were
4  supposed to send me pictures of this property they were
5  dangling us, and they never did, you know.  I don't
6  know.  Maybe it's a -- I'm a little too crazy for them
7  or something.  I don't know, you know.  You learn to get
8  past there.
9      And I was supposed to come back there and check
10  the place out, and I got sick again.  Couldn't do it.
11  And, you know, so what is going to happen now is my
12  kid's going to go back there and look at it and see what
13  they have in mind when he visits Toledo and my brother
14  in Cleveland here this next spring.
15      But I don't know, you know.  I -- I -- my wife
16  is saying, "No way she's going to live in Indiana or
17  move east of the Nevada line," you know, because she's a
18  West Coast girl.
19    Q.  So are there any current plans to try to locate
20  The Hot Dog Hall of Fame anywhere here in San Diego?
21    A.  No.  No.  In fact, I recently had to turn
22  down -- I'm sorry.  I recently had to turn down an offer
23  from New York City where some friends of ours got
24  this -- it's a park right south of Shea Stadium.  It's a
25  big public park.  And they got the boat, the bicycle and

Page 253

1  the hot dog concession on that and wanted me to come
2  back there, but I can't do that and -- you know.
3  Besides it's winter and there's no business there in
4  that park during the winter, so that was rather
5  pointless.
6    Q.  Okay.
7      (Plaintiffs' Exhibit 20 was marked.)
8      THE WITNESS:  Thank you.
9  BY MR. SCHULTZ:
10    Q.  Exhibit No. 20 is -- is this -- well, it says,
11  "Why we moved to Squarefield."
12    A.  Right.
13    Q.  And part of this is also -- appears to be --
14  well, you tell me.  I mean, the front part of it is "Why
15  we moved to Squarefield."  The last three pages are
16  "WeenieGram Adios," "National Hot Dog Month 2001."
17    A.  That was probably in the wrong section is all
18  that is, the WeenieGram thing.
19    Q.  Okay.  The "Why we moved to Squarefield" is
20  information about a restaurant location that you looked
21  at --
22    A.  Yeah.
23    Q.  -- where?
24    A.  In Suisun.
25    Q.  Okay.  And was this the one where the guy

64 (Pages 250 to 253)

Page 254

1  quoted you a price --
2      A.  Yeah.
3      Q.  -- and then changed the price?
4      A.  Yes.
5      Q.  Okay.  Had the price stayed the same, would you
6  have been able to open that restaurant there?
7      A.  Yes.  And I would be bankrupt now.
8      Q.  Why is that?
9      A.  Because when I lived in Fairfield in the late
10  '50s, early '60s, the two towns were right beside each
11  other, and one was a lot poorer than the other.  And to
12  get over to the Suisun side, you had to walk across a
13  plank across a muddy ditch.  And there was no pavement
14  over there.  The -- you know, it was the wrong side of
15  the tracks.
16      And later Fairfield divided off the freeway
17  there.  You couldn't drive from Fairfield to Suisun
18  unless you got in this big cloverleaf and all that.
19      And this guy here, he'd run this bar to the
20  point of where it was a bunch of drug fiends in there.
21  And they got busted for it several times.  And that was
22  a kiss of death for that.  He was going to lose his
23  license if he didn't sell, which is where we came in.
24      And, you know, it was a beautiful old
25  turn-of-the-century brick building.  I still would love

Page 255

1  to have that, except, you know, it took the City of
2  Suisun probably 15 years to build up the rest of
3  downtown now to where that's a thriving piece of real
4  estate.  And that recently sold for a million dollars,
5  that building.
6      But I'd have starved to death in the meantime
7  waiting for that -- you know, for the locals to catch up
8  with you, you know, because Suisun was 25-, 30,000
9  people.  Fairfield is eighty to a hundred thou, you
10  know.  And you have to look at demographics like that.
11  Like one percent of those people will be your restaurant
12  customers, and that's not a lot of customers.  And, you
13  know, that's, what, 120 a day.  Or was it 1200?
14      Anyway, they don't come by day.  That's just
15  it.  One percent, period, you know.  So I'm glad I
16  didn't do that, though.
17      And then if you notice the shape of the sign
18  there, that's where the logo from the "Uncle Frank Wants
19  You" came from.  That's what first gave me that concept.
20      Q.  Okay.  So the shape of the logo --
21      A.  Yes.
22      Q.  -- that's depicted there gave you the idea for
23  the shape --
24      A.  "Uncle Frank Wants You."  And that's Air Force
25  town and that's where, also, that came from, you know.

Page 256

1      Q.  Okay.  Tell me -- just wrapping up here a
2  little bit -- about your website.
3      How long have you had a website up?
4      A.  At some time before we left Fairfield, we had
5  the start of it.  It was up.  You could get to it, but
6  it was miserable.  It's like I didn't know how to do the
7  left margin in and all that.  And so I had a few
8  pictures, little pictures, little text, and that was it.
9  And I was playing with it and learning as I did it.
10      And then after I got here, we didn't know
11  anybody, so I sat down and spent about a month or so in
12  the computer room and taught myself the rest of HTML to
13  put the thing together.
14      So it was sometime after we first got here in
15  2003 is when the website went into approximately what
16  you see now.  In fact, recently I upgraded it, larger
17  pictures and everything else, because everybody else has
18  high-speed access nowadays.  And so instead of tiny
19  little pictures like that (indicating), you can see some
20  of the things.  Like the Hot Dog Hotline is that long
21  (indicating) across most of the page now.  And it's a
22  beautiful piece, you know.
23      But sometime in 2003 is my best guess.
24      Q.  Was your website taken down for a period?
25      A.  I can't -- I can't remember it being taken

Page 257

1  down.  I'm pretty certain we've been there.
2      Q.  Between the time it started in Fairfield?
3      A.  Oh, yeah.  Oh, yeah.  Without a doubt.  Without
4  a doubt, yeah.  Because it was -- I was disappointed
5  with the whole thing.  And when we moved here, we got
6  new service providers.  We're on about our third service
7  provider here, too.  Now we have Cox high-speed, you
8  know.  And that's been pretty good so far.  And the
9  Wi-Fi has fallen down a couple times.
10      Other than that, I can't complain about Cox as
11  compared to the ones we had in Northern California.  I
12  went through three of those from '95/'96 to '98 or so.
13  I mean, just the whole difference of the professionalism
14  there versus the big Cox thing here.
15      Q.  How long a period of time was your website down
16  between Fairfield and San Diego?
17      A.  It has to be at least maybe a year, maybe more.
18  Somewhere in there.  It's not a long time.  It's just
19  the other one was useless, you know.  I was playing with
20  it is all I was doing.
21      And then after I got here, I got serious.  We
22  got here.  We've rented this house we're in in El Cajon
23  on the 1st of May.  And I had never lived in El Cajon
24  before.  I had lived in Ocean Beach and Pacific Beach.
25  And I thought I'm buying the same thing up there as I

65 (Pages 254 to 257)

Page 258

1  was going to get down here. No.
2      We finally moved in in late May of 2003; and by
3  then, it was a hundred degrees over there, you know. So
4  I basically locked myself in front of the air
5  conditioner and taught myself HTML in the daytime and
6  then go out and run around and do what I had to do at
7  night.
8      You know, so it was right in there. It was in
9  the summer of 2003.
10     Q.  So since that time to the present, the
11  website's been up, correct?
12     A.  Yes. Yes. Yes.
13     Q.  Have you ever monitored to find out how many
14  clicks --
15     A.  Yes.
16     Q.  -- on your website?
17     A.  Yes. I get anywhere from just a hundred to
18  three, four thousand a month. Depends, you know. I go
19  in every once in a while and look. And I don't really
20  care. You know, I'm not really there looking for
21  publicity or anything like that. It's just for those
22  that know who we are.
23     You know, if I refer to something on the
24  website, it's generally good enough that it needs to be
25  seen, you know. And you put it in the newsletter,

Page 259

1  that's one thing. They forget about that. But you put
2  it in the website, it's there 24 hours a day.
3      And that's the main thing. Because a lot of
4  people, I would imagine, they get tired of the
5  newsletter. I go in the "delete" file when it comes in.
6  So if they ever want to look at it again, there it is,
7  you know. If you want to get back in touch with me,
8  there's my e-mail address. There's my phone.
9      Q.  Okay. So your intended audience in terms of
10  who you're hoping the website is reached by are the, you
11  know, hot dog lovers that typically you already know?
12     A.  Generally, people we already know, you know,
13  'cause, like I say, we've been stolen from other times
14  and, you know, I don't want people knowing us there. I
15  want people that I want to know it's there there and
16  that's it.
17     You know, it never has been, like I say,
18  registered with the search engines or any of that stuff.
19  You know, I don't care. You know, I'm not going to get
20  this thing together by somebody seeing the website and
21  going, "Oh, yeah. Why don't I give you a check." It
22  doesn't happen like that, you know.
23     And, you know, it's -- it's -- this is the one
24  that before you actually get in business website, you
25  know. This is the business card thing for the people I

Page 260

1  want to see it.
2      And, you know, it used to be I didn't have the
3  website and I'd try to tell people everything or send
4  them 30 to 60 e-mails, and that doesn't work. You know,
5  you alienate people. Especially back then when people
6  had slower download rates. Now, anybody can go and take
7  their time and look at it. If they want to look at it
8  at 2:00 in the morning, I don't care, you know.
9      Q.  Okay. Mr. Webster, have we discussed
10  everything that you do under the auspices of The Hot Dog
11  Hall of Fame?
12     A.  For the most part. I told you about the
13  National Hot Dog thing, going out and tipping big. And
14  we do National Frankfurters and Sauerkraut Week things
15  on occasion, you know. They keep moving that around to
16  where I've lost track of it.
17     The -- what do you call it? The National Hot
18  Dog and Sausage Council. They have highjacked that.
19  That's their holiday now, and it floats all over.
20  Sometimes it's in the middle of National Hot Dog Month.
21  They have even declared National Hot Dog Day.
22     We've also had things like people that are in
23  other parts of the country and they want to try our hot
24  dogs. So we used to send them stuff in dry ice, you
25  know, but now you can't do it to anywhere -- like we

Page 261

1  have a friend in England. For six years we've been
2  trying to get him, since September 11 -- so that would
3  be eight years now. We've been trying to get him hot
4  dogs over there.
5      I had a buddy in the Air Force, and he used to
6  fly over there twice a year, but now he flies to
7  Afghanistan and Iraq probably ten times a year. Hadn't
8  seen England since, you know.
9      Q.  Anything else that you do as The Hot Dog Hall
10  of Fame?
11     A.  Well, like I say, The Frankie Awards, all that
12  stuff, you know. It's -- almost everything happens in
13  July in National Hot Dog Month. The rest of the time,
14  it's kind of, well, you keep in touch with everybody and
15  they send you e-mails, stuff, and you put it on the
16  newsletter and that sort of thing.
17     But, you know, it's basically on auto stick,
18  all but a month or so of the year. We call it sausage
19  season because it starts in June. Like you will start
20  seeing all of the new sausage and hot dog commercials in
21  June or so, you know, and so we have to, of course,
22  catch all of those. And we try to tape them sometimes,
23  but I'm past that now. I don't care anymore. It's a --
24  you know, besides, everybody's got DVDs and, you know,
25  tapes are a pain, you know, so I don't do that anymore,

66 (Pages 258 to 261)

Page 262

1  either.
2      There are a lot of other little things like
3  that that we still keep our eyes out for. You know, you
4  get, like, you know, e-cards. There's a bunch of those
5  out there, hot dog wise. And so we'll flip those around
6  when we find them. There's Happy Halloweenie. They do
7  that every year. Somebody does one of those. That's
8  kind of silly, but, you know.
9      And then, let's see, Wiener Wonderland. That's
10 our Christmas card thing. You know, somebody out there
11 invariably does an e-card with that on it, you know.
12 And so we'll flip that around.
13     But, basically, it's largely ceremonial and not
14 much to it except the National Hot Dog Month thing.
15     Q. Okay. So is it fair to say that the vast bulk
16 of your activities, maybe even 90 percent of them, take
17 place in the month of July each year?
18     A. Not 90. More like 70, maybe. Maybe. You
19 know, sometimes it's more. Sometimes it's less.
20     We used to do the cookouts, plus we'd taste new
21 places. And, you know, one month way back when, we
22 tried to eat a hot dog every single day, National Hot
23 Dog Month. Stopped about the 15th or 16th. A friend of
24 ours actually got all the way through it. And so, you
25 know, if somebody does that sort of thing, we will

Page 263

1  report it. But, you know, now we'll go out and eat hot
2  dogs four or five or six times during National Hot Dog
3  Month and, you know, like I say, tip really well.
4      You know, if there is a grand opening to be had
5  or something like that, we'll go do that. But, you
6  know, it's -- the older you get, the less you can do.
7  And I'm at the point now of -- I'd decided, you know,
8  the Woody Weenie Wagon would have been my last
9  Weeniemobile as far as trying to sell off of. And I
10 don't even have the energy for that. From day one, it
11 was, "Well, somebody else is going to have to drive this
12 thing because I can't take the heat in the summer here,"
13 you know.
14     But we're -- you know, I was -- you know, I
15 can't do a cart because of the outdoor thing. And
16 it's -- I don't know. All that's left is The Hot Dog
17 Hall of Fame, you know. That's it.
18     MR. SCHULTZ: Okay. All right. Thank you,
19 Mr. Webster. I don't have any further questions for you
20 today.
21     There's some documents that I'm going to want
22 you to try and see if you can find.
23     There's also something I -- a statement I'm
24 going to make on the transcription record, but we don't
25 have to have it as part of the video. Okay?

Page 264

1      THE VIDEOGRAPHER: This marks the end of
2  Videotape No. 3. This is the conclusion of the
3  deposition of Frank Webster.
4      Going off the record.
5      The time is 3:08 p.m.
6  BY MR. SCHULTZ:
7      Q. And now, Mr. Webster, I'm going to put this
8  statement on the record, and I am doing it for a couple
9  of reasons.
10     No. 1, so that we have a record of it. And the
11 statement is going to be that this is what is known
12 under the Federal Rules of Evidence as a settlement
13 discussion. Okay?
14     A. All right.
15     Q. Which means the fact that you and I are about
16 to talk about this --
17     A. Right.
18     Q. -- doesn't come into evidence.
19     A. Got you.
20     Q. And it doesn't -- and it actually doesn't get
21 repeated to the judge, even.
22     A. Got you.
23     Q. Now, I do not have any authority to make a
24 settlement offer on behalf of Mr. Schussler.
25     A. Okay.

Page 265

1      Q. However, I will speak with him again, but I
2  want to -- I just want to share with you what I believe
3  to be -- well, how I size everything up here. Okay?
4      A. Yes.
5      Q. Based on the testimony that I've heard today, I
6  don't think this case is going to get to trial. Okay?
7  I honestly believe that we will seek some summary
8  judgment and we'll get it.
9      Now, when we were here before for the early
10 neutral evaluation, I don't know if we got to the point
11 of Mr. Schussler making you a settlement offer. I
12 believe he did. And at that time, he was willing to pay
13 you up to maybe as high as $75,000 to let this thing go
14 away and for you to not contest his right to open his
15 restaurants. And he, in return, would not make any
16 claims against you or try to keep you from either
17 opening a restaurant yourself or anything like that.
18     At the time, that wasn't something that you
19 were interested in doing. And I don't know, frankly, if
20 that's still available or not. But here's my suggestion
21 and the thing, I guess, I want to put on the record:
22     Mr. Schussler is not a vindictive man. He's
23 not interested in -- he doesn't particularly like being
24 involved in litigation. He doesn't really want to have
25 to spend the time and money for me to bring a motion for

67 (Pages 262 to 265)

Page 266

1  summary judgment and travel back out here and argue it.
2      So I suspect that if you are willing to
3  entertain a notion like we've already talked about, that
4  I can probably get Mr. Schussler to make an offer. And
5  I would strongly advise you -- it's not my place to
6  advise you. I understand that. But you're also acting
7  as your own lawyer, so I get to talk to you like you're
8  a lawyer as well. I would strongly advise you to think
9  long and hard about that and, you know, maybe you can
10 walk out of here with some money, anyway.
11     So do you want me to go back to Mr. Schussler
12 and see if he's willing to offer some money?
13     A.  I would be remiss not to listen.
14     Q.  Okay. Well, I will do that.
15         I can pretty much guarantee you that this will
16 be, I think, the last time that he's going to be willing
17 to do that.
18         So I'll do that. I will communicate that to
19 you, and we'll see if that bears fruit. Okay?
20     A.  Worth a shot.
21     Q.  All right. Well, I appreciate your patience
22 and your, you know, sitting here today. I know it's not
23 fun.
24     A.  I'm better now, now that's it's over.
25     Q.  Isn't that always the way?

Page 267

1      A.  Yeah. Well, I don't have the nervous system I
2  used to have. This -- I haven't slept or anything in
3  the last day or so, you know. So glad it's over.
4      Q.  I gave up sleeping about three years ago.
5      A.  My father, when he died at 63 --
6      COURT REPORTER: Would you like this to be on
7  the record?
8      MR. SCHULTZ: No.
9      (Whereupon, at 3:12 p.m., the deposition
10     was adjourned.)
11
12 I, J. Frank Webster, declare under penalty of perjury
13 under the laws of the State of California that the
14 foregoing is true and correct; that I have read my
15 deposition and have made the necessary corrections,
16 additions or changes to my answers I deem necessary.
17
18     Executed on this_____day of_____,
19 2008.
20
21
22     _____
            J. Frank Webster
23
24
25

Page 268

1  I, BRIDGET L. MASTROBATTISTA, Certified Shorthand
2  Reporter for the State of California, do hereby certify:
3
4  That the witness in the foregoing deposition was by me
5  first duly sworn to testify to the truth, the whole
6  truth and nothing but the truth in the foregoing cause;
7  that the deposition was taken by me in machine shorthand
8  and later transcribed into typewriting, under my
9  direction, and that the foregoing contains a true record
10 of the testimony of the witness.
11
12 Dated:  This 9th day March, 2008, at San Diego,
13 California.
14
15
16
17
18     _____
           BRIDGET L. MASTROBATTISTA
19         C.S.R. NO. 7715, RPR
20
21
22
23
24
25

68 (Pages 266 to 268)

1  James P Collins
   Cotkin & Collins
   200 West Santa Ana Blvd. Suite 800
2  PO Box 22005
   Santa Ana, Ca. 92702-2005
3
   David T Scholtz
4  Maslon, Edelman, Borman & Brand
   3300 Wells Fargo Center
5  90 South Seventh Street
   Minneapolis, Minnesota 55402-4140
6

7

8                    United States District Court

9                    Southern District of California

10
   Steven Schussler and Schussler Creative, Inc,      Case No.: No. 07 CV 2016IEG
11
              Plaintiff,                               Defendant's Production of Documents
12
                  vs.
13
   J Frank Webster, Mr. Hot Dog, Uncle Frank,
14
              Defendant
15

16

17  **REQUEST NO.1:**

18      As per our agreement during the telephone conference of 13 February 2008, we are submitting 15 of

19  approximately 80 issues of The Frankfurter Chronicles (the Newsletter with Relish).

20      Eight have been transmitted digitally via email and there is a second, printed batch attached to this

    document of approximately 7 more issues (No. 1, 2, 7, 12, 15, 22 and 26).
21
        Additionally, we have submitted approximately 14 out of close to 200 WeenieGrams, also via email
22
    (there was never a print version of them), further buttressing our rights to our own concepts and names.
23
        Finally, we've also attached a Hot Diggidy Dollar from our time at Hot Diggidy Dogs (the early
24
    80's), imprinted with The Hot Dog Hall Of Fame's Official Seal showing our continuous use of the
25
    concept and name in conjunction with our other hot dog businesses throughout the entire 29 years (since
26
    we came up with it in the late 70's). It has been attached to our printed response and you will receive it in
27
    the mail soon along with the print issues of the newsletter.
28

EXHIBIT
1016
Webster

-1-

1    Email portions of this are in the messages titled REQUEST NO.1 – The Frankfurter Chronicles and

2    REQUEST NO. 1 – WeenieGrams

3

4    REQUEST NO. 2:

5        Regarding Plaintiff's request for communication regarding our plans to develop an organization under

6    the name of The Hot Dog Hall Of Fame, please see the aforementioned Newsletters and WeenieGrams

7    as well as the email (also transferred digitally as per our agreement).

8        It will be titled "REQUEST NO. 2 - About our plans to build The Hot Dog Hall Of Fame" which

9    contains an excerpt from our web site and an older message about why we moved to Fairfield.

10       As stated previously, our plans have been consistent and persistent since the late 70's.

11       Also see "REQUEST NO. 2 - Newspaper and magazine articles about us" sent via email

12

13   REQUEST NO. 3:

14       All correspondence between us and all of the others regarding this situation with the Plaintiff has been

15   deleted as the restraining order explicitly forbade me in contacting anyone else but I don't deny a thing.

16       It was a stock message and I simply forwarded it to everyone when another web site popped up touting

17   Mr. Schussler's Hot Dog Hall Of Fame and you very likely already have a copy of it.

18       I'll forward it as REQUEST NO. 3 - Stock Message.

19

20   REQUEST NO. 4:

21       We had briefly considered filing an application for a trademark recently but decided it could wait until

22   this matter has been resolved by the court as it certainly would not change Plaintiff's actions against us at

23   this time.

24

25   REQUEST NO. 5:

26       All documents relied upon by me in defense of this matter are the 15 issues of newsletter, the 14

27   WeenieGrams and the Hot Diggidy Dollar already mentioned and other documents already submitted.

28

-2-

**REQUEST NO. 6:**

There are NO documents relating to the sale of the collection to one of our long term supporters. We have known each other for many, many years, we respect each other as gentlemen, we trust each other with our lives and a good, firm hand shake is all that is necessary.

**REQUEST NO. 7:**

Other than the Cease & Desist demand letters, there are NO documents which I base my assertion the "Mr. Schussler is a liar, thief and con man" on.

The jury will decide that matter based on overwhelming evidence of our past 30 years of doing this, the credibility of the witness to the meeting Plaintiff and I had at Fisherman's Wharf and the actions of Plaintiff and his EMPLOYEES in concert with the suspicious timing of these matters.

Additionally, I have located a document about our initial approach to Mr. Schussler in our files and will forward it to Plaintiff's attorneys via email.

It is titled **REQUEST NO. 7 - First Contact: 29 April 2000.**

Note that this date is slightly before the Grand Opening of the Rainforest Café at Fisherman's Wharf).

It also specifically mentions **The Hot Dog Hall Of Fame** by name, both in the text and along the bottom of the page (our address at the time) and describes our concept in rough terms (Hall Of Fame / Museum / Restaurant / Gallery & Gift Shop), etc.

**REQUEST NO. 8:**

At the moment, we are still putting this document together from a variety of sources (personal journals, records, etc) and hope to complete it in the near future.

**REQUEST NO. 9:**

We have been unable to find anything about our initial meeting at Fisherman's Wharf (other than the witness mentioned in our list of witnesses) but I did make comment to at least several of our friends (and family) at the time as I found it puzzling more than anything else.

-3-

73

1   I had admired Mr. Schussler until he started telling me he was going to take our concept and do it

2   without us and was in shock from the apparent disconnect from what I had thought might be a good

3   meeting and what he actually said.

4   I may have also sent a few of our friends and relatives an email message about it but have not found it

5   so far after going through most of the 700 diskettes from that time. I do know that potential witnesses

6   such as **Chris Masterson, Darla** and **Moon Webster** can testify to my state of mind after that meeting.

7   Regardless, I am content to let the rest of the facts speak for themselves when we go to trial but will

8   continue to search for it.

9

10  **REQUEST NO. 10:**

11  The only commercial usage of the term **"The Hot Dog Hall Of Fame"** is in our new product line

12  which you can now see on our web site.

13  We've developed a line of T-shirts and another of baseball caps so far, and we are selling copies of a

14  hot dog book and a movie; we have more designs in the works and soon hope to add a number of novelty

15  hot dog items to our online store.

16

17  **REQUEST NO. 11:**

18  As per our agreement, I am sending Plaintiff's attorneys an email to show our display at Hall Of Fame

19  Hall Of Fame and a brief note about an exhibition we had started to put together at **Grossmont College**

20  (and then abandoned when we realized Mr. Schussler was back at it again, attempting to misappropriate

21  everything we had done for the past 30 years and then suing us on top of it all).

22  The message is titled **REQUEST NO. 11 - Hall Of Fame Hall Of Fame.**

23  There is also an excerpt from our web site in this file as well as few newspaper articles about the show

24  at that time (all told, there were approximately 50 articles about that show, in newspapers all across the

25  US, including a feature on CNN and other TV news programs.

26  We also did a segment for a TV show from **OPB** (Oregon Public Broadcasting) called **"Neat Stuff"**.

27

28  **REQUEST NO. 12:**

-4-

74

1    Again, I no longer specifically have messages to anyone in particular regarding this case, just the

2    generic one I sent to all of them and I never sent a message to Mr. Claflin specifically (it was sent to

3    info@reddevelopment.com or something like that).

4    And like I mentioned in my response to Request No. 9, I have been unable to locate those (60) email

5    messages and will continue to search for them. I can tell you their contents though, as before I had learned

6    to build a web site, our usual practice was to show a little of the collection, some of our Great American

7    Hot Dog Machines, discuss our search for The World's Best Hot Dogs, etc, stuff that you can see on the

8    web site now.

9    I also told Plaintiff about **Hamburger Harry** of **The International Hamburger Hall Of Fame** as

10   Harry and I had recently discussed putting both of our fairly comprehensive fast food art collections under

11   the same roof (here in San Diego) to make it easier for us to raise the money we needed to give them the

12   permanent homes that they deserve, so that the entire world can see and enjoy them.

13   And I showed Plaintiff a few things about Hamburger Harry's collection as well.

14   It wasn't these 60 email messages content so much as it establishes when we introduced ourselves to

15   Plaintiff and that we had shown him a lot of our work.

16   Unfortunately, these 60 messages may have gotten deleted when we bought this computer last Spring

17   as I may have looked at them and decided that since I hadn't heard of Plaintiff attempting to usurp our

18   rights to our own concepts and names for the past 6 years, they were no longer important (my best guess).

19   I am not 100% sure if that is what happened and they could also be on one of our Zip disks from that

20   period which has been corrupted and I can not open it.

21   I've sent the disk to a computer expert to see if he can fix it (it happened before, a common problem

22   with Zip drives, especially the older ones) and they call it "the click of death".

23

24   **REQUEST NO. 13:**

25   The documents mentioned on our web site are the 2 Cease & Desist letters we sent to Mr. Rittenberg

26   and Mr. Schussler and I will forward them to Plaintiff's attorneys although they should have them now.

27   This email will be titled: REQUEST NO. 13 – Cease & Desist letters.

28

-5-

75

**REQUEST NO. 14:**

The 6 other problems we have had over the years, which I mentioned in Judge Battaglia's chambers never got as far as court and to a person, they either abandoned their attempts to take our intellectual property or apologized and moved on to find their own concepts or names.

**REQUEST NO. 15:**

I no longer have any of the correspondence between Mr. Schussler and myself (other than the first letter to introduce ourselves to him and both Cease & Desists letters).

I didn't even know we had that first letter until I went through the old diskettes this last week.

And as I methodically clean up my computer on a daily basis and once this started, I realized Mr. Schussler would keep such a file himself.

**REQUEST NO. 16:**

As I mentioned in the telephone conference on 8 February 2008, I no longer have anything from my days in the military as it got rained on when our garage roof leaked in the winter of 1975, got covered in black mold and I threw it all away. It's been so long that I no longer remember my military serial number either, and, like the Judge agreed, it's not really relevant as it happened years before I decided to go into the hot dog business.

Dated this 18th day of February, 2008

J. Frank Webster
President
The Hot Dog Hall Of Fame
1502 Via Elisa
El Cajon, Ca. 92021

-6-



1
James P Collins
Cotkin & Collins
200 West Santa Ana Blvd. Suite 800
2
PO Box 22005
Santa Ana, Ca. 92702-2005
3

4
David T Schultz
Maslon, Edelman, Borman & Brand
3300 Wells Fargo Center
5
90 South Seventh Street
Minneapolis, Minnesota 55402-4140
6

7
                    United States District Court
8
                  Southern District of California
9

10
Steven Schussler and Schussler Creative,       Case No.: No. 07 CV 2016IEG

11
Inc,                                           Defendant's Initial Rule 26 Disclosures

12
            Plaintiff

13
              vs.

14
J Frank Webster, Mr. Hot Dog, Uncle Frank,

15
            Defendant

16

17
For disclosure under Federal Rule of Civil Procedure 26, Defendant J Frank Webster

18
states the following:

19
A. Fact Witnesses:

20
    The following individuals are believed to have discoverable information regarding

21
the facts alleged in Defendant's defense:

22

23
1. J Frank Webster

24
We have been working as The Hot Dog Hall Of Fame since at least 1 June 1978 and have

25
continuously used and defended the concept and name since that time.

26

27
2. Al Newman (Milpitas, Ca.)

28

EXHIBIT
2 mill
Webster

-1-

Al and I have known each other since approximately 1982. Although he's not a regular contributor or newsletter reader, he knows what we do and has seen it all, for at least the last 25 years or so.

His email address: al.notax.newman@sbcglobal.net

His phone number: (408) 263-4150

**3. Al Bernal (Campbell, Ca.)**

Al and I have known each other since 1983 and although he isn't a contributor or reader of the newsletter, he knows what we have been doing since way back when...

His email address: PH2OCRAFT@gmail.com

**4. Arthur Lechuga (Santa Clara, Ca.)**

Art was our cook at Hot Diggidy Dogs in Santa Clara in 1983 and will be glad to tell you how we've spent years doing this. Art doesn't have internet access, etc but his address and phone number follow:

Art Lechuga
1505 #211 Agnew Road
Santa Clara, Ca. 95054-1702

Ph: (408) 980-8982

**5. Captain Ron Russell (The Bahamas)**

Ron and I have worked together since 1985 and he is an occasional contributor to **The Frankfurter Chronicles.**

His email address: captainron@batelnet.bs

**6. Chris Masterson (Seattle, Washington)**

I've known Chris since 1973 and he discovered the 3 clone web site addresses registered to Plaintiff's employee Rittenberg. Chris is a Frankie recipient, our representative in the Pacific Northwest and long term contributor to **The Hot Dog Hall Of Fame** and **The Frankfurter Chronicles** (since the very beginning) and he has seen it all.

His email address: Chris@ChrisMasterson.com

His phone number: (425) 488-4072

**7. Darla J Webster (Mrs. Uncle Frank)**

We've been married since 1973. She is the biggest contributor to **The Hot Dog Hall Of Fame** and has 2 Frankie Awards for Outstanding Contributions to Hot Dog History to show for it.

Her email address: DarlaWebster@Cox.Net

Her web site: www.DarlaWebster.com

2

**78**

**8. James D Webster (Cleveland Heights, Ohio)**

Jim is my younger brother and he is a long term contributor to **The Hot Dog Hall Of Fame** (and **The Frankfurter Chronicles**) and was awarded a **Frankie** for his numerous generous contributions over the years.

His email address: OneCocaCola@Adelphia.Net

His phone number: (408) 476-4816

**9. John D Horsley (Florida)**

John was my room mate in college and we've known each other since that time (1967) and he's seen it all as well. He's also a contributor to **The Hot Dog Hall Of Fame** and **The Frankfurter Chronicles**.

His email address: johnd162@juno.com

**10. Moon S Webster**

Moon is our only child and was born in 1974. He's also a **Frankie** recipient for his numerous generous donations to the collection over the years and has seen it all, since Day One.

His email address: msw_66@yahoo.com

His cell phone number: (619) 368-8307

**11. Terry Axelson (Sunnyvale, Ca.)**

We've known Terry since approximately 1980 and he was one of the first **Frankie** recipients (1982) for his creation of **The Hot Dog Hot Line**, our hot dog shaped telephone. He's seen us work on this project since at least that time. Terry doesn't have a computer but can be reached at (408) 733-9478. Evenings are best as he's a very busy electrical contractor.

**12. Tammy Kaiser (Dixon, California)**

We've known Tammy since about 1992. She was instrumental in the creation of **The Frankfurter Chronicles** (The Newsletter with Relish) and helped us get online in 1996. She is also a **Frankie** recipient for her many, many generous contributions to both **The Frankfurter Chronicles** and **The Hot Dog Hall Of Fame**.

Her email address: tk2000@pacbell.net

**13. Wes Evans (Benicia, California)**

We've known Wes since approximately 1990, shortly after we moved to Fairfield and he can tell you that we performed all of the duties of **The Hot Dog Hall Of Fame** during those years.

His email address: WESLIO@peoplepc.com

**14. Ray Nelson (Georgia)**

We've known Ray since approximately 1984 as he was a neighbor when we were in Silicon Valley. Ray wrote us a hot dog jingle (and won a Frankie for his efforts). He's also participated in a number of our official ceremonies.

His email address: Guitarsonwheels@aol.com

**15. Rene King (Fairfield, Ca.)**

Rene was our boss (both the wife and I) when we moved to Fairfield in **1988** and worked for him at Denny's (he was a manager). More importantly, he worked for Plaintiff at **Rainforest Cafe at the Fisherman's Wharf** location and witnessed Plaintiff and me meeting at the Grand Opening in the spring of **2000**.

His email address: SaM2855King@aol.com

**B: Description by Category of Documents Relevant to the Disputed Facts that are in Defendant's Possession:**

1. Thirteen plus years of **The Frankfurter Chronicles** (The Newsletter with Relish) on file in both print and digital formats which substantiate the width and breadth of our involvement with **The Hot Dog Hall Of Fame.**

2. Approximately 200 **WeenieGrams** further documenting our 30 years as **The Hot Dog Hall Of Fame.**

3. Documents previously submitted to establish our claim on the concept and name all the way back to at least **1978.**

**C. Damage Estimates:**

Defendant requests general, special and exemplary damages. Plaintiff's reckless actions have cost the Defendant approximately $50,000 to date, loss of employment (for Darla), our imminent bankruptcy, possible IRS default, and should Plaintiff prevail in this matter, long term losses possibly in the millions of dollars. This was to have been our way into retirement eventually as we have no life savings, any real assets, etc.

It has also cost us to defend ourselves and we are keeping track of expenses incurred, we are keeping a log of what we spent, will get copies of receipts and other related expenses soon.

Then there are the impacts this has had (and continues to have) on my health (hypertension, insomnia, eye strain).

**D. Insurance Agreement:**

Not applicable

**E: Right to Supplement:**

The above disclosures are based on the information readily available to Defendant who has not fully completed his investigation of the facts of this case and reserves the right to amend, change or supplement the above information as required by Federal Rules of Civil Procedure and by any other order entered by the court.

Dated this 18th day of February, 2008

-4-

**80**

J Frank Webster
President
The Hot Dog Hall Of Fame
1502 Via Elisa
El Cajon, Ca. 92021

5

James P Collins
Cotkin & Collins
200 West Santa Ana Blvd. Suite 800
PO Box 22005
Santa Ana, Ca. 92702-2005

David T Schultz
Maslon, Edelman, Borman & Brand
3300 Weiss Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-4140

United States District Court

Southern District of California

Steven Schussler and Schussler Creative, Inc,

Plaintiff,

vs.

J Frank Webster, Mr. Hot Dog, Uncle Frank,

Defendant

Case No.: No. 07 CV 2016IEG

Defendant's Production of Documents

## REQUEST N0.1:

As per our agreement during the telephone conference of **13 February 2008**, we are submitting 15 of approximately **80** issues of **The Frankfurter Chronicles** (the Newsletter with Relish).

Eight have been transmitted digitally via email and there is a second, **printed batch attached** to this document of approximately **7** more issues (No. 1, 2, 7, 12, 15, 22 and 26).

Additionally, we have submitted approximately **14** out of close to **200 WeenieGrams**, also via email (there was never a print version of them), further buttressing our rights to our own concepts and names.

Finally, we've also attached a **Hot Diggidy Dollar** from our time at **Hot Diggidy Dogs** (the early 80's), imprinted with **The Hot Dog Hall Of Fame's Official Seal** showing our continuous use of the concept and name in conjunction with our other hot dog businesses throughout the entire **29** years (since we came up with it in the late 70's). It has been attached to our printed response and you will receive it in the mail soon along with the print issues of the newsletter.

1   Email portions of this are in the messages titled **REQUEST NO.1 – The Frankfurter Chronicles** and

2   **REQUEST NO. 1 – WeenieGrams**

3

4   **REQUEST NO. 2:**

5      Regarding Plaintiff's request for communication regarding our plans to develop an organization under

6   the name of **The Hot Dog Hall Of Fame**, please see the aforementioned Newsletters and WeenieGrams

7   as well as the email (also transferred digitally as per our agreement).

8      It will be titled **"REQUEST NO. 2 - About our plans to build The Hot Dog Hall Of Fame"** which

9   contains an excerpt from our web site and an older message about why we moved to Fairfield.

10     As stated previously, our plans have been consistent and persistent since the late **70's**.

11     Also see **"REQUEST NO. 2 - Newspaper and magazine articles about us"** sent via email

12

13  **REQUEST NO. 3:**

14     All correspondence between us and all of the others regarding this situation with the Plaintiff has been

15  deleted as the restraining order explicitly forbade me in contacting anyone else but I don't deny a thing.

16     It was a stock message and I simply forwarded it to everyone when another web site popped up touting

17  Mr. Schussler's Hot Dog Hall Of Fame and you very likely already have a copy of it.

18     I'll forward it as **REQUEST NO. 3 - Stock Message.**

19

20  **REQUEST NO. 4:**

21     We had briefly considered filing an application for a trademark recently but decided it could wait until

22  this matter has been resolved by the court as it certainly would not change Plaintiff's actions against us at

23  this time.

24

25  **REQUEST NO. 5:**

26     All documents relied upon by me in defense of this matter are the 15 issues of newsletter, the 14

27  WeenieGrams and the Hot Diggidy Dollar already mentioned and other documents already submitted.

28

**REQUEST NO. 6:**

There are NO documents relating to the sale of the collection to one of our long term supporters. We have known each other for many, many years, we respect each other as gentlemen, we trust each other with our lives and a good, firm hand shake is all that is necessary.

**REQUEST NO. 7:**

Other than the Cease & Desist demand letters, there are NO documents which I base my assertion the "Mr. Schussler is a liar, thief and con man" on.

The jury will decide that matter based on overwhelming evidence of our past **30** years of doing this, the credibility of the witness to the meeting Plaintiff and I had at Fisherman's Wharf and the actions of Plaintiff and his EMPLOYEES in concert with the suspicious timing of these matters.

Additionally, I have located a document about our initial approach to Mr. Schussler in our files and will forward it to Plaintiff's attorneys via email.

It is titled **REQUEST NO. 7 - First Contact: 29 April 2000.**
Note that this date is slightly before the Grand Opening of the Rainforest Café at Fisherman's Wharf).

It also specifically mentions **The Hot Dog Hall Of Fame** by name, both in the text and along the bottom of the page (our address at the time) and describes our concept in rough terms (Hall Of Fame / Museum / Restaurant / Gallery & Gift Shop), etc.

**REQUEST NO. 8:**

At the moment, we are still putting this document together from a variety of sources (personal journals, records, etc) and hope to complete it in the near future).

**REQUEST NO. 9:**

We have been unable to find anything about our initial meeting at Fisherman's Wharf (other than the witness mentioned in our list of witnesses) but I did make comment to at least several of our friends (and family) at the time as I found it puzzling more than anything else.

-3-

**84**

1   I had admired Mr. Schussler until he started telling me he was going to take our concept and do it

2   without us and was in shock from the apparent disconnect from what I had thought might be a good

3   meeting and what he actually said.

4   I may have also sent a few of our friends and relatives an email message about it but have not found it

5   so far after going through most of the **700** diskettes from that time. I do know that potential witnesses

6   such as **Chris Masterson, Darla** and **Moon Webster** can testify to my state of mind after that meeting.

7   Regardless, I am content to let the rest of the facts speak for themselves when we go to trial but will

8   continue to search for it.

9

10  **REQUEST NO. 10:**

11  The only commercial usage of the term **"The Hot Dog Hall Of Fame"** is in our new product line

12  which you can now see on our web site.

13  We've developed a line of T-shirts and another of baseball caps so far, and we are selling copies of a

14  hot dog book and a movie; we have more designs in the works and soon hope to add a number of novelty

15  hot dog items to our online store.

16

17  **REQUEST NO. 11:**

18  As per our agreement, I am sending Plaintiff's attorneys an email to show our display at Hall Of Fame

19  Hall Of Fame and a brief note about an exhibition we had started to put together at **Grossmont College**

20  (and then abandoned when we realized Mr. Schussler was back at it again, attempting to misappropriate

21  everything we had done for the past **30** years and then suing us on top of it all).

22  The message is titled **REQUEST NO. 11 - Hall OF Fame Hall Of Fame.**

23  There is also an excerpt from our web site in this file as well as few newspaper articles about the show

24  at that time (all told, there were approximately **50** articles about that show, in newspapers all across the

25  US, including a feature on **CNN** and other TV news programs.

26  We also did a segment for a TV show from OPB (Oregon Public Broadcasting) called "Neat Stuff".

27

28  **REQUEST NO. 12:**

-4-

*9*

1    Again, I no longer specifically have messages to anyone in particular regarding this case, just the

2    generic one I sent to all of them and I never sent a message to Mr. Claflin specifically (it was sent to

3    info@reddevelopment.com or something like that).

4    And like I mentioned in my response to Request No. 9, I have been unable to locate those (60) email

5    messages and will continue to search for them. I can tell you their contents though, as before I had learned

6    to build a web site, our usual practice was to show a little of the collection, some of our Great American

7    Hot Dog Machines, discuss our search for **The World's Best Hot Dogs**, etc, stuff that you can see on the

8    web site now.

9    I also told Plaintiff about **Hamburger Harry** of **The International Hamburger Hall Of Fame** as

10   Harry and I had recently discussed putting both of our fairly comprehensive fast food art collections under

11   the same roof (here in San Diego) to make it easier for us to raise the money we needed to give them the

12   permanent homes that they deserve, so that the entire world can see and enjoy them.

13   And I showed Plaintiff a few things about Hamburger Harry's collection as well.

14   It wasn't these **60 email** messages content so much as it establishes when we introduced ourselves to

15   Plaintiff and that we had shown him a lot of our work.

16   Unfortunately, these **60** messages may have gotten deleted when we bought this computer last Spring

17   as I may have looked at them and decided that since I hadn't heard of Plaintiff attempting to usurp our

18   rights to our own concepts and names for the past **6** years, they were no longer important (my best guess).

19   I am not 100% sure if that is what happened and they could also be on one of our Zip disks from that

20   period which has been corrupted and I can not open it.

21   I've sent the disk to a computer expert to see if he can fix it (it happened before, a common problem

22   with Zip drives, especially the older ones) and they call it "the click of death".

24   **REQUEST NO. 13:**

25   The documents mentioned on our web site are the 2 Cease & Desist letters we sent to Mr. Rittenberg

26   and Mr. Schussler and I will forward them to Plaintiff's attorneys although they should have them now.

27   This email will be titled: **REQUEST NO. 13 - Cease & Desist letters.**

**REQUEST NO. 14:**

The 6 other problems we have had over the years, which I mentioned in Judge Battaglia's chambers never got as far as court and to a person, they either abandoned their attempts to take our intellectual property or apologized and moved on to find their own concepts or names.

**REQUEST NO. 15:**

I no longer have any of the correspondence between Mr. Schussler and myself (other than the first letter to introduce ourselves to him and both Cease & Desists letters).

I didn't even know we had that first letter until I went through the old diskettes this last week.

And as I methodically clean up my computer on a daily basis and once this started, I realized Mr. Schussler would keep such a file himself.

**REQUEST NO. 16:**

As I mentioned in the telephone conference on **8 February 2008**, I no longer have anything from my days in the military as it got rained on when our garage roof leaked in the winter of **1975**, got covered in black mold and I threw it all away. It's been so long that I no longer remember my military serial number either, and, like the Judge agreed, it's not really relevant as it happened years before I decided to go into the hot dog business.

Dated this 18th day of February, 2008

_____

J Frank Webster
President
The Hot Dog Hall Of Fame
1502 Via Elisa
El Cajon, Ca. 92021

-6-

**87**

**United States District Court**

**Southern District of California**

FILED

'07 DEC -7  AM 10: 16

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT CALIFORNIA

Steven Schussler and Schussler Creative, Inc,

    Plaintiff,

      vs

J Frank Webster, Mr. Hot Dog, Uncle Frank,

    Defendant

Response to: Summons in a Civil Action

Case No. 07 CV 2016IEG    (r

                    DEPUTY

Complaint for Monetary Damages (Tort),
Injunctive Relief; Demand For Jury

Answer

## The Parties

4. Whether we are currently operating a business using the hot dog collection or currently selling anything is absolutely none of Plaintiff's business. And it is not a requirement in seeking a Trademark according to the US Patent & Trademark Office.

Registering a Trademark isn't necessary either if you have used the Trademark all along, which we have, and which Mr. Schussler is well aware of (**Exhibit 1**).

And we do and have operated a number of hot dog businesses in relation to our collection, yet again, none of Mr. Schussler's business.

We have spent 31 years of our lives in preparing to build our combination restaurant, museum, hall of fame, gallery and gift shop, and as we have not yet raised the money, we are not open to the public, again, none of plaintiff's business (**Exhibit 2**).

Finally, we no longer own the collection, the related projects (Lamborweenie, The Great American Hot Dog Machines, The Woodie Weenie Wagon, our newsletter, blogs, archives and files or any of the other properties accrued through our efforts in this endeavor as they have all been sold to a long term supporter, who wishes to remain anonymous, for their safekeeping, as much of this world class collection was donated by several hundred contributors and it really belongs to all of them.

EXHIBIT
3    184
Webster

PENGAD 800-631-6989

-1-

### Factual Background

9. WE have been developing our concept since at least 1978 (**Exhibit 3**) and plan on opening 1 (**One**) outlet, period.

13. In fact, we have yet to see this message (Schussler's Cease & Desist letter or any thing else from his attorneys) as we do not open emails from people we do not know.

It may be in our spam file (unopened) and if we find it there, we will deliver it to the Court's computer expert for verification at the appropriate time. Furthermore, since Mr. Schussler paid absolutely no attention to BOTH of OUR Cease & Desist demand letters, his is totally irrelevant.

18. We HAVE NOT contacted officials in Kansas City regarding Mr. Schussler.

19. Our allegations relating to Mr. Schussler are 100% correct and factual, which we will prove to the legal standards of this court when given the opportunity.

21. If anything, Mr. Schussler's false statements constitute illegal and unjustified interference with OUR business relationships and have injured OUR reputation and have damaged, disrupted and caused undue delay to OUR (The Hot Dog Hall Of Fame's) business affairs.

### Count I

### (Defamation)

23. We stand by our assertion that Mr. Schussler is a "liar, thief and con man" and that he has, indeed attempted to usurp the intellectual property, concept, name and URL of The Hot Dog Hall Of Fame and that these statements will be proven in court. They are neither false nor defamatory.

27. Mr. Schussler's actions have cost us far more than we could possibly have cost him, especially since he is attempting to use this court to legally take our own intellectual property from us, developed over the past 30 years (**Exhibit 4**).

### Count II

### (Tortious Interference with Prospective Economic Advantage)

2

1   33. We are acting with the express purpose of protecting OUR intellectual property while Mr.

2   Schussler's motives are quite suspect as this all started when he met us in 2000, despite his

3   claims to have been developing the concept for the past TEN years.

4

5   **Count III**

6   **(Tortious Interference with Contract)**

7   36. Schussler, et al have valuable and competitively advantageous contractual relations with its

8   business partners and associates ONLY if he actually owns the right to the name, etc, which he

9   does not, and which we will also demonstrate in court.

10  Furthermore, we contacted RED Development to warn (not threaten) them about this situation as

11  they have a legal duty to protect their investors and contacted the Mayor of Sparks, Nevada to

12  alert them of possible future legal activities to protect the citizens of Sparks.

13

14  **Count IV**

15  **(Injunctive Relief)**

16  41. As we stated in court previously, we contacted MOST of the parties mentioned with the

17  intent of bringing this matter into court, which it has done. No further action by this Court is

18  required and we ask to have the Restraining Order lifted as unnecessary.

19

20  **Count V**

21  **(Declaratory Relief)**

22  43. Mr. Schussler may have APPLIED for a Trademark but we have contacted the US Patent and

23  Trademark Office and are currently in the process of

24  a. Disputing Mr. Schussler's right to said Trademark (Hot Dog Hall Of Fame) and

25  b. Registering our own Trademark (The Hot Dog Hall Of Fame)

26

27  **PRAYER FOR RELIEF**

28  Wherefore Defendant prays for judgment against the plaintiff as follows:

-3-

90

1. Immediate dismissal of this suit as totally groundless, without merit and frivolous, a complete waste of the Court and the taxpayer's time and money.

1. Award of general, special and exemplary damages on Counts I, II, and III according to proof at the time of trial (**Exhibit 5**).

2. Cancellation of the permanent injunction against speaking out about Mr. Schussler's attempted use of the court system to steal our intellectual property.

3. We petition the Court to declare that the defendant (J Frank Webster, Uncle Frank, Mr. Hot Dog) to be the legal owner of our own intellectual properties, concepts, names, good reputation and URLs.

4. For such other and further relief as the Court deems just and equitable.

Dated this 6th day of December, 2007

**J Frank Webster**
**President**
**The Hot Dog Hall Of Fame**

**From:** Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
**Sent:** Sunday, June 10, 2007 1:22 PM
**To:** Steve Schussler
**Cc:** ir@hosthotels.com; reuteman@RockyMountainNews.com; readerep@courant.com; dhoekstra@suntimes.com; peter.rowe@uniontrib.com
**Subject:** Dear Mr. Schussler:

CEASE & DESIST:

This is the SECOND time we've had to advise you that the concept, name, URL and good reputation of The Hot Dog Hall Of Fame is solely our intellectual property(s).

To refresh your memory a bit: we met at the Fisherman's Wharf location of The Rainforest Cafe shortly after it opened.

You tried to buy our collection and then, when we mentioned our obligation to the hundreds of contributors that made our World Class collection possible, you told us that you were just going to take our concept.

Shortly after that meeting, we discovered that you had one of your minions from Gold Coast Hot Dogs register several versions of our URL.

We responded with a formal demand that you Cease & Desist at that time.

If your memory is a little hazy, we'd be glad to forward that letter to you and all of the addressees above.

However, if you'd like to eventually fund it all for US, just keep doing what you're doing and we'll turn the lawyers loose on you...

You have been warned, AGAIN!

CEASE & DESIST

With Relish,

Uncle Frank

EXHIBIT
4102
Webster



**The Hot Dog Hall Of Fame**

www.thehotdoghalloffame.com

PS: We've already contacted Host Marriott, Levy Restaurants, Success Magazine, The Hartford Courant, Rocky Mountain News, The Chicago Sun Times, The San Diego Union Tribune and Chain Leader Magazine.

NOTE: For those of you who received this as a BCC file (Blind Copy), you can see what Mr. Schussler is attempting to do in this article: http://www.successmagazine.com/article.php?article_id=54

There's another one here: http://www.chainleader.com/web-exclusives/schussler.asp

And Mr. Schussler's web site: www.schusslercreative.com

John W. Provo
Direct Phone: (612) 672-8331
Direct Fax: (612) 642-8331
John.Provo@maslon.com

[Sent Via Electronic Mail and CMRRR]
Frank Webster
El Cajon, California

Re:     HOT DOG HALL OF FAME Trademark

Dear Mr. Webster

This firm represents Schussler Creative, Inc.   Your June 15 correspondence falsely accusing our client of misappropriating rights you claim to own by virtue of having collected hot dog memorabilia has been forwarded to us by certain of our client's business partners to whom you sent it.

Your deliberate publication of false and misleading statements to media organizations and companies in the hospitality industry defames Schussler Creative and Steve Schussler individually.   Your June 15 correspondence acknowledges your specific intent to damage Schussler Creative's reputation and business by "poisoning the well" for its restaurant business through unsolicited email correspondence sent to our client's business partners, media organizations and other hospitality companies.

Unless we receive your immediate assurance that you will cease and desist from any defamatory statements regarding Schussler Creative, its principals or any of agents by 5:00 o'clock p.m. on Tuesday, June 26, 2007, we have recommended that our client authorize our firm to seek sanctions and all further relief as may be necessary to protect its valuable name, reputation and goodwill and to prevent further tortuous interference with our client's business and economic activities.

I look forward to hearing from you.

Sincerely,

John W. Provo

JWP/cw
cc:     Doug Holod
        Schussler Creative



530266

EXHIBIT  4

-21-

94

MASLON

F 612.672.8200
F 612.672.8397
www.maslon.com

3300 WELLS FARGO CENTER
90 SOUTH SEVENTH STREET
MINNEAPOLIS, MINNESOTA
55402-4140

September 19, 2007

John W. Provo
Direct Phone: (612) 672-8331
Direct Fax: (612) 642-8331
John.Provo@maslon.com

SENT VIA ELECTRONIC MAIL AND CMRRR
Steven Bernier
1030 Whistler Drive
Suisun, CA 94585

Re:     HOT DOG HALL OF FAME Trademark

Dear Mr. Bernier:

This firm represents Schussler Creative, Inc., the owner of U.S. Trademark Application Serial No. 78/591560 for the "HOT DOG HALL OF FAME" trademark for restaurant services, retail store and wholesale distributorship services. Your e-mail correspondence addressed to Steve Schussler and sent to various media organizations and hospitality companies with which Schussler Creative has current or anticipated future economic relationships have been provided to us for consideration and response.

As the creator of some of the nation's most innovative restaurants, Schussler Creative has great respect for the intellectual property rights of others. After careful review and investigation, however, Schussler Creative cannot agree that you own any rights in the "HOT DOG HALL OF FAME" trademark.

It is well-settled law that trademark rights are established only through use for an actual product or service. Such use must be genuine for products or services offered to the public, and not a mere fantasy or ambition to launch a business at some future date. Similarly, mere self-promotion does not create such rights. Your website consists of personal journal entries and blog entries about cars, movie reviews, people, family members' library cards, etc., rather than a business. While no doubt of personal interest to you, these personal narratives about your hobbies and interests do not provide a legal basis for you to prevent others from pursuing commercial business endeavors.

Your claim ". . . that the concept, name, URL and good reputation of The Hot Dog Hall Of Fame is solely our intellectual property(s).[sic]" vastly overreaches any legitimate rights that you may have. As noted above, ownership rights derive from actual ". . , use [of a trademark] on a commercially realistic scale, in the ordinary course of trade," and not merely as an attempt to appropriate such rights for future use. Sporadic or casual use of a name also creates no enforceable rights. As your website indicates, you have assembled a personal collection of hot dog memorabilia as a hobby, and not as a business. A variety of media sources document the personal, noncommercial nature of your collection.

527926.1

–22–

2

**95**

Steven Bernier
September 19, 2007
Page 2



p 612.672.8200    3300 WELLS FARGO CENTER
F 612.672.8397    90 SOUTH SEVENTH STREET
                  MINNEAPOLIS, MINNESOTA
www.maslon.com    55402-4140

Your correspondence also overlooks the fact that other organizations have and continue to use the slogan "Hot Dog Hall of Fame" for wiener eating contests, promotions and similar events, including the following businesses:

1.    The Corner Bar, Rockford, Illinois, which maintains a "Hot Dog Hall of Fame" consisting of the names of over 5,000 participants in the bar's competitive eating event (see Exhibit A attached).

2.    Vienna Beef Limited, Chicago, Illinois, which maintains a "Vienna Beef Hot Dog Hall of Fame" recognizing delicatessen operators that sell Vienna beef products (see Exhibit B attached).

3.    Lancaster Jet Hawks, Lancaster, California, which offers induction into its "Wienie Wednesday Hot Dog Hall of Fame" to any customer who "buy(s) 15 hot dogs at one time (see Exhibit C attached).

This is an important issue for our client. Your deliberate publication of false and misleading statements to media organizations and companies in the hospitality industry with whom Schussler Creative has either current or anticipated future economic relationships defames Schussler Creative and Steve Schussler individually. To start with, we have two demands:

1.    Your immediate assurance that you will cease and desist sending defamatory statements regarding Schussler Creative or any of its principals or agents; and

2.    Your apology and agreement to take responsibility for all such misrepresentations.

I look forward to hearing from you.

Sincerely,

John W. Provo

JWP/cw
Enclosures

cc:    Doug Holod
       Steve Schussler

527926.1



**GIFT CARDS**

**MERCHANDISE**

**HOT DOG HALL OF FAME**

**OUR MENU**

**WHAT'S HAPPENING**

**CONTACT US**

**HISTORY**

**DAILY SPECIALS**

**LOCATION**

## Hot Dog Hall of Fame

The Corner Bar's Hot Dog Hall of Fame was established in 1968. Since then, more than 5,000 names have been added to the Hot Dog Hall of Fame. Our longest-reigning champion was Sharon VanDuinen who ate 42 ½ chili dogs in the four-hour time allotment in March 1982 - a record that stood for 23 years.

In December 2005, Balinda Gould gulped down 43 hot dogs to pass Sharon and be crowned our Amateur Champion. Then in March 2006, a number of competitors from the International Federation of Competitive Eating descended to take on what is perhaps the world's only chili-dog competition. Tim Janus beat out Joey Chestnut, Patrick Bertoletti and Hall Hunt to eat 43 1/2 dogs and become the reigning Professional Champion.

**Amateur Champion - Balinda Gould**

    

**Professional Champion - Tim Janus**

 

| E-newsletter Signup | Email Address | Zip |
|---|---|---|

The Corner Bar - 31 N Main St - Rockford, MI 49341 - Restaurant 616.866.9866 - Catering

©2007 Rockford Corner Bar
Site Design by Fluis, Inc. -- Site Developed by SLB Networks

4



STUDY 10 HOURS OF PLAYER PROFILES





## Hot Dog Hall of Fame

Hot Dog Hall of Fame serves up an amazing array of hot dogs, sausages, dumplings (pierogis, blintzes, kreplaches, raviolis, wontons, pot stickets), French fries (curly, straight fries, skin on, skin off, with mayonnaise, fries with vinegar), roasted in the husk corn on the cob, mustards (honey, brown, yellow, hot, spicy, horse radish), ketchups, pickles, relishes, horseradishes, olives, sauerkrauts, onions and peppers from all over the world.

Hot Dog Hall of Fame will serve only the Best of the Best. Only the finest meats, along with an unmatched selection of buns (toasted, sesame seed, poppy seed and more). Hot dogs and sausages will become the most sought after meal, thanks to the unmatched selection of top quality food on the menu.

Hot Dog Hall of Fame will be featured in a major theme park in Orlando and will then be licensed to stadiums, airports & universities all over the world. Hot Dog Hall of Fame will give credibility to simple foods cooked and presented with an extraordinary flare.

Hundreds of different mustards, ketchups, pickles, relishes, peppers and onions will be provided by the manufacturers. As strategic partners, they would benefit with shelf space and receive recognition via Hot Dog Hall of Fame's international advertising and marketing.

Hot Dog Hall of Fame locations will range in size, depending upon the venue (500 to 4,000 square feet with up to 150 seats).





-27-



Page 1 of 1

**From:** Dave Claflin [mailto:dclaflin@reddevelopment.com]
**Sent:** Tuesday, September 18, 2007 1:47 PM
**To:** Steve Graham; Steve Schussler
**Subject:** FW: Again, We are The Hot Dog Hall Of Fame

**From:** Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
**Sent:** Tuesday, September 18, 2007 11:18 AM
**To:** Dave Claflin
**Subject:** Again, We are The Hot Dog Hall Of Fame

Please be advised that WE are The Hot Hog Hall Of Fame, not that liar, thief and con man Steve Schussler.

We've been doing this since 1976 and he is attempting to steal our concept, good name, business name, URL's, etc.

We made the mistake of telling him about us at a meeting we had with him at the Grand Opening of the Fisherman's Wharf (San Francisco) Rainforest Cafe in 2000.

We have also been talking to someone within his organization who tells us that he may not actually own another one of the concepts he's currently touting.

You can read all about it (we've already served him 2 Cease & Desist demand letters) on our web site: www.thehotdoghalloffame.com

Go to "About Us" and select the hyperlink in the body of the text portion of that page for "Hot Dogs In A Cold World".

With Relish,

Uncle Frank





**101**



*Airbrush rendering by Joe Roche*

"HOT DOGS IN A COLD WORLD" - The Final Chapter?

16 June 2007

Dear fellow hot dog lovers, family, friends, contributors and supporters:

As most of you know, we've been working on our book ("Hot Dogs In A Cold World") for at least the last 15 years now, from before we got our first PC in 1996. You've seen much of the material in various other forms, but mainly in our newsletter "The Frankfurter Chronicles" (who'd have ever thought that I could write about hot dogs for 11 plus years now?). The part that had eluded us all of this time was the ending, as none of us can see into the future...

We may now have that ending although it isn't anything we'd have ever imagined and it's certainly nothing that any of us, including you, our wonderful fellow hot dog lovers, family, friends, supporters and contributors, deserve.

Back in the Spring of 2000, we became aware of an up-and-coming phenomena: the Rainforest Cafe.

It combined spectacular design, state-of-the-art animatronics, first class marketing with mediocre, mostly frozen fare and people were spending hours waiting in line just to see the place. That wasn't the main appeal to us however; it was the man behind it all and his innovative way of making his point. Steve Schussler, the founder, had spent several hundred thousand dollars to convert his house into a working model of the chain he hoped to build.

For years, we had resisted doing the same in our house as I'm claustrophobic just to start with, we'd seen other of our friends go the same route and besides, who wants to be known as that weirdo who lives in a museum?

We emailed Mr. Schussler, telling him how much we respected his accomplishments, that we were a struggling Hall Of Fame and that we were looking for a partner to help bring it all to life. To our surprise, Mr. Schussler responded and we traded slightly over 60 emails in a couple of weeks, describing who we are and what we do.

 EXHIBIT                    10/4/2007

**102**

Then he invited us to meet him at the Grand Opening of their new location at Fisherman's Wharf in San Francisco.

Needless to say, we were ecstatic (but after years of similar meetings, so far resulting in absolutely nothing, we were cautiously optimistic at best).

Around the same time, an old friend was just starting his new job at that Rainforest Cafe location, a likable guy who had once been our boss when the wife and I worked at Denny's.

I won't name him at this time but if we ever wind up in court, he did witness it all...

The day before the meeting, our son had come down with the flu and I got hit with it full force the morning of that meeting, but I was going anyway. How often do you get to meet a guy worth an estimated half a billion bucks (at the time) who also seems to appreciate what you do? I rented a car and drug myself to the meeting (...wild horses and all that...). When we got there, Mr. Schussler wasn't there and I sat around waiting almost an hour before he finally showed up. I spent much of that time talking to our friend who worked there and soon discovered that Mr. Schussler and several of his officers had taken off moments before I had arrived. When he finally showed up, he almost immediately brushed me off. He said he was going to build The Hot Dog Hall Of Fame himself; what does he need me for (then why am I even here)? I left, thinking it a huge waste of my time and what an arrogant little asshole...

A few weeks later, Chris Masterson in Seattle emailed to say he'd "Googled" us and that someone had set up several very similar web sites (www.hotdoghalloffame.com, www.hotdoghalloffame.net & www.hotdoghalloffame.org).

After a bit of research, we discovered it to be an employee of Mr. Schussler's chain of weenie stands in the Chicago area, Gold Coast Hot Dogs, and sent him a "Cease & Desist" demand letter (See EXHIBIT A below).

We also contacted ICANN, the internet governing body to protest these infringements and apparently, they eventually abandoned these names and it was all over, so we thought...

Over the years, we've had to defend a number of our business names and that's a nasty process and we were glad this problem had just went away.

Fast Forward: 7 Years Later

Last Saturday, I "Googled" The Hot Dog Hall Of Fame to see if I could find a link to an internet news agency that had done several features about us only to discover that Mr. Schussler was back at it again. He'd done interviews in several online and print publications, asserting it was he who had come up with the name, concept, URL's, etc and that he had the world's largest collection of hot dog stuff...

I should probably point out a couple of things here:

1) I don't think he has the World's largest collection as we've acquired this stuff since approximately 1977 (besides, that's not really important) as

2) there's a bit more to being a true Hall Of Fame than the collection (there are certain PUBLIC obligations, just to start with or have you overlooked that, Mr. Schussler?), and

3) there are at least a dozen other people out there seriously collecting hot dog stuff (just check out the hot dog action on Ebay).

4) One of the ideas he's touting, a veritable wall of mustards from around the world, is a "throw out" concept I gave him during our brief meeting, a tactic the CIA calls "disinformation", which we sometimes use to check someone's trust-worthiness (we've been seriously ripped off before and can show you several other examples of it on certain other web sites) and

5) we long ago donated all of our mustard stuff to the Mount Horeb Mustard Museum and they already have the "Wall of Mustard"...

http://vvww.thehotdoghalloffame.com/page15.htm

10/4/2007

-30-

Needless to say, after discovering that he was up to his same old tricks again, we emailed him another "Cease & Desist" (See EXHIBIT B below).

We also emailed everyone listed in the article as well as the publishers themselves to say that WE are The Hot Dog Hall Of Fame.

He emailed back, attempting to assert his right to the name, concept, URL's, etc and threatening to sue US...

Over the next few days, we talked to a number of lawyers and if we decide to go that route, it generally boils down to whose wallet is bigger. We've had a few days to think about it now and we've come to a decision: we can't possibly hope to prevail in the legal system as he's far more affluent than we are or ever really hope to be. Instead, we are going to "poison the well" so to speak. If he thinks he can steal from us, he has another thing coming. We didn't spend most of our lives doing this, at enormous expense to ourselves, just to roll over and play dead so he can walk right in and take whatever he wants.

After a quick look through our (print) files, we came up with literally hundreds of letters from the years we've been in The Hot Dog Hall Of Fame business. We had planned on adding several dozen of them to this web site but halfway through scanning them all, I saved them to an email message and will show them to anyone who hasn't watched us do what we do for the last 30 years or so..

A partial list:

A letter from The National Hot Dog & Sausage Council (1980)
A letter to the the Founder / President of the Doggy Diner chain (1981)
A letter from Edelman Public Relations (1981)
A "Cease & Desist" letter from our attorney, John Pope of San Jose (1982)
A letter to The McFly Restaurant Group (1983)
A letter to David Letterman's head writer (1983)
A letter from J Michael Zabkar, the Founder / President of Zab's White Hots in Rochester, New York (1983)
A letter to Nolan Bushnell, creator of Pong, Atari and Pizza Time Theater (1983)
A letter to "Evening Magazine" (1983)
A letter to "The San Francisco Chronicle (1983)
A letter from The Reagan White House (1983)
Several letters from KTEH Channel 54 (PBS) in San Jose (1983)
Another letter to "The San Francisco Chronicle" (1983)
A second letter from The Reagan White House (1983)
A letter from Donald Trump (1990)
A letter from The Clinton White House (1995)
Numerous mentions in Herb Caen's column in "The San Francisco Chronicle" (early 1990's)
A letter from author Michael Karl Witzel (1993)
A letter from mega producer Jeffrey Katzenberg and mega director Steven Spielberg (1995)
A letter to actor Bruce Willis (1996) and
Numerous letters from Center for the Arts in San Francisco's Yerba Buena Gardens (1996) from Hall Of Fame Hall Of Fame, a show featuring exhibits from 54 halls of fame all across the US.

Then there are the several hundred newspaper articles, radio spots, tv appearances and promotional stunts we've participated in over the years.

And I should probably point out that Mr. Schussler was approximately 14 years old in 1980 so I sincerely doubt he can stake any sort of claim that far back...

Then, every time he uses our name, concept, variants of our URL, etc, we will email these individuals the link to the site and point out that they are being conned by a one hit wonder (Rainforest Cafe really wasn't all that successful when you look under the financial hood) and that WE are The Hot Dog Hall Of Fame and have fulfilled all of the duties as The Hot Dog Hall Of Fame for almost 30 years now.

104

Essentially, he has placed us in the position of having NOTHING to lose now and we WELCOME him to sue us.

I'm old and have been sick (with numerous serious health issues) for the past 10 years now, I'm unemployed, I'm broke, I don't even have a car at the moment, much less own a house, the wife is only working 2 shifts a week as a part time waitress at a small, downscale, tourist cafe, we have no money, $7000 plus of credit card debt and neither of us are eligible for welfare, unemployment or Social Security. The only thing keeping us afloat is the fact that our son has been kind enough to loan us a truck and we couldn't even pay our rent without his (and the rest of the family's) help as it costs us twice as much to live here as it did up north, so I'm ready to stare him down to the bitter end (and I'm hoping he is dumb enough to have me arrested).

And talk about a real David-vs-Goliath scenario; the newspapers would love this story, especially if he's foolish enough to stay this course to disaster, legally harassing us after he's already stolen from us (and adding insult to injury)...

And, as many of you know, we had planned on leaving this wonderful collection to The Smithsonian should we fail to give it the home it deserves (they say they'd love to have it) but it could end up in crates in the basement so we're now thinking of giving it to a very well known restaurateur in New York City (and all attendant rights to the name, concept, URL's etc) so Mr. Schussler will have someone his own size to pick on (if he actually had the balls for it).

Anyone who knows us can also attest to the fact that we are meticulous record keepers as well (you have to be, with the nature of what we are doing, the business climate in general and our own personal finances, etc) but what Mr. Schussler may not be aware of is that we also saved the 60 some email messages we sent him (and his replies to them) and can prove what he knew and when he knew it.

We will produce them when and if he dares to drag us into court.

With Relish,

Uncle Frank

PS: And doesn't this also go to show what this concept is really worth, if a guy with that much to lose is willing to steal it from us and risk everything that he owns?

I mean, I'm kind of flattered, but...

---

EXHIBIT A:

27 July 2000

Mr. James Rittenberg
State & Hubbard Corp.
5 W. Hubbard St.
Chicago, IL 60610

Dear Mr. Rittenberg:

Apparently you are confused and do not realize that we plan to sue you and Mr. Schussler back into the stone age should this farce of an attempt to usurp our URL, our business concepts and our good name continue.

We know Mr. Schussler could stand to lose a few million one way or the other, but the question you must ask yourself is whether you can stand to lose everything you have worked for all of your life, Mr. Rittenberg.

Abandon the URL's, and the use of our name and our concept immediately or suffer the dire legal consequences.

We did not spend over half of our lives putting this together to roll over and play dead when someone takes a liking to our concept and name and decide to appropriate them for themselves, no matter how much money they may have.

http://www.thehotdoghalloffame.com/page15.htm

10/4/2007

105

I am, among many other things, a writer Mr. Rittenberg and have friends in high places in major newspapers all over the country (including The Chicago Sun Times). Would you like to see this story on the front page there (ask Dave Hoekstra if he knows Uncle Frank)?

And, having used and vigorously defended the name of The Hot Dog Hall Of Fame for over 20 years, you really don't have a prayer of prevailing, legally. If you insist in continuing this folly, be advised that we plan to first blacken both of your eyes (yours and Mr. Schussler's) professionally, first in the papers and on TV, then we will see you in court.

In this particular instance, we can not only prove what Mr. Schussler knew, but when he knew it.

For example, he registered (through your offices as an employee of a company he holds) these URL's after he had read our material (and before we had met in San Francisco, where he obviously forgot to tell us he was planning on stealing us blind).

By the time this is over, should you continue in this manner, we will be the owners of Gold Coast Hot Dogs and hopefully a substantial share of Rainforest Cafe and maybe even a house or two as well (both yours and Mr. Schussler's).

Is it really worth it to you, Mr. Rittenberg?

Are you going to follow Mr. Schussler into a fight neither of you can win and risk losing everything you have or will you do the right thing, abandon our concept, name and URL and walk away?

You have been warned.

The next time you will hear from us will be through our attorneys.

We won't have a bit of trouble finding a real mean lawyer when they realize how much money is in Mr. Schussler's pocket.

Can you afford the legal bills this may cost you?

Cease and Desist.

J Frank Webster
President
The Hot Dog Hall Of Fame
PO Box 658
Fairfield, Ca. 94533

The Hot Dog Hot Line
(707) 426-4618

PS: We have already contacted www.register.com and explained that we own the URL www.thehotdoghalloffame.com and that your registering the domain names you did is

A) too similar as to be confusing and essentially the same name and

B) done in Bad Faith as Mr. Schussler had received certain materials from us before that date (we have copies of all of our correspondence with Mr. Schussler to substantiate our position) and that he knew these concepts, names and URL's were our intellectual property.

You will also notice that this message has been sent to multiple addressees.

Some of them are stalwarts within the industry, and others are business writers or television people.

http://www.thehotdoghalloffame.com/page15.htm                                    10/4/2007

**106**

Several copies will follow this via regular mail and Registered Mail with Return Receipt Requested which hereby effectively constitutes legal delivery.

Again, we admonish you Mr. Rittenberg, Cease & Desist.

---

**EXHIBIT B:**

10 June 2007

**Dear Mr. Schussler:**

**CEASE & DESIST:**

This is the SECOND time we've had to advise you that the concept, name, URL and good reputation of **The Hot Dog Hall Of Fame** is solely our intellectual property(s).

To refresh your memory a bit: we met at the Fisherman's Wharf location of The Rainforest Cafe shortly after it opened.

You tried to buy our collection and then, when we mentioned our obligation to the hundreds of contributors that made our World Class collection possible, you told us that you were just going to take our concept.

Shortly after that meeting, we discovered that you had one of your minions from Gold Coast Hot Dogs register several versions of our URL.

We responded with a formal demand that you Cease & Desist at that time.

If your memory is a little hazy, we'd be glad to forward that letter to you and all of the addressees above.

However, if you'd like to eventually fund it all for US, just keep doing what you're doing and we'll turn the lawyers loose on you...

You have been warned, AGAIN!

**CEASE & DESIST**

**With Relish,**

**Uncle Frank**

PS: We've already contacted Host Marriott, Levy Restaurants, Success Magazine, The Hartford Courant, Rocky Mountain News, The Chicago Sun Times, The San Diego Union Tribune and Chain Leader Magazine.

–34–

http://www.thehotdoghalloffame.com/page15.htm

10/4/2007

**107**

Page 1 of 2

**From:** Mayberry, Adam [mailto:amayberry@cityofsparks.us]
**Sent:** Tuesday, September 18, 2007 12:49 PM
**To:** Dave Claflin
**Cc:** Carey, Shaun
**Subject:** FW: Hello from The Hot Dog Hall Of Fame

Hi Dave - The Mayor received this message from the noted individual.

Just wanted to let you know about it.  Let me know if you have any additional insight.

Adam

**From:** Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
**Sent:** Tuesday, September 18, 2007 9:10 AM
**To:** Martini, Geno
**Cc:** Chris Masterson
**Subject:** Hello from The Hot Dog Hall Of Fame

18 September 2007

The Honorable Geno Martini
Mayor
Sparks, Nevada

Dear Mayor Martini:

Please be advised that WE are The Hot Hog Hall Of Fame, not that liar, thief and con man Steve Schussler.

We've been doing this since 1976 and he is attempting to steal our concept, good name, business name, URL's, etc.

We made the mistake of telling him about us at a meeting we had with him at the Grand Opening of the Fisherman's Wharf (San Francisco) Rainforest Cafe in 2000.



file://C:\Documents and Settings\jdarda\Local Settings\Temp\XPGrpWise\46F7D0E5MAS...  9/27/2007

EXHIBIT 7    –35–

We have also been talking to someone within his organization who tells us that he may not actually own another one of the concepts he's currently touting.

You can read all about it (we've already served him 2 Cease & Desist demand letters) on our web site: www.thehotdoghalloffame.com

Go to "**About Us**" and select the hyperlink in the body of the text portion of that page for "**Hot Dogs In A Cold World**".

In the near future, we plan to go VERY public with this situation and are letting your office know about it so that you will be properly prepared to deal with the fallout this will cause.

**With Relish,**

**Uncle Frank**

PS: Most of my wife's family is from Nevada and you may recognize some of their names (previous office holders, car dealership owners, etc).



www.thehotdoghalloffame.com

file://C:\Documents and Settings\jdarda\Local Settings\Temp\XPGrpWise\46F7D0E5MAS...  9/27/2007

-36-

2

**109**

-----Original Message-----
From: Dan Lowe <DLowe@reddevelopment.com>
To: Steve Schussler
Sent: Fri Jun 15 10:25:33 2007
Subject: RE: From the next issue of "The Frankfurter Chronicles' (The Newsletter with Relish)

Doesn't look like they are even a restaurant?

Dan Lowe
RED Development, LLC
4717 Central
Kansas City, MO 64112
816.777-2833 direct
816-777-3501 fax
dlowe@reddevelopment.com
www.reddevelopment.com

This electronic mail message contains CONFIDENTIAL information which is
(a) ATTORNEY-CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY
IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b)
intended only for the use of the Addressee(s) named herein. If you are
not an Addressee, or the person responsible for delivering this to an
Addressee, you are hereby notified that reading, copying or distributing
this message is prohibited. If you have received this communication in
error, please immediately notify us by telephone, and return the
original message to us at the above address via the U.S. Postal Service.
Thank you.

-----Original Message-----
From: Steve Schussler [mailto:steven@schusslercreative.com]
Sent: Friday, June 15, 2007 10:26 AM
To: Dan Lowe
Subject: Re: From the next issue of "The Frankfurter Chronicles' (The
Newsletter with Relish)

Already have my attorney on it!

---------------------------
Sent using BlackBerry

-----Original Message-----
From: Dan Lowe <DLowe@reddevelopment.com>
To: Steve Schussler



EXHIBIT 8



-54-

**110**

Sent: Fri Jun 15 10:02:08 2007
Subject: FW: From the next issue of "The Frankfurter Chronicles' (The Newsletter with Relish)

See below. I will follow with another email we received. Strange, but we ought to discuss. dan


Dan Lowe

RED Development, LLC

4717 Central

Kansas City, MO 64112

816.777-2833 direct

816-777-3501 fax

dlowe@reddevelopment.com <mailto:dlowe@reddevelopment.com>

www.reddevelopment.com <http://www.reddevelopment.com>


This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY-CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying or distributing this message is prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.


---

From: Dave Claflin
Sent: Friday, June 15, 2007 8:14 AM
To: Dan Lowe
Subject: FW: From the next issue of "The Frankfurter Chronicles' (The Newsletter with Relish)

2

**111**

From: Mr.HotDog [mailto:Mr.HotDog@Cox.Net]
Sent: Thursday, June 14, 2007 7:49 PM
To: Dave Claflin
Subject: PS: From the next issue of "The Frankfurter Chronicles" (The Newsletter with Relish)

Dear fellow hot dog lovers, family, friends, contributors and supporters:

As most of you know, we've been working on our book ("Hot Dogs In A Cold World") for at least the last 15 years now, from before we got our first PC in 1996. You've seen much of the material in various other forms, but mainly in our newsletter "The Frankfurter Chronicles" (who'd have ever thought that I could write about hot dogs for 11 plus years now?). The part that had eluded us all of this time was the ending, as none of us can see into the future...

We may now have that ending although it isn't anything we'd have ever imagined and it's certainly nothing that any of us, including you, our wonderful fellow hot dog lovers, family, friends, supporters and contributors, deserve.

Back in the Spring of 2000, we became aware of an up-and-coming phenomena: the Rainforest Cafe.

It combined spectacular design, state-of-the-art animatronics, first class marketing with mediocre, mostly frozen fare and people were spending hours waiting in line just to see the place. That wasn't the main appeal to us however; it was the man behind it all and his innovative way of making his point. Steve Schussler, the founder, had spent several hundred thousand dollars to convert his house into a working model of the chain he hoped to build.

For years, we had resisted doing the same in our house as I'm claustrophobic just to start with, we'd seen other of our friends go the same route and besides, who wants to be known as that weirdo who lives

B

in a museum?

We emailed Mr. Schussler, telling him how much we respected his accomplishments, that we were a struggling Hall Of Fame and that we were looking for a partner to help bring it all to life. To our surprise, Mr. Schussler responded and we traded slightly over 60 emails in a couple of weeks, describing who we are and what we do. Then he invited us to meet him at the Grand Opening of their new location at Fisherman's Wharf in San Francisco. Needless to say, we were ecstatic (but after years of similar meetings, so far resulting in absolutely nothing, we were cautiously optimistic at best). Around the same time, a friend of ours was just starting his new job at that same Rainforest Cafe location, a very likable guy who had once been our boss when the wife and I worked at Denny's. I won't name him at this time but if we ever wind up in court, he witnessed it all...

The day before the meeting, our son had come down with the flu and I got hit with it full force the morning of that meeting, but I was going anyway. How often do you get to meet a guy worth an estimated half a billion bucks (at the time) who also seems to appreciate what you do? I rented a car and drug myself to the meeting (...wild horses and all that...). When we got there, Mr. Schussler wasn't there and I sat around waiting almost an hour before he finally showed up. I spent much of that time talking to our friend who worked there and soon discovered that Mr. Schussler and several of his officers had taken off moments before I had arrived. When he finally showed up, he almost immediately brushed me off. He said he was going to build The Hot Dog Hall Of Fame himself; what does he need me for (then why am I even here)? I left, thinking it a huge waste of my time and what an arrogant little asshole...

A few weeks later, Chris Masterson in Seattle emailed to say he'd "Googled" us and that someone had set up several very similar web sites (www.hotdoghalloffame.com, www.hotdoghalloffame.net & www.hotdoghalloffame.org).

After a bit of research, we discovered it to be an employee of Mr. Schussler's chain of weenie stands in the Chicago area, Gold Coast Hot Dogs, and sent him a "Cease & Desist" demand letter.

We also contacted ICANN, the internet governing body to protest these infringements and apparently, they eventually abandoned these names and it was all over, so we thought...

4

**113**

Over the years, we've had to defend a number of our business names and that's a nasty process and we were glad this problem had just went away.

Fast Forward 7 Years:

Last Saturday, I "Googled" The Hot Dog Hall Of Fame to see if I could find a link to a local internet news agency that had done several features about us only to discover that Mr. Schussler was back at it again. He'd done interviews in several online and print publications, asserting it was he who had come up with the name, concept, URL's, etc and that he had the world's largest collection of hot dog stuff...

I should probably point out a couple of things here:

1) I don't think he has the World's largest collection as we've acquired this stuff since approximately 1977 (besides, that's not really important) as

2) there's a bit more to being a true Hall Of Fame than the collection (there are certain PUBLIC obligations, just to start with or have you overlooked that, Mr. Schussler?), and

3) there are at least a dozen other people out there seriously collecting hot dog stuff (just check out the hot dog action on Ebay).

4) One of the ideas he's touting, a veritable wall of mustards from around the world, is a "throw out" concept I gave him during our brief meeting, a tactic the CIA calls "disinformation", which we sometimes use to check someone's trust-worthiness (we've been seriously ripped off before and can show you several other examples of it on certain other web sites) and

5) we long ago donated all of our mustard stuff to the Mount Horab Mustard Museum and they already have the "Well of Mustard"...

114

Needless to say, after discovering that he was up to his same old tricks again, we emailed him another "Cease & Desist".

We also emailed everyone listed in the article as well as the publishers themselves to say that WE are The Hot Dog Hall Of Fame.

He emailed back, attempting to assert his right to the name, concept, URL's, etc and threatening to sue US...

Over the next few days, we talked to a number of lawyers and if we decide to go that route, it generally boils down to whose wallet is bigger. We've had a few days to think about it now and we've come to a decision: we can't possibly hope to prevail in the legal system as he's far more affluent than we are or ever really hope to be. Instead, we are going to "poison the well" so to speak. If he thinks he can steal from us, he has another thing coming. We didn't spend the majority of our lives doing this, at enormous expense to ourselves, just to roll over and play dead so he can walk right in and take whatever he wants.

In the near future, we plan to add several dozen letters to our web site which are to / from The Hot Dog Hall Of Fame and The National Hot Dog & Sausage Council (1980 ), the Founder / President of The Doggy Diner (1981), a letter from Edelman Public Relations (1981), a Cease & Desist" letter from our attorney, John Pope of San Jose (1982), a letter to the McFly Restaurant Group, another to David Letterman's head writer , one from J Michael Zabkar, the Founder / President of Zab's White Hots in Rochester, New York, a letter to Nolan Bushnell (creator of Pong, Atari and Pizza Time Theater),a letter to The San Francisco Chronicle, a letter to "Evening Magazine", a letter from the Reagan White House, a couple from KTEH Channel 54 (PBS) in San Jose, a second letter to The San Francisco Chronicle, a second letter from The White House, a job application from our first employee (all from 1983), a letter from Donald Trump (1990), a letter from the Clinton White House (1995), numerous mentions in Herb Caen's column in The San Francisco Chronicle (early 1990's), a letter from author Michael Karl Witzel (1993), a letter from mega producer Jeffrey Katzenberg and director Steven Spielberg (1995), a letter to actor Bruce Willis and  numerous letters from Center for the Arts in San Francisco's Yerba Buena Gardens (1996) from Hall Of Fame Hall Of Fame, a show featuring exhibits from 54 halls of fame all across the US (some say we stole the show).

I should probably point out that Mr. Schussler was approximately 14 years old in 1980 so I sincerely doubt he can stake any sort of claim that far back...

Then, every time he uses our name, concept, variants of our URL, etc, we will email these individuals the link to the site and point out that they are being conned by a one hit wonder (Rainforest Cafe wasn't all that successful when you look under the financial hood) and that WE are The Hot Dog Hall Of Fame and have fulfilled all of the duties as The Hot Dog Hall Of Fame for almost 30 years now.

Essentially, he has placed us in the position of having NOTHING to lose now and we welcome him to sue us.

I'm old and have been sick (with numerous serious health issues) for the past 10 years now, I'm unemployed, I'm broke, I don't even have a car at the moment, much less own a house, the wife is only working 2 shifts a week as a part time waitress at a small, downscale, tourist cafe, we have no money, $7000 plus of credit card debt and neither of us are eligible for welfare, unemployment or Social Security.

The only thing keeping us afloat is the fact that our son has been kind enough to loan us a truck and we couldn't even pay our rent without his (and the rest of the family's) help as it costs us twice as much to live here as it did up north, so I'm ready to stare him down to the bitter end (and I'm hoping they are dumb enough to have me arrested).

Talk about a real David-vs-Goliath scenario. The newspapers would love this story, especially if he's foolish enough to stay this course to disaster, legally harassing us after he's already stolen from us (and adding insult to injury)...

And, as many of you know, we had planned on leaving this wonderful collection to The Smithsonian should we fail to give it the home it deserves (they say they'd love to have it) but it could end up in crates in the basement so we're now thinking of giving it to a very well known restaurateur in New York City (and all attendant rights to the name,

116

concept, URL's etc) so Mr. Schussler will have someone his own size to pick on (if he actually had the balls for it)...

Anyone who knows us can also attest to the fact that we are meticulous record keepers as well (you have to be, with the nature of what we are doing, the business climate in general and our own personal finances, etc) but what Mr. Schussler may not be aware of is that we also saved the 60 some messages we sent him (and his replies to them) and can prove what he knew and when he knew it. We will produce them when and if he dares to drag us into court.

With Relish,

Uncle Frank

www.TheHotDogHallOfFame.com

PS: And doesn't this also go to show what this concept is really worth, if a guy with that much to lose is willing to steal it from us and risk everything that he owns (I mean, I'm kind of flattered, but...)?



### A Brief History of The Hot Dog Hall Of Fame

I grew up as a military brat, crisscrossing the US numerous times in the 50's and 60's, long before the Interstate freeways were finished and the fast food chains took over. My dad was a serious chili dog freak and although my palate was too unsophisticated and immature to appreciate them at the time, some of my most vivid memories are of us stopping by literally dozens of early day drive-ins and roadside stands in his pursuit of excellence in a bun.

In high school and college, I studied **Architectural Design** and had planned on taking up the construction trade but life, the war in Viet Nam, a wife and kid changed everything and I eventually found my way into the wiener trade, generally an honorable profession peopled with a wide array of colorful characters (what's not to like?).

And as a military brat (and later, as a member of the US Navy), I traveled all over the US (32 states or so), lived in 6 of them, traveled all over the world (Japan, Taiwan, Singapore, Hong Kong, the Philippines, Viet Nam, Australia, Thailand, New Zealand, England, France, Italy, Germany, Rhodes, even Communist Yugoslavia), I started grade school in Okinawa and graduated from high school in Turkey. I mention all of this as I ultimately decided that I liked San Diego the best and one day promised myself I'd live here. It only took us 30 years to make it back...

We didn't come empty handed either as we brought a spectacular, world class collection with us as well as being hard working, industrious people (my son recently got his MBA, works in the aerospace industry and my wife is working on her BS degree after a fairly long and successful career in the restaurant business).

Sometime in the first year or so (1976 - 1977) of my new career, people started giving us all kinds of hot dog related things such as an old Oscar Mayer Wienermobile piggy bank here, a clipping from the newspaper there, etc.

At first, I was just mildly amused and threw it all onto a shelf in the garage...

After a while, it got out of control so I started sorting it out and boxing it up.

I still didn't pay too much attention to it and the boxes really started stacking up.

Sometime around 1978 or 1979, I decided to get organized with it and inventoried it all.

At that time, there were nearly 1,000 pieces and it took up every square inch of table and counter tops, a fair chunk of the house's wall space and the entire living room floor.

I was beginning to think there was something to this but had to put it all away, this time stored to protect it from damage, dust, moisture, UV, infestation, skin oils from handling, theft, etc (we have lost several items over time).

It percolated around in my brain for some time, until I was sitting at the counter in the **Denny's** right across the highway from Marriott's Great America in Silicon Valley, waiting for the wife to get off of work and noticed the menu on the wall behind the counter, taped up there so the waitresses could refer to the new menu (and prices).

It was a handsome, full color, laminated menu (we collect them too) but what drew my attention was the full page of photos of their new, larger burgers. I realized that I had just been handed the solution.

The menu touted their **"Hamburger Hall Of Fame"** and I knew exactly what I had to do...

Part of an architect's psychological makeup is the desire to leave something behind; to build something great, something of lasting value, something the world will remember him by and I had just found mine!

2

**119**

In 1982, we finally found a hot dog trophy which would allow us to present **The First Annual "Frankie" Awards for Hot Dog Excellence,** which we did, that July, **National Hot Dog Month.**

And the flood of donations continued; accelerated in fact...

In 1996, shortly after we got our first PC, we started our book **"Hot Dogs In A Cold World"** and then realized that we had the software (Page Maker) to produce a print edition of a newsletter.

A few months later, we launched **"The Frankfurter Chronicles"** (The Newsletter with Relish).

Until that time, we had maintained an extremely low profile as we were very wary of someone ripping us off (it had happened a number of times over the years, even from major companies, whose names you'd recognize).

For instance, the print and email version of the newsletter were BY INVITATION ONLY, our web site also has no Meta-Tags which would help everyone find it, nor is it registered with any of the search engines, (they are all for our supporters ONLY) and our blogs are also available ONLY to a select few friends, contributors and supporters.

In 1996, we also participated in **"Hall Of Fame Hall Of Fame"** a gathering of 54 Halls Of Fame at San Francisco's beautiful (and new) Center for the Arts at Yerba Buena Gardens.

Life long hot dog lover **Herb Caen** of the **San Francisco Chronicle** had urged us to "surface", to let the world know about us, to participate in Hall Of Fame Hall Of Fame and we were told that we literally stole the show...

There were literally dozens of article written about it, everything from the local (Bay Area) newspapers to CNN and **The Associated Press** and that may have been the beginning of the end and the reason we're here in court today.

In 2000, we made the most serious tactical blunder ever and approached an up-and-coming restaurant super star **Steve Schussler,** Founder of the **Rainforest Café** chain.

Frankly, we admired his accomplishments, creating a fantastic something out of nothing and emailed to introduce ourselves, hoping he'd see the promise of what we were doing and maybe give us a hand in bringing it to life.

We traded maybe 60 emails about our plans and I saved them to disk, just in case (we'd been ripped off before)...

When we met him at the Grand Opening of the newest Rainforest Café at San Francisco's Fisherman's Wharf, (he had invited us to meet him there), he was an hour late, immediately tried to buy the collection, told us he owned Chicago's **Gold Coast Hot Dogs,** then said he has a warehouse full of stuff and was going to do it without us.

His exact words were "We don't need you..."

Which begs several questions:

Why did he offer to meet us?

Why didn't he tell us he had already come up with the concept (which he now legally swears came to him in **1997**)?

And why did he abandon the URL's he had one of his minions register shortly after we met in 2000?

And if it was his concept, name, intellectual property, etc, why did he wait another 7 years until trying again?

And why didn't he immediately serve US with a "Cease & Desist" if it was his concept, etc?

Before we get too far down the line here, I should mention that we were in and out of the hot dog business a number of times over the years.

We fielded a number of weenie mobiles (Frank's Quality Franks, The Great American Hot Dog Machines, 1 through 5, the latest, our Woodie Weenie Wagon) of various designs and degrees of success, we took over a small (23 seat) hot dog stand ("Hot Diggidy Dogs & Great Burgers Too"), on Silicon Valley's El Camino Real (with 4 parking spots, there were fist fights in the parking lot), and we also helped a number of our friends launch and promote their new hot dog businesses, etc.

All along, our goal has been to eventually provide a permanent home for this wonderful, world class collection.

Besides the only time it has ever been seen in total, when we lived on Franck Avenue, in the late 70's or so, we displayed a few dozen items at the weenie stand on the El Camino, and then there are the several dozen pieces we loaned to Center for the Arts for HOFHOF but mainly, it's sat in boxes, year after year, waiting for the day...

**The Ebay Years:**

Over the years, we got contributions from hundreds of people all over the US but that changed when we discovered the internet and Ebay. Now we could find (and buy) those items we'd only heard about before.

Of course, we paid dearly for some of them and quickly realized we were bidding on things that used to get tossed away at the end of a neighborhood garage sale or sold for pennies on the dollar. Now we were bidding against the entire US for these items and it wasn't pretty at first, sometimes paying several times more than an item was worth.

But the collection grew and grew and we eventually had to build a shed out back to protect the household items we'd had to displace. And around that time, we started telling people that we lived in The Wiener Warehouse...

**A Mature Collection:**

That all came to a screeching halt in early 1999, when the wife noticed an inch thick stack of postal money order receipts, amounting to thousands of dollars and promised me grievous bodily injury if she caught me on Ebay again.

And I didn't really have the time as I was spending an hour a day there and besides, we were getting ready to move.

This Spring (2007) I took a final dip in Ebay and picked up several dozen items (for just over $700) but that's all there was, our collection only lacks half a dozen "must have" items, a fully mature collection which we're proud of.

**Our gift to the people of San Diego:**

Over the years, we've discussed providing this wonderful collection a permanent home with The Donald (Trump), The Smithsonian (they've written that they'd love to have it), Frankfort, Indiana (Home of The Frankfort Indiana Hot Dog Festival) and Armour, South Dakota both approached us about moving there, we offered it to New York City restaurateur Danny Meyer and we had also approached Coney Island, and the New York City Library, etc.

Those scenarios were all in case we were unable to make it happen by ourselves but what we would really like to do is ultimately donate the entire collection, as our present, to San Diego, our new home. With the restaurant, gallery and gift shop, it will eventually be self supporting and a world famous tourist destination...

**OUR DEFINITION:**

**THE HOT DOG HALL OF FAME** will be a combination

- **HALL OF FAME** which will celebrate hot doggers everywhere and
  - Present The Frankie Awards for Hot Dog Excellence (since 1982)
  - Publish "The Frankfurter Chronicles"
  - Create promotional items and vehicles (Lamborweenie) and
  - Create a database from the archives

- **MUSEUM** to display this wonderful, world class collection of Hot Dog
  - Art
  - Collectibles
  - Cookware
  - Clothing
  - Historical artifacts
  - Memorabilia
  - Promotionals
  - Toys, etc

- **RESTAURANT** which will proudly feature **The World's Best Hot Dogs**
  - Chicago style hot dogs
  - New York style hot dogs
  - West Coast style hot dogs
  - Daily sausage specials from our extensive collection of recipes

- **GALLERY** featuring a number of local artist's hot dog related works on consignment
  - Paintings
  - Sculpture
  - Numerous other mediums

- **GIFT SHOP** with a full line of hot dog merchandise
  - T-shirts
  - Bumper stickers
  - Numerous novelty hot dog items
  - Our book ("Hot Dogs In A Cold World")
  - Gift certificates, etc

**THE HOT DOG HALL OF FAME: A Local Landmark, National Treasure & World Famous Tourist Destination...**

**DEFINITION:**

**Wikipedia:**

Hall Of Fame

A hall of fame (sometimes HOF) is a type of museum established for any a field of endeavor to honor **individuals (emphasis ours)** of noteworthy achievement in that field.

In some cases, these halls of fame consist of actual halls or museums which enshrine **the honorees** with sculptures, plaques, and displays of memorabilia.

In other cases, the hall of fame is more figurative, and simply consists of a list of names of noteworthy **individuals** maintained by an organization.

**Dictionary.com:**

Hall of Fame

1. A national shrine in New York City commemorating the **names of outstanding Americans.**

2. A room, building, etc., set aside to honor **outstanding individuals** in any profession, locality, nation, or the like.

3. A number of **individuals** acclaimed as outstanding in a particular profession, field of endeavor, locality, or the like.

**American Heritage Dictionary:**

Hall of Fame

1. A group of **persons** judged outstanding, as in a sport or profession.

2. A building housing memorial items honoring **illustrious persons.**

**WordNet:**

Hall of Fame

A building containing trophies honoring **famous people**

**NOTE:** As referenced by Mr. Schussler's attorneys, neither the Corner Bar in Rockford, Michigan, or the Vienna sausage company's use of the term (or any others'), "Hot Dog Hall Of Fame" does not also refer to the name of their businesses but we are properly **"The Hot Dog Hall Of Fame"** through previous, current and future usage.

And we are a **true Hall Of Fame,** not just a collection of items (more properly, a museum, as used by Mr. Schussler) and unlike his collection, ours has been donated by hundreds of hot dog lovers from all across the United States and each item will be properly annotated when placed on display.

This is about the people, **not** the collection and we've made a career out of popularizing the people in this field.

**HALLS OF FAME:**

**General**

- Hall of Fame for Great Americans
- Walhalla temple

**Music halls of fame**

- Alabama Music Hall of Fame
- Alabama Jazz Hall of Fame
- Big Band and Jazz Hall of Fame
- Blues Hall of Fame
- Buffalo Music Hall of Fame
- Canadian Music Hall of Fame
- Country Music Hall of Fame
- Dance Music Hall of Fame
- Down Beat Jazz Hall of Fame
- Gospel Music Hall of Fame
- Grammy Hall of Fame (for recordings)
- Grammy Lifetime Achievement Award (for people)
- International Polka Music Hall of Fame
- National Band Association Hall of Fame of Distinguished Band Conductors
- Nashville Songwriters Foundation
- Polka Hall of Fame
- Rockabilly Hall of Fame
- Rock and Roll Hall of Fame
- Songwriters Hall of Fame
- UK Music Hall of Fame
- Vocal Group Hall of Fame

**Show business halls of fame**

- American Theatre Hall of Fame
- Broadcaster's Hall of Fame
- Mascot Hall of Fame
- Television Hall of Fame

**Sports halls of fame**

- Alabama Sports Hall of Fame
- Alberta Sports Hall of Fame
- American Bowling Congress
- Americas Cup Hall of Fame
- Australian Cricket Hall of Fame
- Australian Football (soccer) Hall of Fame
- Australian Football Hall of Fame (Australian rules football)
- Australian Racing Hall of Fame
- Australian Rugby League Hall of Fame
- Basketball Hall of Fame
- Bay Area Sports Hall of Fame

- BC Sports Hall of Fame
- Billiard Congress of America Hall of Fame
- Boston Red Sox Hall of Fame
- British Rugby League Hall of Fame
- British Softball Hall of Fame
- Canadian Amateur Wrestling Hall of Fame
- Canadian Baseball Hall of Fame
- Canadian Basketball Hall of Fame
- Canadian Curling Hall of Fame
- Canadian Football Hall of Fame
- Canadian Horse Racing Hall of Fame
- Canadian Lacrosse Hall of Fame
- Canadian Motorsport Hall of Fame
- Canadian Rodeo Hall of Fame
- Canadian Sports Hall of Fame
- Cincinnati Reds Hall of Fame
- College Baseball Hall of Fame
- College Football Hall of Fame
- Colorado Sports Hall of Fame
- English Football Hall of Fame
- Georgia Sports Hall of Fame
- Green Bay Packers Hall of Fame
- Hockey Hall of Fame
- International Bowling Museum and Hall of Fame
- International Boxing Hall of Fame
- International Game Fishing Hall of Fame
- International Gymnastics Hall of Fame
- International Jewish Sports Hall of Fame
- International Motorsports Hall of Fame
- International Rugby Hall of Fame
- International Surfing Hall of Fame
- International Swimming Hall of Fame
- International Tennis Hall of Fame
- International Women's Sports Hall of Fame
- IRB Hall of Fame (International Rugby Board)
- Japanese Baseball Hall of Fame
- Lethbridge Sports Hall of Fame
- Michigan Sports Hall of Fame
- Mobile Sports Hall of Fame
- Motorsports Hall of Fame of America
- Mountain Bike Hall of Fame
- NASCAR Hall of Fame *(to be completed in 2009)*
- National Baseball Hall of Fame and Museum
- National Dirt Late Model Hall of Fame
- National Distance Running Hall of Fame
- National Italian American Sports Hall of Fame
- National Lacrosse Hall of Fame
- National Lacrosse League Hall of Fame (Indoor Lacrosse)
- National Midget Auto Racing Hall of Fame
- National Museum of Racing and Hall of Fame (USA Thoroughbred Horse Racing)
- National Soccer Hall of Fame

- National Softball Hall of Fame
- National Sprint Car Hall of Fame
- National Surfing/Wrestling "Ironman" Hall of Fame
- National Track & Field Hall of Fame
- National Wrestling Hall of Fame
- North Carolina Sports Hall of Fame
- Norwich City F.C. Hall of Fame
- Off-road Motorsports Hall of Fame
- Ontario Lacrosse Hall of Fame
- Polo Museum and Hall of Fame
- Professional Women Bowlers Hall of Fame
- Professional Wrestling Hall of Fame
- Pro Football Hall of Fame
- ProRodeo Hall of Fame
- Raymond Sports Hall of Fame
- San Diego Hall of Fame
- St. Louis Cardinals Hall of Fame Museum
- Scotland Football Hall of Fame
- Scottish Sports Hall of Fame
- Towson University Hall of Fame
- United States Bicycling Hall of Fame
- United States Hockey Hall of Fame
- United States National Ski Hall of Fame and Museum
- U.S. Figure Skating Hall of Fame
- U.S. Olympic Hall of Fame
- U.S. Weightlifting Hall of Fame
- Virginia Sports Hall of Fame
- Volleyball Hall of Fame
- WCW Hall of Fame
- Welsh Sports Hall of Fame
- Wisconsin Hockey Hall of Fame
- WWE Hall of Fame
- World Figure Skating Hall of Fame
- World Golf Hall of Fame
- Women's Basketball Hall of Fame

**Other halls of fame**

- AIAS Hall of Fame
- Alabama Hall of Fame
- AVN Hall of Fame
- American Quarter Horse Hall of Fame
- American Theatre Hall of Fame
- Astronaut Hall of Fame
- Australian Stockman's Hall of Fame
- Australian Television Logie Hall of Fame
- Automotive Hall of Fame
- Buffalo Jewish Hall of Fame[1]
- California Social Work Hall of Distinction
- Canadian Business Hall of Fame
- Canadian Cartoonist Hall of Fame

9    **126**

- Canadian Medical Hall of Fame
- Canadian News Hall of Fame
- Chairmaker's Hall of Fame at the Windsor Institute
- Christian Hall of Fame
- Circus Hall of Fame
- Georgia Hall of Fame
- Insurance Hall of Fame
- International Space Hall of Fame
- Jewish-American Hall of Fame[2]
- Military Intelligence Hall of Fame
- Movieland Star Hall of Fame (see Gloria Estefan)
- National Agricultural Center and Hall of Fame
- National Aviation Hall of Fame
- National Cowboy Hall of Fame
- National Inventors Hall of Fame
- National Mining Hall of Fame
- National Museum of Dance and Hall of Fame
- National Toy Hall of Fame
- National Women's Hall of Fame
- North Dakota Cowboy Hall of Fame
- Radio Hall of Fame
- Robot Hall of Fame
- Science Fiction Museum and Hall of Fame
- Texas Cowboy Hall of Fame
- World Chess Hall of Fame





JOHN N. POPE, JR.
ATTORNEY AT LAW
1820 THE ALAMEDA
SUITE 512
SAN JOSE, CALIFORNIA 95126
TELEPHONE 292-6155

Page Two
June 1, 1978
Mr. Junius (Jim) McKelvey

Your refusal to cooperate as requested above
result in legal action for injunctive relief at a substantial
cost to all concerned.

Your earliest reply will therefore be appreciated.

Yours very truly,

JOHN N. POPE, JR.

Mr. Junius (Jim) McKelvey
1097 White Road
Santa Clara, California 95051

RE:   John A. Webster, The Great American Hot Dog

Dear Mr. McKelvey:

I represent Mr. John A. Webster, with whom you became
briefly associated in April or 1978 in the hot dog
business.

It is my understanding that Ms. Stella Kapogianius of
1616 Hollenbeck, Sunnyvale, California, acting as your
agent, breached your agreement with Mr. Webster on
May 8, 1978, by causing to have filed with the Santa
Clara County Clerk's office the fictitious name
"Great American Hot Dog Machine", file number 037338,
giving your address as owner.

The demand is hereby made for the abandonment of said
fictitious name by Ms. Kapogianius within ten days from
this date as evidenced by an endorsed, filed copy
of said abandonment delivered to my client in care of
this office, together with your acknowledgment that
Mr. Webster alone has exclusive right to use the name
"The Great American Hot Dog Machine", "Great American
Hot Dog Machine", and any similar name and the names
"Hot Dog Hall of Fame" and "Hot Dogs in the Cold World",
and like similar names.  Upon your performance within
the above specified time, Mr. Webster assures me that he
will promptly refund the $50.00 you paid to him, and
deliver the trike and welded steel cage all within five
days thereafter.  He shall also alone assume and hold
you harmless from the business debts in the approximate
sum of $12,000.00.

2

Page Two
June 1, 1978
Mr. Junius (Jim) McKelvey


Your refusal to cooperate as requested above may well result in legal action for injunctive relief at a substantial cost to all concerned.

Your earliest reply will therefore be appreciated.

Yours very truly,


JOHN N. POPE, JR.

JNP/wg

cc: Mr. John A. Webster



## The National Hot Dog & Sausage Council

November 20, 1980

Mr. Jay F. Webster
1760 Franck Street
Santa Clara, California  95051

Dear Mr. Webster:

We were delighted to learn about your venture---The Great
American Hot Dog Machine, and Hot Dog Hall of Fame and
Museum and wish you every success in establishing your
restaurant.

Enclosed are a few of the items we discussed which will
give you better insight into the Council's work.

We just finished visiting Vienna Sausage Company, 2501 N.
Damen, Chicago 60647, and learning about what makes a real
"Chicago Style Hot Dog."  You may wish to contact them for
their publicity kit and further information.

If we can be of further assistance to you, let us know.
And please keep in touch as time permits.

Sincerely,

Frances Altman
Executive Secretary


Enclosures

THE HOT DOG HALL OF FAME
1760 Frank Avenue
Santa Clara, California 95051
(408) 246-8224

January 6, 1981

Mr. Marvin Mohn, President
Doggy Diners, Inc.
4700 Telegraph Avenue
Oakland, California 94609

Dear Mr. Mohn:

I would like to acquire one of your Dog heads to be included in my collection of Hot Dog Art, which I have been collecting since 1976. I plan to feature the collection in my museum; the Hot Dog Hall of Fame. I belive your logo to be a beautiful piece of Hot Dog Art, and I would enclose it in its own wood and glass cabinet, with an appropriate brass plaque.

In addition, I have hundreds of hot dog artifacts, everything from lapel pins to a 10 foot fiberglass hot dog. I also have a hot dog piggy bank, radio, music box, a model of the Oscar Meyer Weiner wagon, a 3 foot inflatable hot dog, a 6 foot paper mache hot dog, jig saw hot dog puzzels, a weiner whistle, framed artwork, records, platters, books, soap, magic tricks, napkins, placemats and squeeze toys.

You asked why you haven't heard of The Hot Dog Hall of Fame? That is because I am a perfectionist by nature and have deliberately maintained a low profile until I am ready to announce our grand opening. The Hot Dog Hall of Fame will have red, white and blue anwnings, hardwood paneling, brass rails, and casablanca style fans.

Thank you for the opportunity to present my concept to you and for your attention to my request.

Sincerely,

J. Frank Webster
President

JFW:asap
Enclosures

JOHN N. POPE, JR.
ATTORNEY AT LAW
1628 THE ALAMEDA-SUITE 512
SAN JOSE, CALIFORNIA 95126
TELEPHONE (408) 293-0155

November 18, 1982

Mr. and Mrs. Alexander Warner        Ms. Vickie Blindert
164 Commercial Street                978 E. Evelyn
Sunnyvale, California  94086         Sunnyvale, California  94086

Dear Mr. and Mrs. Warner and Ms. Blindert:

I represent J. Frank Webster, doing business as "The Great American Hot Dog Machine". Mr. Webster has informed me that you have attempted to misappropriate his business name by using same at your hot dog stands located at Maud and Mathilda, Sunnyvale, and at Greenbriar, and that you have filed a fictitious name statement at the Santa Clara County Clerk's Office on September 30, 1982. As you have previously been advised, Mr. Webster filed the same name with the County Clerk on May 12, 1978 and, at this time, is seriously considering legal action to enjoin said use and to seek substantial damages unless you immediately abandon said name and remove it from all of your hot dog stands. Your compliance with this demand will be expected within the next seven (7) days.

Yours very truly,

JOHN N. POPE, JR.

JNP:lma

cc:  Client

133



GLENN W. HOFFMANN, PRESIDENT
100 SKYPORT DRIVE, SAN JOSE, CA 95115
(408) 947-9654

August 31, 1983

Mr. J. Frank Webster
THE HOT DOG HALL OF FAME
1320 Westmont Avenue
Campbell, CA 95008

Dear Mr. Webster:

KTEH thanks you for organizing the group of volunteers from THE HOT DOG
HALL OF FAME to help us with our summer pledge festival. We know the role
of coordinator can be demanding and we appreciate your special effort.
Without phone volunteers we would have no pledge and our financial
situation would be desperate indeed!

Enclosed are Certificates of Appreciation for each member of the group who
signed the attendance sheet. Could you see that they receive this small
thank-you on our behalf?

We hope that your experience with KTEH was satisfying. We certainly
enjoyed having your volunteers join us for the evening. Unless you prefer
otherwise, we will keep THE HOT DOG HALL OF FAME on our contact list for
future pledge periods.

Again, thank you for your help and for supporting KTEH.

Sincerely,

Trixie Johnson
Volunteer Coordinator

TJ:jh

Enclosures

A DEPARTMENT OF THE SANTA CLARA COUNTY OFFICE OF EDUCATION
AN EQUAL OPPORTUNITY EMPLOYER



April 10, 1990

Mr. J. Frank Webster
P O Box 658
Fairfield, CA  94533

Dear Mr. Webster:

Mr. Trump has received your letter inquiring about his
interest in bringing the Hot Dog Hall of Fame to New York
City.

While he appreciates your bringing this opportunity to his
attention, regretfully, it is of no interest to him at the
present time.

Thank you for writing Mr. Trump.  We wish you much success
in your endeavors.

Sincerely,

Norma I. Foerderer
Assistant to the President

NF:lr

**THE TRUMP ORGANIZATION**
**725 FIFTH AVENUE · NEW YORK, N.Y. 10022  212·832·2000  TELEX·427715**



December 5, 1993


J. Frank Webster
Hot-Dog Hall of Fame
P.O. Box 658
Fairfield, California  94533

Dear Mr. Webster:

I am currently writing a book about the history of The American Drive-In Restaurant and got your name from Harvey Kaplan in New York (make silver jewelry).

Within this publication, I will be including a brief sidebar on the hot-dog, it's history, folklore, etc.  Approximately 5-800 words.

If there is any way you could assist me with relevant information and or photographs, I would be greatly indebted. My problem is, all materials must be in by the end of January.  My publisher, Motorbooks International, gets all the stuff at the end of February--so I'm caught in a race for time.

If there is any advice you could give, please feel free to call me during the day (collect if need be).  I thank you in advance for your time!

Sincerely,



Michael Witzel




# MICHAEL KARL WITZEL
1427 GOEBEL CIRCLE, WICHITA, KANSAS 67207   (316)-687-5887

**THE WHITE HOUSE**

WASHINGTON

January 26, 1995

Mr. J. Frank Webster
President
The Hot Dog Hall of Fame
Post Office Box 658
Fairfield, California 94533

Dear Mr. Webster:

Thank you for your interest in meeting with President Clinton. He does appreciate your offer and is sorry he will be unable to speak with you.

Unfortunately, the tremendous demands on the President as he works to move our country forward do not give him the opportunity to meet with as many people as he would like.

On behalf of the President, thank you again for your invitation. Your continued interest, input and support are deeply appreciated.

Sincerely,

William M. Webster, IV
Director of Scheduling and Advance

WMW/inj



(206) 441-0435
88 Virginia, Unit #2
Seattle, Washington 98101

April 16, 1996

Uncle Frank
The Frankfurter Chronicles
P.O. Box 658
Fairfield, California 94533

Dear Uncle Frank,

You have my permission to publish my Sausage Salad recipe, but call it Weenie Salad.

You must credit the cookbook from which the recipe comes, THE FRUGAL GOURMET.

I wish you well.

Cordially,

Jeffrey L. Smith
JLS/pew





## OUR MEDIA RESUME

### BOOKS, NEWSPAPERS & MAGAZINES

1) "The Great American Hot Dog Machine"
Nightwire
The De Anza College Newspaper
Beth Peters
March 1977
Our first exposure to the media.

2) "San Jose's Great Wiener War is just heating up"
The San Jose Mercury News
Mark Saylor
1978
Uncle Frank (before he was Uncle Frank) mediates hot dog dispute, curbs bad publicity surrounding "Wienergate"

3) "Fairfield Hot Dog King-This man's wild about franks"
The Daily Republic
Cathy Pool
July 1988
Great article, best one to date, good photo of Uncle Frank

4) "Flash: Man bites dog"
The Daily Republic
Debbie Minnema
15 February 1989
Several page food feature with several parts to the article including photo a great photo of Uncle Frank, another, smaller photo of Postman Bites Dog, recipes, history and trivia.
This article was also printed in "The Tempest", Solano Community College's newspaper 9 Feb 1989

5) "Hot Doggin'"
The Daily Republic
Small photo feature with caption to announce PBS TV feature.
Date/writer uncertain (file photo).
Uncle Frank invites you over for a kraut dog served on a silver platter to commemorate National Frankfurters & Sauer Kraut Week.

6) "Hot Diggity"
'Another frankfurter eatery to open soon'
The Vacaville Reporter
Cynthia Roberts
Reporter Business Editor
10 July 1989
Fabulous Franks in Vacaville ~ "Frankie" presented during the interview.
Great photo and smaller one above the header on section front page

### HALL OF FAME HALL OF FAME ARTICLES:
At last count, there were over 50 articles (and a piece for CNN) about this wonderful show but we have only seen the following:

7) "Museums That Make Their Mark"
The San Francisco Chronicle
Jerry Carroll
22 November 1996

8) "Hot Dog Hall Frankly Fantastic"
The Daily Republic
Matt Pelken

140

30 November 1996
Color photo (smaller version above the header on front page), good article

9) Hall Monitor"
The Oakland Tribune
Susan Young
November 1996 (?)

10) "Alternative Culture Revisited"
The Associated Press
December 1996

11) "Their 15 Minutes of Fame" / "He's Wienerdom's Top Dog"
Anita Amirrezvani
Contra Costa Times
6 December 1996
Our very favorite article (sidebar) about us.

12) "Hall of Fame that honors the same has little shame"
James O. Clifford
The Associated Press
9 December 1996

13) "Bay City Best"
San Francisco Examiner Magazine
George Powell
5 January 1997

14) "Halls of Fame: They're the Greatest"
The Washington Post
Megan Rosenfeld
12 August 1998

15) "A Place to Relish... The Hot Dog Hall Of Fame"
Out West ~ The newspaper that roams
Chuck Woodbury
Editor
Winter 1997

Two other Out West articles:

16) "He's a Hog for Dogs"

17) "Weenie News Hot Off The Grill"

19) "On a Mission from Dog"
Tracie Cone
The West
The San Jose Mercury News Sunday Magazine
19 July 1998
Extremely funny article, great color photos.

20) "Online auction popular way to collect"
Pat King
The Daily Republic
Date uncertain (early 1999)
Article about eBay with large color photo of Uncle Frank wearing his hot dog apron and surrounded by a large number of items from the collection. Front Page Saturday Edition in color. Can't beat that!

3

21) "Hot Dogs Are Us"
**Donald Dale Jackson**
**Smithsonian Magazine**
**July 1999**
We are deeply honored to have been included in Mr. Jackson's last article before he retired. This article traced the history of the hot dog and mentioned most of the current players.  Nine full pages, a large number of photos.

22) "Frankly, to big fan, every dog has every day"
Peter Rowe
**The San Diego Union Tribune**
**1 January 2004**
Welcome to San Diego!

23) "Hot Diggity Dog"
**American Profile Magazine**
**Marti Attoun**
**July 2005**

**BOOKS:**

1) "The American Drive In"
Michael Karl Witzel
Motorbooks International
1994

We provided the basic research for the hot dog segment.

This great book is still available in stores, online and by mail order.

2) "Little Museums"
Lynne Arany & Archie Hobson

(We wrote the blurb):

"The book lists hundreds of small museums by state and even though we keep track of such things, we were amazed by the thoroughness of the research.... It has something for everyone and will soon be a treasured addition to any reference library."

J. Frank Webster
The Hot Dog Hall of Fame

**RADIO APPEARANCES & PROMO STUNTS, ETC (all dates approximate)**

1) "KSJO Eats It Week" (1978)

2) Our First Guinness World Record Attempt (1979)

3) Our Second Guinness World Record Attempt (1979)

4) "National Frankfurters & Sauer Kraut Week" (1980)

5) "National Hot Dog Month" (1980)

6) "KFAT / KSJO Softball Tournament & Weenie Roast" (1981)

7) Capitol Gold - London - Paul Coyte - 9 August 2005

8) Radio Dublin - Johnny - 12 August 2005

9) The Gary Burbank Show in Cincinnati - 15 August 2005

10) KPRI FM 102.1 in San Diego - Madison - 18 August 2005

**TELEVISION:**

1) "Mark Thompson's Neighborhood Weather"
Channel 11
San Jose, Ca.
July 1983 (?)
5th Annual Frankie Awards & Cook Out at our friend John Crawford's house.
We have a photo of this event but missed taping it on the TV.
Mark Thompson is the guy on the Guinness World Records program if the name seems familiar.

2) KTEH
Channel 54
San Jose (PBS)
Fundraising Week
1985 (?)
Catered the entire week and manned the phone bank the last day.

3) "Weird TV"
Fox Television Network
1991 (?)
Chuck Cirino brings his quirky style of video to La Casa Weenie.
"Not for the faint of heart..." Roger Ebert

4) "Best of the Worst"
Network
1993 (?)
Program cancelled shortly after segment was shot and it never aired.

5) "Hall Of Fame Hall Of Fame"
CNN
December 1996
We missed this one entirely but a friend in Nevada told us about seeing it.

6) "Neat Stuff"
At the Hall Of Fame Hall Of Fame
Oregon Public Broadcasting (OPB)
A PBS Subsidiary
Shown on The Learning Channel
May 1997

From:        "Mr.HotDog" <Mr.HotDog@Cox.Net>
To:          "David Schultz" <David.Schultz@maslon.com>, <jpc@cotkincollins.com>
Date:        2/18/2008 2:41 PM
Subject:     Witnesses, Request filings
Attachments: Witnesses.doc, Requests.doc

Print versions of these documents are in the mail including the older (print) issues of the newsletter and the Hot Diggidy Dollar.



EXHIBIT 13

DEFT 000001

**146**

| | |
|---|---|
| **From:** | "Mr.HotDog" <Mr.HotDog@Cox.Net> |
| **To:** | "David Schultz" <David.Schultz@maslon.com>, <jpc@cotkincollins.com> |
| **Date:** | 2/18/2008 2:47 PM |
| **Subject:** | REQUEST NO. 1 - The Frankfurter Chronicles (National Hot Dog Month issues) - 8 out of approximately 80... |
| **Attachments:** | The Frankfurter Chronicles - The Newsletter with Relish - July 2004; The Frankfurter Chronicles - The Newsletter with Relish - July 2005; The Frankfurter Chronicles - The Newsletter with Relish - July 2006; The Frankfurter Chronicles - The Newsletter with Relish: July 2007; FINAL2.PDW; TFC24B.PM5; The Frankfurter Chronicles - The Newsletter with Relish: February 2008; The Frankfurter Chronicles - The Newsletter with Relish - Volume II, Issue I |

NOTES:

1) There is no date on the (printed) Premier Issue of The Frankfurter Chronicles (The Newsletter with Relish) but it talks about a few hot dog items we got for Christmas and Issue 2 was created on 2 / 2 / 96 so it's very likely Issue 1 was created in January of 1996.

Even though we can't open any of the early issues (they were written in PageMaker, a program we no longer have), we can see the date the second issue was created by looking at its' properties.

We still haven't found the files for the Premier Issue.

Issue 1 also clearly states it is "...the official organ of The Hot Dog Hall Of Fame..." (highlighted).

We have attached Issue 2's file to this message for you to be able to corroborate these dates.

Besides responding via email, the printed versions will be in Tuesday's regular mail, the same time I file the paperwork at the courthouse here.

These copies were Xeroxed from the master copies, some of which are now 13 years old, and many are missing photos from that time.

That also means we were wrong about when we got the first computer by at least 6 months (it was sometime in 1995, not 1996).

And as far as we can determine, the last print issue of the newsletter was put together in March of 1999.

That file is also attached.

And we attached the current issue (February 2008) and the very first issue of the email version (Volume II, Issue I) to show the span of it in this time (November 2003 to the present).

It also references the several year's worth of emails sent in lieu of the newsletter when we went from printed format to the email based version we do now. "You may remember the recipe for Italian Sausage Sandwiches we sent last year (it's on the web site)" in the section about checking out the Italian restaurants around here.

2) We resumed the (email version of the) newsletter not too long after moving to San Diego (May of 2003) and moved the web site to another ISP and even added it at about the same time.

So far, there are no email versions of the newsletter in our files but as per our agreement in the telephone conference of 13 February 2008, we've only included The National Hot Dog Month (July) issues for the most part.

We also forwarded a few WeenieGrams which are referred to in a number of the email versions of the newsletter to allow you to corroborate the timeline.

DEFT 000002

2

**147**

**From:**  "Uncle Frank" <hotdog@abac.com>
**Date:**  8/20/2004 11:45 AM
**Subject:**  The Frankfurter Chronicles - The Newsletter with Relish - July 2004



Top of the menuboard at our local **Wienerschnitzel's** drive thru lane

**A little National Hot Dog Month fun:**

Saturday night it was Rib-eye steaks over an open wood fire way out in Descanso on 10 acres our friends are building a house on. Yummy!

Sunday for the 4th, it was Hot Dogs. (Damn you, everytime you e-mail me I want a Hot Dog!).

Unfortunately when you decide you want hot dogs on July 4th at 1:00pm there ain't much to choose from at Von's

But it was Ball Park all beefs, slow roasted on the grill. Some very good and large Vons' Rolls, toasted on the grill and the best part some Hebrew National Sauerkraut! This is the best Sauerkraut we have had out here, crisp and it was, believe it or not, sour! Just like we used to get fresh on the east coast at some markets and deli's. The wife a mix of French's and yes, Catsup plus relish and kraut. Me, just Guldens and kraut

Sunday we decided to head over to Coronado since no one would be there cause they were all there for the 4th..... wrong! The parade was today since the 4th was on a Sunday, they moved it to the 5th. (So to not interfere with Sunday services). So after maneuvering ourselves around the parade route we did find the last remaining parking spot in all of Coronado and headed over to the Miracle Mile Deli. Which I wanted to try even before you reviewed it and even more so after you did. We got in just before the parade ended and got the last table outside which was the best table in the house from which we could watch the end of the parade (A Falun Gong group, bet they were glad they weren't parading in China).

I had just a plain old Hot Pastrami, the wife had the New Yorker; Pastrami, Cole Slaw and Russian Dressing. Really good. Nice size, good Rye Bread and even though the fries came from a warming tray in the steam table they were replenished frequently with fresh fries and ours were hot and good. and of course a great Deli Pickle. Very nice and maybe we will have to become regulars for lunch on Sunday before we hit the beach. All in all a nice day.

Me thinks I will have to stir-fry tonight as I can't eats another grilled item.

**PT**

**PT** of **Catsup Soup Productions** in **La Jolla** is a transplant from **New Jersey**.

DEFT 000003

And we had sent numerous emails out in the period in between the print and email versions but none of it was printed or saved to disk (we were too busy to deal with it as I came down with pneumonia, we made several exploratory trips down here, crating and preparing everything for the move was a humongous task and then the move itself was back breaking (I'm an old man).

3) And we have also discovered that we wrote literally dozens of letters looking for partners or investors during that period (1995 - 1999) and they were all in **Print Shop** format, another old program we no longer have.

Since that time, we've used Microsoft's **Word** and we can provide a great number of those files if necessary...

4) Also included is a Hot Diggidy Dollar from our time at Hot Diggidy Dogs.

Notice our **Official Seal** on the front side (our long term strategy at Hot Diggidy Dogs was to buy the bar next door to expand and convert it into **The Hot Dog Hall Of Fame** but they wouldn't agree to sell.

As Hot Diggidy Dogs only had 4 parking spaces and 23 seats (there were fist fights in the parking lot for parking spaces), it was like driving around in first gear and we sold the business.

The blank space on the back of the Hot Diggidy Dollar was for different stamps depending our specials.

DEFT 000004



**Buster's crew: Celeste McAllister, Miguel Rios, Manny Mota, Fernando Cabrera & Tom Goslinowski**

**The 23rd Annual Frankie Awards for Hot Dog Excellence:**

As you know from our **WeenieGram** earlier this month, this year's recipient is **Buster's Windy City Dogs** in nearby Sorrento Valley.

When we presented **The Frankie**, co-owner **Celeste Mc Allister** made sure that the rest of the Busters crew (**Miguel Rios, Manny Mota and Fernando Cabrera** ) stopped what they were doing to get their picture taken too. Celeste says "...we couldn't do it without them" and also that ". .Manny is Miguel's nephew and Fernando is Miguel's brother-in-law. We're one big happy family. We love those guys..."

And we forgot to mention that they make their own potato chips at **Buster's** and **the Boy** scarfed them down (with ranch dressing).

Busters was also featured on the local news (**Channel 8**) with **Larry Himmel** who is also from Chicago on Monday, the **26th** of July, and much to our surprise, they actually showed The Frankie Award (we taped it)...

You can see the text version on their (**Channel 8's**) web site by clicking on this link: www.kfmb.com and look under **Local 8 Special Features**, then click on **Larry Himmel** and there's the story (text version although it has been slightly edited from the actual content of the show).

See the video here: http://www.kfmb.com/larry_himmel/details.php?storyID=27626

Celeste also emailed to say that they also added The Frankie graphic to their web site's splash page ( www.busterswindycitydogs.com )

Our congratulations once again for a job very well done!

DEFT 000005

**150**